# Exhibit 29

 Search



Message   More...


Commonwealth Licensing Services LLC

University of Kentucky College of Law

## Roger Ross · 3rd

CEO and Founder Commonwealth Licensing Services LLC

San Francisco Bay Area · 500+ connections · Contact info

### Get the LinkedIn app and see more profiles like Roger's anytime, anywhere

×

tenayar@gmail.com          Send me a link

**Or send me an SMS instead**

Roger Ross
CEO and Founder C...

## About

Specialties include licensing, standards
essential patents and FRAND, intellectual property creation and monetization,
patent pooling and aggregated licensing.

Frequently advises clients with
respect to their participation in various industry standards-related activities
and the licensing of patents and other intellectual property through patent
pools, industry consortia and other joint licensing paradigms. Previously
advised clients in their participation in standardizing and licensing
technologies such as WiMAX, LTE, Blu-ray Disc; BD+; AACS; NFC, OCAP; MHP; MPEG-4
Audio; DVD; and G.729.1.

## Experience

**CEO and Founder**
Commonwealth Licensing Services LLC
Jan 2016 – Present · 3 yrs 8 mos
San Carlos, California

 Search

**Advisor**
FreeWill
Mar 2017 – Present · 2 yrs 6 mos
Palo Alto, California

Advisor to founders of early stage online will generation and charitable giving service: getfreewill.com



**Mentor**
Stanford University
Jan 2017 – Present · 2 yrs 8 mos
Palo Alto, California

Mentoring team of students for Lean Launchpad (lean startup methodology) course in Stanford School of Engineering.



**Mentor**
University of California, Berkeley, Haas School of Business
Jan 2016 – Present · 3 yrs 8 mos
Berkeley, California

Mentor for Entrepreneurship class in MBA program.

**Director, Worldwide Licensing**
Prominent European Patent Owner -- Telecommunications
Jun 2016 – Feb 2019 · 2 yrs 9 mos
Germany

Oversee global licensing of extensive telecommunications patent portfolio comprised of standards essential patents and product specific patents. Develop and implement licensing strategy and coordinate patent assertion efforts with external counsel.



**President**
Via Licensing Corporation
Dec 2012 – Dec 2015 · 3 yrs 1 mo
San Francisco, California



**Vice President Legal Affairs**
Via Licensing Corporation
May 2008 – Jan 2012 · 3 yrs 9 mos
San Francisco, California



**Partner**
McDermott Will & Emery
2006 – 2008 · 2 yrs
Silicon Valley



**Counsel**
Weil Gotshal & Manges
Feb 2001 – Sep 2006 · 5 yrs 8 mos



Silicon Valley
Search

**Show fewer experiences** ^



**University of Kentucky College of Law**
JD
1990 – 1993

Managing Editor of the Kentucky Law Journal. Admitted to practice in California.



**University of Colorado at Boulder**
B.S., Information Systems
1978 – 1983

Bachelor's degree in Information Systems.

## Skills & Endorsements

**Licensing** · 51

 Endorsed by **Paul Zeineddin and 17 others who are highly skilled at this**

 Endorsed
Licensing

**Intellectual Property** · 45

 Endorsed by **Sharaz Gill and 13 others who are highly skilled at this**

 Endorsed
Licensing

**Patents** · 37

Endorsed by **2 of Roger's colleagues at Via Licensing Corporation**

Industry Knowledge

**Due Diligence** · 18

**Patent Law** · 7

**Business Development** · 4

**Commercial Litigation** · 2

**Copyright Law** · 10

**Litigation** · 6

**Venture Capital** · 4

Mergers & A

Privacy Law ·

Trademarks ·

Start-ups · 1

Interpersonal Skills

**Contract Negotiation** · 12

Other Skills ⑦

**Patent Litigation** · 12

Patent Prose

 🔍 Search

## Recommendations

**Received (1)**    Given (1)

**Michael Chang**
Vice President, Business & Legal Affairs at Warner
Bros. Studios
December 19, 2006, Michael worked with Roger in
different groups

Roger is extremely good at what he does which is to bridge transact
patience toward understanding the technology side of the business.
your corner.

## Accomplishments

**8**    **Publications**

Speaker - Patent Transactions and Innovative Business Models • Moderator - Panel on Standards Essential Patents and FRAND • Spe
Administrators • Speaker - Patent Pools & Consortia • Speaker - Mobile and Consumer Electronics Licensing • Speaker - Antitrust /
paradigm? Reforming patent pool guidelines • Speaker – Patent pools for essential patents

**1**    **Project**

LTE Patent Pool

## Interests

 **Intellectual Ventures**
25,867 followers

 **Wireless Communications & M**
19,596 members

 **RPX Corporation**
1,919 followers

 **Venture Capital Patent and IP S**
2,513 members

 **Hanson Bridgett LLP**
2,723 followers

 **Stanford University**
636,305 followers

**See all**



🔍 Search

Learn the skills Roger has

 **Business Law for Managers**
Viewers: 12,887

 **Music Law: Copyrighting a Song**
Viewers: 5,822

 **Music Law: Managing a Band's Business**
Viewers: 8,229

See more courses

Promoted                                                ...

 **Need More Clients?**
Lawyer Referral Service Can Help! Get
Clients While Serving Your Community.  ⟩

 **Dispute Resolution LLM**
Online LLM from Pepperdine Law,
ranked #2 for dispute resolution. JD
req'd.                                   ⟩

 **Get Business Internet.**
Then, add Phone & TV for just $34.90
more per month.                          ⟩

**Linked**in

| | | |
|---|---|---|
| About | Talent Solutions | Community Guidelines |
| Careers | Marketing Solutions | Privacy & Terms ⌄ |
| Advertising | Sales Solutions | Mobile |
| Small Business | Safety Center | |

? **Questions?**
Visit our Help Center.

Select Language

English (English)

⚙ **Manage your account and privacy.**
Go to your Settings.

LinkedIn Corporation © 2019

Exhibit 30

### *Crossing the Bridge to Europe; Financed by a U.S. hedge fund and German industrialists, a patent-holding company in Germany targets Nokia.*

IP Law and Business

October 1, 2008 Wednesday

Copyright 2008 ALM Media Properties, LLC All Rights Reserved Further duplication without permission is prohibited



**Section:** OPENING STATEMENTS; Pg. 11; Vol. 6; No. 10

**Length:** 789 words

**Byline:** Philippa Maister

## Body

**C**ould it be that the patent troll, once believed to survive only in the concrete jungles, high-tech valleys, and small Texas towns of North America, has extended its range to Europe? A case pending before a German court in Mannheim could signal its arrival.

The plaintiff is IPCom GmbH & Co., of Pullach, Germany. The defendant is Nokia, the Finnish mobile phone company. IPCom is claiming payments that could total a whopping 12 billion for infringement of its patents on mobile telecom technology.

IPCom acquired the patents in 2007 from Robert Bosch GmbH, a global automotive and industrial technology company that pioneered the technology. The patents fall into 11 groups, within them 35 "standard and essential patents" used in most mobile phones, including SIM cards. IPCom seeks to enjoin Nokia from using the patents in Germany.

In an e-mailed statement, Nokia spokesperson Laurie Armstrong said Nokia will vigorously defend itself. "Nokia believes it has good defenses, the patents in suit being invalid and not infringed," Armstrong said. "In addition, we have our own claims pending against Bosch. The company has refused to honor its commitments to standardization organizations and Nokia." Armstrong asserts that IPCom is "owned by Bosch's outside counsel."

The German patent lawyer she is referring to is IPCom's managing director, Bernhard Frohwitter. Frohwitter cofounded Bardehle Pagenberg, one of Europe's largest IP law firms, before going on to launch Munich-based Frohwitter Intellectual Property Counselors in 1998. He says he did indeed represent Bosch, helping to assemble the patent portfolio and arrange licenses. But Frohwitter rejected the implication that he was part of any "scheme."

As he tells it, Bosch decided in 2000 that telephony no longer fit in with its core business. Frohwitter moved to buy the patents, partnering with two companies with deep pockets, the Schoeller Group of Pullach, a packaging, container and logistics firm dating from 1600, and, interestingly, Fortress Investment Group, a big publicly held New York based hedge and private equity fund.

Crossing the Bridge to Europe; Financed by a U.S. hedge fund and German industrialists, a patent-holding company in Germany targets Nokia.

Like many in the IP field, Frohwitter argues about the semantics of "patent troll," and angrily denies that IPCom is one. He describes IPCom as an "intellectual property asset manager." During a ten-year stint in Houston, Frohwitter says he came to admire the professional approach of U.S. firms to exploiting patents as an asset class, something that did not exist in Europe, and wanted to copy this model. "I saw in the U.S. what a patent troll is a kind of blackmailer. That is not our business. IPCom is not a litigating firm. We like amicable settlements. The standard is what is fair and reasonable, no more and no less," Frohwitter says.

According to Frohwitter, Nokia had been in negotiations for five years. He says litigation was originally initiated by Nokia, which sought a declaratory judgment in Mannheim and agreed to fair and reasonable licensing fees. But it balked at IPCom's definition: 5 percent of Nokia's mobile phone sales in countries covered by Bosch patents, or 600 million a year totaling 12 billion over 20 years. IPCom then sought the injunction. Both cases are currently ongoing.

Sabine Rojahn, a partner in Taylor Wessing's Munich office, says German law tends to work very much in favor of the patent owner. IPCom has an advantage in bringing the suit in Mannheim's regional court, which specializes in patent infringement cases, Rojahn notes. The Mannheim court rules on whether a patent has been infringed before the federal patent court in Munich decides on validity. In addition to seeking damages, patent owners have an automatic right to an injunction if infringement is found before the federal court has ruled on validity, says Rojahn. Also, "if a patent troll wins damages, the infringer can be forced to pay back its gross revenues for a product as damages," she says, "and not just its net profit."

Duncan Curley, director and founder of Innovate Legal Services, a London IP boutique, says Nokia's response suggests that it may question whether Bosch fully disclosed all its patents as required by standards-setting organizations (SSOs), a familiar question in U.S. courts.

Frohwitter said both Bosch and IPCom played by the SSO rules. He says IPCom's technology has been licensed amicably to other companies, including Siemens AG, Motorola, Inc., Philips Electronics and Alcatel-Lucent and a settlement has just been reached with Research in Motion, Ltd., the Canadian maker of BlackBerry devices.

Whatever decision the German courts reach will apply only in Germany a fact that so far has discouraged patent troll activity in Europe. But if IPCom wins even a fraction of what it's asking, that could change.

**Load-Date:** April 17, 2011

---

End of Document

Exhibit 31

## *Apple Hit With $2 Billion Patent Infringement Lawsuit -- 2nd Update*

Dow Jones Institutional News

February 5, 2014 Wednesday 5:27 PM GMT

Copyright 2014 Factiva ®, from Dow Jones
All Rights Reserved



Copyright © 2014, Dow Jones & Company, Inc.

**DOW JONES** NEWSWIRES

**Length:** 549 words

**Byline:** By Friedrich Geiger

# Body

FRANKFURT-- Apple Inc. faces a claim for $2 billion in damages from a German patent owner, which alleges the tech giant infringed on a cellular telephone technology it owns, a German court said Wednesday.

IPCom GmbH accuses Apple of improperly using a patent for technology that gives emergency calls priority on mobile networks. IPCom in 2007 bought the patent from Robert Bosch GmbH, a German automotive-parts company that was a pioneer in car phones but exited the business at the dawn of hand-held devices.

A spokesman for IPCom said the demand for more than 1.57 billion euros ($2.12 billion) covers only Apple's alleged infringement relating to devices sold in Germany. He didn't exclude the possibility of IPCom filing similar suits in other countries.

An Apple spokesman declined to comment.

The lawsuit at a regional court in Mannheim is the latest battle in the global fight over smartphone patents. Apple, Samsung Electronics Co. Ltd., Motorola Mobility and others have launched multiple suits in several countries over recent years claiming licensing fees from rivals or seeking to hamper competitors.

IPCom's suit comes after the European Patent Office last month rejected requests from Apple, Nokia Corp., HTC Corp., Vodafone Group PLC and Ericsson to declare the patent invalid. IPCom said it is suing other companies for alleged infringement of the patent beside Apple, including Nokia. Nokia didn't immediately respond to requests for comment.

The patented technology gives handsets access to the networks of several mobile telecommunications providers. It is particularly important for emergency services and police because it gives them priority access if networks are overloaded. It is a mandatory element of the UMTS and LTE cellphone standards, according to IPCom.

Apple Hit With $2 Billion Patent Infringement Lawsuit -- 2nd Update

The Bavarian firm owns almost 1,200 mobile communications patents developed by Bosch and Japan's Hitachi Ltd. Spokesman Alistair Hammond said IPCom has licensing agreements with several smartphone makers but declined to disclose the names. The firm received a three-digit million euro amount from Deutsche Telekom AG last year as part of such an agreement, he said.

IPCom isn't a technology company but a patent assertion entity, sometimes referred to as a patent "troll." Such companies, which buy patents and claim royalties on them, are increasingly controversial. Many technology companies say they thwart product development and employment with frivolous lawsuits, while some inventors welcome their financing of research. But some inventors and universities say they promote innovation by paying for patents.

IPCom executive Bernhard Frohwitter, a former patent attorney for Bosch, founded the company in 2007. It acquired the patents for an undisclosed sum with financial backing from Fortress Investments Group L.L.C. The U.S. fund manager owns about half of IPCom, with Mr. Frohwitter and his co-executive Christoph A. Schoeller holding the rest.

A spokesman for Mr. Hammond said the patent now asserted against Apple is IPCom's most important patent. Several courts have ruled that several companies are infringing on it, including Nokia, other mobile-phone manufacturers and network operators.

Write to Friedrich Geiger at *friedrich.geiger@wsj.com*

(END) Dow Jones Newswires

February 05, 2014 12:27 ET (17:27 GMT)

## Notes

PUBLISHER: Dow Jones & Company, Inc.

**Load-Date:** February 6, 2014

End of Document

Exhibit 32

## *German court rejects $2-bn patent infringement suit against Apple*

domain-b

March 1, 2014 Saturday 6:30 AM EST

Copyright 2014 domain-b, distributed by Contify.com All Rights Reserved

**Length:** 216 words

# Body

A German court yesterday rejected a $2-billion patent infringement suit filed against Apple Inc by German patent-holding company IPCom GmbH for allegedly infringing on its 100A patent.

The 100A patent is a technology used to manage priority emergency access when mobile networks are overloaded.

The German court also dismissed a similar lawsuit filed by IPCom against Taiwanese smartphone maker HTC Corp.

The court did not disclose the grounds for rejecting IPCom's suit, but a German Court had earlier this month narrowed down the scope of the patent granted by the European Patent Office.

Munich-based IPCom had acquired the ''100A'' series patents from German car-parts maker Robert Bosch GmbH, which held these patents as part of its R&D for its pioneering car telephony systems.  Bosch exited the business in 2000, and sold the patents to IPCom in early 2007.

IPCom is a patent holding firm that some call a "patent troll" - a company that buys patents with the sole intention of not using it, but to make money through license fees, royalties and enforcing patents through litigation.

IPCom, backed by Fortress Investment Group, holds 1,165 patents that were bought mainly from Hitachi and Bosch. These patents are in the field of mobile communications and are registered in Europe, the US and Asia.

**Load-Date:** March 1, 2014

End of Document

Exhibit 33

This website uses cookies. If you continue without changing your settings, we'll assume that you are happy to receive all cookies on the VanillaPlus website. However, if you would like to, you can change your cookie settings at any time.

SIGMA
Next Done Now.™

Create, sell and deliver **differently** for business enterprise customers.

LEARN MORE

B2Be Different.

# We will monetise our IP no matter how much it costs, says IPCom managing director

16 November, 2018 at 12:52 PM

Posted by: George Malim

Pio Suh, IPCom

The telecoms industry has always been enabled by the innovations of multiple companies and this has led to extensive patent disputes that continue between leading vendors. Often these intellectual property (IP) battles run for many years and are complex wars of attrition. However, organisations are increasingly adopting FRAND principles to ensure that licensing of patents is fair, reasonable and non-discriminatory. George Malim, the managing editor of VanillaPlus, asks, Pio Suh, the managing director of IPCom, which acquired a portfolio of cellular patents from Bosch in 2007 and is still battling through multiple legal systems to have the patents recognised and licence fees agreed, why the process is so convoluted?

**George Malim: You've recently joined IPCom. What are the challenges of trying to ensure intellectual property is respected?**

**Pio Suh:** If you look into IPCom´s litigation and patent history, we're forced to litigate against the whole telecoms industry and the perception of IPCom is therefore very negative. We've been seen as the role model for being a patent troll. I'm trying to change that perception by emphasising that we have our own R&D team, with full-time engineers including a former-Bosch employee who has been with us since 2014. We regularly visit the 3GPP standards setting organisation (SSO) and contribute ideas and inventions.

**GM: What does FRAND mean to you and how does it help change the perception of patent owning companies?**

**PS:** Our licensing practice is in line with FRAND principles and the recent decision on the Unwired Planet versus Huawei case in the UK was a good trigger. The decision confirms and strengthens the position of the IP owner.

FRAND has a very important role because it sets out the need to provide a licence offer consisting of a patent list with claim charts of selected patents, licence agreement including the payable licence fee and benchmarking as to the specific royalty rate that should be set and why you regard it as FRAND. The FRAND package [for the Bosch portfolio] is ready and we're always prepared to send it out.

**GM: You've been battling for the Bosch IP in the courts since 2007 and that's over technology that is nearing obsolescence, what are IPCom's future plans?**

**PS:** The Bosch portfolio is now a rather old portfolio and we're approaching the end of the life of that portfolio of mostly 2G, 3G and 4G technology. One of my highest priorities is to reach settlements with licensing candidates as soon as possible. We have handset manufacturers, network [equipment] providers and network operators on our target list and that's a huge list to approach and try to settle with.

Dealing with multinationals is about having power in capital, in market position, in public relations and lobbying. Nokia, for example, has attacked each and every part of the Bosch portfolio in the past. That must have been a political decision at that time. Now we're trying to monetise our patents no matter how much it costs as it is important to level the playing field and to signal that the legal duty of taking a licence does not depend on the financial and market power of huge corporations.-

For the first time since 2007, [recent case outcomes] are slightly turning the coin and saying patent law is property law and the patent owner has the discretion to decide under which circumstances to give away its property.

We've received a request to administer the patents portfolio of a very large company and the general direction for us is to acquire new patent portfolios to stack up and expand our portfolio and to monetise the patents in a legitimate way.

category: News, Top telecoms IT stories

Tags: 2G, 3G, 3GPP, Bosch, FRAND, George Malim, Huawei, Intellectual Property, IP, IPCom, Nokia, patents, Pio Suh, Unwired Planet

Exhibit 34

More                                                                Create Blog   Sign In

# F O S S   P A T E N T S

THIS BLOG COVERS SOFTWARE PATENT NEWS AND ISSUES WITH A PARTICULAR FOCUS ON
WIRELESS, MOBILE DEVICES (SMARTPHONES, TABLET COMPUTERS).

TUESDAY, JUNE 18, 2013

## Patent firm IPCom settles with T-Mobile, will be more active in U.S. with ex-Hitachi patents

IPCom is a patent licensing firm based in the Munich area that acquired a portfolio of cellular standard-essential patents (SEPs) from Bosch, a company that exited the mobile devices business about a decade ago. IPCom has been embroiled in litigation with Nokia and HTC for more than five years, and is also asserting patents against the resale of Nokia and HTC devices by certain carriers and retailers. IPCom also alleged that carriers use certain patents covering network infrastructure components and the provision of services implementing cellular standards. The center of gravity of the IPCom disputes is in Germany, though there is also significant activity in other jurisdictions such as the UK (1, 2) and the U.S., where a declaratory judgment action brought by HTC even reached the Federal Circuit. In 2009 the European Commission was looking at (though not conducting a full-blown investigation of) a complaint by Nokia, in response to which IPCom made a public promise to honor Bosch's FRAND pledge, which the EU's antitrust enforcers welcomed.

Today IPCom announced a global settlement further to which Deutsche Telekom (T-Mobile) is paying for the use of IPCom's patents and all litigation between the two parties is withdrawn. The terms of the agreement were not disclosed, but it's easy to figure that royalty payments are involved and also supported by IPCom director Bernhard Frohwitter's statement that "this agreement will also send a signal to those companies that use these patents without paying license fees for them". IPCom has other licensees including BlackBerry (Research In Motion). Some companies, such as Samsung, licensed the former Bosch patents from their original assignee.

**CONTACT FORM**

FOLLOW @FOSSPATENTS ON
TWITTER

Follow @FOSSpatents      13.8K followe

FOLLOW BY EMAIL

Email address...

BLOG ARCHIVE

▶ 2019 (136)
▶ 2018 (100)
▶ 2017 (66)
▶ 2016 (53)
▶ 2015 (90)
▶ 2014 (179)
▼ 2013 (493)
  ▶ December (32)
  ▶ November (30)
  ▶ October (33)
  ▶ September (36)
  ▶ August (42)
  ▶ July (43)
  ▼ June (45)
    Qualcomm may have to modify Snapdragon chip for No...

    Preliminary ITC ruling against InterDigital involv...

    Apple and Samsung drop two patents each from Calif...

Earlier this year it appeared that Nokia and IPCom were close to a settlement, but they hit an impasse mentioned in a May 2013 UK ruling.

Rumor has it that IPCom is also suing Apple. I have not yet been able to obtain information on this from the Mannheim court, but if and when a public hearing takes place, any litigation becomes discoverable.

IPCom's international litigations are coordinated by Dr. Roman Sedlmaier of the Frohwitter patent law firm. This is a complex cross-jurisdictional effort, involving at some point over 100 cases (including numerous invalidation actions brought by Nokia and HTC in various countries).

The most interesting part of IPCom's press release today is the following quote from IPCom director Christoph Schoeller:

> "We are now proceeding with the licensing of a further portfolio of mobile telecoms patents, which we acquired from Hitachi. The Hitachi patents are particularly important in the US market, but also in Europe."

This means IPCom is going to be more active in licensing and, if negotiations fail, litigation in the U.S. than before, where it appears that it was actually HTC's choice to trigger litigation there. The press release reveals the following about the Hitachi deal:

> "The Hitachi patents consist of 135 patents in 17 patent families, and cover important aspects of the UMTS standards. The technology is also present in the 3G standards CDMA 2000 and HSUPA. Among the Hitachi patents, two standard-essential patents are particularly important : EP 0957 594 describes the synchronisation of handset and network in the UMTS standard. DE 69735 459 describes a process that controls the transmission strength for a CDMA message transfer system."

The U.S. equivalent of the European patent is U.S. Patent No. 6,507,576 on a "code division multiple access mobile communication system". There are at least two U.S. patents belonging to the same family as the German patent: U.S. Patent No. 6,307,844 and U.S. Patent No. 6,483,816 on a "CDMA communication system and its transmission power control method".

IPCom's overall patent portfolio "currently consists of about 1,200 patents in roughly 160 patent families", including patents declared essential to "global telecoms standards such as 2,5G (GSM/GPRS), 3G (UMTS) and LTE".

Microsoft wins release of $100 million bond posted...

HTC recently filed two additional lawsuits in Germ...

Judge keeps Galaxy S4 out of second Apple-Samsung ...

Apple urges United States Trade Representative to ...

Presumptive Acacia subsidiary sues HTC, LG, ZTE, B...

German court inclined to hold Samsung liable for u...

Microsoft wants to tell jury in patent contract ca...

Google asks German high court to review one of Mic...

Japanese appeals court upholds dismissal of Apple-...

ITC staff submissions a mixed blessing for Samsung...

Apple prevails on rubber-banding patent in Japan, ...

German court unlikely to approve Google's 2.25% SE...

ITC institutes investigation of Nokia's second com...

Federal Circuit schedules appellate hearing on Mic...

FTC preparing broadbased Section 6(b) cost-benefit...

Intellectual Ventures files second patent lawsuit ...

Google refuses $7 million in patent royalties from...

Patent firm IPCom settles with T-Mobile, will be m...

Anonymous reexamination requests filed against two...

This blog primarily reports on litigations between large operating companies. I didn't even blog about several IPCom-related hearings and trials I attended over the last two years. But every once in a while I do talk about NPE activities (particularly if FRAND-pledged SEPs are involved), and today's IPCom announcement caught my interest because of an increased focus on the U.S. market following the Hitachi deal.

*If you'd like to be updated on the smartphone patent disputes and other intellectual property matters I cover, please subscribe to my RSS feed (in the right-hand column) and/or follow me on Twitter @FOSSpatents and Google+.*

Follow @FOSSpatents    13.8K followers

Share with other professionals via LinkedIn:    Share

Share  |

EINGESTELLT VON FLORIAN MUELLER UM 6:53 PM

LABELS: APPLE, DEUTSCHE TELEKOM, FRAND, HITACHI, HTC, IPCOM, LICENSE FEES, NOKIA, NON-PRACTICING ENTITIES, PATENT LITIGATION, SETTLEMENTS, STANDARDS, T-MOBILE

Newer Post                    Home                    Older Post

German VP8 infringement cases show Google's inabil...

European Commission looking into competition-chill...

Apple says Samsung has continued importing infring...

Huge win for Apple at the patent office: key claim...

ITC staff rejects Google's public interest argumen...

Apple insists on adding Galaxy S4 to second Califo...

Nokia drops power-saving patent from ITC investiga...

Small carriers, minority activists, others write t...

Nokia announces partial settlement with ViewSonic:...

Patent dispute heats up as Google files motion to ...

Microsoft brief stresses that standard-setting wou...

Workarounds not mentioned once in pro-Samsung brie...

Apple says Samsung keeps launching devices with fe...

Samsung sides with 'patent troll' InterDigital aga...

Here's the ITC letter instructing U.S. customs to ...

ITC bans importation of older iPhones and iPads in...

Reexamination requested against two iPhone design ...

Google lobbying front grossly overstates economic ...

Exhibit 35



## Assignment abstract of title for Application 09744084

| Invention title/Inventor | Patent | Publication | Application | PCT | International registration |
|---|---|---|---|---|---|
| METHOD FOR TRANSMITTING DIGITAL USEFUL DATA | 6920124 Jul 19, 2005 | | 09744084 Apr 5, 2001 | | |
| Dirk Lappe, Martin Hans, Josef Laumen | | | | | |

## Assignments (4 total)

**Assignment 4**

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 030571/0649 | Jun 7, 2013 | Jun 7, 2013 | 100 | 7 |

Conveyance
SECURITY AGREEMENT

| Assignors | Correspondent |
|---|---|
| IPCOM GMBH & CO. KG | LEYDIG, VOIT & MAYER, LTD. |
| | TWO PRUDENTIAL PLAZA, SUITE 4900 |
| | 180 NORTH STETSON AVENUE |
| | CHICAGO, IL 60601-6731 |

Assignee
LANDESBANK BADEN-WUERTTEMBERG
AM HAUPTBAHNHOF 2
STUTTGART 70173
GERMANY

**Assignment 3**

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 020929/0320 | Apr 3, 2008 | May 9, 2008 | 14 | 19 |

Conveyance
SECURITY AGREEMENT

| Assignors | Correspondent |
|---|---|
| IPCOM GMBH & CO. KG | STRIKER, STRIKER & STENBY |
| | 103 EAST NECK ROAD |
| | HUNTINGTON, NY 11743 |

Assignee
KAROLS DEVELOPMENT CO. LLC
C/O FORTRESS INVESTMENT GROUP LLC, 1345 AVENUE OF AMERICAS
NEW YORK, NEW YORK 10105

**Assignment 2**

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 020325/0053 | Nov 26, 2007 | Jan 7, 2008 | 34 | 5 |

Conveyance
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

| Assignors | Correspondent |
|---|---|
| ROBERT BOSCH GMBH | MICHAEL J. STRIKER |
| | 103 EAST NECK ROAD |
| | HUNTINGTON, NY 11743 |

Assignee
IPCOM GMBH & CO. KG
ZUGSPITZSTRASSE 15
PULLACH 82049
GERMANY

**Assignment 1**

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 011698/0961 | Mar 8, 2001 | Apr 9, 2001 | 1 | 2 |

Conveyance
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

| Assignors | Correspondent |
|---|---|
| LAPPE, DIRK | MICHAEL J. STRIKER |
| HANS, MARTIN | 103 EAST NECK ROAD |
| LAUMEN, JOSEF | HUNTINGTON, NY 11743 |

Assignee
ROBERT BOSCH GMBH
WERNERSTRASSE 1
STUTTGART D-704
GERMANY

Exhibit 36

## Schedule 1 to the Master Pledge Agreement

### DEED OF PLEDGE

Between

1. **IPCom GmbH & Co. KG,** having its place of business at Zugspitzstraße 15, 82049 Pullach, Germany, being registered with the Local Court (*Amtsgericht*) of Munich, Germany under HRA 89197 and represented by IPCom Beteiligungs GmbH, registered at the Local Court (*Amtsgericht*) in Munich, Germany, under HRB 167303,

(hereinafter referred to as "**Pledgor**")

and

2. **Karols Development Co LLC,** a Delaware limited liability company, c/o Fortress Investment Group LLC, 1345 Avenue of the Americas, New York, NY 10105, United States of America;

(hereinafter referred to as the "**Pledgee**" and together with the Pledgor collectively referred to as the "**Parties**")

WHEREAS:

The Parties (amongst others) have entered into a Master Patent and Licence Security Pledge Agreement dated 03 April 2008 (the "**Master Pledge Agreement**") under which the Pledgor undertakes to pledge to the Pledgee certain Patents and Licences.

NOW, THEREFORE, THE PARTIES HERETO AGREE AS FOLLOWS:

### § 1
### Pledge of the Purchased Patent Rights

The Pledgor hereby irrevocably and unconditionally pledges (*verpfändet*) to the Pledgee the patent rights as specified and defined in Annex 1 hereto (the "**Purchased Patent Rights**") and all rights, titles and interests in and to the Purchased Patent Rights, and all inventions described therein including without limitation all enforcement rights and all rights pertaining thereto, and all rights to royalties, damages and compensation under the Purchased Patent Rights, including

~4326505

**PATENT
REEL: 020929 FRAME: 0322**

- 14 -
MASTER PATENT AND LICENCE PLEDGE AGREEMENT IPCOM AND NETWORK PHASE II
EXECUTION COPY II
HENGELER MUELLER
03 APRIL 2008

the right to sue for past infringement free and clear of all encumbrances (other than as permitted under the Master Pledge Agreement). The pledge extends to all claims under any licence agreements existing at the time hereof and entered into with respect to the Purchased Patent Rights in the future.

## § 2
### Acceptance of Pledge and Secured Claims

(1)     The Pledgee hereby accepts the pledges pursuant to § 1.

(2)     The Pledges over the Purchased Patent Rights pursuant to this Deed of Pledge shall secure all existing and future claims of the Pledgee including, for the avoidance of doubt, the claims set forth in Clause 8.4(a) of the Loan Facilities Agreement and all claims to current and future Profit Participation Rights (the "PPR"), (the "Secured Claims"). This shall include, in particular, any claims for the payment of principal, interest, costs, expenses, fees or damages and claims based on unjust enrichment (*ungerechtfertigte Bereicherung*) or tort (*Delikt*), as well as any claims arising from the insolvency administrator's choice to fulfil mutual agreements that have not been fully fulfilled by both parties to it according to Section 103 of the German Insolvency Code (*Insolvenzordnung*) or any equivalent provisions under foreign law, which may arise in connection with any of the Finance Documents. Secured Claims also include all claims (including in case of an increase of the amount of a claim) due to future amendments of the Finance Documents and any third party costs, fees and expenses (including legal fees) actually incurred in connection with the enforcement of or the preservation of any rights under any Finance Document.

(3)     The Pledges over the Purchased Patent Rights are in addition and without prejudice to any other security which the Pledgee may now or hereafter hold in respect of the Secured Claims.

## § 3
### Relation to Master Pledge Agreement and other

### Deeds of Pledge

The terms and conditions of the Master Pledge Agreement shall apply to this Deed of Pledge. Nothing in this Deed of Pledge shall prevent the Pledgors to take any action for the purpose of protecting the Purchased Patent Rights against infringements by third parties or to enter into licence agreements with regard to the Purchased Patent Rights. This Deed of Pledge shall not

~4326505

MASTER PATENT AND LICENSE PLEDGE AGREEMENT IPCOM AND NETWORK PHASE II
EXECUTION COPY II
BENGELER MUELLER
03 APRIL 2008

- 15 -

affect or be affected (by) any other Deed of Pledge made pursuant to the Master Pledge Agreement.

IPCom GmbH & Co. KG
represented by its general partner
IPCom Beteiligunge GmbH
(as Pledgor)

Karols Development Co LLC
(as Pledgee)

Gisela Patent Pledge PHASE II (incl. Short Form Deed)_Execution Copy II clean1.DOC

PATENT
REEL: 020929 FRAME: 0324

-16-
MASTER PATENT AND LICENCE PLEDGE AGREEMENT IPCOM AND NETWORK PHASE II
EXECUTION COPY II
HENGELER MUELLER
03 APRIL 2008

## Annex 1 to Schedule 1 to the Master Pledge Agreement

### ~ Pledged Patents ~

~4326505

MASTER PATENT AND LICENCE PLEDGE AGREEMENT IPCOM AND NETWORK PHASE II
EXECUTION COPY II
HENGELER MUELLER
03 APRIL 2008

| Bosch Mobile Telecommunications Patent Portfolio | | | |
|---|---|---|---|
| **Rollen Nr.** | **No.** | **Working Title** | **Referenz.No. - not current list of patents in force** |
| 24600 | 1 | Improving channel parameter Estimate | DE 40 28 322 C2 |
| 28097 | 2 | Vector coding | WO 94 272 85 A1<br>FI 95 053 24 A<br>AU 68 25 05 B<br>US 57 296 54 A<br>HU 21 65 57 B<br>EP 69 71 24 B1 |
| 28311 | 4 | Bit suppression | WO 94 272 84 A1<br>FI 95 053 23 A<br>AU 67 99 80 B<br>US 57 941 83 A<br>HU 21 56 20 B<br>EP 69 71 23 B1<br>DE 4315319 C1 |
| 28314 | 5 | Vector Coding of Speech Signals | WO 94 272 86 A1<br>FI 95 053 25 A<br>AU 68 1137 B<br>HU 21 62 23 B<br>EP 69 71 25 B1<br>US 6175817 |
| 28476 | 6 | Codec cf. Annex II | FI 92 51 70 A<br>DE 413 76 09 C2<br>EP 54 20 65 B1 |
| 29054 | 7 | TFO without OACS cf. Annex II | WO 96 352 99 A1<br>DE 195 16 078 A1<br>EP 82 48 33 B1<br>AU 70 66 69 B<br>HU 21 71 42 B<br>US 60 672 89 A |
| 29724 | 8 | TFO / TrFO cf. Annex II | WO 97 204 40 A1<br>DE 195 44 367 A1<br>JP 200 05 009 41W<br>CA 22 436 78 C<br>US 65 56 644<br>EP 864 237 B1<br>EP 13 153 88 A2<br>US 6 785 557 B2 |
| 30095 | 9 | Chip card reader | EP 80 38 31 B1 |
| 30232 | 10 | Transmitter performance | WO 97 40 577 A1<br>US 59 594 97 A<br>EP 83 42 17 B1 |

~4326505

PATENT
REEL: 020929 FRAME: 0326

– 18 –
MASTER PATENT AND LICENCE PLEDGE AGREEMENT IPCOM AND NETWORK PHASE II
EXECUTION COPY II
HENGELER MUELLER
03 APRIL 2008

| Bosch Mobile Telecommunications Patent Portfolio | | | |
|---|---|---|---|
| 30773 | 11 | Antenna with capacitatively adjustable loop | WO 98 127 73 A1<br>EP 92 74 38 B1<br>US 61 443 46 A<br>JP 200 15 006 94 W |
| 31010 | 13 | Recognizing use authorization for e.g. car radio or mobile telephone | DE 197 01 056 C2 |
| 31187 | 14 | Re-Synchronisation in TFO Mode cf. Annex II | EP 84 72 10 A3<br>DE 196 50 140 A1 |
| 31188 | 15 | TFO Establishment cf. Annex II | EP 84 72 11 A3<br>DE 196 50 141 A1 |
| 31348 | 17 | Radio transceiver circuit | EP 86 36 08 A1 |
| 31803 | 19 | Handset with movable antenna | WO 98 560 65 A1<br>DE 197 23 331 A1<br>EP 98 68 35 B1A1<br>TW 41 39 64 B<br>KR 200 10 133 70 A<br>JP 2002 508 900 T2<br>US 65 421 25 B1 |
| 33000 | 20 | Retractable antenna | WO 92 169 80 A1<br>EP 57 65 31 B1<br>DE 69201556 T2 |
| 33287 | 21 | Antenna with directional and omni-directional | EP 95 95 25 A3<br>DE 198 23 126 A1 |
| 33288 | 22 | Dual-band antenna | WO 99 606 62 A1<br>DE 198 22 371 A1<br>EP 10 865 09 A1<br>JP 2002 516 505 A<br>US 65 189 22 B1 |
| 33776<br>37589 | 23 | Shielding components as a patch antenna | WO 98 019 19 A3<br>DK 9600742 A<br>EP 10 066 05 A1<br>(=37589)<br>EP 916166 B1<br>DE 69713103 |
| 34103 | 24 | Preventing Impact of Radiation | EP 99 79 78 B1<br>US 6 600 901 B1 |
| 34162 | 25 | Mobile Phone with Smart Antenna | EP 98 78 38 B1 |
| 36297 | 26 | Embedded Antenna | EP 10 676 27 A1 |

~4326505



– 19 –
MASTER PATENT AND LICENCE PLEDGE AGREEMENT IPCOM AND NETWORK PHASE II
EXECUTION COPY II
HENGELER MUELLER
03 APRIL 2008

| Bosch Mobile Telecommunications Patent Portfolio | | | |
|---|---|---|---|
| 25058-1 | 27 | Character Input – T9 | WO  93  174  96  A1<br>JP  066  07  037  B<br>CH  68  61  04  A5<br>US  56  070  21  A<br>EP  58  19  29  B1<br>FR 268 99 88 B1 |
| BE112 | 28 | Synchronization | DE  413  61  47  C2<br>EP  54  08  08  B1<br>JP  3305374  B2<br>US  53  902  16  A<br>FI 10 61 64 B1 |
| BE1187 | 30 | Location Positioning Services (LCS) | EP 29 07 25 B1 |
| BE2788 | 31 | Sliding Cover | DE S8 364 06 C |
| TN4292 | 37 | 2-Keys | DE  410  77  45  C1<br>EP 50 32 57 B1 |
| 29957 | 38 | Input keyboard function reprogramming | EP  80  60  49  B1 |
| 30013 | 39 | Decorative part for mobile phone | EP  79  07  30  B1<br>US  5  960  078<br>US 6 246 887 |
| 30864 | 40 | Telephone system especially for DECT | EP  83  75  69  A1<br>DE 198 43 293 A1 |
| 30956 | 41 | Handset for securing to pocket | DE  196  47  979  C1<br>EP 84 47 71 A3 |
| 30985 | 42 | Calling Number Truncation | DE  196  51  383  A1<br>EP  84  85  31  A2<br>US 613 78 71 A |
| 31067 | 43 | Key-Placement adjacent to the display | WO  98  37  681  A1<br>DE  197  08  595  C1<br>EP  96  2D  84  B1<br>TW  385  714  A<br>CN  112  40  11  C<br>KR 2000 071 200 A<br>JP 2001 508 977 W<br>US 09/387589 |
| 31257 | 44 | Mobile telephone with touch sensitive display | EP  85  94  98  B1<br>DE 197 05 836 C2 |
| 31304 | 45 | Menu structure of the mobile phone | EP  86  09  68  A2<br>DE 197 07 455 A1 |
| 31312 | 46 | SMS text blocks | EP  86  09  71  A2<br>DE 197 06 596 A1 |

~4326505

PATENT
REEL: 020929 FRAME: 0328

| Bosch Mobile Telecommunications Patent Portfolio | | | |
|---|---|---|---|
| 31833 | 47 | Calling from phone book entry | DE 197 44 225 C2<br>EP 92 32 17 A1 |
| 31844 | 48 | One-hand control — context sensitive menu | DE 197 39 876 C1<br>EP 90 25 77 A2 |
| 32507 | 49 | Menu system - Different Operating Modes | DE 197 42 851 A1<br>WO 99 175 14 A1<br>EP 10 219 04 A1<br>CN 127 14 90 A<br>KR 2001 040 247 A<br>JP 2001 518 752 W<br>US 645 99 12 B1 |
| 32922 | 50 | Mobile Phone employing a Repeater | WO 99 304 22 A2<br>DE 197 55 049 C2<br>EP 10 445 78 A2<br>SK 2000 000 855 A3<br>CZ 2000 002 033 A3<br>CN 128 16 21 A<br>HU 2001 000 646 A2<br>PL 34 15 75<br>RU 22 095 15 C2 |
| 32955 | 51 | Radio data transmission | EP 94 82 24 A2 |
| 33260 | 52 | Key-backlight | WO 99 522 57 A1<br>EP 10 687 12 A1<br>DE 198 15 014 C2<br>JP 2002 510 940 T<br>US 6 738 475 |
| 34153 | 53 | RACH Control | EP 98 29 55 A2<br>DE 198 38 832 A1 |
| 34396 | 54 | Dual Screen Design | DE 199 10 937 A2 |
| 34414 | 55 | Pivotable Antenna / Reducing radiation | EP 10 304 99 A1 |
| 34779 | 56 | Pen phone | DE 199 56 296 A1<br>WO 00 035 169 A1<br>EP 11 476 51 A1<br>US 09/857677<br>JP 2002 532794 T |
| 35059 | 57 | Interference Elimination | WO 00 054 449 A1<br>EP 11 618 07 B1<br>CN 134 9593 T<br>US 09/936115<br>RU 2249306 C2<br>KR-2001108314 A<br>JP 2002539877W |

~4326505

PATENT
REEL: 020929 FRAME: 0329

–21–
MASTER PATENT AND LICENCE PLEDGE AGREEMENT IPCOM AND NETWORK PHASE II
EXECUTION COPY II
HENGELER MUELLER
03 APRIL 2008

| Bosch Mobile Telecommunications Patent Portfolio | | | |
|---|---|---|---|
| 35855 | 58 | Transmit Power Control | EP  10  545  17  B1<br>DE 199 23 580 A1 |
| 36273 | 59 | Broadcast Multicast Services | WO  01  019  020  A2<br>DE  199  43  058  A1<br>EP      1214813      B1<br>US 10/070652<br>CN 1557066 A |
| 36275 | 60 | Sequential Despreading. | WO 2001 024 395 A1<br>EP  12  227  52  B1<br>CN    137  39    35T<br>US 10/089434 |
| 36279 | 61,<br>167 | Coded data signal (bursts) | DE 199 50 021 A1<br>WO  02  32  065  A1<br>EP  1  327  342  A1<br>JP 2004 511190 T<br>US 10/380583 |
| 36282 | 62 | Multiple transmission modes | WO  01  026  261  A2<br>DE  199  46  866  A1<br>EP  12  227  66  A1<br>CN  11  756  10  C<br>US 10/089395 |
| 36372 | 63 | Time Slot Access Control | EP  1  083  758  B1<br>DE 199 42 505 A1 |
| 36447 | 64 | Iterative Channel Decoding | EP  10  795  29  A2<br>DE 199 40 666 C2 |
| 36499 | 65 | Mobile Multimedia Device | EP  10  837  68  B1<br>DE 199 428 43 A1 |
| 36697 | 66 | Display of Operation Functions | DE  199  49  716  C2<br>WO  01  030  052  A1<br>EP      1224791      A1<br>US      10/110622<br>JP 2003 512778 T |
| 36760 | 67 | Bending sensors | EP  10  964  19  A2<br>DE  199  52  087  C1<br>US 6 707 445 B1 |
| 36828-1 | 68 | Messaging for Handover | WO  01  017  303  A1<br>DE  199  42  768  A1<br>EP  123  63  68  A1<br>CN  137  03  85  B<br>TW 54 9D 03 B<br>US 6983147 |
| 36928 | 69 | Measuring  data  transmission properties | EP  10  875  87  A1<br>DE 199 452 73 A1 |
| 36946 | 70 | Compression        Algorithm Mapping cf. Annex II | DE  199  44  334  C1<br>EP 10 857 16 A1 |

~4326505

PATENT
REEL: 020929 FRAME: 0330

- 22 -
MASTER PATENT AND LICENCE PLEDGE AGREEMENT IPCOM AND NETWORK PHASE II
EXECUTION COPY II
HENGELER MUELLER
03 APRIL 2008

| Bosch Mobile Telecommunications Patent Portfolio | | | |
|---|---|---|---|
| 37194 | 71 | Keyboard cover | EP 11 566 39 A1 |
| 37212 | 72 | Ambient noise control | DE 298 15 735 U1 |
| 38717 | 73 | Telecommunication Terminal with a camera | WO 01 994 20 A1<br>EP 1 297 698 A1<br>DE 100 304 03 A1<br>JP 2004 501578 T |
| 38748 | 74 | Card holder | DE 100 309 34 A1 |
| 38807 | 75 | Front end for a mobile communication device | EP 11 798 94 A1 |
| 38875 | 76 | Handset with separable microphone | EP 11 709 28 A1<br>DE 100 323 55 A1 |
| 38994 | 77 | Mobile phone with browser function | DE 100 383 02 C1 |
| 39003 | 78 | Hands-free speaking system | DE 100 39 775 A1<br>EP 11 80 913 A |
| 39122 | 79 | Message Indicator | DE 100 432 84 C1<br>DE 201 22 148 U1<br>WO 02 19 676<br>EP 1316199 A1<br>US 2004/033783 A1<br>JP 2004/507982 T<br>EP-1622348 A1 |
| TN4362 | 83 | Presentation of control functions | DE 424 35 63 C2 |
| 34471 | 85 | Application signaling | DE 198 42 569 A1<br>EP 99 31 54 A2 |
| 34665 | 86 | Variable Length Block Code | DE 198 46 721 A1<br>WO 00 02 27 40 A1<br>EP 11 217 62 B1<br>US 639 64 23 B1<br>JP 2002 527 982 T |
| 34665 | 87 | Fire-Code | WO 00 022 737 A1<br>EP 11 217 60 B1<br>JP 2002 527 979 T<br>US 09/623946 |
| 37661 | 88 | CDMA Receiver with ranking arrangement | EP 11 54 585 A1 |
| 32699 | 90 | SIM Card Positioning in the Mobile Phone | EP 91 56 07 A3<br>DE 197 49 059 C1<br>US 6 535 750 B1<br>DE 29825258 |
| 33621 | 91 | Coupler for Multi-Band | EP 97 73 01 A1 |

~4326505

| | | Bosch Mobile Telecommunications Patent Portfolio | |
|---|---|---|---|
| 34069 | 92 | Codec Negotiation in TFO/TrFO cf. Annex II | WO 00 00 73 97 A1<br>EP 11 013 78 A1<br>DE 198 33 318 C2<br>TW 43 50 24 B<br>CN 11 19 910 C<br>KR 2001 07 19 80 A<br>JP 2002 521 987 T<br>US 6 920 124 |
| 34176 | 93 | Mobile Phone with Audio Video Interface | EP 1 111 882 B1 |
| 34420 | 94 | Tx Switchable Up-Conversion Loop | US 647 01 91 BA |
| 34421 | 95 | Multiband receiver | EP 10 066 69 B1<br>US 6,584,304 |
| 34483 | 96 | Presence Service | DE 198 55 142 C1<br>EP 10 067 47 A3 |
| 34603 | 97 | Combined Channel Estimator | EP 99 80 54 B1<br>JP 2000 138 522 A<br>US 6 603 749 B1 |
| 34734 | 98 | MMS Data Frame cf. Annex II | DE 198 56 440 C2<br>WO 00 035214 A1<br>EP 11 381 63 B1<br>EP 14 849 30 A2<br>US 6,987,980<br>JP 2002/532981 T2 |
| 34744 | 99 | MMS Notification Message cf. Annex II | WO 00 035 213 A1<br>EP 11 381 62 B1<br>DE 198 55 441 C2<br>US 09/857676<br>JP 2002/532796 T2<br>DE-19861323 B4<br>EP-1353519 B1<br>EP-1594325 A2 |
| 35535 | 100 | Channel access allocation | WO 00 054 534 A1<br>DE 199 102 39 A1<br>EP 1186189 A1<br>CN-1135045 C<br>US 09/914967<br>JP 2002 539693 T |
| 35869-1 | 102 | IMEI Security | EP 10 562 41 B1<br>DE 199 58 599 A1 |
| 36276 | 104 | Data transmission method | DE 199 53 894 A1 |
| 36450 | 105 | Automatic time zone adjustment | DE 100 109 77 A1 |

~4326505

- 24 -
MASTER PATENT AND LICENCE PLEDGE AGREEMENT IPCOM AND NETWORK PHASE II
EXECUTION COPY II
HENGELER MUELLER
03 APRIL 2008

| Bosch Mobile Telecommunications Patent Portfolio | | | |
|---|---|---|---|
| 37033-1 | 107 | MMS Relay | WO 2001 026 310 A1<br>DE 199 56 023 A1<br>EP 12 22 782 A1<br>JP 2003 511769 T2<br>EP-1610511 A1<br>US 10/089523 |
| 37071 | 108 | SIR Estimation in Data Channel | WO 01 041 327 A3<br>DE 199 58 383 A1<br>EP 123 84 74 B1<br>US 10/148785<br>JP 2003 516088 T |
| 37119 | 109 | Mobile phone with SIM/USIM card | DE 100 04 164 A1 |
| 37120 | 110 | Regulating data transmission quality QoS | EP 11 308 36 A2<br>DE 100 10 437 A1 |
| 37135 | 111 | Discontinuous Reception | WO 01 043 465 A1<br>DE 199 58 777 A1<br>EP 123 85 48 A1<br>JP 2003 516661 T<br>US 10/149095 |
| 37154-1 | 112 | Allocation of Transmission Channels | WO 01 041 487 A1<br>DE 100 08 838 A1<br>EP 123 85 51 A1<br>US 2005 037766 A1<br>JP 2003 516063 T<br>EP-1605720 A1 |
| 37186 | 113 | Unequal Error Protection | WO 01 041 349 A1<br>EP 123 84 67 B1<br>US 10/148773<br>JP 2003 518346 T<br>EP 14 011 37 A1 |
| 37200 | 114 | Negotiating Context Configuration | DE 199 50 853 A1<br>WO 01 030 042 A3<br>EP 12 26 692 A2<br>US 10/111511<br>JP 2003 51277 4T<br>CN 13 82 337 A<br>KR-2002070425 A<br>EP-1568760 A1 |
| 37227 | 115 | Detection Hierarchical CDMA Codes | WO 01 056 162 A2<br>EP 12 12 844 B1<br>US 6 813 256 B2<br>JP 2003 521188 A |

~4326505

| | | Bosch Mobile Telecommunications Patent Portfolio | |
|---|---|---|---|
| 37232 | 116 | Circuit-Switched            Data Services | WO  01  061  957  A3<br>DE  100  07  012  A1<br>EP  12  58  110  B1<br>US  2003  002507  A1<br>JP 2003 523150 T |
| 37263 | 117 | Advertising during Connection Establishment | WO  01  052  559  A3<br>DE  100  00  498  A1<br>EP  124  91  37  A2<br>US  2003  103813  A1<br>JP 2003 529977 T |
| 37272-1 | 118 | Provider          Independent Encryption | WO  01  043  471  A1<br>EP  124  07  94  A1<br>JP2003516683T2<br>US2003097341A1 |
| 37488-1 | 119 | Relocation after Handover | WO  01  039  522  A3<br>EP  123  53  72  A2<br>US 10/130857<br>JP-2003524320 W |
| 37506 | 120 | Transmit Power Control II | EP  11  118  09  A2<br>DE 199 62 339 A1 |
| 37568 | 121 | Extended          Internet-Email-Addressing II | WO  01  043  348  A3<br>DE  199  59  528  A1<br>EP  12  40  758  A2<br>US          10/149555<br>JP 2003 516 662 T |
| 37602 | 122 | Tx Diversity | WO  01  063  796  A1<br>EP  126  20  31  B1<br>US  2003  128677  A1<br>JP 2003 524989 T |
| 37603 | 123 | Pre-equalized data signals | WO  01  047  139  A3<br>DE  199  61  594  A1<br>EP  124  30  79  A2<br>US          10/158587<br>JP 2003 518810 T |
| 37604 | 124 | Re-connection | WO  01  80  585<br>EP  1  287  716  B1<br>DE  100  194  02  A1<br>US          6,928,288<br>JP 2004 501537 T |
| 37636 | 125 | Extended          Internet-Email-Addressing | WO  01  045  320  A3<br>EP  12  43  107  A2<br>US          10/168158<br>JP 2003 517 770 T<br>EP 1559747 A |

PATENT
REEL: 020929 FRAME: 0334

– 26 –
MASTER PATENT AND LICENCE PLEDGE AGREEMENT IPCOM AND NETWORK PHASE II
EXECUTION COPY II
BENGELER MUELLER
03 APRIL, 2008

| Bosch Mobile Telecommunications Patent Portfolio | | | |
|---|---|---|---|
| 37637 | 126 | Synchronization of data transfer devices | WO  01  52  490  A1<br>EP  12  50  782  A1<br>US  2003 137972  A1<br>JP 2004 501525 T |
| 37730 | 128 | Transmission Type Dependent Compression | EP 1 133 203 A3 |
| 37751 | 130 | GPS aided beam steering | DE 100 04 000 A1 |
| 37753 | 131 | SMS in Multimedia Services cf. Annex II | WO  01  058  183  A1<br>DE  100  04  280  A1<br>EP  125  62  41  B1<br>EP-1594323  A2<br>US  2003 109269  A1<br>JP 2003 528490 T<br>JP-2006270994 A |
| 37838 | 132 | Error Message to Convergence Layer | WO  01  063876A1<br>EP  12  73  147  B1<br>US  2003 137931  A1<br>JP 2003 529981 T |
| 37850 | 133 | Second Radio Link | DE  100  13  607  A1<br>EP 1 137 240 A2 |
| 37868 | 134 | Shared Header Signaling | WO  01  074  022  A3<br>EP  1  269  718  B1<br>US  2003 103513  A1<br>JP 2003 529290 T |
| 38219 | 135 | Variable TPC Step Size | WO  01  091  320  A1<br>DE  100  25  041  A1<br>EP  1  290  813  A1<br>US  2003 128559  A1<br>JP 2003 534708 T |
| 38255-1 | 136 | Method for Transmitting Signaling | WO  01  741  06  A1<br>DE  100  425  11  A1<br>EP  1  269  791  B1<br>US  2002 154676  A1<br>JP 2003 529249 T |
| 38256 | 137 | Electronic signature via mobile phone | WO  01  91  478  A3<br>EP  1  290  905  A2<br>DE  100  263  26  A1<br>US  2004  111616<br>JP 2003 535497 T |
| 38341 | 138 | Mobile phone with laser pointer | EP  1  168  779  A2<br>DE 100 302 73 A1 |
| 33877 | 140 | Transmitting Video Data | DE  198  13  412  B4<br>EP 946 059 A3 |

~4326505

- 27 -
MASTER PATENT AND LICENCE PLEDGE AGREEMENT IPCOM AND NETWORK PHASE II
EXECUTION COPY II
HENGELER MUELLER
03 APRIL 2008

| Bosch Mobile Telecommunications Patent Portfolio | | | |
|---|---|---|---|
| 33774 | 141 | Separation of superimposed encoded signals | DE 198 26 036 C2 |
| 33788 | 142 | Data transmission with mobile stations | WO 99 564 41 A1<br>DE 198 18 215—C1<br>EP 10 741 29 B1<br>CN 129 85 96 T<br>US 09/674022 |
| 34709 | 143 | Data transmission | DE 198 50 279 A1<br>WO 00 027 046 A1<br>EP 1 125 376 B1<br>EP 1 320 200 B1<br>US 09/830540<br>JP 2003 530723 T |
| 35181 | 144 | Method for Controlling the Power Dissipation | EP 1 056 218 A1 |
| 35183 | 145 | Data Transmission using VRC-Technique | EP 1 047 199 A2<br>DE 199 18 507 A1 |
| 35814 | 146 | Spread spectrum transmission | EP 1 107 465 A2 |
| 35815 | 147 | Additive noise reduction | WO 00 069 133 A1<br>DE 199 20 819 C1<br>EP 1 179 251 A1<br>US 10/009288 |
| 36409 | 148 | Estimation of the mobile terminal speed | EP 10 915 33 A1 |
| 29946 | 149 | Variable Channel Bit Rate | DE 196 05 418 A1<br>WO 97 305 30 A1<br>AU 71 79 99 B<br>US 61 417 81 A<br>EP 880 836 B1<br>JP 2000 504 903 T<br>CA 22 462 76 A1 |
| BE 1087 | 150 | Chip-card system | DE 371 51 99 C1 |
| BE 8 | 151 | Chip card for public transport | DE 391 16 67 C2 |
| 30595 | 152 | Data transfer between chip card and terminal | DE 196 26 651 C1 |
| 28129 | 153 | Chip card storing compressed data | EP 62 38 96 B1 |
| 32762 | 154 | Smart card with optical fiber transmission. | EP 902 392 B1 |
| 34504 | 155 | Chip card for automatic charge | WO 00 019 352 A1<br>EP 1 116 161 B1 |

~4326505

PATENT
REEL: 020929 FRAME: 0336

- 28 -
MASTER PATENT AND LICENCE PLEDGE AGREEMENT IPCOM AND NETWORK PHASE II
EXECUTION COPY II
HENGELER MUELLER
03 APRIL 2008

| | | Bosch Mobile Telecommunications Patent Portfolio | |
|---|---|---|---|
| 38023 | 159 | Chip cards for protecting appliances | DE 100 153 07 A1 |
| 31011 | 160 | Data exchange of smart card | DE 196 489 12 A1<br>FR 27 573 35 A1<br>SE 521264 C2<br>KR 980 42 718 A |
| 30701 | 161 | Programming electrical equipment | WO 98 07 121 A1<br>CN 122 76 49 A<br>TW 38 21 02 B<br>JP 200 15 009 98 W<br>KR 200 00 298 72 A<br>EP 920 683 B1 |
| 26889 | 163 | Transmission of data by fixed length words | EP 0 698 316 B1<br>JP 08510619T2<br>US 5771102 A |
| 27031 | 164 | Arithmetic decoding system | DE 44 295 85 C1<br>EP 69 77 70 B1<br>JP 080 790 95 A<br>US 573 73 45 A |
| 37110 | 165 | Junk Mail Screening | WO 01/ 54436<br>EP 1 252 779 A1<br>DE100 02 030 A1<br>JP 2003 520534 T<br>US 2003 100292 A1 |
| 34466 | 166 | Detecting CDMA-coded signals | WO 00 16 495 A1<br>EP 1 112 623 B1<br>JP 2002 525 906 T2<br>TW 437 199 B<br>DE 198 41 578 A1<br>US 7042861 |
| 37073 | 168 | Phase Correction | EP 1 113 585 A2<br>JP 2001 160 771 A2<br>DE 199 49 007 C1<br>US-7154935 B1 |
| 36278 | 169 | Correlating non-hierarchical codes | EP 1 230 742 B1<br>WO 01/35542<br>US 10/089208<br>JP2003 514429T |
| 35179 | 170 | Adaptive Filtering | EP 1 052 784 A1 |
| 34298 | 171 | Two step channel estimation | DE 199 34 355 C2<br>EP 1 071 247 A3 |

~4326505

PATENT
REEL: 020929 FRAME: 0337

– 29 –
MASTER PATENT AND LICENCE PLEDGE AGREEMENT IPCOM AND NETWORK PHASE II
EXECUTION COPY II
HENGELER MUELLER
03 APRIL 2008

| Bosch Mobile Telecommunications Patent Portfolio | | | |
|---|---|---|---|
| 30832 | 172 | Controlled Power Ramp Up | EP  1  469  596  A2<br>EP  0  954  903  B1<br>JP  2001/508620  T2<br>US        6,477,358<br>WO 1998/33273 A1<br>KR-2000070315 A |
| 35164 | 173 | Handover | DE  199  00  436  A1<br>EP  1  560  454  A2<br>EP  1  018  849  A2<br>US 6,879,830 |
| 32707 | 174 | Mobile   Phone   as   Remote Control | EP 0 913 979 A3 |
| BE 81 | | Funktelefonnetz | EP 492051 B1 |
| BE 1588 | | Funktelefon | DE 3822848 C2 |
| BE 2968 | | Funktelefon | EP 369110 B1 |
| 26097 | | Vibrationsmotor | EP 622932<br>DE 4313531 |
| 28148 | | Trägerfrequenzsynchonisation | EP 764373<br>FI 114 952<br>AU 26108/95 B<br>US 5652641 |
| 31323 | | HF Verstärker | DE 19705447<br>EP 980483<br>US 6697648 |
| 31578 | | Tragekiipp | DE 19705120<br>EP 862277 B1 |
| 36657 | | Antennendiversity | EP 1160999 |
| 41777 | | Dringlichkeit von Anruf | DE 10153526<br>JP 2005-509374<br>US-7162022  B2  EP-1442586 A1 |

~4326505

Exhibit 37



# Third Generation Partnership Project

# 3GPP

## Working Procedures

20 October 2016

# Foreword

These Working Procedures of the Third Generation Partnership Project (3GPP) are effective from 31 December 2014.

An electronic version of these Partnership Project Working Procedures is available from the following address:

http://www.3gpp.org

# SECTION A:   GENERAL

# Article 1:      Description

The Partnership Project is not a legal entity but is a collaborative activity between the following recognized Standards Development Organizations:

ARIB     (Japan)

CCSA     (China)

ETSI      (Europe)

ATIS      (US)

TTA      (Korea)

TTC      (Japan)

TSDSI    (India)

The Partnership Project is entitled the "THIRD GENERATION PARTNERSHIP PROJECT" and may be known by the acronym "3GPP".

top

# Article 2:      Purpose

The purpose of 3GPP is to prepare, approve and maintain globally applicable Technical Specifications and Technical Reports for

- a 3rd Generation Mobile System based on the evolved GSM core network, and the Universal Terrestrial Radio Access (UTRA),

- further development of radio technologies such as LTE, coupled with evolution of core network elements such as the Evolved Packet Core (EPC),

- continuing evolution of the 2nd generation GSM/EDGE Radio Access Network (GERAN),

to be transposed by the Organizational Partners into appropriate deliverables (e.g., standards).

top

# Article 3:      Scope and objectives

The 3rd Generation Mobile System and its capabilities shall be developed in a phased approach. Initially, 3GPP shall prepare, approve and maintain the necessary set of Technical Specifications and Technical Reports for a 3rd Generation Mobile System including:

- UTRAN (including UTRA; in Frequency Division Duplex (FDD) and Time Division Duplex (TDD) modes);

- 3GPP Core Network (Third Generation networking capabilities evolved from GSM. These capabilities include mobility management, global roaming, and utilisation of relevant Internet Protocols);

- Terminals for access to the above (including specifications for a UIM); and

- System and service aspects.

3GPP shall prepare, approve and maintain the necessary set of Technical Specifications and Technical Reports for:

- the Global System for Mobile communication (GSM) including GSM evolved radio access technologies (e.g., General Packet Radio Service (GPRS) and Enhanced Data rates for GSM Evolution (EDGE)).

3GPP shall consider the long term evolution.

The Technical Specifications and Technical Reports shall be developed in view of global roaming and circulation of terminals.

The set of 3GPP Technical Specifications and Technical Reports for the 3GPP core network and the specifications for the GSM core network should be common to the greatest extent possible and should not be unnecessarily different.

Options in the form of a regulatory requirement particular to one or more regions / nations shall be included in 3GPP specifications.  TSGs should not debate the inclusion or rejection of such options.

The results of the 3GPP work shall form the basis of member contributions to the ITU in accordance with existing procedures.

3GPP shall take account of emerging ITU recommendations on interworking between IMT-2000 family members.

In the framework of agreed relationships, the 3GPP Technical Specifications and Technical Reports will form the basis of standards, or parts of standards, of the Organizational Partners.

top

# SECTION B:  PARTICIPATION

# Article 4:        Categories

Participation in 3GPP shall be classified into one of the following categories:

- Partners;

- Individual Members;

- ITU Representatives;

- Observers;

- Guests.

top

# Article 5:        Partnership

Partners in 3GPP shall be classified into one of the following two categories:

- Organizational Partners;

- Market Representation Partners.

top

# Article 6:        Organizational Partnership

Organizational Partnership is open to any Standards Organization, irrespective of its geographical location, which has:

- a national, regional or other officially recognized status and the capability and authority to define, publish and set standards within the 3GPP scope, in that nation or region;

- an Intellectual Property Rights (IPR) Policy which is compatible with those of the Organizational Partners;

- committed itself to all or part of the 3GPP scope;

- signed the Partnership Project Agreement.

Standards Organizations may apply to become an Organizational Partner by writing to any of the existing Organizational Partners.

top

# Article 7:        Market Representation Partnership

The Organizational Partners may invite Market Representation Partners to take part in 3GPP.

An invitation for Market Representation Partnership is open to any organization, irrespective of its geographical location, which:

- has the ability to offer market advice to 3GPP and to bring into 3GPP a consensus view of market requirements (e.g., services, features and functionality) falling within the 3GPP scope;

- does not have the capability and authority to define, publish and set standards within the 3GPP scope, nationally or regionally;

- has committed itself to all or part of the 3GPP scope;

- has signed the Partnership Project Agreement.

Organizations may apply to become Market Representation Partners by writing to any of the existing Partners. Further guidance for MRP applicants can be found in annex E.

top

# Article 8:        Individual Membership

Membership in an Organizational Partner is a pre-requisite for Individual Membership of 3GPP. All entities registered as members of an Organizational Partner and eligible for participation in the technical work of that Organizational Partner, can become Individual Members of 3GPP if they are committed to support 3GPP and:

- to contribute technically or otherwise to one or more of the Technical Specification Groups within the 3GPP scope;

- to use the 3GPP results to the extent feasible.

An Individual Member has the right to participate in the work of 3GPP by attending meetings of the Technical Specification Groups and subtending groups.

Applications for Individual Membership of a Technical Specification Group shall be made in writing to the relevant Organizational Partner using the form given at annex C. Applications may also be made on-line using the template available at http://www.3gpp.org.

Individual Members act in 3GPP in their own right and carry the full responsibility for their contributions.

top

# Article 45:      Drafting rules

The Technical Specifications and Technical Reports drafted by the TSGs shall follow the 3GPP drafting rules, using document processing facilities, format, languages and notations agreed by the Organizational Partners, and on a medium suited for electronic document handling and publishing.

top

# Article 46:      Copyright and ownership

The Organizational Partners will have joint ownership (including copyright) of the Technical Specifications and Technical Reports produced by 3GPP.

top

# Article 47:      Conversion by Organizational Partners

Organizational Partners shall use their best endeavours to convert the Technical Specifications and Technical Reports approved by the Partnership Project into national/regional deliverables in a timely manner through their normal processes.

The Organizational Partners are urged not to change the technical parts of the Technical Specifications and Technical Reports; they may add non-technical parts required by their own deliverable schemes and they may add descriptions of options selected.

Organizational Partners should ensure that all unresolved comments raised during their public enquiry and approval phases are delivered to the appropriate TSG.

top

# SECTION I:    REPORTING

# Article 48:      Chairman's reporting obligations

A report shall be prepared by the Chairman following all PCG and TSG meetings.

top

# Article 49:      Changes to structure and officials

The Chairman of each TSG shall inform the PCG of all organizational changes concerning Working Groups and their officials. An up to date record of the 3GPP structure shall be maintained.

top

# Article 50:      Calendar of meetings

The PCG and TSGs shall maintain an up to date calendar of the dates and venues for future meetings.

top

A TSG or any subtending Working Group may send individual liaisons to any external organization (other than ITU) without PCG approval, except if the statement is considered sensitive by the TSG Chairman, in which case PCG clearance is needed.

It is not necessary to have all external liaisons copied to the PCG and/or TSG SA. The liaison originating TSG should decide, at its own discretion, which should be copied. External liaisons that may have management implications such as schedules, organization, process, procedures, and policy shall be copied to the PCG, or approved by the PCG if sensitive.

Relations with the ITU are described in article 51.

*top*

# SECTION K:   MISCELLANEOUS

## Article 53:       Resources

The resources for the operation of 3GPP shall be managed by the Organizational Partners. The resources are allocated to the TSGs by the PCG.

*top*

## Article 54:       Support Team

The Partners shall provide logistical support to, and assist in the operation of, 3GPP. The support shall be in the form of a Support Team which shall operate under the overall management of the PCG and the day to day management of TSGs.

*top*

## Article 55:       Intellectual Property Rights (IPR) Policy

Individual Members shall be bound by the IPR Policy of their respective Organizational Partner.

Individual Members should declare at the earliest opportunity, any IPRs which they believe to be essential, or potentially essential, to any work ongoing within 3GPP. Declarations should be made by Individual Members to their respective Organizational Partners.

Organizational Partners should encourage their respective members to grant licences on fair, reasonable terms and conditions and on a non-discriminatory basis.

The PCG shall maintain a register of IPR declarations relevant to 3GPP, received by the Organizational Partners.

*top*

## Article 56:       Working language

The working language for 3GPP shall be English.

Meetings of the PCG and TSGs shall be conducted in English.

3GPP Technical Specifications and Technical Reports shall be prepared in English (as defined by the Shorter Oxford English Dictionary).

*top*

Exhibit 38



# Operating Procedures for
# ATIS Forums and Committees
# (version 5.5)

third of the members of the Forum shall constitute a quorum for conducting business at a meeting. Observers shall not be counted for the purposes of establishing a quorum.

## 8.3    Industry Expert Attendance

Forum leadership may at its discretion invite an industry subject matter expert(s) to attend specific Forum meetings when his/her expertise is required to assist the Forum in resolving a specific Issue. The expert shall not participate in consensus decisions or voting processes.

## 9    MEETING NOTES

ATIS Forums shall publish fair, objective, and unbiased meeting notes developed by consensus and ensure they accurately reflect the activities, resolutions, and action items that result from meetings.  All meeting notes shall be published in a timely manner.

## 9.1    Meeting Note Content

Meeting notes shall include at a minimum:

> ➢ Date(s), type of meeting (i.e., virtual meeting, conference call, face-to-face), leadership, person taking the notes;
> ➢ Attendance list;
> ➢ Approved agenda;
> ➢ Identification of Issues discussed at the meeting and their status;
> ➢ A notation of corrections/additions made to a previous meeting record;
> ➢ Points noted/alternatives discussed including opposing viewpoints;
> ➢ Agreements reached;
> ➢ Action items indicating responsible party and due date;
> ➢ Participants' contributions or similar documents or a reference to where those documents are available on the ATIS website;
> ➢ Text specifically requested to be included by a participant with attribution; and
> ➢ Copies of presentations made during the meeting or a reference to where the presentations are available on the ATIS website.

## 10    INTELLECTUAL PROPERTY RIGHTS POLICY

### 10.1    General Policy Statement

In all matters of intellectual property rights, it is the intention of ATIS and its Forums to benefit the public while respecting the legitimate rights of intellectual property owners.

### 10.2    Confidentiality

As a general rule, neither ATIS nor its Forums will consider any contributions, presentations, or other documentation that is subject to any requirement of confidentiality or any restriction on its dissemination.  Neither ATIS nor its Forums assume any obligations of confidentiality with respect to any contribution, presentation, documentation or other submissions.  Exceptions to the general rule are determined on a case-by-case basis by the relevant Forum leadership in conjunction with ATIS General Counsel and are only appropriate where the work cannot be accomplished through other means.  Prior to the distribution or discussion of any materials accorded exception status and considered as confidential or otherwise restricted, full disclosure of the status must be made to the audience Forum.

## 10.3     Copyright

### 10.3.1   Copyright Policy

In order that ATIS may facilitate, promote, and disseminate the work of its Forums, it is necessary that each contributor grant ATIS the rights necessary to adapt, copy, and publicly distribute any contribution or submittal made to an ATIS Forum.  In accordance with this policy, each contribution or document submitted to an ATIS Forum is subject to an unlimited perpetual, non-exclusive, royalty-free, world-wide right, and license to ATIS of any copyrights in such contribution.  This license includes the right to copy, publish, and distribute the contribution in any way, and to prepare derivative works that are based on or incorporate all or part of the contribution, the license to such derivative works to be of the same scope as the license of the original contribution.

### 10.3.2   ATIS Deliverables

All ATIS guidelines, standards, or other ATIS deliverables are copyrighted by ATIS. Except as expressly permitted by ATIS, no guideline, standard, or other ATIS deliverable, or any portion thereof, may be reproduced or distributed in any form, without the prior express written permission of ATIS.

### 10.3.3   Notice

The following copyright notice shall be included in all guidelines, standards, or other ATIS deliverables:

"Copyright © ATIS [date of publication].  All Rights Reserved."

## 10.4     Patents

### 10.4.1   Patented Inventions Generally

As a general matter, there is no objection for an ATIS Forum to develop guidelines, standards, or other ATIS deliverables that refer to or, primarily in the case of American National Standard, require the use of patented inventions.

In the case of standards, guidelines, and other ATIS deliverables that make reference to a patented invention, but do not require use of the invention for purposes of adopting, complying with, or following the guideline or deliverable, the following statements shall be expressly included in the published work:

➢ The patented invention is for reference only.
➢ Neither ATIS nor the relevant Forum is responsible for identifying the existence or evaluating the applicability of any patents referenced in or that may be relevant to any standard, guideline or other ATIS deliverable.
➢ Neither ATIS nor the relevant Forum shall be responsible for interpreting or making any determination concerning the validity, enforceability or scope of any patented invention referenced in or that may be relevant to any standard, guideline, or other ATIS deliverable.

Further in the case of standards, guidelines and other ATIS deliverables the following procedures shall apply:

➢ If reference to a patented invention shall be made in a standard, guideline, or other ATIS deliverable, disclosure of the patented invention should be encouraged at the earliest possible time in the development of the standard, guideline, or other ATIS deliverable.  The party

making any such disclosure should provide an explanation regarding the relevancy of the patented invention to the work under development.

➢ Where possible, the standard, guideline, or other ATIS deliverable referencing a patented invention should identify the patent number and name, as well as the identity of the patent owner.

➢ To the extent a Forum participant, or any other third party, desires a license for a patented invention referenced in a standard, guideline, or other ATIS deliverable, all negotiations and discussion of license terms shall occur between the patent owner and the prospective licensee *outside* the deliberations of the Forum.  No discussion or negotiation of license terms shall be permitted in any Forum.

➢ In the event that use of the patented invention is required for purposes of adopting, complying with, or otherwise utilizing the standard, guideline, or other ATIS deliverable, the provisions of the ANSI Patent Policy, as adopted by ATIS and as set forth below, shall apply.  Any writing submitted as of January 31, 2011, to ATIS for the purpose of expressing a licensing assurance under this Section shall not qualify as such an assurance unless it expressly states that the assurance is irrevocable.

Any deviation from the foregoing procedures shall occur only after prior consultation with and approval of the ATIS General Counsel.

*10.4.2   American National Standards*

In connection with the development of American National Standards, or other deliverables that require use of essential patent claims, the use of essential patent claims shall be governed by the American National Standards Institute ("ANSI") Patent Policy as adopted by ATIS and as set forth below.  In addition, disclosure of essential patent claims at the earliest possible time in the development process should be encouraged.  Further, as with standards, guidelines and other ATIS deliverables, no discussion or negotiation of license terms shall occur in the relevant Forum.  All such discussions and negotiations shall occur directly between the owner of the essential patent claim and each prospective licensee.

The terms of the ANSI Patent Policy as adopted by ATIS are as follows:

*ANSI Patent Policy – Inclusion of Patents in American National Standards*

There is no objection in principle to drafting a proposed American National Standard (ANS) in terms that include the use of an essential patent claim (one whose use would be required for compliance with that standard), if it is considered that technical reasons justify this approach.

If ATIS receives a notice that a proposed ANS or an approved ANS may require the use of such a patented claim, the procedures in this clause shall be followed.

Participants in the ATIS standards development process are encouraged to bring patents with claims believed to be essential to the attention of ATIS.

*Statement from patent holder*

Prior to approval of such a proposed ANS, ATIS shall receive from the identified party or a party authorized to make assurances on its behalf, in written or electronic form, either:

(a)  assurance in the form of a general disclaimer to the effect that such party does not hold and does not currently intend holding any essential patent claim(s); or

(b)  assurance that a license to such essential patent claim(s) will be made available to applicants desiring to utilize the license for the purpose of implementing the standard either:

   (i)  under reasonable terms and conditions that are demonstrably free of any unfair discrimination; or

   (ii) without compensation and under reasonable terms and conditions that are demonstrably free of any unfair discrimination.

Such assurance shall indicate that the patent holder (or party authorized to make assurances on its behalf) will, in any documents transferring ownership of patents subject to the assurance, include provisions sufficient to ensure that the commitments in the assurance are binding on the transferee, and that the transferee will similarly include appropriate provisions in the event of future transfers with the goal of binding each successor-in-interest.

The assurance shall also indicate that it is intended to be binding on successors-in-interest regardless of whether such provisions are included in the relevant transfer documents.

*Record of Statement*

A record of the patent holder's statement shall be retained in the files of both ANSI and ATIS.

*Notice*

When ATIS receives from a patent holder the assurance set forth above, the standard shall include a note substantially as follows:

NOTE – The user's attention is called to the possibility that compliance with this standard may require use of an invention covered by patent rights.

By publication of this standard, no position is taken with respect to the validity of any such claim(s) or of any patent rights in connection therewith. If a patent holder has filed a statement of willingness to grant a license under these rights on reasonable and nondiscriminatory terms and conditions to applicants desiring to obtain such a license, then details may be obtained from ATIS.

*Responsibility for Identifying Patents*

Neither ATIS nor ANSI shall be responsible for identifying patents for which a license may be required by an American National Standard or for conducting inquiries into the legal validity or scope of those patents that are brought to their attention.

## 11    COMMUNICATIONS

Informal internal communications between the leadership of the ATIS Forums, Subtending Committees, and Subcommittees is encouraged. ATIS Forum, Subtending Committees, and Subcommittee leadership is encouraged to communicate directly, via electronic mail or otherwise, with other ATIS Forums. Formal communications conveying a Forum position and those communications from an ATIS Forum to external organizations shall be agreed upon by the Forum. The ATIS General Counsel shall review, prior to distribution, all proposed communications to regulatory, legislative, or governmental bodies, as well as any other sensitive material.

Exhibit 39

2019-08-04                    **3GPP MEMBERSHIP**                    Version 1.1

                                                    

**New Query**

---

**Selected categories:**                        • **Individual Members** (all partners)

**Selected filters:**                           **Organization Name starts with "IPCOM"**

Choose csv separator : [ , ∨ ]

---

 ● **INDIVIDUAL MEMBERS** ●                    

| Organization | Country | Partner |
|---|---|---|
| **IPCom GmbH & Co.KG**<br>**(IPCom GmbH & Co.KG)** | GERMANY | ETSI |

Total : 1 Individual Member

---

     Any comments or problems with this application? Please let us know...     

Exhibit 40

# IPCOM GMBH & CO. KG

Zugspitzstraße 15
D-82049 Pullach

Tel   +49 89 55277 300
Fax  +49 89 55277 305

E-Mail:
info@ipcom-munich.com

Sitz Pullach
AG München
HRA 89197

Persönlich haftender
Gesellschafter:

IPCom Beteiligungs GmbH
Sitz Pullach

AG München
HRB 167303

Geschäftsführer:

Bernhard Frohwitter
Christoph Schoeller

Bankverbindung:

HypoVereinsbank München
KTO:  668 503 861
BLZ:  700 202 70

USt-ID. Nr. DE254375205

IPCom GmbH & Co. KG Zugspitzstraße 15 D-82049 Pullach

IPCom has made the following declaration to the European Commission, thus reaffirming its policy of licensing its patents on FRAND terms.

IPCom hat der Europäischen Kommission die folgende Erklärung abgegeben, und damit seine Politik der Lizenzvergabe auf FRAND-Basis nochmal klargestellt.

10 December 2009

IPCom GmbH & Co. KG

# FRAND-DECLARATION

1.    IPCom is aware of the obligations imposed on owners of standard-essential patents under the competition rules of the EC Treaty to grant licenses with respect to standard-essential patents on fair, reasonable and non-discriminatory (FRAND) terms and conditions. IPCom is of the opinion that it always has honoured these obligations and has therefore adopted the policy and hereby expressly declares to be willing to license its standard-essential patents under FRAND terms and conditions to any user of a telecommunication standard which is covered by one or several of IPCom's patents.

2.    In 2007, IPCom purchased the mobile telecommunication patent portfolio of Robert Bosch GmbH (the "Bosch Mobile Telecommunication Patent Portfolio"). The Bosch Mobile Telecommunication Portfolio encompasses about 160 patent families in the field of mobile communications – more than 1,000 patents registered in Europe, the US and Asia, most of which have been granted. The Bosch Mobile Telecommunication Portfolio contains patents that already are essential for mobile communications standards such as 2G (GSM), 2.5G (GPRS), 3G (UMTS) and subsequent generations (3.9G) or may become essential in the future.

3.    Bosch has between 1997 and 2000 rendered several declarations vis-à-vis ETSI in which Bosch committed itself to license the standard-essential patents of the Bosch Mobile Telecommunication Portfolio on fair, reasonable and non-discriminatory (FRAND) terms according to Sec. 6.1 of the ETSI IPR policy.

4.    Following informal discussions with the European Commission IPCom hereby declares that it is fully prepared and ready to take over vis-à-vis third parties any applicable licensing undertaking of Bosch vis-à-vis ETSI to grant irrevocable licenses to patents of the Bosch Mobile Telecommunication Patent Portfolio on a fair, reasonable and non-discriminatory basis in accordance with the terms and conditions set forth under clause 6.1 of the ETSI IPR Policy as if IPCom had been the original participant in the setting of the GSM and UMTS Standards and was subject to a commitment vis-à-vis ETSI to do so. IPCom acknowledges the terms of clause 6.1 of the ETSI IPR Policy and the requirements thereunder. For the avoidance of doubt this declaration does not intend to make IPCom liable for omissions, mistakes, misrepresentations or any other acts of Bosch (if any) contrary to the ETSI rules in the standard setting process or as a member of ETSI.

5.   **IPCom hereby irrevocably declares that it is prepared to grant irrevocable licenses under the essential intellectual property rights of its Bosch Mobile Telecommunication Patent Portfolio on fair, reasonable and non-discriminatory terms and conditions to the following extent:**

- **production of any system or device fully conforming to a mobile telecommunication standard, including the right to make or have made customized components and sub-systems to the licensee's own design for use in such production;**
- **sell, lease or otherwise dispose of any system or device fully conforming to a mobile telecommunication standard so produced;**
- **repair, use or operate any system or device fully conforming to a mobile telecommunication standard; and**
- **use any method or operation fully conforming to a mobile telecommunication standard.**

**IPCom will take all necessary efforts to inform ETSI of this declaration. IPCom will also issue a press release with the content of this declaration.**

6.   IPCom hereby expressly invites any potential user seeking a license under IPCom's essential intellectual property rights of the Bosch Mobile Telecommunication Patent Portfolio to enter into bilateral good faith negotiations with IPCom with regard to a license agreement on FRAND terms and conditions. In any case, without limiting the scope of IPCom's declarations according to no. 4 and 5 above these declarations shall not be construed as a waiver of any of its rights resulting from its patents and do not serve as a license or any other right to use, offer to license or pre-contractual obligation to enter into a specific license agreement. Licenses will be negotiated and entered into with each licensee individually. This FRAND-DECLARATION and its effects as well as any legal relationship between IPCom and any potential licensee shall be exclusively determined and governed by German law, unless the parties expressly agree in writing on a different applicable law after bilateral negotiations.

Bernhard Frohwitter
Managing Director
IPCom GmbH & Co. KG

Christoph Schoeller
Managing Director
IPCom GmbH & Co. KG

Exhibit 41



10 Aug 2019 - 16:36:49 (GMT+2)        Username
Sophia Antipolis - France             Password

Login
Sign Up
Forgot your password ?

Declaration    Reporting

# GENERAL DECLARATION ℹ️

History
Current state : Reflected

| **IPR HOLDER/ ORGANISATION** ("DECLARANT") | **REFERENCES** |
|---|---|
| **Legal Name :** IPCom GmbH & Co.KG | **Reference :** GD-201406-001 **external ID :** |

## GENERAL IPR LICENCING DECLARATION

with reference to

○ ETSI STANDARD(S) OR TECHNICAL SPECIFICATION(S) No:        , or

○ ETSI Project(s):        , or

◉ all ETSI STANDARDS AND TECHNICAL SPECIFICATIONS

and with reference to

◉ IPR(s) contained within technical contributions made by the Declarant and/or its AFFILIATES, or

○ any IPRs

☑ This irrevocable undertaking is made subject to the condition that those who seek licences agree to reciprocate

## SIGNATURE

**Authorized person :**              Bernhard Frohwitter
**Title of authorized person**       Director
**Place :**                          Pullach
**Date :**                           11/06/2014

## ATTACHED DOCUMENTS

| Title | DocumentType |
|---|---|
| InitDecl | Initial declaration form |
| 1 | Page 1 of 1, items 1 to 1 of 1. |

*Copyright © ETSI 2011 - All rights reserved* | Disclaimer | User Guide | Helpdesk