SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
MARTIN R. BADER, Cal. Bar No. 222865
mbader@sheppardmullin.com
MATTHEW W. HOLDER, Cal Bar No. 217619
mholder@sheppardmullin.com
MICHAEL K. HEINS. (*pro hac vice* pending)
mheins@sheppardmullin.com
12275 El Camino Real, Suite 200
San Diego, California 92130
Telephone:858.720.8900
Facsimile:858.509.3691

LAI L. YIP, Cal. Bar No. 258029
lyip@sheppardmullin.com
TENAYA RODEWALD Cal. Bar No. 248563
trodewald@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, California 94111
Telephone:415.434.9100
Facsimile:415.434.3947

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LENOVO (UNITED STATES) INC. and MOTOROLA MOBILITY, LLC,<br><br>*Plaintiffs,*<br><br>v.<br><br>IPCOM GMBH & CO., KG,<br><br>*Defendant.* | **Case No. 19-cv-01389-EJD**<br><br>**PLAINTIFFS' MOTION FOR ANTI-SUIT INJUNCTION**<br><br>**DATE:  November 14, 2019**<br>**TIME:  9:00 a.m.**<br>**CTRM: Courtroom 1, 5th Floor**<br>**JUDGE: Honorable Edward J. Davila**<br><br>**Complaint Filed: March 14, 2019**<br>**Trial Date: TBD** |

TO THE COURT, DEFENDANT, AND ITS COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on November 14, 2019 at 9:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Edward J. Davila, located at 280 South 1st Street, San Jose, California 95113, Plaintiffs respectfully request that this Court:  (1) enjoin IPCom from prosecuting the patent infringement action filed in the United Kingdom against Plaintiffs' U.K. affiliates; and (2) enjoin IPCom from instituting against Plaintiffs, Plaintiffs' affiliates, or any of their customers any action alleging infringement of IPCom's claimed 2G, 3G and/or 4G SEPs during the pendency of this action.  The anti-suit injunctive relief sought by Plaintiffs is more fully set forth in the Proposed Order filed herewith.

This motion is based on this notice of motion and supporting memorandum of points and authorities, the supporting declaration of Martin R. Bader, the accompanying exhibits, the proposed order, the reply briefing in further support of this motion and supporting declarations and accompanying exhibits, as well as other written or oral argument that Plaintiffs may present to the Court.

Dated: September 18, 2019          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By   */s/ Martin R. Bader*
MARTIN R. BADER
MATTHEW W. HOLDER
LAI YIP
TENAYA RODEWALD
MICHAEL K. HEINS

*Attorneys for Plaintiffs Lenovo (United States) Inc. and Motorola Mobility, LLC*

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND ................................................................................3

    A.    The Nature and Risks of Standardization ...........................................3

    B.    The Dispute Between the Parties...........................................................5

          1.    IPCom refuses to provide sufficient information during negotiations. ................................................................................5

          2.    IPCom threatens Plaintiffs and their affiliates' customers.....................6

          3.    Plaintiffs request assistance from this Court through this action. ...........6

          4.    IPCom retaliates by filing the U.K. action and seeking an injunction. ..................................................................................7

III.  LEGAL STANDARD ...........................................................................................8

IV.   IPCOM SHOULD BE ENJOINED FROM PROSECUTING SEP INFRINGEMENT CLAIMS AGAINST PLAINTIFFS. ...............................................9

    A.    The Parties and Issues Are the Same.....................................................9

          1.    The parties are functionally the same.....................................9

          2.    This lawsuit will resolve the claims in IPCom's U.K. action. .............11

          3.    This lawsuit will resolve IPCom's threatened infringement actions against Plaintiffs' affiliates' customers...................................13

    B.    Multiple *Unterweser* Factors Justify an Anti-Suit Injunction. ........................14

          1.    IPCom's U.K. action is brought to forum-shop, harass Plaintiffs, and pressure settlement on *supra*-FRAND terms................15

          2.    IPCom's request for injunctive relief from the U.K. court frustrates the purposes of FRAND and important U.S. policies. .........16

          3.    IPCom's U.K. action may result in inconsistent judgments with this Court. ..........................................................................17

    C.    The Impact of an Anti-Suit Injunction on Comity is Tolerable. ....................17

V.    CONCLUSION ..................................................................................................19

1

TABLE OF AUTHORITIES

2

Page(s)

3

<u>Cases</u>

4

*Apple Inc. v. Samsung Elecs. Co.*
   No. 11-CV-01846, 2012 U.S. Dist. LEXIS 67102 (N.D. Cal. May 14,
5
   2012) ...................................................................................................3, 4

6

*Apple v. Motorola*
   757 F.3d 1286 (Fed. Cir. 2014).......................................................16
7

8

*Applied Med. Distrib. Corp. v. Surgical Co. BV*
   587 F.3d 909 (9th Cir. 2009)..........................................8, 9, 11, 19
9

10

*Codex Corp. v. Milgo Electronic Corp.*
   553 F.2d 735 (1st Cir. 1977) ............................................................14
11

12

*E. & J. Gallo Winery v. Andina Licores S.A.*
   446 F.3d 984 (9th Cir. 2006)..................................................*passim*

13

14

*Ericsson, Inc. v. D-Link Sys., Inc.*
   773 F.3d 1201 (Fed. Cir. 2014)........................................................3

15

*Gilbane Fed. v. United Infrastructure Projects Fzco*
   Case No. 14-cv-03254-VC, 2014 WL 4950011 (N.D. Cal. Sep. 24, 2014) ...................10
16

17

*Huawei Techs., Co. v. Samsung Elecs. Co.*
   Case No. 3:16-CV-02787-WHO, 2018 WL 1784065
18
   (N.D. Cal. Apr. 13, 2018) .........................................................*passim*

19

*Kahn v. General Motors Corp.*
   889 F.2d 1078 (Fed. Cir. 1989).......................................................14
20

21

*Katz v. Lear Siegler, Inc.*
   909 F.2d 1459 (Fed. Cir. 1990).......................................................14
22

23

*Lockheed Martin Corp. v. Aceworld Holdings Pty Ltd.*
   No. 19-CV-04074-EJD, 2019 WL 3767553 (N.D. Cal. Aug. 9, 2019) ...................13, 14

24

*Medtronic, Inc. v. Catalyst Research Corp.*
   518 F. Supp. 946 (D. Minn. 1981), *aff'd*, 664 F.2d 660 (8th Cir. 1981) ........................11
25

26

*Microsoft Corp. v. Motorola, Inc.*
   696 F.3d 872 (9th Cir. 2012)...................................................*passim*
27

28

*Microsoft Corp. v. Motorola Inc.*
   795 F.3d 1024 (9th Cir. 2015).........................................................3

*Microsoft Corp. v. Motorola, Inc.*
   871 F. Supp. 2d 1089 (W.D. Wash. 2012), aff'd, 696 F.3d 872 (9th Cir.
   2012) ...............................................................................................8, 15, 17, 19

*In re Nintendo of Am., Inc.*
   756 F.3d 1363 (Fed. Cir. 2014) ..................................................................14

*Quanta Computer, Inc. v. LG Electronics, Inc.*
   553 U.S. 617 (2008) ....................................................................................14

*Realtek Semiconductor Corp. v. LSI Corp.*
   946 F. Supp. 2d 998 (N.D. Cal. 2013) ..........................................................2

*Realtek v. LSI*
   946 F. Supp. 2d at 1006–08 ..........................................................................5

*Seattle Totems Hockey Club, Inc. v. National Hockey League*
   652 F.2d 852 (9th Cir. 1981)...............................................................1, 2, 16

*TCL Comm. Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*
   No. 14-cv-00341, Dkt. 279-1 ..................................................................11, 12

*In re Unterweser Reederei, GmbH*
   428 F.2d 888 (5th Cir. 1970)..........................................................................9

*Zynga, Inc. v. Vostu USA, Inc.*
   816 F. Supp. 2d 824 (N.D. Cal. 2011) ............................................8, 9, 10, 12

Statutes

Patents Act (1977) § 60 ......................................................................................14

Other Authorities

*Current Members*, ETSI, https://www.etsi.org/membership/16-
   membership/23-current-members (last visited Sept. 17, 2019).........................4

F.R.C.P. 12(g)(2) ..................................................................................................2

# I.     **INTRODUCTION**

On March 14, 2019, Plaintiffs filed this action, asking the Court to decide the terms and conditions of a FRAND license to IPCom's portfolio, among other things.  Nearly four months later, IPCom retaliated by suing Plaintiffs' affiliates in the U.K. for alleged infringement of just a single patent out of that same portfolio (of over ███ patents).  (*See* Bader Decl., ¶ 2, Ex. 1).  In the U.K. action, IPCom expressly acknowledges that this U.S. action: (1) was filed first; (2) is broader than the claims in the U.K. action; and (3) requests that this Court set the terms of a global FRAND license to IPCom's portfolio, which includes the single patent asserted in the U.K. case.  Indeed, this case is completely dispositive of the U.K. case, because Plaintiffs agree to be bound by the FRAND determinations of this Court, subject to rights of appeal.  (*See* Dkt. 1, Compl., ¶¶ 1, 67.) IPCom's U.K. action is designed to pressure Plaintiffs to accept *supra*-FRAND terms before this Court has a chance to determine a FRAND license.  IPCom is also hoping to "race to judgment" in the U.K. case, frustrate and compromise the findings of this Court, and otherwise interfere with these proceedings.  The Court should enjoin IPCom from prosecuting its U.K. action and attempting to waste judicial resources.  IPCom should also be enjoined from using piecemeal actions around the world and threats of litigation to pressure Plaintiffs into a *supra*-FRAND license.

This Court has the power to issue an anti-suit injunction against IPCom.  *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006) ("*Gallo*") ("Courts derive the ability to enter an anti-suit injunction from their equitable powers.").  Where a subsequently filed action such as IPCom's is intended to "compromis[e] the court's ability to reach a just result in the case before it free of external pressure on [the party] to enter into a 'holdup' settlement [for a SEP license] before the litigation is complete," an anti-suit injunction is appropriate.  *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 886 (9th Cir. 2012) ("*Microsoft I*").  Anti-suit injunctions are also appropriate when "unnecessary delay and substantial inconvenience and expense to the parties and witnesses" will likely result from adjudicating an issue in two separate actions.  *Seattle Totems Hockey Club, Inc. v.*

*National Hockey League*, 652 F.2d 852, 855 (9th Cir. 1981).  Such injunctions are further appropriate where "separate adjudications could result in inconsistent rulings or even a race to judgment." *Id.*

IPCom's strategy of a "race to judgment" in the U.K. action is evident in its attempts to delay this case, however procedurally improper.  For example, IPCom has indicated it will file serial pleading challenges if its pending motion to dismiss for lack of personal jurisdiction does not prevail.[1]  (Jt. Case Management Statement, Dkt. 31, p. 8:14-19.)  In the U.K. case, IPCom says it is willing to submit to this Court's global FRAND determinations, but only if this Court makes such determinations "without delay."  Setting aside whether such an ultimatum is proper, IPCom is laying bare its strategy of subverting this Court's determinations by racing first to judgment in the U.K. case.  Plaintiffs should not be forced to litigate two overlapping cases at once, in two distant jurisdictions, in a race to potentially inconsistent judgments.  Notably, IPCom's request for an injunction in the U.K. case against willing licensees contravenes IPCom's own FRAND commitment. *Microsoft I*, 696 F.3d at 885 (finding that a SEP holder seeking "injunctive relief against infringement is arguably a remedy inconsistent with the [FRAND] licensing commitment"); *see also Realtek Semiconductor Corp. v. LSI Corp.*, 946 F. Supp. 2d 998, 1006–08 (N.D. Cal. 2013).

Importantly, IPCom's strategy of exerting "external pressure" to influence the outcome of this proceeding is not directed only at Plaintiffs, but even at their affiliates' customers.  IPCom has sent at least two letters to Plaintiffs' affiliates' customers in the U.K., threatening each with SEP infringement litigation, based solely on their sale of standard-compliant products.  This campaign of foreign threats and litigation is designed to pressure Plaintiffs into accepting a *supra*-FRAND license before this Court has had the opportunity to set the terms of a FRAND license, and evade U.S. antitrust law.  Under prevailing Ninth Circuit law, Plaintiffs are entitled to seek a FRAND license in this case free from such "external pressure" and "holdup" from foreign infringement lawsuits.

---

[1] This would be procedurally improper at least due to F.R.C.P. 12(g)(2) waiver.

1       The Court should grant this Motion and: (1) enjoin IPCom from prosecuting its

2   lawsuit in the U.K against Plaintiffs' affiliates; and (2) enjoin IPCom from filing further

3   SEP infringement actions against Plaintiffs, their affiliates, or their customers while the

4   FRAND action here remains pending.  The anti-suit injunctive relief sought by Plaintiffs is

5   more fully set forth in the Proposed Order filed herewith.

6   **II.     FACTUAL BACKGROUND**

7           **A.     The Nature and Risks of Standardization**

8       IPCom allegedly owns SEPs that are subject to obligations imposed by various

9   standard-setting organizations ("SSOs").  These include the Third Generation Partnership

10  Project ("3GPP"), a global initiative that unites seven telecommunications SSOs, including

11  the European Telecommunications Standards Institute ("ETSI").  (Dkt. 1, ¶¶ 3-4.)  While

12  the development of 2G, 3G, and 4G technology standards (*i.e.*, those at issue in this

13  litigation) has many benefits, it also carries the risk that SEP owners will engage in

14  anticompetitive behavior.  *See Microsoft Corp. v. Motorola Inc.*, 795 F.3d 1024, 1030–31

15  (9th Cir. 2015) ("*Microsoft II*").

16      In particular, once a standard is widely adopted, SEP holders obtain substantial

17  leverage over manufacturers of standard-compliant products.  *See id.* at 1031.  By

18  definition, to manufacture standard-compliant products without using the SEPs is not

19  possible, so manufacturers are not free to use other technology.  This provides SEP holders

20  with monopoly power.  *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846, 2012 U.S.

21  Dist. LEXIS 67102, at *23-27 (N.D. Cal. May 14, 2012).  SEP holders can abuse that

22  power by demanding more for a license than the patented technology would be worth had it

23  not been adopted by the SSO.  *See Microsoft II*, 795 F.3d at 1031.  The tactic of

24  withholding a license unless and until a manufacturer agrees to pay an unduly high royalty

25  rate for a SEP is referred to as "hold-up."  *Id.*; *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d

26  1201, 1209 (Fed. Cir. 2014).  To mitigate the risk that SEP holders will extract more than

27  the fair value of their patented technology, SSOs require SEP holders to declare potentially

28  essential patents and commit to license those patents on FRAND terms and conditions.  For

example, the ETSI IPR Policy requires SEP owners to commit to provide "irrevocable licenses on fair, reasonable and nondiscriminatory ('FRAND') terms and conditions." (Bader Decl., ¶ 3, Ex. 2 at § 6.1.)  "ETSI members participating in 3GPP must comply with the ETSI IPR policy."  *Apple Inc.*,  2012 U.S. Dist. LEXIS 67102 at *12.

IPCom is a member of 3GPP and ETSI.  *See Current Members*, ETSI, https://www.etsi.org/membership/16-membership/23-current-members (last visited Sept. 17, 2019).  IPCom has made binding, irrevocable commitments to license its SEPs on FRAND terms and conditions.  Specifically, on June 11, 2014, IPCom submitted a general declaration to ETSI (and to 3GPP by way of ETSI) stating that it is prepared to grant irrevocable licenses under its standard-essential IPR in accordance with Clause 6.1 of the ETSI IPR Policy, which requires licensing on FRAND terms and conditions.  (*Id.*, ¶ 4, Ex. 3.)  IPCom is also bound by the FRAND commitments of its predecessor-in-interest as to many of its SEPs, Robert Bosch GmbH.  (*Id.*, ¶ 5, Ex. 4 ("Robert Bosch GmbH herewith confirms its commitment to the ETSI IPR Policy, i.e. in particular its preparedness to grant irrevocable licenses under its IPR on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy . . . .").)  After acquiring the Bosch portfolio, IPCom declared to the European Commission that "it is fully prepared and ready to take over vis-a-vis third parties any applicable licensing undertaking of Bosch vis-a-vis ETSI to grant irrevocable licenses to patents of the Bosch Mobile Telecommunication Patent Portfolio on a fair, reasonable and nondiscriminatory basis . . . ."  (*Id.*, ¶ 6, Ex. 5.)

However, the mere existence of the FRAND commitment alone, without judicial enforcement, does not protect against the efforts of some SEP owners to act in an anti-competitive manner.  As the Federal Trade Commission has explained, SEP owners seeking to inappropriately exploit the market power and value added solely by virtue of standardization "may have especially severe consequences for innovation and competition in the context of standardized technology."  (*Id.*, ¶ 7, Ex. 6 at p. 22.)  This pursuit of overcompensation would raise the price to consumers or even "threaten to undermine the collaborative innovation that can result from the standard setting process."  (*Id.*, p. 28.)

Courts and commentators also have recognized that "injunctive relief against infringement is arguably a remedy inconsistent with the [FRAND] licensing commitment." *Microsoft I,* 696 F.3d at 885; *Realtek v. LSI*, 946 F. Supp. 2d at 1006–08; Bader Decl., ¶ 8, Ex. 7 at pp. 6–7 ("Patent holders should not generally be allowed to obtain injunctions in the presence of a FRAND commitment.  As a matter of economics, injunctions are inimical to some of the fundamental objectives of FRAND, such as fostering broad licensing of SEPs and adoption of the standard.").  This inconsistency arises from a recognition that the mere threat of injunctive relief gives the SEP owner additional power to hold up implementers.  *Microsoft I*, 696 F.3d at 886 (the threat of injunctive relief "compromis[es] the court's ability to reach a just result in the case before it free of external pressure on [the accused infringer] to enter into a 'holdup' settlement before the litigation is complete"); Bader Decl., ¶ 8, Ex. 7 at p. 7 ("An injunction provides a means for a patent holder to exercise the additional market power gained by inclusion of a patent in a standard, and the threat of an injunction places at risk the investment and ongoing profits of firms using the standard.  This allows the patent holder to engage in hold-up and ask for payment in excess of the *ex ante* value of the patent.").

**B.     The Dispute Between the Parties**

**1.     IPCom refuses to provide sufficient information during negotiations.**

Plaintiffs and their affiliates are leading providers of wireless telecommunications devices, including tablets, laptops, and mobile phones, in the United States and around the world.  (Dkt. 1, ¶ 1.)  IPCom purports to hold a large portfolio of SEPs related to the 2G, 3G, and/or 4G standards.  (*Id.*, ¶ 3.)  Plaintiffs spent at least a year negotiating in good faith in an effort to reach a license to IPCom's claimed SEPs on FRAND terms.  (*Id.*, ¶¶ 48-57.)  IPCom demanded *supra*-FRAND royalties while simultaneously refusing to provide Plaintiffs with the necessary information to evaluate these exorbitant royalty demands, such as comparable licenses and relevant claim charts.  (Dkt. 26-6, ¶¶ 7–14.)  IPCom even demanded that Plaintiffs pay royalties on expired and abandoned patents and applications.

1   (Dkt. 1, ¶¶ 8, 51.)

2          **2.     IPCom threatens Plaintiffs and their affiliates' customers.**

3          Notwithstanding Plaintiffs' good faith efforts to negotiate a license, in February

4   2019, IPCom sent threatening letters to at least two of Plaintiffs' affiliates' customers in the

5   U.K. (Dkt. 26-6, ¶ 14.) These letters alleged infringement of IPCom's patents by Motorola

6   phones. (*Id.*) The letters also said that those customers were "putting [their] company at

7   serious legal and financial risks" by selling such phones. (Dkt. 18-8; 18-9.) They noted

8   that "even if your company does not actually manufacture smartphone devices that utilize

9   the standard essential patents of IPCom, any unauthorized importation, use, offering for

10  sale, or sale of such devices can still constitute an infringement of IPCom's patents under

11  UK law." (*Id.*) IPCom also threatened Plaintiffs with litigation in the U.S., the U.K. and

12  elsewhere unless Plaintiffs immediately acquiesced to IPCom's *supra*-FRAND demands

13  and its unreasonable requests to license even expired and abandoned patents. (Dkt. 26, Ex.

14  27, at p.1.)

15         **3.     Plaintiffs request assistance from this Court through this action.**

16         IPCom's unreasonable licensing demands, threats against Plaintiffs and their

17  affiliates' customers, and refusal to provide information necessary to properly evaluate its

18  proposed license, left Plaintiffs with no choice but to seek help from this Court. On March

19  14, 2019, Plaintiffs filed the present action. (Dkt. 1.) In so doing, Plaintiffs sought the

20  Court's assistance in resolving the global dispute with IPCom by, among other things,

21  setting the terms and conditions of a FRAND license, and upholding U.S. antitrust law.

22  (*See* Dkt. 1, ¶¶ 66–67 (seeking declaratory judgment regarding "what constitutes FRAND

23  terms and conditions for a license to IPCom's alleged 2G, 3G, and 4G SEPs, with those

24  terms and conditions being imposed on the parties").) Similarly, the Prayer for Relief asks

25  the Court to "[a]djudge and decree that Plaintiffs <u>and all of their worldwide affiliates</u> are

26  entitled to a license from IPCom . . . under FRAND terms and conditions pursuant to

27

28

IPCom's obligations to ETSI."[2]  (*Id.*, Prayer for Relief, at B; *see also id.*, Prayer for Relief, at C (requesting that the Court "[a]djudge, set, and decree the FRAND terms and conditions to which Plaintiffs are entitled under IPCom's obligations to ETSI for a license to IPCom's 2G, 3G, and 4G SEPs, so that Plaintiffs may obtain a FRAND license on those terms").)

### 4. IPCom retaliates by filing the U.K. action and seeking an injunction.

On July 2, 2019, nearly four months after Plaintiffs filed this U.S. action, IPCom filed a lawsuit in the U.K. against Plaintiffs' U.K. affiliates, Lenovo Technology (United Kingdom) Limited and Motorola Mobility UK LTD.  (Bader, ¶ 2, Ex. 1.)  Despite purporting to hold a portfolio of over ███ SEPs, IPCom's U.K. complaint sought a declaration that a single patent, European Patent No. 1841268B2 (the "'268 patent"), is essential to the 3G standard, and that it has been infringed by Plaintiffs' U.K. affiliates. (*Id.*, p. 3; *see* Dkt. 26, Ex. 28, Appx. A.)  In the U.K. case, IPCom also seeks an injunction against Plaintiffs' U.K. affiliates, "either by themselves or through their agents, affiliates or third parties or howsoever otherwise," from infringing the '268 patent.  (*Id.*)

IPCom's U.K. complaint admits that its portfolio, including the asserted '268 patent, is "the subject of a General IPR Licensing Declaration dated 11th June 2014" in which IPCom irrevocably declared that it is "prepared to grant irrevocable licenses . . . on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy."  (*Id.*, p. 7, ¶¶ 11-12.)  As IPCom acknowledges, "Clause 6.1 of the ETSI IPR Policy requires an SEP owner to offer to grant licences on terms that are fair, reasonable and non-discriminatory ('**FRAND**') (the '**FRAND Obligation**')."  (*Id.*, Ex. 1, p. 7, ¶ 12 (bold in original).)  Despite acknowledging its duty to license the '268 patent on FRAND terms and conditions, IPCom's U.K. action seeks "[a]n <u>injunction to restrain Defendants</u>" from practicing its purported SEP.  (*Id.*, p. 3.)

Notably, IPCom's U.K. complaint asks for an "undertaking" from Plaintiffs'

---

[2] In quotations in this brief, underlining is added for emphasis, and internal quotations and citations are omitted.

1   affiliates that if the '268 patent is found to be valid, essential, and infringed, "they will,

2   without delay, enter into a license covering all of the Defendants' acts of infringement on

3   terms deemed to be FRAND <u>in the U.S. FRAND proceeding</u>." (*Id.*, Ex. 1, p. 3.)  In other

4   words, IPCom acknowledges on the face of its complaint that the U.K. action is entirely

5   redundant of the relief Lenovo and Motorola have already requested in this U.S. action.

6   The U.K. complaint is directed to only one of IPCom's patents (out of over █████), while

7   this U.S. action is designed to globally resolve the dispute regarding IPCom's entire

8   portfolio.  Despite demanding in the U.K. action that Plaintiffs prosecute this action

9   "without delay," IPCom seeks to delay this action with a strategy of serial pleading

10  challenges.  (Dkt. 31, p. 8:14-19.)

11  ## III.   LEGAL STANDARD

12          This Court has the power to enjoin parties from proceeding with an action in the

13  courts of a foreign country.  *See Microsoft I,* 696 F.3d at 880–81; *Gallo*, 446 F.3d at 989.

14  "Such injunctions allow the court to restrain a party subject to its jurisdiction from

15  proceeding in a foreign court in circumstances that are unjust." *Gallo*, 446 F.3d at 989.

16  Anti-suit injunctions are appropriate when a party's foreign actions "frustrate[] this court's

17  ability to adjudicate issues properly before it" or when "[w]ithout the issuance of an anti-

18  suit injunction, the integrity of the action before this court will be lessened." *Microsoft*

19  *Corp. v. Motorola, Inc.*, 871 F. Supp. 2d 1089, 1100 (W.D. Wash. 2012), *aff'd*, 696 F.3d

20  872 (9th Cir. 2012).  The Ninth Circuit emphasizes that district courts have "a duty to

21  protect their legitimately conferred jurisdiction to the extent necessary to provide full

22  justice to litigants." *Gallo*, 446 F.3d at 995.

23          A request for an anti-suit injunction is evaluated under "the *Gallo* test," not the

24  traditional test for a preliminary injunction.  *See Microsoft I*, 696 F.3d at 881 (addressing

25  only the *Gallo* factors in a request for anti-suit injunction in a global FRAND dispute);

26  *Applied Med. Distrib. Corp. v. Surgical Co. BV*, 587 F.3d 909, 913 (9th Cir. 2009) (same);

27  *Zynga, Inc. v. Vostu USA, Inc.*, 816 F. Supp. 2d 824, 827 (N.D. Cal. 2011) ("To obtain an

28  anti-suit injunction, the applicant is not required to show a likelihood of success on the

1  merits of the underlying claim. Rather, it need only demonstrate that the factors specific to

2  an anti-suit injunction weigh in its favor."); *id.* at 827 n.4 (noting that "the absence of any

3  mention of the *Winter* factors [for preliminary injunction] by the *Applied Medical*

4  *Distribution* court suggests" that consideration of those factors for an anti-suit injunction is

5  unnecessary"); *see also Huawei Techs., Co. v. Samsung Elecs. Co.*, Case No. 3:16-CV-

6  02787-WHO, 2018 WL 1784065, *4 (N.D. Cal. Apr. 13, 2018) ("*Huawei*") ("The Ninth

7  Circuit's analysis [in *Microsoft*] convinces me that I need only focus on the three-part

8  inquiry under *Gallo* . . . .").

9        Under the *Gallo* test, the court first determines "whether or not the parties and the

10  issues are the same" in both actions, and whether the current action is dispositive of the

11  action to be enjoined.  *Microsoft I*, 696 F.3d at 881 (citing *Gallo*, 446 F.3d at 991); *see also*

12  *Applied Med.*, 587 F.3d at 914–15 (explaining the first step of the *Gallo* test is a "functional

13  inquiry concerning dispositiveness," not a requirement that the claims be identical).

14  Second, the court determines whether at least one of the "*Unterweser* factors" applies,

15  asking whether the litigation to be enjoined would "(1) frustrate a policy of the forum

16  issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's *in rem*

17  or *quasi in rem* jurisdiction; or (4) where the proceedings prejudice other equitable

18  considerations."  *Microsoft I*, 696 F.3d at 881-82; *In re Unterweser Reederei, GmbH*, 428

19  F.2d 888, 890 (5th Cir. 1970).  Finally, the court assesses whether the proposed injunction's

20  impact on comity is tolerable.  *See Microsoft I*, 696 F.3d at 881.  However, "[c]omity is less

21  likely to be threatened in the context of a private contractual dispute than in a dispute

22  implicating public international law or government litigants."  *Id.* at 887.

23  **IV.  IPCOM SHOULD BE ENJOINED FROM PROSECUTING SEP**

24       **INFRINGEMENT CLAIMS AGAINST PLAINTIFFS.**

25      **A.**  The Parties and Issues Are the Same.

26         1.  The parties are functionally the same.

27      "The threshold consideration for a foreign anti-suit injunction is whether or not the

28  parties and the issues are the same in both the domestic and foreign actions, and whether or

not the first action is dispositive of the action to be enjoined." *Huawei,* 2018 WL 1784065 at *6. "Perfect identity of parties is not required for an anti-suit injunction." *Zynga*, 816 F. Supp. 2d at 828. Rather, the relevant inquiry is whether the parties are "affiliated in such a way that their interests coincide." *Id.*; *see also Gilbane Fed. v. United Infrastructure Projects Fzco*, Case No. 14-cv-03254-VC, 2014 WL 4950011, at *5 (N.D. Cal. Sep. 24, 2014) (finding identity of the parties where their "interests are practically identical and are well represented by each other"). "The consideration should be approached functionally, not in a technical or formal sense, but in the sense that all the issues in the foreign action can be resolved in the local action." *Huawei,* 2018 WL 1784065 at *6.

The parties in the two actions are functionally the same. IPCom is both the defendant in this case and the plaintiff in the U.K. action, so there can be no dispute that the IPCom entity is the same in both actions. Meanwhile, the defendants in the U.K. action are affiliates of Plaintiffs, and all are companies within the Lenovo group of companies. (Bader Decl., ¶ 9, Ex. 8, pp. 288-289.) One defendant in the U.K. action is Lenovo Technology (United Kingdom) Limited ("Lenovo U.K."), which is responsible for the wholesale of personal computers and mobile telecommunications equipment in the U.K., including devices practicing the 2G, 3G, and/or 4G standards. (*Id.*, ¶ 10, Ex. 9.) Before January 2018 (and after its acquisition into the Lenovo group of companies), Motorola Mobility UK Ltd. ("Motorola U.K."), the other defendant in the U.K. action, was responsible for sales of mobile telecommunications devices. (*Id.*, ¶ 11, Ex. 10.) After January 2018, Lenovo U.K. assumed those responsibilities, with Motorola U.K. continuing any research and development activities. *Id.* Notably, in draft license agreements covering worldwide sales of the Lenovo group of companies, including the two U.K. companies named in IPCom's U.K. action, IPCom identified Plaintiff Lenovo (United States) Inc. as the licensee. (Dkt. 26, Ex. 15, p. 1; Dkt. 26, Ex. 28, p. 1.)

Under similar circumstances, courts have held that the "same party" element of the test is satisfied. For example, in *Microsoft*, the Ninth Circuit found the parties were the same even though Motorola's lawsuit in Germany targeted two of Microsoft's foreign

1   subsidiaries, which were not parties in the U.S. litigation.  *See Microsoft I*, 696 F.3d at 879

2   n.7; *see also Huawei*, 2018 WL 1784065 at *6.  As another example, in *TCL v. Ericsson*,

3   the district court enjoined Ericsson's infringement actions against TCL's foreign

4   subsidiaries responsible for sales in local markets.  *See TCL Comm. Tech. Holdings, Ltd. v.*

5   *Telefonaktienbolaget LM Ericsson*, No. 14-cv-00341, Dkt. 279-1, p. 5 (C.D. Cal. June 29,

6   2015) (attached as Ex. 11 to Bader Decl.).  Similarly here, the parties in the U.S. and U.K.

7   actions are functionally the same and satisfy this threshold consideration for an anti-suit

8   injunction.

9                    2.    This lawsuit will resolve the claims in IPCom's U.K. action.

10           In deciding a request for an anti-suit injunction, a court should assess "whether the

11  issues are the same not in a technical or formal sense, but [rather] in the sense that all the

12  issues in the foreign action . . . can be resolved in the local action."  *Microsoft I,* 696 F.3d at

13  882–83; *Applied Med.*, 587 F.3d at 915 ("[T]o the extent the domestic action is capable of

14  disposing of all the issues in the foreign action . . . , the issues are meaningfully the same.").

15  In *Microsoft I*, the Ninth Circuit affirmed the anti-suit injunction issued by the district court,

16  agreeing that Microsoft's RAND claim was capable of resolving Motorola's infringement

17  claim in Germany.[3]  *See id.* at 883–84.  This was because Motorola's licensing offers

18  included the German patents and Motorola promised to license those German patents on

19  RAND terms.  *See id.*; *see also Medtronic, Inc. v. Catalyst Research Corp.*, 518 F. Supp.

20  946 (D. Minn. 1981), *aff'd*, 664 F.2d 660 (8th Cir. 1981) (issuing an anti-suit injunction

21  against the enforcement of foreign patents based on a contract between the parties not to

22  enforce the patents).

23           Other courts have likewise sought to avoid piecemeal infringement suits on

---

24  [3] Certain SSOs use the term RAND ("reasonable and non-discriminatory") instead of

25  FRAND.  These terms are functionally equivalent.  (*See* Bader Decl., ¶ 13, Ex. 12 at 50 n. 1

26  ("In some contexts (e.g., 802.11), the term "RAND" ("reasonable and nondiscriminatory")

27  is used instead of FRAND. As economists, we view the two terms as having the same

28  meaning.")).

1  individual SEPs, in favor of global resolutions of FRAND licensing disputes.  In *TCL,* the

2  court granted an anti-suit injunction to prevent Ericsson from pursuing foreign patent

3  claims on individual SEPs because "the [domestic] FRAND action should resolve [the

4  parties'] global licensing dispute." *TCL v. Ericsson*, No. 14-cv-00341, Dkt. 279-1, p. 5.  In

5  *Huawei*, the court found that the parties' competing breach of contract claims under

6  FRAND controlled the parties' disputes and thus Samsung's claims filed in California were

7  "dispositive of Huawei's Chinese actions." *Huawei*, 2018 WL 1784065 at *7–8.  In short,

8  foreign infringement actions regarding individual SEPs fall within the "contractual

9  umbrella" of global FRAND claims. *Microsoft I*, 696 F.3d 872, 883 (9th Cir. 2012); *see*

10  *Zynga*, 816 F. Supp. 2d at 829 (noting that "most cases upholding the use of antisuit

11  injunctions . . . arise from a contract and thus raise the specter of inconsistent interpretations

12  of the same document").

13       Similarly, IPCom's U.K. patent infringement case falls under the "contractual

14  umbrella" of Plaintiff's FRAND breach of contract claims here, and therefore will be

15  resolved in this action. *Microsoft I*, Inc., 696 F.3d at 883.  IPCom's U.K. claims relate to

16  the alleged essentiality and infringement of a single patent out of a portfolio purportedly

17  containing over ███ patents.  (Bader Decl., ¶ 2, Ex. 1.)  IPCom admits that it is bound by

18  both its own FRAND commitments to ETSI and 3GPP, as well as the FRAND

19  commitments of the original assignees of its patents.  (*Id.*, pp. 7–8, ¶¶ 10-21 ("The IPCom

20  Portfolio, including EP 268, is the subject of a General IPR Licensing Declaration dated

21  11th June 2014 . . . ."))  Plaintiffs' complaint in this action is based on IPCom's breach of

22  those contractual FRAND commitments and violation of antitrust laws.  (Dkt. 1, ¶¶ 59–64.)

23  As in *Microsoft* and *Huawei*, "the availability of injunctive relief for [alleged infringement

24  of IPCom's] SEPs depends on the breach of contract claims" at issue in this action.

25  *Huawei*, 2018 WL 1784065 at *8; *Microsoft I*, 696 F.3d at 883.

26       Moreover, Plaintiffs here seeks a declaration that they "and all of their worldwide

27  affiliates are entitled to a license from IPCom . . . under FRAND terms and conditions

28  pursuant to IPCom's obligations to ETSI" and an adjudication setting the FRAND terms for

such a license.  (Dkt. 1, Prayer for Relief, at B & C.)  Plaintiffs have agreed to be bound by the FRAND determinations of this Court, subject to rights of appeal.  (*See* Dkt. 1, Compl., ¶¶ 1, 67.)  Therefore, when this Court determines the FRAND terms and conditions of the license to Plaintiffs and their worldwide affiliates, IPCom's U.K. infringement claims will be moot.  IPCom's U.K. complaint admits this.  (*See* Bader Decl., ¶ 2, Ex. 1, p. 3 (seeking an undertaking that, if the '268 patent is found valid, essential, and infringed, Defendants will "enter into a licence covering all of the Defendants' acts of infringement on terms deemed to be FRAND <u>in the US FRAND Proceedings</u>").)  In other words, IPCom admits that this case is capable of resolving all of the issues in IPCom's U.K. action.

3.      <u>This lawsuit will resolve IPCom's threatened infringement actions against Plaintiffs' affiliates' customers.</u>

If the Court enjoins IPCom from proceeding with its U.K. action, IPCom may try to circumvent this by suing Plaintiffs' or their affiliates' customers for patent infringement, by virtue of their sale of standard-compliant devices.  IPCom has clearly communicated its willingness to do this, by sending cease-and-desist letters to at least two of Plaintiffs' affiliates' customers.  (Dkt. 18-8; 18-9.)  Threats of litigation, even if actual litigation has not commenced, support an anti-suit injunction.  *See Lockheed Martin Corp. v. Aceworld Holdings Pty Ltd.*, No. 19-CV-04074-EJD, 2019 WL 3767553, at *3 (N.D. Cal. Aug. 9, 2019) (granting anti-suit injunction because defendants "threatened on multiple occasions to sue Lockheed in Australia under Australian law").  Part of the concern is practical:  "If the court does not issue an anti-suit injunction, Defendants may well bring the threatened claims against Lockheed [in Australia]. Then Lockheed will certainly return to this court to, once again, request an anti-suit injunction. Such a result would waste the resources of the parties and the U.S. and Australian courts, and it would cause a greater harm to international comity."  *Id.* at *4.

As in *Lockheed*, IPCom has expressly threatened to sue Plaintiffs' affiliates' customers in the U.K.  By letter, IPCom told those customers that "you may unknowingly be putting your company at <u>serious legal and financial risks</u> by dealing with **unlicensed**

products." (Dkts. 17-11, 18-8, 18-9 (bold in original).) *Id.* IPCom's letters then say that the customers' "unauthorized importation, use, offering for sale, or sale of such devices can [] constitute an <u>infringement</u> of IPCom's patents under UK law." (*Id.*) IPCom invokes specific U.K. law in its threats of infringement against the customers: "Disposing of or offering to dispose of an unlicensed product which <u>infringes a Patent</u> is contrary to <u>section 60 of the Patents Act (1977)</u>." (*Id.*)

Enjoining any lawsuits by IPCom against Plaintiffs' or their affiliates' customers would also be appropriate under the "customer suit exception" doctrine. Under this doctrine, courts enjoin lawsuits against a manufacturer's customer when there is a pending proceeding involving the manufacturer. *See In re Nintendo of Am., Inc.*, 756 F.3d 1363, 1365 (Fed. Cir. 2014); *Katz v. Lear Siegler, Inc.*, 909 F.2d 1459, 1464 (Fed. Cir. 1990). "The customer suit exception is based on the manufacturer's presumed greater interest in defending its actions against charges of patent infringement; and to guard against possibility of abuse." *Kahn v. General Motors Corp.*, 889 F.2d 1078, 1081 (Fed. Cir. 1989). "At the root of the preference for a manufacturer's declaratory judgment action is the recognition that, in reality, the manufacturer is the true defendant in the customer suit." *Codex Corp. v. Milgo Electronic Corp.*, 553 F.2d 735, 737–38 (1st Cir. 1977). Moreover, if this action results in a FRAND license to IPCom's SEPs for Plaintiffs and their worldwide affiliates, it will also resolve any claim against their customers from the sale of Plaintiffs' products. *See Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 625 (2008) ("The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item.")

**B.      Multiple *Unterweser* Factors Justify an Anti-Suit Injunction.**

The second step of the framework followed in *Microsoft I* is to determine if any of the *Unterweser* factors apply. While only one factor needs to apply for injunctive relief to be appropriate (*Gallo*, 446 F.3d at 991), multiple *Unterweser* factors apply here. In particular, IPCom's U.K. action is vexatious and oppressive, will frustrate U.S. law and policy, and prejudices equitable considerations.

1               **1.**       **IPCom's U.K. action is brought to forum-shop, harass Plaintiffs,**

2                         **and pressure settlement on *supra*-FRAND terms.**

3       IPCom waited nearly four months after Plaintiffs filed this U.S. action, before filing

4 its case in the U.K.  (Bader Decl., ¶ 2, Ex. 1.)  Such timing "raises concerns of forum

5 shopping and duplicative and vexatious litigation."  *Microsoft*, 871 F. Supp. 2d at 1100,

6 *aff'd Microsoft I*, 696 F.3d at 885–86 (granting anti-suit injunction where six-month delay

7 in filing foreign action "raises concerns of forum shopping and duplicative and vexatious

8 litigation").  Moreover, despite claiming a portfolio of over ███ patents, IPCom's U.K.

9 complaint is limited to just one patent.  (Bader Decl., ¶ 2, Ex. 1.)  This also exacerbates

10 concerns regarding "forum shopping and duplicative and vexatious litigation."  *Microsoft*,

11 871 F. Supp. 2d at 1100 ("The court's concerns over forum shopping and duplicative and

12 vexatious litigation are heightened by the fact that Motorola's commitments to the ITU

13 involved approximately 100 Motorola-owned patents, yet Motorola invoked the German

14 Action implicating only two (the European Patents) of these patents and sought injunctive

15 relief in Germany before this court could adjudicate that precise issue.").

16       For the U.K. court to adjudicate a single patent out of IPCom's portfolio does not

17 resolve the entire contractual dispute at issue in this case, IPCom's threatened lawsuits

18 against Plaintiffs' affiliates' customers, or IPCom's antitrust violations.  Accordingly,

19 IPCom's U.K. litigation appears designed to harass Plaintiffs, drive up their litigation cost,

20 and force a settlement on *supra*-FRAND terms through the specter of injunctive relief in the

21 U.K.  Seeking an injunction against willing licensees to gain leverage in licensing

22 negotiations, as IPCom is doing here, is precisely the kind of "hold up" that FRAND

23 obligations and U.S. antitrust laws were designed to prevent.  *Microsoft I*, 696 F.3d at 886

24 (finding such conduct improperly compromises "the court's ability to reach a just result in

25 the case before it free of external pressure on [Plaintiffs] to enter into a 'holdup' settlement

26 before the litigation is complete.").  "Without the issuance of an anti-suit injunction, the

27 integrity of the action before this court will be lessened."  *Microsoft*, 871 F. Supp. 2d at

28 1100.

## 2. IPCom's request for injunctive relief from the U.K. court frustrates the purposes of FRAND and important U.S. policies.

Courts have repeatedly found that foreign litigation will frustrate domestic policy when defendants use it to evade contractual obligations or compliance with U.S. law.  *See Seattle Totems,* 652 F.2d at 853, 856 (where plaintiff brought U.S. litigation alleging that certain contracts violated U.S. antitrust law, district court appropriately enjoined defendants from bringing foreign suit seeking damages under the contracts); *Gallo*, 446 F.3d at 991–92.  Seeking injunctive relief against a willing licensee is antithetical to a SEP holder's FRAND commitments.  *See, e.g., Microsoft I*, 696 F.3d at 885 (upholding order preventing enforcement of German injunction, because injunctive relief was inconsistent with the contractual RAND obligation); *Apple v. Motorola*, 757 F.3d 1286, 1332 (Fed. Cir. 2014); Bader Decl., ¶ 8, Ex. 7 at pp. 6–7 ("As a matter of economics, injunctions are inimical to some of the fundamental objectives of FRAND, such as fostering broad licensing of SEPs and adoption of the standard.").  In *Huawei v. Samsung*, the district court likewise granted a motion for anti-suit injunction in view of the important policy of preserving the "court's ability to determine the propriety of injunctive relief."  *Huawei*, 2018 WL 1784065, at *10.

Plaintiffs have clearly demonstrated they are willing licensees by first negotiating a license with IPCom and, when negotiations failed, asking this Court to set the FRAND terms and conditions to a license for IPCom's SEPs.  Therefore, IPCom's request for injunctive relief against Plaintiffs' affiliates are inconsistent with, and designed to frustrate, its contractual FRAND commitments and important U.S. policies, providing further justification for an anti-suit injunction.

An anti-suit injunction is also proper here as IPCom is attempting to escape its contractual commitments and antitrust laws by threatening a U.K. injunction to pressure Plaintiffs to accept *supra*-FRAND terms.  *See, e.g., Seattle Totems*, 652 F.2d at 853, 856.  An anti-suit injunction upholds U.S. law and policy by preventing IPCom from using foreign injunctive relief to extract a license from Plaintiffs on *supra*-FRAND terms and thereby abusing its dominant position.

### 3. IPCom's U.K. action may result in inconsistent judgments with this Court.

An anti-suit injunction is warranted against IPCom's U.K. action because it poses a serious risk of inconsistent judgments. *See Microsoft,* 871 F. Supp. 2d at 1100 (granting anti-suit injunction in view of "court policies against avoiding inconsistent judgments"). IPCom's U.K. complaint acknowledges that its claims are wholly subsumed within the claims presented in this U.S. action, which was filed first and is dispositive of the U.K. claims. (*See* Bader Decl., ¶ 2, Ex. 1, p. 3 (requesting "in the event that the US FRAND Proceedings fail to settle the terms of a FRAND licence (without delay or at all) covering all of the Defendants' acts of infringement found by the [U.K. court]," that they "submit to the [U.K. court] for a determination of an appropriate licence on FRAND terms to cover all such outstanding acts of infringement and enter into that licence"). IPCom's foreign action is therefore a professed attempt to forum shop and "race to judgment" in its preferred forum, the U.K. court, if this Court does not proceed "without delay." This raises the very real prospect that while this U.S. action is proceeding, the U.K. court will render a potentially inconsistent judgment regarding FRAND terms for IPCom's SEPs. The lawsuits threatened against Plaintiffs' affiliates' customers likewise would present a risk of inconsistent judgments for similar reasons.

Any of the factors discussed above, by itself, "may justify a foreign anti-suit injunction." *Microsoft I*, 696 F.3d at 882 n.9. Because multiple *Unterweser* factors apply, Plaintiffs' request for an anti-suit injunction should be granted.

### C. The Impact of an Anti-Suit Injunction on Comity is Tolerable.

The final step of the *Gallo* analysis is to address whether the injunction's "impact on comity is tolerable." *Gallo*, 446 F.3d at 991. "Comity is the 'recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.'" *Gallo*, 446 F.3d at 994, citations omitted. Comity is "neither a matter of absolute obligation . . . nor of mere

courtesy and good will." *Id.*  The Ninth Circuit has made clear that private contractual

disputes like the one here have little, if any, impact on comity.  *See Microsoft I*, 696 F.3d at

887 (citing *Gallo*, 446 F.3d at 994) ("[C]omity is less likely to be threatened in the context

of a private contractual dispute than in a dispute implicating public international law or

government litigants.").  The anti-suit injunction requested by Plaintiffs in this case would

have little to no impact on comity.  This is a dispute between companies based on the

contractual promise made by IPCom and its predecessors-in-interest.  That promise was to

license SEPs to implementers like Plaintiffs on FRAND terms and conditions.  IPCom's

breach of that promise violates both IPCom's contractual commitments and U.S. law.  The

purpose of this U.S. action is to enforce IPCom's obligation to license its SEPs to Plaintiffs

and establish the FRAND terms and conditions for such a license.

Further, an anti-suit injunction against a duplicative, later-filed action in a foreign

court has little impact on comity.  As the Ninth Circuit has stated, "[t]he order in which the

domestic and foreign suits were filed, although not dispositive, may be relevant to this

determination depending on the particular circumstances."  *Microsoft I*, 696 F.3d at 887

(citing *Applied Med.*, 587 F.3d at 921) (where "subsequent filing" of foreign action "raises

the concern that [party] is attempting to evade the rightful authority of the district court,"

enjoining foreign action would not "intolerably impact comity").

The requested anti-suit injunction merely prevents IPCom from using later-filed

piecemeal patent infringement actions, accompanying injunctive requests, and the threat of

litigation against Plaintiffs' or their affiliates' customers for improper purposes.  These

would include harassing Plaintiffs into capitulating to a *supra*-FRAND license before this

first-filed action can adjudicate the FRAND terms of the license.  Under these

circumstances, the impact on comity is clearly not "so great as to be intolerable."

*Microsoft*, 696 F.3d at 886.  Notably, the U.K. action is still in its very early stages: as of the

filing of this motion, defendants in the U.K. case have not yet filed their response to

1    IPCom's complaint.[4]

2    **V.    <u>CONCLUSION</u>**

3         This Court has the power, and should exercise that power, to grant an anti-suit

4    injunction against IPCom.  This action was filed first and will be dispositive of the U.K.

5    claims.  Plaintiffs here seek a worldwide license to IPCom's entire portfolio, which

6    includes the lone patent IPCom selectively asserts in the U.K. case.  IPCom should not be

7    permitted to force both Plaintiffs and this Court through parallel litigation with the U.K.

8    court that may result in inconsistent and conflicting judgments.  Not only will this be

9    wasteful, "the integrity of the action before this court will be lessened."  *Microsoft*, 871 F.

10   Supp. 2d at 1100.  For IPCom to forum-shop and "race to judgment" at the expense of this

11   Court's integrity is improper.  Nor should IPCom be allowed to use the U.K. action to

12   interfere with these proceedings, or "evade the rightful authority of the district court."

13   *Applied Med.*, 587 F.3d at 921.  Plaintiffs' motion should be granted.

14   Dated: September 18, 2019          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

15                                      By    */s/ Martin R. Bader*

16                                            MARTIN R. BADER
                                              MATTHEW W. HOLDER

17                                            LAI L. YIP
                                              TENAYA RODEWALD

18                                            MICHAEL K. HEINS

19
                                              *Attorneys for Plaintiffs Lenovo (United States) Inc. and*
20                                            *Motorola Mobility, LLC*

21

22

23

---

24   [4] In fact, on information and belief, IPCom had no right to bring the U.K. action at all

25   because IPCom has never had title to the '268 patent asserted in that case.  The '268 patent

26   was purportedly assigned by Bosch to IPCom.  But in the Deed of Trust filed with the

27   European Patent Office by Bosch, which purportedly identifies all the patents it assigned to

28   IPCom, the '268 patent is missing.