Exhibit 1

# Bristows

Bristows LLP
100 Victoria Embankment
London EC4Y 0DH

T  +44 20 7400 8000

bristows.com

FAO the Legal Department
Motorola Mobility UK LTD
Redwood Chineham Business Park
Crockford Lane
Basingstoke
Hampshire
RG24 8WQ

Our ref:  450/PMJ/10295.0040

4 July 2019

Dear Sirs

**HP-2019-000024: IPCom GMBH & Co. KG v (1) Lenovo Technology (United Kingdom) Limited, (2) Motorola Mobility UK LTD. (the "Proceedings")**

We act for the Claimant in the above Proceedings. We enclose, by way of service, the following documents:

1. IPCom's claim form;
2. IPCom's Particulars of Claim and accompanying Annexes 1 to 5;
3. IPCom's Particulars of Infringement and accompanying Annexes 1 to 4;
4. IPCom's Initial Disclosure List; and
5. Response pack.

Please confirm receipt by email to nicholas.round@bristows.com

Pursuant to our client's obligations under paragraph 5.1 of CPR Practice Direction 51U, we enclose our client's Initial Disclosure List. We confirm that steps have been taken by the Claimant to preserve relevant documents in accordance with the duties under paragraph 3.1(1) and 3.2(1) of CPR Practice Direction 51U, and as required by paragraphs 4.1 to 4.4 of CPR Practice Direction 51U.

The Claimant requests and requires the Defendants to demonstrate that they are respectively willing licensees by entering into the undertakings set out in the prayer for relief (the "Undertakings") within 14 days of the date of this letter.   Pending receipt of the same, the Claimant reserves its right to take further steps in the proceedings.

Yours faithfully

Bristows LLP.

**Bristows LLP**

**Encs.**

32075148



**Claim Form**

| In the |
| --- |
| **High Court of Justice, Business and Property Courts of England and Wales, Patents Court (ChD)** |

02 Jul 2019

| **Fee Account no.** | PBA0083291 | HP-2019-000024 |
| --- | --- | --- |
| **Help with Fees – Ref. no. (if applicable)** | H W F - ☐☐☐ - ☐☐☐ | |

You may be able to issue your claim online which may save time and money. Go to www.moneyclaim.gov.uk to find out more.

| | *For court use only* |
| --- | --- |
| Claim no. | |
| Issue date | |

Claimant(s) name(s) and address(es) including postcode
IPCOM GMBH & CO. KG of Zugspitzstrasse 15, 82049 Pullach, Federal Republic of Germany

SEAL

Defendant(s) name and address(es) including postcode
  (1) Lenovo Technology (United Kingdom) Limited, 2nd Floor, Redwood 3 Chineham Park, Crockford Lane, Basingstoke, Hampshire, United Kingdom, RG24 8WQ
  (2) Motorola Mobility UK LTD, Redwood Chineham Business Park, Crockford Lane, Basingstoke, Hampshire, United Kingdom, RG24 8WQ

Brief details of claim

The claim is for the infringement of EP 1 841 268 B2

**THE CLAIMANT CLAIMS:**

(1)    A declaration that EP 1 841 268 B2 is essential to the ETSI UMTS telecommunications standard.
(2)    A declaration that EP 1 841 268 B2 has been infringed by the Defendants and each of them.
(3)    An order for appropriate measures for the dissemination and publication of the judgment to be taken at the expense of the Defendants and each of them.
(4)    Costs.
(5)    Further or other relief.

**AND UNLESS the Defendants and each of them undertake to IPCom GmbH & Co. KG and the High Court of Justice of England and Wales that:**

(a)    in the circumstances where the High Court of Justice of England and Wales has found European Patent (UK) 1,841,268 B2 to be valid, essential and infringed by the Defendants (or either of them), they will, without delay, enter into a licence covering all of the Defendants' acts of infringement on terms deemed to be FRAND in the US FRAND Proceedings;

(b)    they will procure that Lenovo (United States) Inc. and Motorola Mobility LLC and each of them prosecute their claim against IPCom GmbH & Co. KG filed on 14th March 2019 before the United States District Court for the Northern District of California ("the US FRAND Proceedings") without delay; and

(c)    in the event that the US FRAND Proceedings fail to settle the terms of a FRAND licence (without delay or at all) covering all of the Defendants' acts of infringement found by the High Court of Justice of England and Wales, submit to the High Court of Justice of England and Wales for a determination of an appropriate licence on FRAND terms to cover all such outstanding acts of infringement, and enter into that licence without delay.

**THEN THE CLAIMANT FURTHER CLAIMS**

(6)    An injunction to restrain the Defendants and each of them, either by themselves or through their agents, affiliates or third parties or howsoever otherwise, from infringing EP 1 841 268 B2.
(7)    An inquiry as to damages (including damages in accordance with Regulation 3 of the Intellectual Property (Enforcement, etc.) Regulations 2006, SI 2006/1028) suffered by the Claimant or (at the Claimant's option) an account of profits accrued to the Defendants and each of them by reason of their acts of infringement and an order for the payment of all sums found due upon the taking of such inquiry or account, together with interest thereon pursuant to section 35A of the Senior Courts Act 1981 or the equitable jurisdiction of the Court

Value

For the purposes of CPR 3.12(1)(b) this claim, whilst unspecified is valued at £10,000,000 or more

You must indicate your preferred County Court Hearing Centre for hearings here *(see notes for guidance)*

| Defendant's name and address for service including postcode | Lenovo Technology (United Kingdom) Limited, 2nd Floor, Redwood 3 Chineham Park, Crockford Lane, Basingstoke, Hampshire, RG24 8WQ | | £ |
|---|---|---|---|
| | | Amount claimed | >£10,000,000 |
| | | Court fee | £10,528 |
| | | Legal representative's costs | To be assessed |

|  | Total amount | Unspecified |
|--|--|--|

| Claim No. | |
|--|--|

Does, or will, your claim include any issues under the Human Rights Act 1998?   [ ] Yes [ x ] No

Particulars of Claim (attached) to follow

**Statement of Truth**
*(I believe)(The Claimant believes) that the facts stated in this claim form are true.
* I am duly authorised by the claimant to sign this statement

Full name _RICHARD JOHN PINKNEY_

Name of claimant's legal representative's firm____BRISTOWS LLP_____

signed _R.J. Pinkny_     position or office held__PARTNER_____
*(Claimant)(Litigation friend)              (if signing on behalf of firm or company)
(Claimant's legal representative)

*delete as appropriate*

Bristows LLP
100 Victoria Embankment
London
EC4Y 0DH

Claimant's or claimant's legal
representative's address to which
documents or payments should be
sent if different from overleaf including
(if appropriate) details of DX, fax or e-
mail.

Claim No. HP-2019-000024

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**INTELLECTUAL PROPERTY LIST (CHANCERY DIVISION)**
**PATENTS COURT**

**B E T W E E N :**

**IPCOM GMBH & CO. KG**
**(a company incorporated under the laws of Germany)**

**Claimant**

**- and -**

**(1)  LENOVO TECHNOLOGY (UNITED KINGDOM) LIMITED**

**(2)  MOTOROLA MOBILITY UK LTD**

**Defendants**

---

**PARTICULARS OF CLAIM**

---

**THE CLAIMANT AND THE PATENT**

1.      The Claimant is a company incorporated under the laws of Germany and is the proprietor of European Patent (UK) 1,841,268 B2 ("**EP 268**") a copy of which is attached as **Annex 1** hereto.   A certified English translation of the textual description is attached as **Annex 2** hereto.

2.      European Patent 1,841,268 B1 (**"EP 268 B1"**) was granted on 17th March 2010. Following opposition proceedings before the European Patent Office, a decision to maintain EP 268 in amended form (being the B2 amended version of EP 268 B1) was published on 25th April 2018.

3.      EP 268 B1 in a further UK-only amended form ("**EP 268 B1(UK)**") was held to be valid, infringed and essential to the UMTS Standard by the United Kingdom's Court of Appeal in 2012 ([2012] EWCA Civ 567).   A further amended form (which mirrors EP 268) was held to be valid, infringed and essential to the UMTS Standard by the United Kingdom's Court of Appeal in 2017 ([2017] EWCA Civ 90).

4.      EP 268 is in force.

1

5.      A certificate of contested validity pursuant to s.65 of the Patents Act 1977 (**"the 1977 Act"**) was issued in respect of EP 268 B1(UK) by Floyd J dated 8th July 2011 and upheld by the Court of Appeal ([2012] EWCA Civ 567). A further such certificate was issued in respect of EP 268 by Birss J dated 8th June 2015, upheld by the Court of Appeal ([2017] EWCA Civ 90), and remains in force.

## THE DEFENDANTS

6.      The First Defendant, Lenovo Technology (United Kingdom) Limited ("**Lenovo UK**"), is a UK company with the registered office: 2nd Floor, Redwood 3 Chineham Park, Crockford Lane, Basingstoke, Hampshire, United Kingdom, RG24 8WQ. Lenovo UK's Strategic Report for the year ended 31 March 2018 ("**Lenovo UK's 2018 Annual Report**"), attached as **Annex 3** hereto, states that Lenovo's "*principal active … during the year was the wholesale of personal computing and mobile telephone equipment and peripherals*". Lenovo UK is a wholly owned subsidiary of the Lenovo Group Limited ("**the Lenovo Group**"), a corporation organized under the laws of Hong Kong.

7.      The Second Defendant, Motorola Mobility UK LTD ("**Motorola UK**") is a UK company with the registered office: Redwood Chineham Business Park, Crockford Lane, Basingstoke, Hampshire, United Kingdom, RG24 8WQ. Motorola UK is a wholly owned subsidiary of Motorola Mobility Sales International LLC, a corporation organized under the laws of the State of Delaware, which itself is a wholly owned subsidiary of the Lenovo Group.

8.      As set out in the Particulars of Infringement served herewith: (a) prior to 16th January 2018 the devices complained of herein were sold in the United Kingdom by Motorola UK; and (b) subsequent to that date and continuing, the said devices were and are sold in the United Kingdom by Lenovo UK.

## ESSENTIALITY, FRAND AND INFRINGEMENT

9.      EP 268 is part of a portfolio of patents owned by the Claimant (**"the IPCom Portfolio"**) that have been declared as "Standard Essential" pursuant to the policy of the European Telecommunications Standards Institute (**"ETSI"**). Herein the terms **"Standard"** and **"Essential"** have the meanings set out in the ETSI

Intellectual Property Rights Policy dated 18th April 2018 and contained within Version 39 of the ETSI Directives dated 8th October 2018 (**"the ETSI IPR Policy"**).

10.     The IPCom Portfolio, including EP 268, is the subject of a General IPR Licensing Declaration dated 11th June 2014 (a copy of which is attached as **Annex 4** hereto) and made by the Claimant to ETSI in the following terms:

> *In accordance with Clause 6.1 of the ETSI IPR Policy the Declarant and/or its AFFILIATES hereby… irrevocably declares that (1) it and its AFFILIATES are prepared to grant irrevocable licences under its/their IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy…*

11.     An earlier declaration was made by the Claimant to the European Commission (published on 10 December 2009), in which the Claimant stated that it was:

> *prepared to grant irrevocable licenses under the essential intellectual property rights of its Bosch Mobile Telecommunication Patent Portfolio on fair, reasonable and non-discriminatory terms and conditions.*

12.     Clause 6.1 of the ETSI IPR Policy requires an SEP owner to offer to grant licences on terms that are fair, reasonable and non-discriminatory ("**FRAND**") (the "**FRAND Obligation**").

13.     The Claimant accordingly is and at all material times has been prepared to grant a FRAND licence to EP 268 and the other Essential patents comprising the IPCom Portfolio in accordance with the FRAND Obligation.

14.     EP 268 is and remains Essential to the UMTS standard as previously determined by the UK Courts (albeit the Claimant recognises the previous judgments of the UK Courts are not formally binding on the Defendants).

15.     The Claimant has, since at least 2014 been actively pursuing negotiations with the Lenovo group seeking to license the IPCom Portfolio, including EP 268, to the Lenovo group (including therein the Defendants) on FRAND terms but has thus far been unsuccessful.

16.    Neither of the Defendants, nor any company with the Lenovo group, have taken a licence from the Claimant in respect of EP 268 and all of the Defendants' acts complained of herein have been, and continue to be, without the consent of the Claimant.

17.    In the premises, the Defendants have infringed EP 268 and continue to do so by having conducted and continuing to conduct the acts set out in the Particulars of Infringement served herewith.

18.    The Claimant is and remains prepared to grant a FRAND licence to the Defendants covering the past and threatened future acts complained of herein.

19.    The Claimant made its most recent licensing offer to the Lenovo group (including therein the Defendants) in March 2019 informing them that it would consider litigation if the offer was not accepted by 15th March 2019. In response, on 14th March, the Lenovo group, by the legal persons of US companies Lenovo (United States) Inc. and Motorola Mobility LLC (together the "**US Entities**"), filed proceedings in the United States District Court for the Northern District of California (the "**US Proceedings**"). The US Proceedings are yet to be formally served on IPCom but it has seen a copy of the pleadings, a copy of which is attached as **Annex 5** hereto.

20.    By the US Proceedings, Lenovo purports (via the US Entities), *inter alia*, to seek an adjudication of the appropriate terms of a FRAND licence for the IPCom Portfolio. However, whether in those proceedings or otherwise howsoever, no Lenovo entity (including therein the Defendants) has provided any undertaking, assurance or commitment that any Lenovo entity (including the Defendants) will enter into a FRAND licence so-determined or at all.

21.    Provided that the Defendants are prepared to enter a binding commitment to IPCom and the High Court of England and Wales to evince that they are willing licensees, the Claimant is content for any Court of competent jurisdiction to determine the terms of a FRAND licence between the Claimant and the Defendants (or any other Lenovo entity where the licence includes the Defendants' acts complained of herein).

22.   Without prejudice to the generality of the foregoing, for the purpose of these proceedings, the Claimant is entitled to, and is prepared to accept, the following undertakings:

*The Defendants and each of them undertake to IPCom GmbH & Co. KG and the High Court of Justice of England and Wales that:*

(a)   *in the circumstances where the High Court of Justice of England and Wales has found European Patent (UK) 1,841,268 B2 to be valid, essential and infringed by the Defendants (or either of them), they will, without delay, enter into a licence covering all of the Defendants' past and future threatened acts of infringement on terms deemed to be FRAND in the US FRAND Proceedings;*

(b)   *they will procure that Lenovo (United States) Inc. and Motorola Mobility LLC and each of them prosecute their claim against IPCom GmbH & Co. KG filed on 14th March 2019 before the United States District Court for the Northern District of California ("the US FRAND Proceedings") without delay; and*

(c)   *in the event that the US FRAND Proceedings fail to settle the terms of a FRAND licence (without delay or at all) covering all of the Defendants' acts of infringement found by the High Court of Justice of England and Wales, submit to the High Court of Justice of England and Wales for a determination of an appropriate licence on FRAND terms to cover all such uncompensated acts of infringement, and enter into that licence without delay.*

23.   In the event that the Defendants refuse to provide the undertakings sought, or materially equivalent binding undertakings to establish that they are willing licensees, the Claimant will aver that they are not willing licensees and are no longer entitled to rely upon the FRAND Obligation.

**LOSS, DAMAGE AND INTEREST**

24.   By reason of the Defendants' acts of patent infringement, the Claimant has suffered loss and damage.

25.   Without prejudice to the generality of the foregoing, had the Defendants entered into the FRAND Licence when or before the Defendants first commenced their acts of which the Claimant herein complains, the Defendants would have been licenced and the Claimant would have received licence royalties in respect of the worldwide sales of the Defendants' products and services covered by IPCom's Portfolio. The

Claimant has suffered the loss of this revenue as a direct and foreseeable consequence of the Defendants' decision to implement the invention of EP 268 without taking a FRAND licence from the Claimant.

26.   The Defendants and each of them threaten and intend unless restrained by this Honourable Court to continue their said acts of patent infringement, whereby the Claimant will suffer further loss and damage.

27.   The Claimant is not at present able to give particulars of all the Defendants' actual and intended acts of infringement, but at trial will seek relief in respect of any such act.

28.   The Claimant is entitled to and claims interest on all sums found due to it under section 35A of the Senior Courts Act 1981 and/or pursuant to the inherent jurisdiction of the Court.

**AND THE CLAIMANT CLAIMS:**

(1)   A declaration that EP 1 841 268 B2 is essential to the ETSI UMTS telecommunications standard.

(2)   A declaration that EP 1 841 268 B2 has been infringed by the Defendants and each of them.

(3)   An order for appropriate measures for the dissemination and publication of the judgment to be taken at the expense of the Defendants and each of them.

(4)   Costs.

(5)   Further or other relief.

**AND UNLESS** the Defendants and each of them undertake to IPCom GmbH & Co. KG and the High Court of Justice of England and Wales that:

(a)   in the circumstances where the High Court of Justice of England and Wales has found European Patent (UK) 1,841,268 B2 to be valid, essential and infringed by the Defendants (or either of them), they will, without delay,

enter into a licence covering all of the Defendants' acts of infringement on terms deemed to be FRAND in the US FRAND Proceedings;

(b) they will procure that Lenovo (United States) Inc. and Motorola Mobility LLC and each of them prosecute their claim against IPCom GmbH & Co. KG filed on 14th March 2019 before the United States District Court for the Northern District of California ("the US FRAND Proceedings") without delay; and

(c) in the event that the US FRAND Proceedings fail to settle the terms of a FRAND licence (without delay or at all) covering all of the Defendants' acts of infringement found by the High Court of Justice of England and Wales, submit to the High Court of Justice of England and Wales for a determination of an appropriate licence on FRAND terms to cover all such outstanding acts of infringement, and enter into that licence without delay.

**THEN THE CLAIMANT FURTHER CLAIMS**

(6) An injunction to restrain the Defendants and each of them, either by themselves or through their agents, affiliates or third parties or howsoever otherwise, from infringing EP 1 841 268 B2.

(7) An inquiry as to damages (including damages in accordance with Regulation 3 of the Intellectual Property (Enforcement, etc.) Regulations 2006, SI 2006/1028) suffered by the Claimant or (at the Claimant's option) an account of profits accrued to the Defendants and each of them by reason of their acts of infringement and an order for the payment of all sums found due upon the taking of such inquiry or account, together with interest thereon pursuant to section 35A of the Senior Courts Act 1981 or the equitable jurisdiction of the Court.

**BRIAN NICHOLSON QC**
**BRISTOWS LLP**

STATEMENT OF TRUTH

The Claimant believes that the facts stated in these Particulars of Claim are true.  I am
duly authorised by the Claimant to sign this statement.

Signed:

Full name:

Position:

Served this 4th day of July    by    Messrs    Bristows    LLP    of    100    Victoria
Embankment, London EC4Y 0DH, Solicitors for the Claimant.

8

Exhibit 2

**Page 39**
**RULES OF PROCEDURE, 3 April 2019**

**ANNEX 6:       ETSI Intellectual Property Rights Policy**

**1         Introduction**

The General Assembly of ETSI has established the following Intellectual Property Rights POLICY.

**2         Definitions**

Terms in the POLICY which are written in capital letters shall have the meaning set forth in Clause 15 entitled DEFINITIONS.

**3         Policy Objectives**

3.1     It is ETSI's objective to create STANDARDS and TECHNICAL SPECIFICATIONS that are based on solutions which best meet the technical objectives of the European telecommunications sector, as defined by the General Assembly. In order to further this objective the ETSI IPR POLICY seeks to reduce the risk to ETSI, MEMBERS, and others applying ETSI STANDARDS and TECHNICAL SPECIFICATIONS, that investment in the preparation, adoption and application of STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable. In achieving this objective, the ETSI IPR POLICY seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs.

3.2     IPR holders whether members of ETSI and their AFFILIATES or third parties, should be adequately and fairly rewarded for the use of their IPRs in the implementation of STANDARDS and TECHNICAL SPECIFICATIONS.

3.3     ETSI shall take reasonable measures to ensure, as far as possible, that its activities which relate to the preparation, adoption and application of STANDARDS and TECHNICAL SPECIFICATIONS, enable STANDARDS and TECHNICAL SPECIFICATIONS to be available to potential users in accordance with the general principles of standardization.

**4         Disclosure of IPRs**

4.1     Subject to Clause 4.2 below, each MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

4.2     The obligations pursuant to Clause 4.1 above do however not imply any obligation on MEMBERS to conduct IPR searches.

4.3     The obligations pursuant to Clause 4.1 above are deemed to be fulfilled in respect of all existing and future members of a PATENT FAMILY if ETSI has been informed of a member of this PATENT FAMILY in a timely fashion.  Information on other members of this PATENT FAMILY, if any, may be voluntarily provided.

**5         Procedures for Committees**

ETSI shall establish guidelines for the chairmen of COMMITTEES with respect to ESSENTIAL IPRs.

**6         Availability of Licences**

6.1     When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant

irrevocable licences on fair, reasonable and non-discriminatory ("FRAND") terms and conditions under such IPR to at least the following extent:

- MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;
- sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;
- repair, use, or operate EQUIPMENT; and
- use METHODS.

The above undertaking may be made subject to the condition that those who seek licences agree to reciprocate.

6.1bis    Transfer of ownership of ESSENTIAL IPR

FRAND licensing undertakings made pursuant to Clause 6 shall be interpreted as encumbrances that bind all successors-in-interest. Recognizing that this interpretation may not apply in all legal jurisdictions, any Declarant who has submitted a FRAND undertaking according to the POLICY who transfers ownership of ESSENTIAL IPR that is subject to such undertaking shall include appropriate provisions in the relevant transfer documents to ensure that the undertaking is binding on the transferee and that the transferee will similarly include appropriate provisions in the event of future transfers with the goal of binding all successors-in-interest. The undertaking shall be interpreted as binding on successors-in-interest regardless of whether such provisions are included in the relevant transfer documents.

6.2    An undertaking pursuant to Clause 6.1 with regard to a specified member of a PATENT FAMILY shall apply to all existing and future ESSENTIAL IPRs of that PATENT FAMILY unless there is an explicit written exclusion of specified IPRs at the time the undertaking is made. The extent of any such exclusion shall be limited to those explicitly specified IPRs.

6.3    As long as the requested undertaking of the IPR owner is not granted, the COMMITTEE Chairmen should, if appropriate, in consultation with the ETSI Secretariat use their judgment as to whether or not the COMMITTEE should suspend work on the relevant parts of the STANDARD or TECHNICAL SPECIFICATION until the matter has been resolved and/or submit for approval any relevant STANDARD or TECHNICAL SPECIFICATION.

6.4    At the request of the European Commission and/or EFTA, initially for a specific STANDARD or TECHNICAL SPECIFICATION or a class of STANDARDS/TECHNICAL SPECIFICATIONS, ETSI shall arrange to have carried out in a competent and timely manner an investigation including an IPR search, with the objective of ascertaining whether IPRs exist or are likely to exist which may be or may become ESSENTIAL to a proposed STANDARD or TECHNICAL SPECIFICATIONS and the possible terms and conditions of licences for such IPRs. This shall be subject to the European Commission and/or EFTA meeting all reasonable expenses of such an investigation, in accordance with detailed arrangements to be worked out with the European Commission and/or EFTA prior to the investigation being undertaken.

**6bis        Use of the IPR Licensing Declaration Forms**

MEMBERS shall use one of the ETSI IPR Licensing Declaration forms at the Appendix to this ETSI IPR Policy to make their IPR licensing declarations.

**7        Information on IPR by ETSI**

7.1    Any published STANDARD or TECHNICAL SPECIFICATION shall include information pertaining to ESSENTIAL IPRs which are brought to the attention of ETSI prior to such publication.

7.2    ETSI shall establish appropriate procedures to allow access to information at any time with respect to ESSENTIAL IPRs which have been brought to the attention of ETSI.

**Page 41**
**RULES OF PROCEDURE, 3 April 2019**

**8          Non-availability of Licences**

8.1    Non-availability of licences prior to the publication of a STANDARD or a TECHNICAL SPECIFICATION

8.1.1    Existence of a viable alternative technology

Where prior to the publication of a STANDARD or a TECHNICAL SPECIFICATION an IPR owner informs ETSI that it is not prepared to license an IPR in respect of a STANDARD or TECHNICAL SPECIFICATION in accordance with Clause 6.1 above, the General Assembly shall review the requirement for that STANDARD or TECHNICAL SPECIFICATION and satisfy itself that a viable alternative technology is available for the STANDARD or TECHNICAL SPECIFICATION which:

-    is not blocked by that IPR; and
-    satisfies ETSI's requirements.

8.1.2    Non-existence of a viable alternative technology

Where, in the opinion of the General Assembly, no such viable alternative technology exists, work on the STANDARD or TECHNICAL SPECIFICATION shall cease, and the Director-General of ETSI shall observe the following procedure:

a)    If the IPR owner is a MEMBER,

   i)    the Director-General of ETSI shall request that MEMBER to reconsider its position.

   ii)    If that MEMBER however decides not to withdraw its refusal to license the IPR, it shall then inform the Director-General of ETSI of its decision and provide a written explanation of its reasons for refusing to license that IPR, within three months of its receipt of the Director-General's request.

   iii)    The Director-General of ETSI shall then send the MEMBER's explanation together with relevant extracts from the minutes of the General Assembly to the ETSI Counsellors for their consideration.

b)    If the IPR owner is a third party,

   i)    the Director-General of ETSI shall, wherever appropriate, request full supporting details from any MEMBER who has complained that licences are not available in accordance with Clause 6.1 above and/or request appropriate MEMBERS to use their good offices to find a solution to the problem.

   ii)    Where this does not lead to a solution the Director-General of ETSI shall write to the IPR owner concerned for an explanation and request ultimately that licences be granted according to Clause 6.1 above.

   iii)    Where the IPR owner refuses the Director-General's request and decides not to withdraw its refusal to license the IPR or does not answer the letter within three months after the receipt of the Director-General's request, the Director-General shall then send the IPR owner's explanation, if any, together with relevant extracts from the minutes of the General Assembly to the ETSI Counsellors for their consideration.

8.1.3    Prior to any decision by the General Assembly, the COMMITTEE should in consultation with the ETSI Secretariat use their judgment as to whether or not the COMMITTEE should pursue development of the concerned parts of the STANDARD or a TECHNICAL SPECIFICATION based on the non-available technology and should look for alternative solutions.

**Page 42**
**RULES OF PROCEDURE, 3 April 2019**

8.2 Non-availability of licences after the publication of a STANDARD or a TECHNICAL SPECIFICATION

Where, in respect of a published STANDARD or TECHNICAL SPECIFICATION, ETSI becomes aware that licences are not available from an IPR owner in accordance with Clause 6.1 above, that STANDARD or TECHNICAL SPECIFICATION shall be referred to the Director-General of ETSI for further consideration in accordance with the following procedure:

i) The Director-General shall request full supporting details from any MEMBER or third party who has complained that licences are not available in accordance with Clause 6.1 above.

ii) The Director-General shall write to the IPR owner concerned for an explanation and request that licences be granted according to Clause 6.1 above. Where the concerned IPR owner is a MEMBER, it shall inform the Director-General of ETSI of its decision and provide a written explanation of its reasons in case of continuing refusal to license that IPR.

iii) Where the IPR owner refuses the Director-General's request or does not answer the letter within three months, the Director-General shall inform the General Assembly and, if available, provide the General Assembly with the IPR owner's explanation for consideration. A vote shall be taken in the General Assembly on an individual weighted basis to immediately refer the STANDARD or TECHNICAL SPECIFICATION to the relevant COMMITTEE to modify it so that the IPR is no longer ESSENTIAL.

iv) Where the vote in the General Assembly does not succeed, then the General Assembly shall, where appropriate, consult the ETSI Counsellors with a view to finding a solution to the problem. In parallel, the General Assembly may request appropriate MEMBERS to use their good offices to find a solution to the problem.

v) Where (iv) does not lead to a solution, then the General Assembly shall request the European Commission to see what further action may be appropriate, including non-recognition of the STANDARD or TECHNICAL SPECIFICATION in question.

In carrying out the foregoing procedure due account shall be taken of the interest of the enterprises that have invested in the implementation of the STANDARD or TECHNICAL SPECIFICATION in question.

**9       ETSI ownership of IPRs**

9.1 The ownership of the copyright in STANDARDS and TECHNICAL SPECIFICATIONS documentation and reports created by ETSI or any of its COMMITTEES shall vest in ETSI but due acknowledgement shall be given to copyrights owned by third parties that are identifiable in ETSI copyrighted works.

9.2 In general, in the absence of any exceptional circumstances, where SOFTWARE is included in any element of a STANDARD or TECHNICAL SPECIFICATION there shall be no requirement to use that SOFTWARE for any purpose in order for an implementation to conform to the STANDARD or TECHNICAL SPECIFICATION.

9.2.1 Without prejudice to Clause 9.1, any MEMBER contributing SOFTWARE for inclusion in a STANDARD or TECHNICAL SPECIFICATION hereby grants, without monetary compensation or any restriction other than as set out in this Clause 9.2.1, an irrevocable, non-exclusive, worldwide, royalty-free, sub-licensable copyright licence to prepare derivative works of (including translations, adaptations, alterations) the contributed SOFTWARE and reproduce, display, distribute and execute the contributed SOFTWARE and derivative works for the following limited purposes:

a) to ETSI and MEMBERS to evaluate the SOFTWARE and any derivative works thereof for determining whether to support the inclusion of the SOFTWARE in that STANDARD or TECHNICAL SPECIFICATION;

Page 43
RULES OF PROCEDURE, 3 April 2019

b)    to ETSI to publish the SOFTWARE in that STANDARD or TECHNICAL SPECIFICATION; and

c)    to any implementer of that STANDARD or TECHNICAL SPECIFICATION to evaluate the SOFTWARE and any derivative works thereof for inclusion in its implementation of that STANDARD or TECHNICAL SPECIFICATION, and to determine whether its implementation conforms with that STANDARD or TECHNICAL SPECIFICATION.

9.2.2    (i) The copyright licence granted in Clause 9.2.1 shall also extend to any implementer of that STANDARD or TECHNICAL SPECIFICATION for the purpose of using the SOFTWARE in any compliant implementation unless (ii) the contributing MEMBER gives an irrevocable undertaking in writing at the time of contribution that it is prepared to grant an irrevocable copyright licence on fair, reasonable and non-discriminatory terms and conditions for the purpose of using the SOFTWARE in any compliant implementation.

9.2.3    Any MEMBER contributing SOFTWARE for inclusion in a STANDARD or TECHNICAL SPECIFICATION represents and warrants that to the best of its knowledge, it has the necessary copyright rights to license that contribution under Clause 9.2.1 and 9.2.2 to ETSI, MEMBERS and implementers of the STANDARD or TECHNICAL SPECIFICATION.

Other than as expressly provided in this Clause 9.2.3: (1) SOFTWARE contributed for inclusion in a STANDARD or TECHNICAL SPECIFICATION is provided "AS IS" with no warranties, express or implied, including but not limited to, the warranties of merchantability, fitness for a particular purpose and non infringement of intellectual property rights and (2) neither the MEMBER contributing SOFTWARE nor ETSI shall be held liable in any event for any damages whatsoever (including, without limitation, damages for loss of profits, business interruption, loss of information, or any other pecuniary loss) arising out of or related to the use of or inability to use the SOFTWARE.

9.2.4    With respect to the copyright licenses set out in Clause 9.2.1 and 9.2.2 , no patent licence is granted by implication, estoppel or otherwise.

9.3    In respect of IPRs other than copyright in STANDARDS and TECHNICAL SPECIFICATIONS documentation and reports, ETSI shall only seek ownership of IPRs generated either by its employees or by secondees to ETSI from organizations who are not MEMBERS.

9.4    ETSI shall, on request by a non-member, grant licences to that non-member on fair and reasonable terms and conditions in respect of any IPRs, other than those referred to in Clause 9.1 above, owned by ETSI. MEMBERS shall be allowed to use IPRs owned by ETSI free of charge.

## 10        Confidentiality

The proceedings of a COMMITTEE shall be regarded as non-confidential except as expressly provided below and all information submitted to a COMMITTEE shall be treated as if non-confidential and shall be available for public inspection unless:

-    the information is in written or other tangible form; and
-    the information is identified in writing, when submitted, as confidential; and
-    the information is first submitted to, and accepted by, the chairman of the COMMITTEE as confidential.

CONFIDENTIAL INFORMATION incorporated in a STANDARD or TECHNICAL SPECIFICATION shall be regarded as non-confidential by ETSI and its MEMBERS, from the date on which the STANDARD or TECHNICAL SPECIFICATION is published.

## 11        Reproduction of Standards Documentation

MEMBERS may make copies of STANDARDS and TECHNICAL SPECIFICATIONS documentation produced by ETSI for their own use free of charge but may not distribute such copies to others.

**RULES OF PROCEDURE, 3 April 2019**

**12        Law and Regulation**

The POLICY shall be governed by the laws of France. However, no MEMBER shall be obliged by the POLICY to commit a breach of the laws or regulations of its country or to act against supranational laws or regulations applicable to its country insofar as derogation by agreement between parties is not permitted by such laws.

Any right granted to, and any obligation imposed on, a MEMBER which derives from French law and which are not already contained in the national or supranational law applicable to that MEMBER is to be understood as being of solely a contractual nature.

**13        Policy Decisions**

Without prejudice to ETSI's Statutes and Rules of Procedure, no decisions shall be taken by ETSI in relation to implementation of the POLICY unless supported by a 71 % majority of the weighted individual votes cast by MEMBERS.

**14        Violation of Policy**

Any violation of the POLICY by a MEMBER shall be deemed to be a breach, by that MEMBER, of its obligations to ETSI. The ETSI General Assembly shall have the authority to decide the action to be taken, if any, against the MEMBER in breach, in accordance with the ETSI Statutes.

**15        Definitions**

1        "**AFFILIATE**" of a first legal entity means any other legal entity:

-        directly or indirectly owning or controlling the first legal entity; or
-        under the same direct or indirect ownership or control as the first legal entity; or
-        directly or indirectly owned or controlled by the first legal entity;

for so long as such ownership or control lasts.

Ownership or control shall exist through the direct or indirect:

-        ownership of more than 50 % of the nominal value of the issued equity share capital or of more than 50 % of the shares entitling the holders to vote for the election of directors or persons performing similar functions; or
-        right by any other means to elect or appoint directors, or persons who collectively can exercise such control. A state, a division of a state or other public entity operating under public law, or any legal entity, linked to the first legal entity solely through a state or any division of a state or other public entity operating under public law, shall be deemed to fall outside the definition of an AFFILIATE.

2        "**COMMITTEE**" shall mean any Technical Body of ETSI and shall include ETSI Projects, Technical Committees, ETSI Partnership Projects, and their Working Groups.

3        "**CONFIDENTIAL INFORMATION**" shall mean all information deemed to be confidential pursuant to Clause 10 of the POLICY disclosed directly or indirectly to the MEMBER.

4        "**EQUIPMENT**" shall mean any system, or device fully conforming to a STANDARD.

5        "**METHODS**" shall mean any method or operation fully conforming to a STANDARD.

6        "**ESSENTIAL**" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by

**Page 45**
**RULES OF PROCEDURE, 3 April 2019**

technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

7    "**IPR**" shall mean any intellectual property right conferred by statute law including applications therefor other than trademarks. For the avoidance of doubt rights relating to get-up, confidential information, trade secrets or the like are excluded from the definition of IPR.

8    "**MANUFACTURE**", shall mean production of EQUIPMENT.

9    "**MEMBER**" shall mean a member or Associate member of ETSI. References to a MEMBER shall wherever the context permits be interpreted as references to that MEMBER and its AFFILIATES.

10   "**POLICY**" shall mean ETSI's Intellectual Property Rights Policy.

11   "**STANDARD**" shall mean any standard adopted by ETSI including options therein or amended versions and shall include European Standards (ENs), ETSI Standards (ESs), Common Technical Regulations (CTRs) which are taken from ENs and including drafts of any of the foregoing, and documents made under the previous nomenclature, including ETSs, I-ETSs, parts of NETs and TBRs, the technical specifications of which are available to all MEMBERS, but not including any standards, or parts thereof, not made by ETSI.

The date on which a STANDARD is considered to be adopted by ETSI for the purposes of this POLICY shall be the date on which the technical content of that STANDARD was available to all MEMBERS.

12   "**TECHNICAL SPECIFICATION**" shall mean any Technical Specification (TS) adopted by ETSI including options therein or amended version including drafts, the Technical Specifications of which are available to all MEMBERS, but not including any technical specifications, or parts thereof, not made by ETSI.

The date on which a TECHNICAL SPECIFICATION is considered to be adopted by ETSI for the purposes of this POLICY shall be the date on which the technical content of that TECHNICAL SPECIFICATION was available to all MEMBERS.

13   "**PATENT FAMILY**" shall mean all the documents having at least one priority in common, including the priority document(s) themselves.  For the avoidance of doubt, "documents" refers to patents, utility models, and applications therefor.

14   For the purpose of this IPR Policy, "**SOFTWARE**" shall mean:

-    a set of instructions written in any programming language that either directly, or when further compiled, performs a function when executed by hardware that processes data according to instructions, such as an audio or video CODEC; but also
-    data and stream structure definitions, such as ASN.1, TTCN, or XML data representations; and
-    schema examples, such as SDL diagrams and data flow charts;

which can be transformed, either directly, or when further compiled, into usable/implementable code.

**Page 46**
**RULES OF PROCEDURE, 3 April 2019**
**ANNEX 6 - Appendix A:**          **IPR Licensing Declaration forms**

---

**IPR HOLDER / ORGANISATION ("Declarant")**

Legal Name: _____

**CONTACT DETAILS FOR LICENSING INFORMATION:**

Name and Title: _____
Department: _____
Address: _____
_____

Telephone: _____     Fax: _____
Email: _____     URL: _____

**GENERAL IPR LICENSING DECLARATION**

In accordance with Clause 6.1 of the ETSI IPR Policy the Declarant and/or its AFFILIATES hereby informs ETSI that **(check one box only)**:

☐     with reference to ETSI STANDARD(S) or TECHNICAL SPECIFICATION(S) No.:
_____ , or

☐     with reference to ETSI Project(s): _____ , or

☐     with reference to all ETSI STANDARDS AND TECHNICAL SPECIFICATIONS

and with reference to **(check one box only)**:

☐     IPR(s) contained within technical contributions made by the Declarant and/or its AFFILIATES, or

☐     any IPRs

the Declarant hereby irrevocably declares that (1) it and its AFFILIATES are prepared to grant irrevocable licenses under its/their IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD(S), TECHNICAL SPECIFICATION(S), or the ETSI Project(s), as identified above, to the extent that the IPR(s) are or become, and remain ESSENTIAL to practice that/those STANDARD(S) or, as applicable, any STANDARD or TECHNICAL SPECIFICATION(S) or, as applicable, any STANDARD or TECHNICAL SPECIFICATION resulting from proposals or Work Items within the current scope of the above identified ETSI Project(s), for the field of use of practice of such STANDARD or TECHNICAL SPECIFICATION; and (2) it will comply with Clause 6.1bis of the ETSI IPR Policy with respect to such ESSENTIAL IPR(s).

☐     This irrevocable undertaking is made subject to the condition that those who seek licences agree to reciprocate **(check box if applicable)**.

The construction, validity and performance of this General IPR licensing declaration shall be governed by the laws of France.

Terms in ALL CAPS on this form have the meaning provided in Clause 15 of the ETSI IPR Policy.

**SIGNATURE**

By signing this General IPR Licensing Declaration form, you represent that you have the authority to bind the Declarant and/or its AFFILIATES to the representations and commitments provided in this form.

Name of authorized person: _____
Title of authorized person: _____
Place, Date: _____
Signature: _____

Please return this form duly signed to: Director-General
ETSI - 650, route des Lucioles - F-06921 Sophia Antipolis Cedex – France / Fax. +33 (0) 4 93 65 47 16

---

# IPR INFORMATION STATEMENT AND LICENSING DECLARATION

**IPR HOLDER / ORGANISATION ("Declarant")**

Legal Name: _____

**CONTACT DETAILS FOR LICENSING INFORMATION:**

Name and Title: _____
Department: _____
Address: _____
_____

Telephone: _____    Fax: _____
Email: _____    URL: _____

**IPR INFORMATION STATEMENT**

In accordance with Clause 4.1 of the ETSI IPR Policy the Declarant and/or its AFFILIATES hereby informs ETSI that it is the Declarant's and/or its AFFILIATES' present belief that the IPR(s) disclosed in the attached IPR Information Statement Annex may be or may become ESSENTIAL in relation to at least the ETSI Work Item(s), STANDARD(S) and/or TECHNICAL SPECIFICATION(S) identified in the attached IPR Information Statement Annex.

The Declarant and/or its AFFILIATES **(check one box only)**:

☐    are the proprietor of the IPR(s) disclosed in the attached IPR Information Statement Annex.

☐    are not the proprietor of the IPR(s) disclosed in the attached IPR Information Statement Annex.

**IPR LICENSING DECLARATION**

In accordance with Clause 6.1 of the ETSI IPR Policy the Declarant and/or its AFFILIATES hereby irrevocably declares the following **(check one box only, and subordinate box, where applicable)**:

☐    To the extent that the IPR(s) disclosed in the attached IPR Information Statement Annex are or become, and remain ESSENTIAL in respect of the ETSI Work Item, STANDARD and/or TECHNICAL SPECIFICATION identified in the attached IPR Information Statement Annex, the Declarant and/or its AFFILIATES are (1) prepared to grant irrevocable licences under this/these IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy; and (2) will comply with Clause 6.1bis of the ETSI IPR Policy.

　　　☐    This irrevocable undertaking is made subject to the condition that those who seek licences agree to reciprocate **(check box if applicable).**

☐    The Declarant and/or its AFFILIATES are not prepared to make the above IPR Licensing Declaration (reasons may be explained in writing in the attached IPR Licensing Declaration Annex).

The construction, validity and performance of this IPR information statement and licensing declaration shall be governed by the laws of France.

Terms in ALL CAPS on this form have the meaning provided in Clause 15 of the ETSI IPR Policy.

**SIGNATURE**

By signing this IPR Information Statement and Licensing Declaration form, you represent that you have the authority to bind the Declarant and/or its AFFILIATES to the representations and commitments provided in this form.

Name of authorized person: _____
Title of authorized person: _____
Place, Date: _____

Signature: _____

Please return this form duly signed to: Director-General
ETSI - 650, route des Lucioles - F-06921 Sophia Antipolis Cedex – France / Fax. +33 (0) 4 93 65 47 16

# IPR Information Statement Annex

| STANDARD, TECHNICAL SPECIFICATION or ETSI Work Item | | | | Proprietor | Application No. | Publication No. | Patent/Application Title | Country of registration | FURTHER INFORMATION Other members of this PATENT FAMILY, if any * | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Project or Standard name | Work Item or Standard No. | Illustrative Specific part of the standard (e.g. section) | Version (V.X.X.X) | | | | | | Application No. | Publication No. | Country of registration |
| e.g. UMTS | ETSI TS 125 215 | 6.1.1.2 | V.3.5.0 | Abcd | | EP 1131972 | Scheduling of slotted-mode related measurements | EPC CONTRACTING STATES ( | | AU 12740/00 | Australia |
| | | | | | | | | | | CN 99813100.8 | China P.R. |
| | | | | | | | | | | FI 108270 | Finland |
| | | | | | | | | | | JP 11-318161 | Japan |
| | | | | | | | | | | US 6532226 | USA |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

* Information on other members of a PATENT FAMILY is provided voluntarily (Clause 4.3 of the ETSI IPR Policy).

Please return this form together with the "IPR Information Statement and Licensing Declaration form" to:
Director-General - ETSI - 650, route des Lucioles - F-06921 Sophia Antipolis Cedex – France / Fax. +33 (0) 4 93 65 47 16

**Page 49**
**RULES OF PROCEDURE, 3 April 2019**

# IPR Licensing Declaration Annex

| Optional written explanation of reasons for not making the IPR Licensing Declaration |
| --- |

☐    The Declarant and/or its AFFILIATES are unwilling to grant irrevocable licences under the IPR(s) disclosed in the attached IPR Information Statement Annex on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy.

☐    The Declarant and/or its AFFILIATES are unable to grant irrevocable licences under the IPR(s) disclosed in the attached IPR Information Statement Annex on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, because

    ☐    the Declarant and/or its AFFILIATES are not the proprietor of the IPR(s) disclosed in the attached IPR Information Statement Annex,

    ☐    the Declarant and/or its AFFILIATES do not have the ability to licence the IPR(s) disclosed in the attached IPR Information Statement Annex on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy. In this case, please provide Contact information of those who may have this ability:

    Legal Name: _____

    Name and Title: _____

    Department: _____

    Address: _____
                         _____

    Telephone: _____ Fax: _____

    Email: _____

☐    Other reasons (please specify):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Please return this form together with the "IPR Information Statement and Licensing Declaration form" to:
Director-General
ETSI - 650, route des Lucioles - F-06921 Sophia Antipolis Cedex – France / Fax. +33 (0) 4 93 65 47 16

Exhibit 3



RE**ÇU** 1 1 JUIN 2014

Page 1 (version 7)

**ETSI Rules of Procedure, 20 March 2013**

## Annex 6 - Appendix A:    IPR Licensing Declaration forms

---

**IPR HOLDER / ORGANISATION ("Declarant")**

Legal Name:    IPCom GmbH & Co. KG

**CONTACT DETAILS FOR LICENSING INFORMATION:**

Name and Title:    Bernhard Frohwitter

Department:

Address:    Zugspitzstr. 15

D-82049 Pullach, Germany

Telephone:    +49 89 55277 300        Fax:    +49 89 55277 305

Email:    info@ipcom-munich.com    URL:    www.ipcom-munich.com

**GENERAL IPR LICENSING DECLARATION**

In accordance with Clause 6.1 of the ETSI IPR Policy the Declarant and/or its AFFILIATES hereby informs ETSI that *(check one box only)*:

☐    with reference to ETSI STANDARD(S) or TECHNICAL SPECIFICATION(S) No.:

_____ , or

☐    with reference to ETSI Project(s):    _____ , or

☒    with reference to all ETSI STANDARDS AND TECHNICAL SPECIFICATIONS

and with reference to *(check one box only)*:

☒    IPR(s) contained within technical contributions made by the Declarant and/or its AFFILIATES, or

☐    any IPRs

the Declarant hereby irrevocably declares that (1) it and its AFFILIATES are prepared to grant irrevocable licenses under its/their IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD(S), TECHNICAL SPECIFICATION(S), or the ETSI Project(s), as identified above, to the extent that the IPR(s) are or become, and remain ESSENTIAL to practice that/those STANDARD(S) or TECHNICAL SPECIFICATION(S) or, as applicable, any STANDARD or TECHNICAL SPECIFICATION resulting from proposals or Work Items within the current scope of the above identified ETSI Project(s), for the field of use of practice of such STANDARD or TECHNICAL SPECIFICATION; and (2) it will comply with Clause 6.1bis of the ETSI IPR Policy with respect to such ESSENTIAL IPR(s).

☒    This irrevocable undertaking is made subject to the condition that those who seek licences agree to reciprocate **(check box if applicable)**.

The construction, validity and performance of this General IPR licensing declaration shall be governed by the laws of France.

Terms in ALL CAPS on this form have the meaning provided in Clause 15 of the ETSI IPR Policy.

**SIGNATURE**

By signing this General IPR Licensing Declaration form, you represent that you have the authority to bind the Declarant and/or its AFFILIATES to the representations and commitments provided in this form.

Name of authorized person:    Bernhard Frohwitter

Title of authorized person:    Director                    **IPCom GmbH & Co. KG**
Zugspitzstraße 15, D-82049 Pullach
Place, Date:                                Fon +49 89 55277 300
Fax +49 89 55277 305
Signature:

*Please return this form duly signed to: ETSI Director-General*
*ETSI - 650, route des Lucioles - F-06921 Sophia Antipolis Cedex – France / Fax. +33 (0) 4 93 65 47 16*

# Exhibit 4

# ROBERT BOSCH GMBH                     **BOSCH**

IN the 17/02/98

Via facsimile: 0033-4-93 65 47 16   **New direct lines**
**Phone: (07 11) 8 11-3 31 50**
ETSI                                 **Fax-No.: (07 11) 8 11-3 31 82**
Mr. Karl Heinz Rosenbrock
Director-General

F-06921 Sophia Antipolis Cédex

Telefon (07 11) 8 11-0
Telefax (07 11) 8 11-
Telex 72627-100

Besucher:
Wernerstraße 1
Stuttgart-Feuerbach

Postfach 30 02 20
D-70442 Stuttgart

| Ihre Zeichen/Nachricht vom | Unsere Abteilung/Bearbeiter | |
|---|---|---|
| | ZGL-Dr. Huber/Mö | Telefon-Durchwahl (0711) 8 11-  3 31 50 January 27, 1998 |
| | V-8567/ex0006 | Telefax-Durchwahl (07 11) 8 11-  3 31 82 |

**IPRs related to TD/CDMA and/or W-CDMA**

Dear Mr. Rosenbrock,

This is to confirm that Robert Bosch GmbH holds large portfolios of
patents, some of which may have to be regarded as essential for the
TD/CDMA and/or the W-CDMA system.

Even though it appears premature to make any firm statement on the
essentiality of any of these patents for the proposed technical so-
lutions (last not least because the respective STANDARD has not been
finally formulated yet), Robert Bosch GmbH herewith confirms its
commitment to the ETSI IPR Policy, i. e. in particular its prepared-
ness to grant irrevocable licenses under its IPR on terms and condi-
tions which are in accordance with Clause 6.1 of the ETSI IPR Policy
in respect of the STANDARD to the extent that the IPRs remain essen-
tial.

This undertaking is being made subject to the condition that those
who seek licenses from Robert Bosch GmbH shall agree to reciprocate.

Yours sincerely,

ROBERT BOSCH GMBH
Corporate Licensing Department

ppa Holfeder

Ⓡ A :HL
CC : KHR

Sitz: Stuttgart; Registergericht: Amtsgericht Stuttgart HRB 14000;
Aufsichtsratsvorsitzender: Marcus Bierich; Geschäftsführung: Hermann Scholl:
Heiner Gutberlet, Rainer Hann, Tilman Todenhöfer, Hubert Zimmerar

Exhibit 5

# IPCom GmbH & Co. KG

Zugspitzstraße 15
D-82049 Pullach

Tel    +49 89 55277 300
Fax   +49 89 55277 305

E-Mail:
info@ipcom-munich.com

Sitz Pullach
AG München
HRA 89197

Persönlich haftender
Gesellschafter:

IPCom Beteiligungs GmbH
Sitz Pullach

AG München
HRB 167303

Geschäftsführer:

Bernhard Frohwitter
Christoph Schoeller

Bankverbindung:

HypoVereinsbank München
KTO:  668 503 861
BLZ:   700 202 70

USt-ID. Nr. DE254375205

IPCom GmbH & Co. KG Zugspitzstraße 15 D-82049 Pullach

IPCom has made the following declaration to the European Commission, thus reaffirming its policy of licensing its patents on FRAND terms.

IPCom hat der Europäischen Kommission die folgende Erklärung abgegeben, und damit seine Politik der Lizenzvergabe auf FRAND-Basis nochmal klargestellt.

10 December 2009

IPCom GmbH & Co. KG

# FRAND-DECLARATION

1.     IPCom is aware of the obligations imposed on owners of standard-essential patents under the competition rules of the EC Treaty to grant licenses with respect to standard-essential patents on fair, reasonable and non-discriminatory (FRAND) terms and conditions. IPCom is of the opinion that it always has honoured these obligations and has therefore adopted the policy and hereby expressly declares to be willing to license its standard-essential patents under FRAND terms and conditions to any user of a telecommunication standard which is covered by one or several of IPCom's patents.

2.     In 2007, IPCom purchased the mobile telecommunication patent portfolio of Robert Bosch GmbH (the "Bosch Mobile Telecommunication Patent Portfolio"). The Bosch Mobile Telecommunication Portfolio encompasses about 160 patent families in the field of mobile communications – more than 1,000 patents registered in Europe, the US and Asia, most of which have been granted. The Bosch Mobile Telecommunication Portfolio contains patents that already are essential for mobile communications standards such as 2G (GSM), 2.5G (GPRS), 3G (UMTS) and subsequent generations (3.9G) or may become essential in the future.

3.     Bosch has between 1997 and 2000 rendered several declarations vis-à-vis ETSI in which Bosch committed itself to license the standard-essential patents of the Bosch Mobile Telecommunication Portfolio on fair, reasonable and non-discriminatory (FRAND) terms according to Sec. 6.1 of the ETSI IPR policy.

4.     Following informal discussions with the European Commission IPCom hereby declares that it is fully prepared and ready to take over vis-à-vis third parties any applicable licensing undertaking of Bosch vis-à-vis ETSI to grant irrevocable licenses to patents of the Bosch Mobile Telecommunication Patent Portfolio on a fair, reasonable and non-discriminatory basis in accordance with the terms and conditions set forth under clause 6.1 of the ETSI IPR Policy as if IPCom had been the original participant in the setting of the GSM and UMTS Standards and was subject to a commitment vis-à-vis ETSI to do so. IPCom acknowledges the terms of clause 6.1 of the ETSI IPR Policy and the requirements thereunder. For the avoidance of doubt this declaration does not intend to make IPCom liable for omissions, mistakes, misrepresentations or any other acts of Bosch (if any) contrary to the ETSI rules in the standard setting process or as a member of ETSI.

2

5.   **IPCom hereby irrevocably declares that it is prepared to grant irrevocable licenses under the essential intellectual property rights of its Bosch Mobile Telecommunication Patent Portfolio on fair, reasonable and non-discriminatory terms and conditions to the following extent:**

  - **production of any system or device fully conforming to a mobile telecommunication standard, including the right to make or have made customized components and sub-systems to the licensee's own design for use in such production;**
  - **sell, lease or otherwise dispose of any system or device fully conforming to a mobile telecommunication standard so produced;**
  - **repair, use or operate any system or device fully conforming to a mobile telecommunication standard; and**
  - **use any method or operation fully conforming to a mobile telecommunication standard.**

  **IPCom will take all necessary efforts to inform ETSI of this declaration. IPCom will also issue a press release with the content of this declaration.**

6.   IPCom hereby expressly invites any potential user seeking a license under IPCom's essential intellectual property rights of the Bosch Mobile Telecommunication Patent Portfolio to enter into bilateral good faith negotiations with IPCom with regard to a license agreement on FRAND terms and conditions. In any case, without limiting the scope of IPCom's declarations according to no. 4 and 5 above these declarations shall not be construed as a waiver of any of its rights resulting from its patents and do not serve as a license or any other right to use, offer to license or pre-contractual obligation to enter into a specific license agreement. Licenses will be negotiated and entered into with each licensee individually. This FRAND-DECLARATION and its effects as well as any legal relationship between IPCom and any potential licensee shall be exclusively determined and governed by German law, unless the parties expressly agree in writing on a different applicable law after bilateral negotiations.


Bernhard Frohwitter
Managing Director
IPCom GmbH & Co. KG

Christoph Schoeller
Managing Director
IPCom GmbH & Co. KG

Exhibit 6

# THE EVOLVING IP MARKETPLACE
## ALIGNING PATENT NOTICE AND REMEDIES WITH COMPETITION

**MARCH 2011**











FEDERAL TRADE COMMISSION

.

THE EVOLVING IP MARKETPLACE:
ALIGNING PATENT NOTICE AND REMEDIES
WITH COMPETITION

A REPORT OF THE
FEDERAL TRADE COMMISSION

| | |
|---|---|
| JON LEIBOWITZ | Chairman |
| WILLIAM E. KOVACIC | Commissioner |
| J. THOMAS ROSCH | Commissioner |
| EDITH RAMIREZ | Commissioner |
| JULIE BRILL | Commissioner |

| | |
|---|---|
| Joni Lupovitz | Chief of Staff |
| Eileen Harrington | Executive Director |
| Richard Feinstein | Director, Bureau of Competition |
| David Vladeck | Director, Bureau of Consumer Protection |
| Joseph Farrell | Director, Bureau of Economics |
| Willard K. Tom | General Counsel |
| Randolph W. Tritell | Director, Office of International Affairs |
| Jeanne Bumpus | Director, Office of Congressional Relations |
| Susan S. DeSanti | Director, Office of Policy Planning |
| Cecelia Prewett | Director, Office of Public Affairs |
| Donald S. Clark | Secretary of the Commission |

Report Drafters and Contributors
Suzanne Michel, Deputy Director, Office of Policy Planning
William Cohen, Deputy General Counsel for Policy Studies
William Adkinson, Office of the General Counsel
Erika Meyers, Bureau of Competition
Suzanne Drennon Munck, Office of Policy Planning
Joel Schrag, Bureau of Economics
Karen Goldman, Office of General Counsel
Christopher Bryan, Office of the General Counsel
Christopher Falcone, Office of the General Counsel

Inquiries concerning this report should be directed to:
Suzanne Michel (202) 326-3094 or smichel@ftc.gov

<u>Acknowledgments:</u>

The Commission thanks the Hearings participants for the contribution of their expertise and time to this project.

The Commission thanks the Berkeley Center for Law and Technology and the Competition Policy Center at the University of California at Berkeley for hosting Hearings in Berkeley, California.

# THE EVOLVING IP MARKETPLACE:
# ALIGNING PATENT NOTICE AND REMEDIES
# WITH COMPETITION

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Technology Markets and Patent Markets**

Chapter 1:  Evolving Pathways of Innovation: Open Innovation, Technology Transfer
and Ex Ante Patent Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Chapter 2:  The Evolving Patent Marketplace: Ex Post Patent Transactions . . . . . . . . . . 49

**Patent Notice**

Chapter 3:  Patent Notice: A Competition Perspective . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

**Patent Remedies**

Chapter 4:  The Economic and Legal Foundations of Patent Remedies . . . . . . . . . . . . . . 137

Chapter 5:  Lost Profits Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

Chapter 6:  The Hypothetical Negotiation in Reasonable Royalty Damages . . . . . . . . . . 159

Chapter 7:  Calculating Reasonable Royalty Damages . . . . . . . . . . . . . . . . . . . . . . . . . 177

Chapter 8:  Permanent Injunctions in Patent Cases  . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

**Appendices**

Appendix A:  Statistics Describing Patent Damage Awards. . . . . . . . . . . . . . . . . . . . . . . 245

Appendix B: Overview of Post-*eBay* Permanent Injunction Case Law. . . . . . . . . . . . . . . 253

Appendix C:  Hearing Participants  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 280

Appendix D:  Public Comments and Hearing Submissions . . . . . . . . . . . . . . . . . . . . . . . 293

Appendix E:  Hearing Agendas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 298

i

than the economic value of their inventions compared to alternatives and creating problems of overcompensation and market distortion.

# CHAPTER 7
## CALCULATING REASONABLE ROYALTY DAMAGES

Accurately calculating reasonable royalty damages based on a hypothetical negotiation and the willing licensor/willing licensee model presents numerous challenges for litigants and courts. An economically grounded approach to damages calculation that appreciates the role of competition in establishing the economic value of an invention would increase the accuracy of that determination. Chapter 7 suggests several steps courts can take to increase the accuracy of reasonable royalty damage awards.

### The *Georgia-Pacific* Factors and Their Implementation

Courts and juries often make reasonable royalty damage awards by considering some or all of the *Georgia-Pacific* factors, a list identified by a district court in 1970 as relevant to the issue.[16] This list has served as a touchstone for expert testimony, jury instructions, and judicial review of damage awards. Clarifying the appropriate role of the *Georgia-Pacific* factors would help increase the accuracy of reasonable royalty damage awards. The factors do not provide a conceptual framework for calculating damages. Rather, they are properly understood as a non-exhaustive list of evidence categories that may be, but are not necessarily, relevant to a specific calculation.

> ***Recommendation.*** Courts should consistently adopt and apply the hypothetical negotiation and willing licensor/willing licensee model as the conceptual framework against which conduct of the damages trial is tested. In particular, courts should recognize that the *Georgia-Pacific* factors provide only a list of evidence categories. Implementing this recommendation will have practical consequences regarding jury instructions, admissibility of evidence and decision-making, discussed below.

### The Role of Alternative Technologies

Manufacturers often choose among competing alternative technologies to incorporate into new products. A manufacturer will not pay more to use patented technology than the increased profits it anticipates from using the patented invention compared to the next best alternative. If royalties exceed this economic value of the invention, manufacturers can bargain for a lower rate or choose an alternative. Because alternative technologies play a crucial role in actual licensing negotiations, they must play a commensurate role in the hypothetical negotiation that determines

---

[16]Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971).

reasonable royalty damages. Recent case law has suggested, however, that the availability of non-infringing alternatives does not necessarily cap reasonable royalty damage awards.

> ***Recommendation.*** Courts should recognize that when it can be determined, the incremental value of the patented invention over the next-best alternative establishes the maximum amount that a willing licensee would pay in a hypothetical negotiation. Courts should not award reasonable royalty damages higher than this amount.

> ***Timing of the hypothetical negotiation.*** A manufacturer's costs in choosing an alternative to the patented technology and the ability of alternatives to cap a reasonable royalty can depend on the timing of the hypothetical negotiation. As it chooses technologies to incorporate into a new product, a manufacturer will often make investments (e.g., building manufacturing facilities) based on that choice that make it more costly to switch to an alternative. If the hypothetical negotiation is deemed to take place after investments have increased switching costs, the reasonable royalty may be higher than it would have been at the time of the design choice. This result overcompensates patentees compared to the economic value of the invention because of investments by the infringer. The ability of patentees to demand and obtain royalty payments based on the infringer's switching costs is commonly called "hold-up." The case law places the hypothetical negotiation at the time infringement began, but it does not precisely define that point in time.

> ***Recommendation.*** To prevent damage awards based on switching costs, courts should set the hypothetical negotiation at an early stage of product development, when the infringer is making design decisions and before it has sunk costs into using the patented technology.

> ***Reasonable royalties applied to standards.*** Hold-up may have especially severe consequences for innovation and competition in the context of standardized technology. IT firms often achieve interoperability among products by working together in standard setting organizations (SSOs) to jointly adopt industry-wide technical standards. Alternative technologies compete for inclusion in the standard. Once a technology is incorporated into a standard, a firm with a patent reading on the technology can demand a royalty that reflects not only the value of the technology compared to alternatives, but also the value associated with investments made to implement the standard. Switching costs may be prohibitively high when an industry becomes locked into using standardized technology. Were patentees able to obtain the hold-up value, this overcompensation could raise prices for consumers while undermining efficient choices made among technologies competing for inclusion in a standard.

One way that many SSOs attempt to address this problem is through licensing rules that require participants to agree to license patents on RAND (Reasonable and Non-Discriminatory) terms. But panelists complained that RAND was not defined and provided little guidance in licensing negotiations. More clarity in the damages case law on the role of alternatives and timing in the hypothetical negotiation would support a definition of RAND that limits hold-up. A definition of RAND based on the ex ante value of the patented technology at the time the

standard is chosen is necessary for consumers to benefit from competition among technologies to be incorporated into the standard.

> ***Recommendation.***  Courts should apply the hypothetical negotiation framework to determine reasonable royalty damages for a patent subject to a RAND commitment. Courts should cap the royalty at the incremental value of the patented technology over alternatives available at the time the standard was chosen.

**Courts' Gatekeeping Role in Reasonable Royalty Damages Cases**

Litigants frequently present damages evidence in patent cases to the jury through an expert witness who offers opinion on the appropriate damage award.  The judge acts as a gatekeeper in determining whether that opinion testimony is sufficiently reliable to be admissible under Federal Rule of Evidence (FRE) 702.  To be reliable, expert testimony must be: (1) based on sufficient facts or data; (2) the product of reliable principles and methods; and (3) result from reliable application of those principles and methods to the facts of the case.

Calls for more vigorous judicial gatekeeping excluding unreliable testimony on damages have received heightened attention in the patent community and generated broad agreement at the hearings.  Such gatekeeping is especially important for achieving accurate awards in the context of the hypothetical negotiation, which can be difficult for jurors to apply.  Panelists maintained, however, that courts rarely exercise their gatekeeping authority in patent damages matters. Decisions under *Daubert*[17] that examine only the reliability of an expert's methodology, without fully considering whether he reliably applied that methodology to the facts of the case, can result in admission of improper testimony.  The recent Federal Circuit opinion, *Uniloc v. Microsoft*,[18] emphasizes the need for damages experts to tie accepted methodologies to the facts of the particular case.

> ***Recommendation.***  In their gatekeeper role of enforcing FRE 702, courts should test the admissibility of expert testimony on damages by assessing whether it will reliably assist the trier of fact in determining the amount a willing licensor and willing licensee would have agreed to as compensation for use of the patented invention in the infringing product. Courts should not deem evidence as relevant, reliable and admissible solely because it falls within one of the *Georgia-Pacific* factors.

---

[17]Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

[18]Uniloc USA, Inc. v. Microsoft Corp., Nos. 2010-1035, 2010-1055, 2011 WL 9738 (Fed. Cir. Jan. 4, 2011).

***Recommendation.*** Consistent with FRE 702, courts should require a showing that a damages expert's methodology is reliable, that he reliably applies the methodology to the facts of the case, and that the testimony is based on sufficient data. Demonstration of a reliable methodology without satisfaction of the other two prongs should not establish admissibility.

***Comparable licenses and averages***. The issues surrounding the admissibility of royalty rates on licenses claimed to be comparable to the hypothetically negotiated license illustrate the importance of active gatekeeping. Basing reasonable royalty awards on royalty rates in patent licenses that are "comparable" to the license that would result from the hypothetical negotiation (or averages of such royalty rates) is a common methodology for setting reasonable royalty damages. Such evidence can reliably assist the trier of fact in setting the hypothetical negotiation license only if the patented invention and its infringing use are sufficiently similar to those of the comparable license. Key attributes in assessing comparability include the technology that is licensed, the rights licensed (e.g., whether a license covers one patent or several), and the type and terms of the license (e.g., running royalty or lump sum). In *Lucent v. Gateway*[19] and other cases, the Federal Circuit has recently applied a more rigorous review of damage awards that considers whether licenses offered as "comparable" are sufficiently similar to support a jury verdict.

**Recommendation.** Courts should admit expert testimony based on comparable licenses as reliable only upon a satisfactory showing of similarity between the licensed patent and the infringed patent, and between the non-price terms of the comparable license and hypothetical license. That showing should be sufficient to support an inference that the royalty rate for the comparable license provides a reliable indicator of the royalty that would be reached in the hypothetical negotiation.

## Choosing the Royalty Base: The Entire Market Value Rule

The entire market value rule arose in the context of calculating lost profits damages for a patent covering a component of a product. The law allows the patentee to recover lost profits damages based on the entire market value of the product when the patented component is the "basis for customer demand." Otherwise lost profits damages will be based only on the value of the patented component or "apportioned."

The entire market value rule as developed for lost profits has no corollary in the context of calculating a royalty by multiplying a royalty base times a royalty rate. There is no amount of potential damage funds, such as the profits lost on a product, to be entirely awarded or apportioned. Moreover, the base and rate are closely interrelated. Altering the base in response to a legal test should result in recalibrating the rate. Nonetheless, courts have imported this rule into reasonable royalty determinations as a technique for identifying the royalty base.

---

[19]Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301 (Fed. Cir. 2009).

***Recommendation.*** Courts should eliminate the entire market value rule and the question of whether the patented feature was the "basis for customer demand" from the determination of the appropriate base in a reasonable royalty damages calculation. It is irrelevant and it risks injecting significant confusion that threatens to produce inaccurate awards.

***Identifying the base.*** Multiple considerations apart from the entire market value rule influence parties' choice of a royalty base in actual licensing negotiations, including convenience of the parties and the practice in the industry. Where the patented invention is only one component of a larger product, the product may be the only item that is priced and can be monitored. However, the practical difficulty of identifying a royalty rate that accurately reflects the invention's contribution to a much larger, complex product counsels toward choosing the smallest priceable component that incorporates the invention. Because the choice of a base in an actual licensing negotiation is not driven by whether the patented feature is the "basis for customer demand," that question should not drive the choice of base in a hypothetical negotiation. (The rule's concern with the extent to which a patented invention drives customer demand is relevant for identifying an appropriate royalty *rate*.)

***Recommendation.*** Courts should identify as the appropriate base that which the parties would have chosen in the hypothetical negotiation as best suited for accurately valuing the invention. This may often be the smallest priceable component containing the invention.

# CHAPTER 8
## PERMANENT INJUNCTIONS IN PATENT CASES

In addition to awarding damages for past patent infringement, courts may also grant permanent injunctions prohibiting future infringement. In 2006, in *eBay v. MercExchange*, a unanimous Supreme Court held that the grant of permanent injunctive relief in a patent case is governed by "traditional equitable principles." The Court listed four factors that a patentee must satisfy to obtain an injunction:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.[20]

---

[20]eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006).

**How Permanent Injunctions Affect Innovation and Competition**

Although the injunction analysis is equitable, to most benefit consumers, it should be conducted in a manner that furthers the patent system's goal of promoting innovation and recognizes consumer interest in aligning the patent system and competition policy. Three characteristics of injunctions that affect innovation support generally granting an injunction. The first and most fundamental is an injunction's ability to preserve the exclusivity that provides the foundation of the patent system's incentives to innovate. Second, the credible threat of an injunction deters infringement in the first place. This results from the serious consequences of an injunction for an infringer, including the loss of sunk investment. Third, a predictable injunction threat will promote licensing by the parties. Private contracting is generally preferable to a compulsory licensing regime because the parties will have better information about the appropriate terms of a license than would a court, and more flexibility in fashioning efficient agreements.

A fourth characteristic of injunctions affects the alignment of the patent system and competition policy. An injunction's ability to cause patent hold-up can support withholding injunctive relief in some situations. A manufacturer's high switching costs combined with the threat of an injunction can allow a patent owner to obtain payments unrelated to the economic value of its invention. Hold-up and the threat of hold-up can deter innovation by increasing costs and uncertainty for manufacturers. It can also raise prices to consumers by depriving them of the benefit of competition among technologies. In such circumstances, injunction law threatens to disrupt the alignment of the patent system and competition policy.

A challenge for injunction analysis is to integrate and balance awareness of these issues. Hold-up can harm innovation and competition. But denying an injunction every time an infringer's switching costs exceed the economic value of the invention would dramatically undermine the ability of a patent to deter infringement and encourage innovation. For this reason, courts should grant injunctions in the majority of cases, but criteria are needed to help identify those instances in which the harm to the patentee from ongoing infringement is small compared to the costs from hold-up. These criteria include: (1) whether the patented technology is a minor component of a complex product that would have been easy to design around ex ante; (2) whether the infringement affects the patentee's ability to compete in a product or technology market; and (3) whether the infringer copied the patented technology.

**Analyzing *eBay's* Four Factors**

To be implemented by courts, these concerns about innovation and aligning the patent system and competition policy must be translated into the *eBay* framework. In fact, these concerns fit well within the equitable nature of the injunction remedy and *eBay's* four factor analysis.

*Irreparable harm/inadequacy of money damages*.[21]  Much discussion concerning injunction law post-*eBay* has focused on whether the patentee and infringer compete in a product market.  Conventional wisdom assumes that patentees that do not compete in a product market cannot obtain injunctions because money damages will adequately compensate any harm they may suffer from infringement.  Conventional wisdom also assumes that a patent owner practicing the patent can and should be granted an injunction.

The class of non-practicing patent owners is too diverse to be subject to a simple rule.  Patentees that license as part of a technology transfer program can suffer harm from infringement akin to that suffered by manufacturing patentees.  These patentees compete in a technology market to have their technology purchased for incorporation into new products.  The availability of an injunction is important to such patentees, who rely on the threat to deter infringement and encourage ex ante licensing.  The harm suffered by these patentees as a result of infringement can be analogous to that suffered by manufacturing patentees, including loss of a customer base and harm to reputation as an innovator.  However, denial of an injunction may not prevent a patent assertion entity (PAE) from receiving the full value of the invention. That patentee will not have the same concerns about deterring future infringement and protecting its reputation as an innovator that other patentees may have.

This is not to say, however, that courts should assume all manufacturing patentees will suffer irreparable harm from infringement.  While that might often be the case, the analysis must consider other facts.  The patent may cover a minor component of the infringing product.  Competing products may include non-infringing alternatives that are acceptable to customers, making it less likely that the infringement (as opposed to competition generally) is harming the patentee.  The variety and complexity of different factual scenarios caution against creating any assumptions of irreparable harm based on a finding of infringement, a patentee's use of the patent, or its willingness to license.

> *Recommendation.*  Courts should not presume irreparable harm based on a finding of infringement or the patentee's use of the patent. Conversely, courts should recognize that infringement can irreparably harm the ability of patentees that primarily engage in technology transfer through licensing to compete in a technology market.

> *Balance of the equities and hardships between the parties*.  Under this factor, courts must consider the effect of an injunction on an infringer and balance it against the harm that infringement imposes on the patentee.  This factor allows courts to weigh the expense and harm to an infringer facing hold-up against the harm to the patentee by considering whether the invention is a minor component for which acceptable alternatives are available, and how infringement affects the patentee's ability to compete in a goods or technology market.  Courts can also consider whether the infringer copied the technology.

---

[21]Courts and commentators often analyze these two factors as one.  Appendix B, Section III.A.

> ***Recommendation.*** Courts should consider the hardship of an infringer facing hold-up under this prong. Courts should reject the statement that an infringer "cannot be heard to complain if an injunction against continuing infringement destroys the business"[22] except in those instances where an infringer "elects" to infringe by copying a patented invention with knowledge of the patent.

***Public interest.*** Under the public interest factor, courts must examine the effect an injunction would have on third parties, including the public at large. Courts often cite the public's interest in the patent system's ability to promote innovation as supporting an injunction. While this is important, in some circumstances, such as those involving hold-up based on a patent for a minor component, an injunction could unduly raise prices to consumers and deter rather than promote innovation.

> ***Recommendation.*** When warranted by the facts, courts should consider the public's interest in avoiding patent hold-up, which can increase costs and deter innovation.

## Injunction Analysis in the Standard Setting Context

Hold-up in the standard setting context can be particularly acute. Standards are often adopted to make products compatible and interoperable with other products in the industry. "Lock-in" can make an entire industry susceptible to hold-up. In addition to higher prices and other economic harms, hold-up in standards-based industries may discourage standard setting activities and collaboration, which can harm innovation.

*eBay* provides a framework for evaluating whether to issue an injunction in the standard setting context. A prior RAND commitment by the patentee or its successor-in-interest can provide evidence that denial of an injunction in favor of ongoing royalties will not irreparably harm the patentee. The infringer's inability to participate effectively in the market without complying with the standard is relevant to the balance of hardships. The public interest factor may consider whether grant of an injunction would deprive consumers of interoperable products; raise costs above the incremental value of the invention compared to alternatives at the time the standard was set; or threaten to undermine the collaborative innovation that can result from the standard setting process.

> ***Recommendation.*** Courts should give careful consideration under each of *eBay's* four factors to the consequences of issuing an injunction prohibiting use of a patented invention incorporated into an industry standard. Whether the patent owner made a RAND commitment will also be relevant to the injunction analysis.

---

[22]*E.g.,* 3M Innovative Properties Co. v. Avery Dennison Corp., No. 01-1781, 2006 WL 2735499, at *2 (D. Minn. Sept. 25, 2006).

**Remedies Following Denial of an Injunction**

When the analysis leads a court to deny an injunction, the question naturally arises of what remedy to apply. The court opinions that address the question most commonly require ongoing royalties that allow the manufacturer to continue making the infringing product. The Federal Circuit has held that this remedy can be appropriate in lieu of an injunction. No consensus on how to set the royalty rate has emerged from the case law, however. The Federal Circuit has stated only that district courts must articulate a reasonable basis for determining the amount, and that the award should account for the changed relationship of the parties resulting from an adjudicated finding of infringement of a valid patent.

*Ongoing royalties.* To form a coherent remedies system, the legal rules for ongoing royalties following denial of an injunction must be consistent with the rationale for denying the injunction in the first place. When a court denies an injunction to prevent hold-up, the alternative remedy should not perpetuate the hold-up. The ongoing royalty should be based on a willing licensor/willing licensee model with the assumption that the patent is valid and infringed in order to account for the changed relationship of the parties following litigation. Concerns about preserving the deterrent value of injunctions and patentees' incentives to innovate are best addressed by carefully defining and limiting the circumstances under which injunctions are denied.

> *Recommendation.* The Commission recommends that to fully compensate patentees but avoid creating hold-up, courts base awards of ongoing royalties following denial of an injunction on the willing licensor/willing licensee model, assuming the patent is valid and infringed.

*Delaying the injunction*. In several instances, courts have granted a permanent injunction but delayed the time for it to commence in order to give the infringer time to design around the patent or the parties time to reach a licensing agreement. Where a design around option is feasible and the infringer is afforded sufficient time to implement it, a delayed injunction can be a useful tool to prevent hold-up while avoiding the concerns associated with denying an injunction for the life of the patent. In addition, allowing the parties time to negotiate a license can conserve judicial resources.

**Remedies in the International Trade Commission**

Patent holders who believe that imported products infringe their patents may file a complaint with the International Trade Commission (ITC) under Section 337 of the Tariff Act of 1930. Panelists expressed concern that patentees that are unlikely to obtain an injunction in district court under *eBay* may instead pursue a case in the ITC. Such patentees might include patent assertion entities (PAEs) and those whose patent is subject to a RAND commitment for use in a standard. The Federal Circuit has held that *eBay's* equitable test does not apply to ITC decisions to grant an exclusion order barring importation of infringing products. Thus, unlike the situation in district court, a finding of infringement in the ITC has led to a nearly automatic

29

exclusion order, which is sometimes tantamount to an injunction. In some circumstances, this outcome could generate hold-up and harm innovation and competition.

Section 337 provides two mechanisms through which the ITC can limit the potential harm from hold-up. The first is through the domestic industry requirement. To file suit in the ITC, a patent owner must meet the domestic industry requirement, which can be satisfied by showing "substantial investment in [the patent's] exploitation, including engineering, research and development or licensing."[23] The ITC should interpret the domestic industry requirement as not satisfied by ex post licensing activity solely focused on extracting rents from manufacturers based on marketed products. Consistent with the legislative history's concern with innovation and the language of the statute, relevant licensing activity can be that which "exploits" the patent through technology transfer that can result in the commercialization of new products and services. This interpretation would limit access to the ITC for PAEs, who are least likely to obtain an injunction under *eBay*, but not other non-practicing patent owners who compete in technology markets.

Second, Section 337 requires the ITC to consider "the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers" in deciding whether to grant an exclusion order.[24] The ITC has rarely used this public interest provision to deny a remedy. But its language should allow consideration of whether an exclusion order based on a minor patented component of a complex product can unduly harm consumers by causing hold-up, distorting competition, raising prices and deterring innovation. These concerns can be especially powerful when a patentee asserts a patent in the ITC that is subject to a RAND commitment against standardized technology.

> ***Recommendation*** The FTC recommends that the ITC consider whether only those licensing activities that promote technology transfer "exploit" patented technology within the meaning of Section 337, and therefore satisfy the domestic industry requirement. The FTC also recommends that the ITC incorporate concerns about patent hold-up, especially of standards, into the decision of whether to grant an exclusion order in accordance with the public interest elements of Section 337.

---

[23] 19 U.S.C. § 1337(a)(3).

[24] 19 U.S.C. § 1337(d)(1).



FEDERAL TRADE COMMISSION
FTC.GOV

Exhibit 7

the**antitrust**source ■ www.antitrustsource.com ■ October 2014    1

*The Antitrust Source*, October 2014. © 2014 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

# Implementing the FRAND Commitment

**Janusz Ordover and Allan Shampine**

For many years, standard-setting organizations (SSOs) have required members to commit to license standard-essential patents (SEPs) on Fair, Reasonable and Non-discriminatory (FRAND) terms.[1] How FRAND terms can and should be interpreted has been the subject of extensive debate (as well as litigation in many jurisdictions). While we acknowledge other objectives behind these commitments, we focus here on their role as constraints on the ability of the holders of the SEPs to hold up implementers of such FRAND-encumbered patents, with potential anticompetitive effects.

In this article, we explain why, from a practitioner's perspective and given the economic goals of FRAND terms, a mere commitment to license on FRAND terms does not ensure that the *ex-post* negotiations will invariably satisfy the FRAND principles. We then describe when and how we believe FRAND commitments should be enforced to achieve the economic goals of FRAND terms and avoid anticompetitive effects.[2]

## Goals for FRAND terms

Although standards can have benefits, collaborative standard setting by an SSO can raise competitive concerns. Failure to restrain or mitigate the possibility of anticompetitive conduct by SSO participants can reduce or eliminate the benefits of standards.

FRAND commitments have the following economic goals in order to address potential anticompetitive problems. First, a royalty for a FRAND-encumbered SEP should reflect *ex ante* competitive conditions rather than the *ex post* market conditions. This is because once the relevant IP is included in the standard and an implementer has included it in its product, competitive alternatives within the standard are extinguished. This may give the owner of the SEP *ex post* market power and the ability (albeit not necessarily the incentive) to engage in "hold-up." Second, a non-discriminatory royalty should offer the same terms to all similarly situated licensees, thus ensur-

■

*Janusz Ordover is Professor of Economics at New York University and a Senior Consultant for Compass Lexecon.*

*Allan Shampine is Executive Vice President for Compass Lexecon.*

*The authors thank Theresa Sullivan for her help and Michelle Miller and Joe Kattan for many discussions on the topics of this article. The authors have consulted for various parties on FRAND issues, including Apple, Microsoft, RIM, and Qualcomm.*

---

[1] *See* FED. TRADE COMM'N, THE EVOLVING IP MARKETPLACE: ALIGNING PATENT NOTICE AND REMEDIES WITH COMPETITION 192 (2011) [hereinafter FED. TRADE COMM'N, EVOLVING MARKETPLACE], *available at* http://www.ftc.gov/reports/evolving-ip-marketplace-aligning-patent-notice-remedies-competition. ("Many SSOs attempt to address this [hold-up] problem through disclosure and licensing rules. Disclosure rules typically require participants to disclose patents or patent applications during the standard setting process before a standard is chosen. Licensing rules typically require that participants agree to license disclosed patents on RAND (Reasonable and Non-Discriminatory) or FRAND (Fair, Reasonable and Non-Discriminatory) terms." Internal citations omitted.). We are not aware of any substantive difference between RAND and FRAND requirements. To avoid confusion, we will use the term FRAND throughout this paper.

[2] For more detailed discussions on the economic goals of FRAND terms and of the problems of hold-up and royalty stacking, *see, e.g.*, FED. TRADE COMM'N, EVOLVING MARKETPLACE, *supra* note 1, at 191–94; Dennis Carlton & Allan Shampine, *An Economic Interpretation of FRAND*, 9 J. COMPETITION L. & ECON. 531, 536–45 (2013) [hereinafter Carlton & Shampine, *Economic Interpretation*]; Daniel Swanson & William Baumol, *Reasonable and Nondiscriminatory (RAND) Royalties, Standards Selection, and Control of Market*, 73 ANTITRUST L.J. 1 (2005); Mark Lemley & Carl Shapiro, *Patent Hold-Up and Royalty Stacking*, 85 TEX. L. REV. 1991 (2007); and Joseph Farrell, John Hayes, Carl Shapiro, & Theresa Sullivan, *Standard Setting, Patents and Hold-up*, 74 ANTITRUST L.J. 603 (2007).

ing a level playing field for competition in products implementing the standard.[3] Third, a fair and reasonable royalty should not subvert the SSO's goal of promoting wide adoption of a standard. That is, it would be helpful if it addressed the potential problem of royalty stacking or "Cournot complements."[4] And, finally, the royalties should ensure there are adequate incentives for innovation by all firms, including those using the standard, and for bringing intellectual property into a standard.[5]

## Why Can't Negotiations Alone Avoid Anticompetitive Problems?

The power of a FRAND commitment to influence behavior is determined in large part by its enforceability. To the extent the terms are well understood and parties can enforce them through the courts, one would certainly expect that the potential for recourse to the courts would impact negotiations. Indeed, it is generally the case that negotiations will be affected by the expected outcome of a possible litigation between the parties (e.g., if proposed terms are too different from what either party could expect to obtain through the courts, then parties have an incentive to go to court rather than accept the terms).[6] However, it is sometimes asserted that there is no need for the courts to intervene because a patent holder that has made a FRAND commitment will not offer terms that are inconsistent with FRAND. Or, alternatively, that FRAND commitments require only "good faith" negotiation, and are simple commercial negotiations in which the courts should not intervene barring some egregious show of "bad faith." We believe otherwise.

*[A] FRAND commitment should be defined to address the potential anticompetitive problems raised by the standard-setting process.*

Just because a commitment is made does not mean that the commitment will necessarily be honored, any more than the existence of a contract means that contracting parties will never breach it. Unless there is a way to make a FRAND commitment concrete, there is no guarantee of it being honored. That is, a FRAND commitment must be defined so that courts can determine whether the commitment is being honored or not. Furthermore, a FRAND commitment should be defined to address the potential anticompetitive problems raised by the standard-setting process. For example, if FRAND were interpreted to require only "good faith" negotiations, then, almost by definition, virtually any outcome of a bilateral negotiation could be deemed to meet the FRAND criteria. Such an interpretation would be economically vacuous. The patent holder would have the incentive to exploit whatever ability it may have to exercise hold-up, and a nebulous "good faith" requirement would provide no practical barrier to the ability to do so. One might argue that, if hold-up is not a significant problem, then the goal of providing incentives for innovation should take

---

[3] More specifically, non-discrimination should keep SEP holders from using their acquired market power to impede rivals in downstream markets or expropriate returns from product-differentiating innovations by rivals (or non-rivals). One of the authors has previously written about the importance of non-discrimination and how it can be used to address many of these concerns, particularly where comparable, FRAND-compliant benchmarks are available. Carlton & Shampine, *Economic Interpretation, supra* note 2, at 546–49; *see also* Richard Gilbert, *Deal or No Deal? Licensing Negotiations in Standard-Setting Organizations*, 77 ANTITRUST L.J. 855, 858–59 (2011); Dennis Carlton & Allan Shampine, *Identifying Benchmarks for Applying Non-Discrimination in FRAND*, CPI ANTITRUST CHRON., Aug. 2014 (1), at 2 [hereinafter Carlton & Shampine, *Identifying Benchmarks*].

[4] Preserving *ex ante* competition and ensuring non-discrimination can be addressed even if it proves impractical to address royalty stacking. *See* Carlton & Shampine, *Economic Interpretation, supra* note 2.

[5] We recognize there is debate about whether rates set on an *ex ante* basis provide appropriate incentives. We believe that they do. For opposing viewpoints, see, e.g., Richard Epstein, Scott Kieff & Daniel Spulber, *The FTC, IP, and SSOs: Government Hold-Up Replacing Private Coordination*, 8 J. COMPETITION L. & ECON. 1 (2012); John Golden, *'Patent Trolls' and Patent Remedies*, 85 TEX. L. REV. 2111 (2007); Einer Elhauge, *Do Patent Holdup and Royalty Stacking Lead to Systematically Excessive Royalties?* 4 J. COMPETITION L. & ECON. 535 (2008).

[6] *See, e.g.*, Carlton & Shampine, *Identifying Benchmarks, supra* note 3, at 3–6.

precedence and patent holders' negotiating ability should not be restricted. However, there is evidence to the contrary—that hold-up is a serious concern.[7]

Similar claims that licensing firms always have a self-interest to negotiate to a FRAND rate because of concerns about participation in future standards settings or repeated interactions with other SSO members are also belied by findings that rates demanded by licensors are at times multiple orders of magnitude above what is ultimately determined to be a FRAND rate.[8] Such claims also fail to consider the importance of other strategic incentives to offer non-FRAND terms. For example, other SEP owners might approve of excessive demands for licenses to FRAND-encumbered patents rather than retaliate against the SEP holder at some future time. This is especially so if the firm being asked to pay the excessive rate is a strong competitor of the other firms. Indeed, one concern with collective action amongst competitors is that a group of competitors may work together to disadvantage another group of competitors, e.g., later entrants or firms with no SEPs.[9] For example, if an entrant has been particularly successful competing against many SSO members, those firms might be more likely to reward the patent holder for seeking excessively high rates in future rounds of standard setting than to punish it. Similarly, different SSO members may have different incentives. Some may prefer to see precedents of high rates to be deemed as FRAND, so that they might themselves demand such rates in the future.

While any rate that parties agree on strikes some sort of "balance" between the licensor and licensee, we do not agree that the mere fact that a rate comes from a negotiation is enough to satisfy the strictures of FRAND. In particular, any agreement between a buyer and a monopolist exercising market power strikes a balance, but that balance reflects the exercise of market power. Hence, this *laissez-faire* interpretation of FRAND provides no meaningful restriction on the licensors' ability to exercise market power stemming from an inclusion in the standard. Nor does it offer a clear mechanism by which a potential licensee could challenge a rate as not being "reasonable" under FRAND. Neither party should be allowed to declare a rate to be FRAND without the other party having some mechanism to challenge that claim.

## Who Can Obtain a License?

We now provide suggestions on how FRAND should be implemented from a practical perspective to address the antitrust concerns created through the collective action of SSOs. First, any firm should be able to obtain a license to SEPs covered by a FRAND commitment. In particular, the patent holder should not be able to restrict licensing based on a firm's location in the supply chain. We note that, if a patent holder offers licenses to only downstream firms and refuses to license upstream firms, it presumably expects this strategy to be more profitable than licensing upstream or not offering a license. This scenario gives rise to a serious concern that the patent holder may be attempting, by exercising hold-up, to extract part of the downstream firms' profits from functionality unrelated to the patent holder's patented technology. As a practical matter, it is likely to

---

[7] *See, e.g.*, Microsoft Corp. v. Motorola, Inc., No. 10-1823, 2013 WL 2111217 at *10–11 (W.D. Wash. Apr. 25, 2013) (Roberts, J.); *In re* Innovatio IP Ventures, LLC Patent Litig., No. 11-9308, 2013 WL 5593609, at *8–9 (N.D. Ill. Oct. 3, 2013) (Holderman, J.); Lemley & Shapiro, *supra* note 2, at 2025–35; Fiona Scott Morton & Carl Shapiro, *Strategic Patent Acquisitions*, 79 Antitrust L.J. 463, 482 (2014).

[8] *See, e.g.*, Microsoft Corp. v. Motorola, Inc., No. 10-1823, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013) (Roberts, J.); *In re* Innovatio IP Ventures, LLC Patent Litig., No. 11-9308, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013) (Holderman, J.).

[9] *See, e.g.*, Carl Shapiro, *Setting Compatibility Standards: Cooperation or Collusion?*, *in* Expanding the Boundaries of Intellectual Property 91, 91–92 (Rochelle Cooper Dreyfuss, Diane Leenheer Zimmerman & Harry First eds., 2001) (discussing examples of participants in a standard-setting process abusing that process to exclude competitors from the market).

be easier for the patent holder to exercise hold-up and strategic discrimination against end prod-uct manufacturers than against component manufacturers.[10] There are several reasons for this.

It would likely be more difficult for a judge or an arbitrator to determine whether the royalty claims of a SEP holder are reasonable when the end products are highly complex and contain multiple components, many of which may contain numerous SEPs. That is, attempting to deter-mine the incremental value of patents for each end product manufacturer will likely be more cost-ly and uncertain than determining that value to an upstream component manufacturer. Similarly, it may be more difficult for an end product manufacturer to use comparable licenses to avoid hold-up or discriminatory licensing terms because there is likely greater heterogeneity among end products than among components. Finally, the risks of litigating to obtain a FRAND rate may be greater for end product manufacturers than for component manufacturers because a trier of fact might be more willing to give a small royalty on a large base (the value of the end product) than a large royalty on a small base (the value of the component), even when the former results in a higher total payment. Hence licensing upstream potentially lowers the likelihood that the patent holder will try to exercise hold-up.[11]

In any event, we believe that the FRAND commitment requires the SEP holder to license any firm using the standard and seeking a license, regardless of the level of production.[12] This is par-ticularly important as upstream firms may be impacted by the SEP holders' actions downstream. For example, if a downstream manufacturer is sued for infringement by a SEP holder, the down-stream manufacturer may seek indemnity from an upstream supplier. Even if it does not seek an indemnity, the upstream supplier will be impacted by the changes in demand for its products should a SEP holder exercise hold-up against downstream firms. If an upstream firm is denied a license of its own, it may thus be itself impacted by a hold-up and violation of FRAND, but have no recourse.

*[I]t is likely to be easier*

*for the patent holder to*

*exercise hold-up and*

*strategic discrimination*

*against end product*

*manufacturers than*

*against component*

*manufacturers.*

### When Should Firms Be Allowed to Stop Negotiating and Go to Court?

Either party should be able to go to court at any point to challenge a rate that is "on the table." If, alternatively, parties could not challenge rates during "ongoing" negotiations, then enforcing a FRAND commitment would be difficult.

To set up the issue, consider whether an opening offer (or even a couple of rounds of offers) made in "good faith" should be subjected to judicial scrutiny at a whim of either party.[13] Should not the parties be required, at a minimum, to wait until negotiations have completely broken down and only then have the final offers evaluated by the courts? However, an approach that immunizes any particular offer by a SEP holder undermines the utility of FRAND because it provides no guid-ance for identifying the point in time during the negotiations at which either party could seek a judi-

---

[10] We do not mean to suggest that end product manufacturers should not be licensed. Rather, we are concerned about situations where com-ponent manufacturers wish to take licenses and are not allowed to do so. In our view, a refusal to license a firm is inconsistent with FRAND.

[11] We recognize that there may be a trade-off between reducing the risk of hold-up and reducing the ability of the patent holder to engage in possibly economically efficient price discrimination (which may also be allowable under FRAND to the extent the end product manufactur-ers are not similarly situated). For further discussion of these trade-offs, see Carlton & Shampine, *Economic Interpretation, supra* note 2.

[12] Although it may be the case that there are efficiencies to negotiating licenses at a particular level of production, and, in the absence of any abuses, upstream firms may well not seek to obtain separate licenses.

[13] For further discussion of some of the economics of bargaining in such situations, see Janusz Ordover & Ariel Rubinstein, *A Sequential Concession Game with Asymmetric Information,* Q.J. Econ. 879 (1986); and Ariel Rubinstein, *Choice of Conjectures in a Bargaining Game with Incomplete Information, in* Game-Theoretic Models of Bargaining 99 (Alvin E. Roth ed., 1985).

cial determination of the appropriate rate.[14] For example, if offers were not subject to evaluation, a SEP holder could make an initial offer reflecting substantial hold-up and then gradually reduce it over time but never to a level compliant with a FRAND commitment. Under this approach, the potential licensee would effectively be barred from challenging such a rate as being non-FRAND. The SEP holder could simply say that any particular challenged rate was part of an ongoing negotiation and so need not be constrained by FRAND. Similarly, a licensor must have an ability to eventually call off negotiations and seek enforcement of its patent rights.

In our view, interpreting FRAND as requiring only "good faith" negotiations is not an economically sound approach, nor one that can be readily evaluated from an economic perspective. The difficulty with an approach that relies on unrestricted negotiations can be illustrated by a licensee faced with an excessive royalty demand. If a licensee cannot go to the court while the patent holder is still "negotiating," and there is no clear way to tell if negotiations have finally broken down, then the patent holder could derail a pending law suit at any time by making a new offer or claiming that it is still negotiating in good faith. Furthermore, once one party has gone to court for a ruling, allowing the other party to unilaterally derail the process by making a new offer that would require any challenge to be restarted would make it impractical to obtain relief through the court. It could also be very costly to society if such litigation were continuously started, stopped, and restarted.[15] This untethered negotiations approach offers no relevant constraint on the market power created by the standard-setting process.

In the same vein, a potential licensee should not be able to indefinitely defer payments through stonewalling in negotiations. A patent holder should be able to discontinue negotiations with a potential licensee and sue for damages resulting from infringement based on a FRAND-compliant royalty (i.e., seek a judicial determination of a FRAND rate that the licensee should pay). And once a rate has been determined, the patent holder should be able to have payment of that rate enforced by the court, as we describe below.

It follows from this discussion that rates offered by patent holders should be bounded by a FRAND commitment. That is, all offers should be consistent with FRAND principles. This does not mean that there is always a unique rate that is consistent with FRAND principles, or that the parties will necessarily agree as to the boundaries of FRAND compliant rates. A range of rates may be "reasonable" under FRAND principles.[16] Thus, it is entirely consistent with FRAND principles for an initial licensee to be given an offer that is FRAND-compliant and to bargain from there, potentially resulting in a final license at a lower, but still a FRAND-compliant, rate. (Similarly, the licensee may propose a lower rate and bargain from that to a higher rate.)

---

[14] To be clear, in our view, the patent holder is obligated to offer a FRAND rate, and a licensee should be able to challenge a rate on the table. However, the patent holder should similarly be able to state that it believes the offer on the table is FRAND, and that a licensee should pay or be taken to court and forced to pay. Indeed, if there is a record of existing FRAND licenses, then a patent holder may not negotiate at all, but present non-discriminatory terms and inform the licensee that failure to accept those terms will result in litigation to enforce the patent holder's rights. Such litigation should, however, begin with an adjudication of the FRAND-compliant terms (i.e., we are not suggesting that a patent holder should be able to begin enforcement efforts with an injunction).

[15] If the parties can jointly reach an agreement to settle the litigation, then that is efficient from an economic perspective; but neither party should be able to unilaterally force the other party to abandon an effort to have the court settle the disagreement.

[16] There is a distinction between "reasonable" and "non-discriminatory." An initial negotiation as to rates can occur over a range of "reasonable" numbers, but once a deal has been struck, that deal sets a benchmark for future deals through the "non-discriminatory" part of FRAND. However, as we discuss later, difficulties in comparing licenses, perhaps because of complicating factors such as cross-licenses, may require a court to engage in a hypothetical negotiation even when there are existing licenses.

However, explicitly allowing non-FRAND offers is problematic in several respects. As described above, doing so complicates, and potentially removes, the effectiveness of litigation as an enforcement mechanism. Also, a non-FRAND offer could be accepted, especially if non-acceptance can result in an injunction. That is, if a patent holder knowingly makes a non-FRAND offer, and a licensee accepts it (perhaps because its litigation costs are too high to make challenging the offer worthwhile, or perhaps because it lacks information to effectively assess the offer), it is implausible that the patent holder would subsequently inform the licensee that it was paying "too much," and lower the royalty rate. Explicitly allowing a patent holder to ask for a non-FRAND rate would encourage patent holders to do so in the hope that a licensee will agree to that rate.

### Should Defensive Suspension of Existing FRAND Licenses Be Allowed?

Defensive suspension of FRAND licenses by patent holders can raise concerns about hold-up. An example of defensive suspension would be where a component manufacturer has a general license from a patent holder, but a customer of the component manufacturer sues the patent holder for infringement, at which point the patent holder suspends the license granted to the manufacturer with respect to the customer suing the patent holder. Such conduct can be, in effect, tantamount to a sabotage of the third party's business which is denied access to the components that are essential to the pursuit of its business.

In our view, defensive suspension, by its nature, means that the patent holder anticipates obtaining more from the licensee than it was getting under the existing license. That fact alone is problematic under FRAND, both with respect to hold-up and to non-discrimination. In particular, in our view, two firms are not differently situated with respect to FRAND just because one of the two licensees is suing the patent holder. Some commenters have suggested that an exception should be made if one SEP holder that has already granted a FRAND license is being sued by another SEP holder for a non-FRAND rate.[17] Allowing defensive suspension in such a situation would be a form of fighting fire with fire—saying that if one party is not acting subject to FRAND, then the other party need not as well. More specifically, FRAND commitments sometimes contain reciprocity provisions where the commitment to provide a FRAND license is conditioned on obtaining a FRAND license from the firm seeking a license. While this may be an unobjectionable quid pro quo if neither party has an existing license from the other, complications may arise when one firm already has granted a FRAND-compliant license to the other firm's SEPs, but has concluded that the other firm is asking for a non-FRAND rate. In such a situation, should the firm that has granted the prior license be able to suspend that license? To the extent that reciprocity is assumed under FRAND, such a suspension may be justifiable.

### How Should Injunctions Be Treated in the Presence of a FRAND Commitment?

Patent holders should not generally be allowed to obtain injunctions in the presence of a FRAND commitment. As a matter of economics, injunctions are inimical to some of the fundamental objectives of FRAND, such as fostering broad licensing of SEPs and adoption of the standard. The inclusion of a firm's technology in the standard, based on a collective decision of the members of the SSO, bestows potentially very large economic benefits on the SEP holder, such as the ability to collect royalties on all standard-compliant products and the enlargement of the volume of the products subject to the license. At the same time, the assurance that the IP owner will not be able to revoke

*Patent holders should*

*not generally be*

*allowed to obtain*

*injunctions in the*

*presence of a FRAND*

*commitment.*

---

[17] *See, e.g.,* Mark Lemley & Carl Shapiro, *A Simple Approach to Setting Reasonable Royalties for Standard-Essential Patents,* 28 BERKELEY TECH. L.J. 1135, 1156 (2013).

the license to its SEPs reduces the risks associated with developing products covered by the standard. Because the implementers of products under a standard are locked into the technology, the impacts of granting or denying an injunction in this context are extraordinarily asymmetric.

An injunction provides a means for a patent holder to exercise the additional market power gained by inclusion of a patent in a standard, and the threat of an injunction places at risk the investment and ongoing profits of firms using the standard. This allows the patent holder to engage in hold-up and ask for payment in excess of the *ex ante* value of the patent.

Granting an injunction could inflict serious harm to a potential licensee's business and could lead to irreversible harm to the potential licensee's brand that cannot be compensated monetarily. On the other hand, denying injunctive relief to the SEP owner results only in compensable monetary damages, bearing in mind that SEP holders have agreed to accept royalties from any party in exchange for use of the patented technologies implemented in the standard.

One might suggest that always or generally denying injunctions in the presence of a FRAND commitment denies IP owners the ability to enforce their IP rights. In our view, the proper starting point in the presence of a FRAND commitment is the imposition of damages—i.e., forcing the infringer to pay a reasonable and FRAND compliant royalty. Courts impose infringement damages all the time and enforce those rulings. Generally, injunctions or exclusion orders should be granted only if an infringer has refused to pay an adjudicated FRAND rate, and enforcement through an injunction is more practical than enforcement of a damages order. That is, granting an injunction would be sensible if a court could not enforce a damages verdict but could enforce an injunction. However, such circumstances seem relatively unlikely to arise. Given the large potential harms from granting injunctions and the unlikely nature of the exceptions, a general policy of not granting injunctions for SEPs in the presence of a FRAND commitment might be safest.

## How Should a "Reasonable" Rate Be Determined Under a FRAND Commitment?

Reasonable royalties under a FRAND commitment should be determined using the *ex ante* framework. Although standardization confers or enhances market power, this does not mean that the owner of FRAND-encumbered SEPs will actually convert this de facto monopoly into actual monopoly and engage in "excessive" licensing demands or other anticompetitive conduct. This decision is driven by the private incentives of the SEP owner. Inclusion in a standard lessens the competitive constraints facing the SEP holder and potentially gives it the ability to exercise market power and harm competition in a way that would not be possible if (as in the *ex ante* world) constraints from alternative technologies remained unaffected. The *ex ante* framework, although theoretical, provides a benchmark for the royalties and other terms that a SEP holder would be able to obtain if it had continued to face competition from alternative technologies, i.e., if it lacked the market power, in the relevant IP marketplace, that flows from its inclusion in the standard.

The *ex ante* framework for determining royalties under FRAND principles is widely, albeit not universally, accepted amongst economists. It has also been endorsed by the U.S. Federal Trade Commission.[18] We are not aware of any SSOs that have explicitly endorsed the *ex ante* approach;

---

[18] *See, e.g.*, FED. TRADE COMM'N, EVOLVING MARKETPLACE, *supra* note 1, at 22–23 ("A definition of RAND based on the *ex ante* value of the patented technology at the time the standard is chosen is necessary for consumers to benefit from competition among technologies to be incorporated into the standard."); *see also* Carlton & Shampine, *Economic Interpretation, supra* note 2, at 545; Microsoft Corp. v. Motorola, Inc., No. 10-1823, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013); Daniel Swanson & William Baumol, *Reasonable and Nondiscriminatory (RAND) Royalties, Standards Selection, and Control of Market*, 73 ANTITRUST L.J. 1 (2005); Fiona Scott Morton & Carl Shapiro, *Strategic Patent Acquisitions*, 79 ANTITRUST L.J. 463 (2014).

neither have they generally endorsed any other approach.[19] As we noted at the beginning, SSOs have generally left the interpretation of FRAND to lawyers, economists, and the courts.[20] When interpreting FRAND commitments, it is important to look at the underlying economics of the standard-setting process and the economic concerns, including competition policy concerns, which may arise as a result of the standard-setting process.

To be clear, the *ex ante* framework asks what is the incremental value of the patented technology relative to the alternatives available prior to the standard being set. The goal is to preserve the benefits of any competition that was actually or potentially present prior to the standard being set.[21] This framework can be implemented through a hypothetical negotiation in accord with factors enumerated in *Georgia-Pacific*,[22] with appropriate modifications to reflect the FRAND commitment itself and, potentially, the possibility of royalty stacking. In this respect, we are dealing with a counterfactual exercise, and the relevant distinction is as to the timing of this counterfactual exercise: Is the hypothetical exercise done at the time when the IP embodied in the SEP is not in the standard (*ex ante*) or after it is in the standard (*ex post*)? The *ex ante* framework is not (or need not be) based on an actual negotiation that took place before the standard was set. If such a negotiation did take place, it would certainly be helpful to consider the results of that negotiation,[23] but such negotiations may not have occurred.[24] The *ex ante* framework simply asks what rate (or range of rates) would firms have agreed to, had the competitive alternatives to the SEP not been eliminated (and market power not been conferred or enhanced), by the standard-setting process?

*The goal [of the ex ante framework] is to preserve the benefits of any competition that was actually or potentially present prior to the standard being set.*

As an illustration, consider that there is a standard for what a Martini cocktail consists of. Assume that the standard allows for any brand of gin, and that various brands of gin compete against each other for inclusion in the cocktail. Now assume that the official standard-compliant Martini requires brand X gin. This increases the market power of brand X (beyond the market power it may have had as a result of procompetitive product differentiation). In this setting, it may be relatively easy to ascertain the incremental value of the Martini standard if brand Y is swapped for brand X. Note that in this hypothetical exercise all other elements of the Martini standard remain unchanged. This allows us to isolate the incremental value of brand X gin within the standard. While there are certainly practical difficulties to conducting any counterfactual analysis, the widespread use of counterfactuals and the hypothetical negotiation construct indicates that these difficulties are not insurmountable.

---

[19] Some SSOs implement other approaches that are clearly defined, such as royalty-free licenses. We refer here to particular interpretations of FRAND commitments.

[20] One solution that has been advocated is for SSOs to precisely define FRAND. However, that has not yet occurred to our knowledge, and may be rendered moot to the extent that courts define FRAND in a way sufficient to avoid antitrust liability.

[21] Many standards do not become successful. By implementing an *ex ante* framework, SSOs can save themselves from the cost of having to conduct auctions or otherwise extensively investigate the relative prices and benefits of all possible alternatives. With the *ex ante* framework, that analysis can be done later only if the standard becomes successful, preserving the benefits of competition while conserving resources.

[22] *See, e.g.,* Microsoft Corp. v. Motorola, Inc., No. 10-1823, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013) (referring to Georgia-Pacific Corp. v. US Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970)).

[23] If it exists, such a negotiation can provide a reference point for the non-discriminatory aspect of FRAND. *See, e.g.,* Gilbert, *supra* note 3; Carlton & Shampine, *Identifying Benchmarks, supra* note 4.

[24] In principle, non-discrimination can moot much of this process if benchmark licenses exist. Once a rate has been set, all other parties can take advantage of it, and, to the extent possible, we strongly endorse the application of the non-discrimination portion of FRAND. In practice, we recognize that the existence of cross-licenses and other idiosyncratic terms may complicate the process of comparing licenses, necessitating some individual analyses.

The hypothetical negotiation/*ex ante* framework also allows for use of the non-discrimination provision and evaluation of total implied royalties (royalty stacking) as guiding principles that may be particularly important if it is difficult to determine the incremental value of the relevant patented technologies. It is very difficult to completely address the Cournot complements problem underlying royalty stacking (i.e., the cumulative royalty burden associated with a standard) without setting all rates at the same time and in a coordinated way.[25] However, courts should nonetheless recognize the existence of the royalty stacking problem and that it can exacerbate the problems of hold-up and strategic action.[26] In particular, royalty stacking revolves around having multiple patent holders each of which is trying to extract the entire available surplus. Courts should be wary of granting the entirety of the surplus, or even a majority of it, to a patent holder simply because that patent holder is the first to go to trial. We recognize, however, that this is perhaps the most difficult element to implement.

## What Royalty Base Should Be Used?

Most devices using standards have far greater functionality than just implementation of a particular standard. If profits from complementary innovations could have been achieved if some technology had been put into the standard other than an asserted SEP, then one should be concerned about the implementer being held up over those profits. In an *ex ante* negotiation, a patent holder's demand to share in the fruits of a manufacturer's innovative activities unrelated to the patent holder's contributions to the standard would not have succeeded. Thus, any such *ex post* demands are not "fair and reasonable." These concerns can be addressed in part by the choice of royalty base.

In considering the combined effect of the royalty base and rate, we do not want to imply that the mathematical trade-off between them creates indifference between the two elements of the formula. Rather, when both the base and rate vary significantly between heterogeneous products, it may become increasingly difficult to determine and apply FRAND-compliant royalty rates. One method we favor for dealing with product heterogeneity takes advantage of the fact that standards are sometimes embedded within particular components of downstream products such as, for cellular standards, baseband chipsets. Imposing royalties at the component level is attractive both for its relative simplicity and because it still rewards the innovator with increased revenues in the event of growth of the volume of sales or if the price of the component increases.[27] Another virtue is that charging a fee based on a component price ensures that the license terms can potentially be independent of the end use to which the chipset is put. Thus, unless the price of the component varies with the price of the mobile device, all devices will be burdened with the same license cost. This outcome is consistent with the non-discrimination provisions of FRAND.

Whether the base used is the price of a component or the price of a downstream product, the patent holder benefits from downstream innovation because such innovation increases sales of devices and, therefore, of components. Thus, although a component royalty base limits the patent holder's ability to obtain part of the profits flowing to the downstream manufacturers resulting from

---

[25] For a discussion on some possible ways to address this problem, see Jorge Contreras, *Fixing FRAND: A Pseudo-Pool Approach to Standards-Based Patent Licensing*, 79 Antitrust L.J. 47 (2013).

[26] *See, e.g.*, Lemley & Shapiro, *supra* note 2.

[27] We assume here that the relevant standard is fully implemented within the component. Negotiations at a patent portfolio level, particularly ones including non-SEPs, may well be more complicated, particularly when patented technologies appear in multiple components, or in the interaction between components.

their investments in innovation, it does allow the patent holder to benefit from the expansion in sales driven by those downstream innovations. In particular, using a royalty base of the component can help prevent hold-up when it is difficult to determine and apply FRAND-compliant rates across a highly differentiated range of devices. Often, devices that incorporate significant differentiating IP are highly heterogeneous, while components which implement standardized technology are less so. With respect to the value of the technology, the standard is implemented in the component. Our concern about using the price of the downstream device is that its market price can reflect a great deal of value to consumers derived from other sources—value that a SEP holder can try to expropriate through holdup.

That is, although some components of a device may work better in conjunction with a standard, many others are simply unrelated. It makes economic sense to collect the license fees from components that implement and directly benefit from the standard. To the extent that an end product is more valuable to consumers if it complies with a standard, this differential value is unlikely to be fully attributable to the SEPs. The portion of the incremental benefit that could be attributed specifically to a patent holder's intellectual property is the amount above the base level that could be obtained by using unpatented technology in the standard.[28] In any event, the appropriate compensation for SEPs that contribute an incremental improvement to a standard cannot be the entire amount that a customer would pay for the functionality of the entire standard.

*[I]t may be easier to evaluate the contribution of a given piece of IP to the economic value of a component that embodies it rather than to the economic value of the final product.*

As a practical matter, it may be easier to evaluate the contribution of a given piece of IP to the economic value of a component that embodies it rather than to the economic value of the final product. As a result, it could be easier to gauge the FRAND rate using the component, rather than the final product, as a base. In addition, scores of standards comprising thousands of declared SEPs are often incorporated in different devices. Because of the concern with royalty stacking (the Cournot complements problem) described earlier, the greater the number of SEP owners that attempt to collect royalties on their SEPs (no matter how small their contribution to one standard implemented in one component of the end product), the higher the total royalty burden is likely to be. This problem can be at least partially addressed by limiting the royalty base to the component. This approach is consistent with the FRAND principle that a SEP holder should earn reasonable compensation while still protecting against the exploitation of market power by the SEP holder attributed to standardization.

## What Are the Practical Challenges to Doing All This?

Often, it is not necessary to determine the precise boundaries of FRAND to decide whether a patent holder has stepped outside those boundaries, as the proposed rate is so far above the various benchmarks as to make the violation clear. For example, the courts in *Motorola v. Microsoft* and *Innovatio* found that the FRAND rates were orders of magnitude below the rates demanded by Motorola and Innovatio, respectively. It is commonly the case that qualitative statements are easier to make than quantitative (i.e., it is easy to look at something and say that it is bigger than a breadbox, while it would be more difficult to say by precisely how many inches is it bigger).

In any event, courts (and economists) deal successfully with such issues in patent litigation all the time. If they were entirely straightforward, the parties would likely not be in court. But the issues are resolvable, and courts do so regularly. To the extent that the FRAND analysis is different from

---

[28] The analysis is more complicated in the presence of patented alternatives. However, the key point that it should reflect the competition from the alternatives remains unchanged.

the**antitrust**source ▪ www.antitrustsource.com ▪ October 2014        **11**

a typical royalty analysis, it is in some ways simpler. For example, the non-discrimination aspect of FRAND may render irrelevant many of the factors that come up in non-FRAND patent litigation.

### Conclusion

In our view, the goals of FRAND commitments should be to avoid hold-up, to address royalty stacking, to provide a level playing field between competing users of the standard, and to ensure adequate incentives for innovation and participation in the standard. In order for FRAND commitments to provide any discipline on SEP holders, it is necessary that the option of litigation be clearly available and has some teeth to it. We have explained how we believe these goals are best achieved. ●

Exhibit 8

Lenovo Group Limited | 2018/19 Annual Report

Stock Code 992

# Leading and enabling intelligent transformation





**About Lenovo**

Lenovo (HKSE: 992) (ADR: LNVGY) is a $50bn Fortune Global 500 company, with 57,000 employees and operating in 180 markets around the world.  Focused on a bold vision to deliver smarter technology for all, we are developing world-changing technologies that create a more inclusive, trustworthy and sustainable digital society. By designing, engineering and building the world's most complete portfolio of smart devices and infrastructure, we are also leading an Intelligent Transformation – to create better experiences and opportunities for millions of customers around the world. To find out more visit https://www.lenovo.com, follow us on LinkedIn, Facebook, Twitter, YouTube, Instagram, Weibo and read about the latest news via our StoryHub.





# Contents

| | |
|---|---|
| Financial Highlights | **4** |
| Chairman And CEO Statement | **8** |
| Lenovo Management Team | **12** |
| Management's Discussion And Analysis | **16** |
| Corporate Governance Report | **52** |
| Audit Committee Report | **109** |
| Compensation Committee Report | **116** |
| Sustainability Overview | **127** |
| Directors' Report | **142** |
| Independent Auditor's Report | **173** |
| Consolidated Income Statement | **179** |
| Consolidated Statement Of Comprehensive Income | **180** |
| Consolidated Balance Sheet | **181** |
| Consolidated Cash Flow Statement | **183** |
| Consolidated Statement Of Changes In Equity | **185** |
| Notes To The Financial Statements | **187** |
| Five-Year Financial Summary | **291** |
| Corporate Information | **292** |

### 36 BUSINESS COMBINATIONS *(continued)*

Intangible assets arising from the business combination activities mainly represent customer relationships and an exclusive right. The Group has engaged external valuers to perform fair value assessments on these intangible assets in accordance with HKAS 38 "Intangible Assets" and HKFRS 3 (Revised) "Business Combination".

At March 31, 2019, the Group has not finalized the fair value assessments for net assets acquired (including intangible assets) from the business combination activities. The relevant fair values of net assets stated above are on a provisional basis.

Acquisition-related costs of US$9.4 million have been charged to administrative expenses in the consolidated income statement for the year ended March 31, 2019.

The aggregate revenue included in the consolidated income statement since May 2, 2018 and February 18, 2019 contributed by FCCL and LNTL was approximately US$2,778 million and US$5 million, respectively. FCCL contributed an aggregate profit after taxation of approximately US$89 million and LNTL incurred an aggregate loss after taxation of approximately US$3 million over the same period.

No separate set of financial information was prepared for FCCL and LNTL before the acquisition. Accordingly, disclosure of the revenue and profit/loss after taxation of both newly acquired businesses for the full year from April 1, 2018 has not been made.

### 37 PRINCIPAL SUBSIDIARIES

The following includes the principal subsidiaries directly or indirectly held by the Company and, in the opinion of the directors, are significant to the results of the year or form a substantial portion of the net assets of the Group. The directors consider that giving details of other subsidiaries would result in particulars of excessive length.

| Company name | Place of incorporation/ establishment | Issued and fully paid up capital | Percentage of issued capital held | | Principal activities |
|---|---|---|---|---|---|
| | | | **2019** | 2018 | |
| *Held directly:* | | | | | |
| 聯想 (北京) 有限公司 (Lenovo (Beijing) Limited)[1] (wholly foreign-owned enterprise) | Chinese Mainland | HK$175,481,300 | **100%** | 100% | Manufacturing and distribution of IT products and provision of IT services |
| 聯想 (上海) 有限公司 (Lenovo (Shanghai) Co., Ltd.)[1] (wholly foreign-owned enterprise) | Chinese Mainland | HK$10,000,000 | **100%** | 100% | Distribution of IT products and provision of IT services |

# Notes to the Financial Statements

## 37 PRINCIPAL SUBSIDIARIES *(continued)*

| Company name | Place of incorporation/establishment | Issued and fully paid up capital | Percentage of issued capital held 2019 | 2018 | Principal activities |
|---|---|---|---|---|---|
| *Held indirectly:* | | | | | |
| Fujitsu Client Computing Limited | Japan | JPY400,000,000 | 51% | – | Manufacturing and distribution of IT products |
| 聯寶 (合肥) 電子科技有限公司 (LCFC (Hefei) Electronics Technology Co., Ltd.)[1] (wholly foreign-owned enterprise) | Chinese Mainland | US$265,000,000 | 51% | 51% | Manufacturing and distribution of IT products |
| Lenovo (Asia Pacific) Limited | Hong Kong | HK$3,045,209,504.92 | 100% | 100% | Investment holding and distribution of IT products |
| 北京聯想軟件有限公司 (Beijing Lenovo Software Limited)[1] (wholly foreign-owned enterprise) | Chinese Mainland | HK$5,000,000 | 100% | 100% | Provision of IT services and distribution of IT products |
| Lenovo (Australia & New Zealand) Pty Limited | Australia | AUD45,860,993.40 | 100% | 100% | Distribution of IT products |
| Lenovo (Belgium) BVBA | Belgium | EUR1,317,700,834.94 | 100% | 100% | Investment holding and distribution of IT products |
| Lenovo (Canada) Inc. | Canada | CAD10,000,000 | 100% | 100% | Distribution of IT products |
| Lenovo Computer Limited | Hong Kong | HK$2 | 100% | 100% | Procurement agency and distribution of IT products |
| Lenovo (Danmark) ApS | Denmark | DKK126,000 | 100% | 100% | Distribution of IT products |

## 37 PRINCIPAL SUBSIDIARIES *(continued)*

| Company name | Place of incorporation/ establishment | Issued and fully paid up capital | Percentage of issued capital held | | Principal activities |
|---|---|---|---|---|---|
| | | | **2019** | 2018 | |
| Lenovo (Deutschland) GmbH | Germany | EUR25,100 | **100%** | 100% | Distribution of IT products |
| Lenovo Enterprise Solutions (Singapore) Pte. Ltd. | Singapore | SGD55,958,592 | **100%** | 100% | Manufacturing and wholesaling of computers, computer hardware and peripheral equipment |
| Lenovo Enterprise Solutions Ltd. | Japan | JPY50,000,000 | **100%** | 100% | Distribution of IT products |
| Lenovo (France) SAS | France | EUR1,837,000 | **100%** | 100% | Distribution of IT products |
| Lenovo HK Services Limited | Hong Kong | HK$2 | **100%** | 100% | Provision of business planning, management, global supply chain, finance, and administration support services |
| Lenovo Global Technology (Asia Pacific) Limited | Hong Kong | US$123,001 | **100%** | 100% | Investment holding and distribution of IT products |
| Lenovo Global Technology HK Limited | Hong Kong | US$10,000,001 | **100%** | 100% | Procurement agency and distribution of IT products |
| Lenovo Global Technology (Hong Kong) Distribution Limited | Hong Kong | US$1 | **100%** | 100% | Distribution of IT products |
| Lenovo (Hong Kong) Limited | Hong Kong | HK$74,256,023 | **100%** | 100% | Distribution of IT products |

# Notes to the Financial Statements

## 37 PRINCIPAL SUBSIDIARIES *(continued)*

| Company name | Place of incorporation/ establishment | Issued and fully paid up capital | Percentage of issued capital held 2019 | 2018 | Principal activities |
|---|---|---|---|---|---|
| 惠陽聯想電子工業有限公司 (Lenovo (Huiyang) Electronic Industrial Co., Ltd.)[1] (wholly foreign-owned enterprise) | Chinese Mainland | HK$31,955,500 | **100%** | 100% | Manufacturing and distribution of IT products |
| Lenovo (India) Private Limited | India | INR8,607,471,514 | **100%** | 100% | Manufacturing and distribution of IT products |
| 聯想信息產品（深圳）有限公司 (Lenovo Information Products (Shenzhen) Co. Ltd.)[1] (limited liability company (wholly-owned entity)) | Chinese Mainland | RMB643,966,800 | **100%** | 100% | Manufacturing and distribution of IT products |
| Lenovo (Israel) Ltd. | Israel | ILS1,000 | **100%** | 100% | Distribution of IT products |
| Lenovo (Italy) S.r.l | Italy | EUR100,000 | **100%** | 100% | Distribution of IT products |
| Lenovo (Japan) Ltd. | Japan | JPY100,000,000 | **66.64%** | 66.64% | Distribution of IT products |
| Lenovo Korea LLC | Korea | KRW3,580,940,000 | **100%** | 100% | Distribution of IT products |
| Lenovo Mexico, S. de R.L. de C.V. | Mexico | MXN1,424,048,114 | **100%** | 100% | Distribution of IT products |
| 聯想移動通信科技有限公司 (Lenovo Mobile Communication Technology Ltd.)[1] (foreign-investment enterprise wholly-owned entity) | Chinese Mainland | RMB187,500,000 | **100%** | 100% | Manufacturing and distribution of IT products and provision of IT services |

## 37  PRINCIPAL SUBSIDIARIES *(continued)*

| Company name | Place of incorporation/ establishment | Issued and fully paid up capital | Percentage of issued capital held 2019 | 2018 | Principal activities |
|---|---|---|---|---|---|
| 摩托羅拉（武漢）移動技術通信有限公司 (Motorola (Wuhan) Mobility Technologies Communication Company Limited)[1] 前稱 "聯想移動通信（武漢）有限公司" (formerly known as "Lenovo Mobile Communication (Wuhan) Limited")[1] (foreign-investment enterprise wholly-owned entity) | Chinese Mainland | RMB60,000,000 | 100% | 100% | Manufacturing of mobile products |
| Lenovo NetApp Technology Limited | Chinese Mainland | US$10,000,000 | 51% | - | Delivering IT products and data management solution |
| Lenovo PC HK Limited | Hong Kong | HK$2,377,934,829.50 ordinary and HK$1,000,000 non-voting deferred | 100% | 100% | Procurement agency and distribution of IT products |
| Lenovo PC International Limited | Hong Kong | HK$4,758,857,785 | 100% | 100% | Intellectual properties |
| Lenovo (Schweiz) GmbH | Switzerland | CHF2,000,000 | 100% | 100% | Manufacturing and distribution of IT products |
| Lenovo (Singapore) Pte. Ltd. | Singapore | SGD1,971,231,035.94 | 100% | 100% | Manufacturing and wholesaling of computers, computer hardware and peripheral equipment |

# Notes to the Financial Statements

## 37 PRINCIPAL SUBSIDIARIES *(continued)*

| Company name | Place of incorporation/ establishment | Issued and fully paid up capital | Percentage of issued capital held | | Principal activities |
|---|---|---|---|---|---|
| | | | **2019** | 2018 | |
| Lenovo (South Africa) (Pty) Limited | South Africa | RAND100 | **100%** | 100% | Distribution of IT products |
| Lenovo (Spain), S.L. | Spain | EUR37,475,456.40 | **100%** | 100% | Distribution of IT products |
| Lenovo (Sweden) AB | Sweden | SEK200,200 | **100%** | 100% | Distribution of IT products |
| 聯想系統集成 (深圳) 有限公司 (Lenovo Systems Technology Company Limited)[1] (有限責任公司 (法人獨資)) (limited liability company (wholly-owned entity)) | Chinese Mainland | RMB263,407,660 | **100%** | 100% | Manufacturing and distribution of IT products |
| Lenovo Technology (United Kingdom) Limited | United Kingdom | GBP8,629,510 | **100%** | 100% | Distribution of IT products |
| Lenovo Technology B.V. | Netherlands | EUR20,000 | **100%** | 100% | Distribution of IT products |
| Lenovo Technology Sdn. Bhd. | Malaysia | MYR1,000,000 | **100%** | 100% | Selling and distribution of computer hardware, software and peripherals and services |
| Lenovo Tecnologia (Brasil) Ltda | Brazil | BRL4,424,321,818 | **100%** | 100% | Manufacturing and distribution of IT products |
| Lenovo (Thailand) Limited | Thailand | THB243,000,000 | **100%** | 100% | Distribution of IT products as well as mobile phone, smart phone and tablet, server and storage |
| Lenovo (United States) Inc. | United States | US$1 | **100%** | 100% | Distribution of IT products |
| Lenovo (Venezuela), SA | Venezuela | VEB717,184,632 | **100%** | 100% | Distribution of IT products |

## 37  PRINCIPAL SUBSIDIARIES *(continued)*

| Company name | Place of incorporation/ establishment | Issued and fully paid up capital | Percentage of issued capital held | | Principal activities |
|---|---|---|---|---|---|
| | | | **2019** | 2018 | |
| 聯想 (西安) 有限公司 (Lenovo (Xian) Limited)[1] (Chinese-foreign equity joint venture) | Chinese Mainland | RMB10,000,000 | **100%** | 100% | Provision of IT services and distribution of IT products |
| LLC "Lenovo (East Europe/Asia)" | Russia | RUB1,910,000 | **100%** | 100% | Distribution and marketing of IT products |
| Medion AG | Germany | EUR48,418,400 | **79.84%** | 79.83% | Retail and service business for consumer electronic products and complementary digital services |
| Motorola Mobility Comércio de Produtos Eletronicos Ltda. | Brazil | BRL756,663,401 | **100%** | 100% | Developer, owner, licensor and seller of communications hardware and software |
| Motorola Mobility International Sales LLC | United States | – | **100%** | 100% | Holding company |
| Motorola Mobility LLC | United States | – | **100%** | 100% | Developer, owner, licensor and seller of communications hardware and software |
| NEC Personal Computers, Ltd. | Japan | JPY500,000,000 | **66.64%** | 66.64% | Manufacturing and distribution of IT products |
| 深圳聯想海外控股有限公司 (Shenzhen Lenovo Overseas Holdings Limited)[1] (wholly-foreign owned enterprise) | Chinese Mainland | US$760,822,799.24 | **100%** | 100% | Investment management |

# Notes to the Financial Statements

## 37  PRINCIPAL SUBSIDIARIES *(continued)*

| Company name | Place of incorporation/ establishment | Issued and fully paid up capital | Percentage of issued capital held | | Principal activities |
|---|---|---|---|---|---|
| | | | **2019** | 2018 | |
| Shimane Fujitsu Limited | Japan | JPY450,000,000 | **51%** | – | Manufacturing and distribution of IT products |
| Stoneware, Inc. | United States | US$861,341.25 | **100%** | 100% | Development and distribution of IT products |
| 陽光雨露信息技術服務(北京)有限公司 (Sunny Information Technology Service, Inc.)1 (Chinese-foreign equity joint venture) | Chinese Mainland | RMB50,000,000 | **100%** | 100% | Provision of repair services for computer hardware and software systems |

Notes:

(i)    All the above subsidiaries operate principally in their respective places of incorporation or establishment.

(ii)   All the Chinese Mainland subsidiaries are limited liability companies. They have adopted December 31 as their financial year end date for statutory reporting purposes. For the preparation of the consolidated financial statements, financial statements of these Chinese Mainland subsidiaries for the years ended March 31, 2018 and 2019 have been used.

(iii)  Medion AG is a publicly traded German stock corporation listed on the Frankfurt am Main stock exchange. The percentage of issued capital held is equivalent to approximately 86.52% (2018: 86.51%) excluding treasury shares.

(iv)   The company whose English name ends with a "1" is a direct transliteration of its Chinese registered name.

## 38  APPROVAL OF FINANCIAL STATEMENTS

The financial statements were approved by the board of directors on May 23, 2019.

# Five-Year Financial Summary

## CONDENSED CONSOLIDATED INCOME STATEMENT

|  | 2019 US$'000 | 2018 US$'000 | 2017 US$'000 | 2016 US$'000 | 2015 US$'000 |
|---|---|---|---|---|---|
| Revenue | 51,037,943 | 45,349,943 | 43,034,731 | 44,912,097 | 46,295,593 |
| Profit/(loss) before taxation | 856,664 | 153,202 | 489,927 | (276,851) | 970,967 |
| Taxation | (199,460) | (279,977) | 40,514 | 132,276 | (134,364) |
| Profit/(loss) for the year | 657,204 | (126,775) | 530,441 | (144,575) | 836,603 |
| Profit/(loss) attributable to: |  |  |  |  |  |
| Equity holders of the Company | 596,343 | (189,323) | 535,084 | (128,146) | 828,715 |
| Perpetual securities holders | 53,760 | 53,680 | 1,872 | – | – |
| Other non-controlling interests | 7,101 | 8,868 | (6,515) | (16,429) | 7,888 |
|  | 657,204 | (126,775) | 530,441 | (144,575) | 836,603 |
| Earnings/(loss) per share attributable to equity holders of the Company |  |  |  |  |  |
| Basic (US cents) | 5.01 | (1.67) | 4.86 | (1.16) | 7.77 |
| Diluted (US cents) | 4.96 | (1.67) | 4.86 | (1.16) | 7.69 |

## CONDENSED CONSOLIDATED BALANCE SHEET

|  | 2019 US$'000 | 2018 US$'000 | 2017 US$'000 | 2016 US$'000 | 2015 US$'000 |
|---|---|---|---|---|---|
| Non-current assets | 13,102,282 | 12,830,853 | 12,317,587 | 11,966,613 | 11,889,352 |
| Current assets | 16,886,203 | 15,663,318 | 14,868,387 | 12,966,776 | 15,507,158 |
| Total assets | 29,988,485 | 28,494,171 | 27,185,974 | 24,933,389 | 27,396,510 |
| Non-current liabilities | 5,401,079 | 4,488,461 | 4,756,906 | 6,146,880 | 5,841,997 |
| Current liabilities | 20,490,343 | 19,459,722 | 18,333,846 | 15,760,260 | 17,448,392 |
| Total liabilities | 25,891,422 | 23,948,183 | 23,090,752 | 21,907,140 | 23,290,389 |
| Net assets | 4,097,063 | 4,545,988 | 4,095,222 | 3,026,249 | 4,106,121 |

# Corporate Information

**HONORARY CHAIRMAN**
Mr. Liu Chuanzhi

**BOARD OF DIRECTORS**
**Chairman and Executive Director**
Mr. Yang Yuanqing

**Non-executive Directors**
Mr. Zhu Linan
Mr. Zhao John Huan

**Independent Non-executive Directors**
Dr. Tian Suning
Mr. Nicholas C. Allen
Mr. Nobuyuki Idei
Mr. William O. Grabe
Mr. William Tudor Brown
Ms. Ma Xuezheng
Mr. Yang Chih-Yuan Jerry
Mr. Gordon Robert Halyburton Orr
Mr. Woo Chin Wan Raymond

**CHIEF FINANCIAL OFFICER**
Mr. Wong Wai Ming

**COMPANY SECRETARY**
Mr. Mok Chung Fu, Eric

**REGISTERED OFFICE**
23rd Floor, Lincoln House, Taikoo Place,
979 King's Road, Quarry Bay, Hong Kong

**PRINCIPAL BANKERS**
Bank of China
BNP Paribas
Citibank, N.A.
DBS Bank Ltd.

**INDEPENDENT AUDITOR**
PricewaterhouseCoopers
*Certified Public Accountants*
22nd Floor, Prince's Building,
Central, Hong Kong

**SHARE REGISTRAR**
Tricor Abacus Limited
Level 22, Hopewell Centre,
183 Queen's Road East, Hong Kong

**AMERICAN DEPOSITARY RECEIPTS**
(Depositary and Registrar)
Citibank, N.A.
6th Floor, 388 Greenwich Street,
New York, NY 10013, USA

**STOCK CODES**
Hong Kong Stock Exchange: 992
American Depositary Receipts: LNVGY

**WEBSITE**
www.lenovo.com



www.lenovo.com

This report is printed on environmentally friendly paper manufactured from elemental chlorine-free pulp
Printed on chemistry free plate system and soy ink.

Exhibit 9

Claim No. HP-2019-000024

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**INTELLECTUAL PROPERTY LIST (CHANCERY DIVISION)**
**PATENTS COURT**

**B E T W E E N :**

**IPCOM GMBH & CO. KG**
**(a company incorporated under the laws of Germany)**

**Claimant**

**- and -**

**(1) LENOVO TECHNOLOGY (UNITED KINGDOM) LIMITED**

**(2) MOTOROLA MOBILITY UK LTD**

**Defendants**

_____

**ANNEX 3**
**PARTICULARS OF CLAIM**

_____

**Registered number: 04912819**

# Lenovo Technology (United Kingdom) Limited

**Annual report and financial statements**
**for the year ended 31 March 2018**



FRIDAY

*L7L90W68*

LD3        21/12/2018        #373
COMPANIES HOUSE

# Lenovo Technology (United Kingdom) Limited

## Company Information

| | |
|---|---|
| **Directors** | Colm Gleeson |
| | Christophe C Laurent |
| | Gareth J Holton |
| **Company secretary** | Paula Caldwell |
| **Company number** | 04912819 |
| **Registered office** | 2nd Floor |
| | Redwood 3 Chineham Park |
| | Crockford Lane |
| | Basingstoke |
| | Hampshire |
| | RG24 8WQ |
| **Independent Auditors** | PricewaterhouseCoopers LLP |
| | Chartered Accountants and Statutory Auditors |
| | 141 Bothwell Street |
| | Glasgow |
| | G2 7EQ |

# Lenovo Technology (United Kingdom) Limited

| Contents | Pages |
|---|---|
| Strategic report | 1-3 |
| Directors' report | 4-5 |
| Independent auditors' report | 6-7 |
| Profit and loss account | 8 |
| Balance sheet | 9 |
| Statement of changes in equity | 10 |
| Notes to the financial statements | 11-21 |

# Lenovo Technology (United Kingdom) Limited

## Strategic report
## for the year ended 31 March 2018

The directors present the strategic report and the audited financial statements of the company for the year ended 31 March 2018.

### Principal activities

Lenovo Technology (United Kingdom) Limited is a wholly owned subsidiary of Lenovo Group Limited, a company incorporated in Hong Kong. The company is also included in the consolidated financial statements of Lenovo Group Limited, which are publicly available.

The principal activity of Lenovo Technology (United Kingdom) Limited during the year was the wholesale of personal computing and mobile telephone equipment and peripherals.

### Review of business

The company achieved a profit for the year of £8,800,292 (2017: £7,614,823). The operating profit for the year was £10,995,941 (2017: £10,033,125). The company's revenue in the year was £842,747,752 (2017: £766,616,182) which was mainly from the PC and mobile sales business. The company's net assets as 31 March 2018 were £49,186,255 (31 March 2017: £38,600,712).

On 14 January 2018, Motorola Mobility UK Limited transferred all trading activity to Lenovo Technology (United Kingdom) Limited.   All new sales and purchases from 14 January 2018, relating to Motorola Mobility UK Limited are now made through Lenovo Technology (United Kingdom) Limited. The principal activity of Motorola Mobility UK was the wholesale of mobile telephone equipment and peripherals, which has now become part of Lenovo Technology (United Kingdom) Limited's principal activities.   No assets or liabilities were transferred to Lenovo Technology (United Kingdom) Limited as part of the convergence. Since 14 January 2018, the total revenue relating to Motorola sales was £5,158,710.

Going forward, no major future developments are expected.

During the year sales volumes of desktop and laptop computers decreased in comparison with the prior year. As reported by IDC (International Data Corporation), Lenovo's market share increased in the UK to 20.6% at the end of March 2018 (2017: 18.6%), up 2.0% on the previous year.

Lenovo Group Limited is the world's second largest PC vendor, market share decreased slightly to to 20.4% at the end of March 2018 (2017: 20.4%), down 1.0% on the previous year.

### Key performance indicators (KPIs)

In the assessment of the performance of this region, management focus on the following key performance indicators:

|  | 2018 | 2017 |
|---|---|---|
| Turnover | £842,747,752 | £766,616,182 |
| Gross profit margins | 4.1% | 8.9% |
| Profit before taxation | £10,995,491 | £10,033,125 |

On the basis of the indicators used for the management of the business, management are satisfied with the contribution of the company to the results of the region.

The development, performance and position of Lenovo Group Limited which includes the company, is discussed in the 'Management's Discussion and Analysis' (pages 16 to 47) of the Lenovo Group Limited annual report 2018, which does not form part of this report.

# Lenovo Technology (United Kingdom) Limited

## Strategic report
## for the year ended 31 March 2018

### Principal risks and uncertainties

There are various risks facing the company. The list below is not exhaustive but is intended to focus on the specific risks that the directors believe could have a significant impact on the company's performance.

*Economic conditions*
The level of activity in the markets in which the company operates is dependent on a number of factors such as economic cycles, business confidence and growth in the economy. A downturn in one or more of these indicators could affect the level of spending on the company's products.

*Competition*
The company operates in highly competitive markets. The competitive landscape is changing, with new entrants coming from non-traditional areas, and other competitors are reviewing their position within the marketplace. This presents both opportunities and threats that need to be addressed to continue to grow our business.

*Technology*
The company is required to continually offer new products and services to keep in line with technological developments which it does through its global research and development capabilities based in China, the United States and Japan. The company will continue to bring market leading, innovative and high quality products to the market.

*Parent company*
The company is a subsidiary of Lenovo International Limited and is dependent on this and other Lenovo group companies for the supply of products, brand strength and funding.

### Financial risk management

The company's operations expose it to a variety of financial risks that include liquidity risk, currency risk and credit risk.   In order to utilise Lenovo Group Limited's size and experience, responsibility for the management of these risks has been delegated to the Lenovo group treasury function. The policies set by the group treasury function are implemented by the company's finance department.

*Liquidity risk*
The company retains sufficient cash to ensure it has sufficient funds available for operations. The company would have access to longer term funding from its ultimate parent if required.

*Currency risk*
The company has currency risk associated with the intercompany amounts payable. Potential exposures to foreign currency exchange rate movements are monitored and managed by the Lenovo group treasury function.

*Credit risk*
There is a risk of financial loss to the company arising from the failure of the company's customers to meet their financial obligations for the products provided by the company.

The company manages this situation through credit control procedures and factoring certain classes of debt and management are of the view that the risk is at an acceptable level.

### Corporate responsibility

The company recognises that, as part of a wider community of employees, shareholders, customers, suppliers and others, it has a responsibility to act in a way that respects the environment and minimises any adverse impacts caused by its operations.

**Lenovo Technology (United Kingdom) Limited**

## Strategic report
## for the year ended 31 March 2018

**Corporate responsibility (continued)**

Through its Corporate Responsibility policy the company aims to:

- meet all relevant legislative requirements on environment issues;
- promote environmental awareness among staff and seek their active participation in minimising the environmental impact of the company's operations;
- ensure the safe disposal of manufacturing waste; and
- seek to conserve energy and natural resources by minimising waste, recycling where possible and by maximising its use of renewable resources.

The company remains committed to continuing to improve its impact on the environment.

This report was approved by the Board of Directors on 19 December 2018 and signed on its behalf:

**Gareth Holton**
**Director**

# Lenovo Technology (United Kingdom) Limited

## Directors' report
## for the year ended 31 March 2018

### Results and dividends

The profit for the financial year amounted to £8,800,292 (2017: £7,614,823).

The directors do not recommend the payment of any dividends (2017: £nil).

### Health and safety

The company strives to provide and maintain a safe environment for all employees, customers and visitors to its premises and to comply with relevant health and safety legislation. In addition, the company aims to protect the health of employees with suitable, specific work-based strategies, seeking to minimise the risk of injury from company activity and ensure that systems are in place to address health and safety matters. Compliance with company policy is monitored centrally and an annual health and safety report is produced for the Board.

Health and safety audits and risk assessments are carried out and additional actions and controls are implemented and training conducted to ensure that employees can carry out their functions in a safe and effective manner.

### Disabled employees

All applications from disabled persons are fully considered. Should an employee become disabled, it is the company's practice to continue their current employment where possible or offer suitable alternatives. It is the policy of the company that the training, career development and promotion of the disabled persons should, as far as possible, be identical with that of other employees.

### Employee involvement

Lenovo Technology (United Kingdom) Limited participates in a group operated long-term incentive programme. This programme was approved on 26 May 2005 for the purpose of rewarding and motivating directors, executives and top performing employees of the group. The long term incentive programme is designed to attract and retain the best available personnel, and encourage and motivate participants to work towards enhancing the value of the group and its shares by aligning their interests with those of the shareholders of the group.

The company continues to place importance upon the education and development of its people. There is a well-developed employee involvement programme within the company. Consultation with employees or their representatives has continued at all levels, with the aim of ensuring that their views are taken into account when decisions are made that are likely to affect their interests and that all employees are aware of the financial and economic performance of their business units and of the company as a whole. Communication with all employees continues through regular newsletters. All employees' training and development is supported by continuing in-service education.

### Directors

The directors who served during the year and up to the date of signing this report (unless otherwise stated) were:

Colm Gleeson
Christophe C Laurent
Gareth J Holton

### Qualifying third party indemnity provisions

The company has granted an indemnity to one or more of its directors against liability in respect of proceedings brought by third parties, subject to the conditions set out in the Companies Act 2006. Such qualifying third party indemnity provisions remain in force as at the date of approving the directors' report.

# Lenovo Technology (United Kingdom) Limited

## Directors' report
## for the year ended 31 March 2018

### Statement of directors' responsibilities in respect of the financial statements

The directors are responsible for preparing the Annual Report and the financial statements in accordance with applicable law and regulation.

Company law requires the directors to prepare financial statements for each financial year. Under that law the directors have prepared the financial statements in accordance with United Kingdom Generally Accepted Accounting Practice (United Kingdom Accounting Standards, comprising FRS 102 "The Financial Reporting Standard applicable in the UK and Republic of Ireland", and applicable law). Under company law the directors must not approve the financial statements unless they are satisfied that they give a true and fair view of the state of affairs of the company and of the profit or loss of the company for that period. In preparing the financial statements, the directors are required to:

- select suitable accounting policies and then apply them consistently;
- state whether applicable United Kingdom Accounting Standards, comprising FRS 102, have been followed, subject to any material departures disclosed and explained in the financial statements;
- make judgements and accounting estimates that are reasonable and prudent; and
- prepare the financial statements on the going concern basis unless it is inappropriate to presume that the company will continue in business.

The directors are also responsible for safeguarding the assets of the company and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities.

The directors are responsible for keeping adequate accounting records that are sufficient to show and explain the company's transactions and disclose with reasonable accuracy at any time the financial position of the company and enable them to ensure that the financial statements comply with the Companies Act 2006.

### Disclosure of information to auditors

The directors at the time when this Directors' report is approved have confirmed that:

- so far as that director is aware, there is no relevant audit information of which the company's auditors are unaware; and
- directors have taken all the steps that ought to have been taken in order to be aware of any information needed by the company's auditors in connection with preparing their report and to establish that the company's auditors are aware of that information.

This report was approved by the Board of Directors on 19 December 2018 and signed on its behalf.

**Gareth Holton**
**Director**

Lenovo Technology (United Kingdom) Limited

# *Independent auditors' report to the members of Lenovo Technology (United Kingdom) Limited*

## Report on the audit of the financial statements

### Opinion

In our opinion, Lenovo Technology (United Kingdom) Limited's financial statements:

- give a true and fair view of the state of the company's affairs as at 31 March 2018 and of its profit for the year then ended;
- have been properly prepared in accordance with United Kingdom Generally Accepted Accounting Practice (United Kingdom Accounting Standards, comprising FRS 102 "The Financial Reporting Standard applicable in the UK and Republic of Ireland", and applicable law); and
- have been prepared in accordance with the requirements of the Companies Act 2006.

We have audited the financial statements, included within the Annual report and financial statements (the "Annual Report"), which comprise: the balance sheet as at 31 March 2018; the profit and loss account; the statement of changes in equity for the year then ended; and the notes to the financial statements, which include a description of the significant accounting policies.

### Basis for opinion

We conducted our audit in accordance with International Standards on Auditing (UK) ("ISAs (UK)") and applicable law. Our responsibilities under ISAs (UK) are further described in the Auditors' responsibilities for the audit of the financial statements section of our report. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

*Independence*

We remained independent of the company in accordance with the ethical requirements that are relevant to our audit of the financial statements in the UK, which includes the FRC's Ethical Standard, and we have fulfilled our other ethical responsibilities in accordance with these requirements.

### Conclusions relating to going concern

We have nothing to report in respect of the following matters in relation to which ISAs (UK) require us to report to you when:

- the directors' use of the going concern basis of accounting in the preparation of the financial statements is not appropriate; or
- the directors have not disclosed in the financial statements any identified material uncertainties that may cast significant doubt about the company's ability to continue to adopt the going concern basis of accounting for a period of at least twelve months from the date when the financial statements are authorised for issue.

However, because not all future events or conditions can be predicted, this statement is not a guarantee as to the company's ability to continue as a going concern.

### Reporting on other information

The other information comprises all of the information in the Annual Report other than the financial statements and our auditors' report thereon. The directors are responsible for the other information. Our opinion on the financial statements does not cover the other information and, accordingly, we do not express an audit opinion  or, except to the extent otherwise explicitly stated in this report, any form of assurance thereon.

In connection with our audit of the financial statements, our responsibility is to read the other information and, in doing so, consider whether the other information is materially inconsistent with the financial statements or our knowledge obtained in the audit, or otherwise appears to be materially misstated. If we identify an apparent material inconsistency or material misstatement, we are required to perform procedures to conclude whether there is a material misstatement of the financial statements or a material misstatement of the other information. If, based on the work we have performed, we conclude that there is a material misstatement of this other information, we are required to report that fact. We have nothing to report based on these responsibilities.

With respect to the Strategic Report and Directors' Report, we also considered whether the disclosures required by the UK Companies Act 2006 have been included.

Based on the responsibilities described above and our work undertaken in the course of the audit, ISAs (UK) require us also to report certain opinions and matters as described below.

## Lenovo Technology (United Kingdom) Limited

*Strategic Report and Directors' Report*

In our opinion, based on the work undertaken in the course of the audit, the information given in the Strategic Report and Directors' Report for the year ended 31 March 2018 is consistent with the financial statements and has been prepared in accordance with applicable legal requirements.

In light of the knowledge and understanding of the company and its environment obtained in the course of the audit, we did not identify any material misstatements in the Strategic Report and Directors' Report.

### Responsibilities for the financial statements and the audit

*Responsibilities of the directors for the financial statements*

As explained more fully in the Statement of directors' responsibilities in respect of the financial statements set out on page 5, the directors are responsible for the preparation of the financial statements in accordance with the applicable framework and for being satisfied that they give a true and fair view. The directors are also responsible for such internal control as they determine is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, the directors are responsible for assessing the company's ability to continue as a going concern, disclosing as applicable, matters related to going concern and using the going concern basis of accounting unless the directors either intend to liquidate the company or to cease operations, or have no realistic alternative but to do so.

*Auditors' responsibilities for the audit of the financial statements*

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditors' report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with ISAs (UK) will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these financial statements.

A further description of our responsibilities for the audit of the financial statements is located on the FRC's website at: www.frc.org.uk/auditorsresponsibilities. This description forms part of our auditors' report.

*Use of this report*

This report, including the opinions, has been prepared for and only for the company's members as a body in accordance with Chapter 3 of Part 16 of the Companies Act 2006 and for no other purpose. We do not, in giving these opinions, accept or assume responsibility for any other purpose or to any other person to whom this report is shown or into whose hands it may come save where expressly agreed by our prior consent in writing.

## Other required reporting

### Companies Act 2006 exception reporting

Under the Companies Act 2006 we are required to report to you if, in our opinion:

- we have not received all the information and explanations we require for our audit; or
- adequate accounting records have not been kept by the company, or returns adequate for our audit have not been received from branches not visited by us; or
- certain disclosures of directors' remuneration specified by law are not made; or
- the financial statements are not in agreement with the accounting records and returns.

We have no exceptions to report arising from this responsibility.

Sharron Moran (Senior Statutory Auditor)
for and on behalf of PricewaterhouseCoopers LLP
Chartered Accountants and Statutory Auditors
Glasgow
19 December 2018

# Lenovo Technology (United Kingdom) Limited

## Profit and loss account
## for the year ended 31 March 2018

| | Note | 2018 £ | 2017 £ |
|---|---|---|---|
| **Turnover** | 4 | 842,747,752 | 766,616,182 |
| Cost of sales | | (810,126,335) | (698,175,810) |
| **Gross profit** | | 32,621,417 | 68,440,372 |
| Administrative expenses | | (72,506,493) | (100,824,286) |
| Other operating income | 5 | 50,880,567 | 42,417,039 |
| **Operating profit** | 6 | 10,995,491 | 10,033,125 |
| **Profit before taxation** | | 10,995,491 | 10,033,125 |
| Tax on profit | 9 | (2,195,199) | (2,418,302) |
| **Profit for the financial year** | | 8,800,292 | 7,614,823 |

All amounts relate to continuing operations.

There were no recognised gains and losses for 2018 or 2017 other than those included in the Profit and loss account, and there are no material differences between the profit before taxation and the profit for the financial year and their historical cost equivalents.

The notes on pages 11 to 21 form part of these financial statements.

# Lenovo Technology (United Kingdom) Limited

## Balance sheet
## as at 31 March 2018

|  | Note | £ | 2018 £ | £ | 2017 £ |
|---|---|---|---|---|---|
| **Fixed assets** | | | | | |
| Tangible assets | 10 | | 1,582,042 | | 1,923,595 |
| Investments | 11 | | 27,977,718 | | 27,977,718 |
| | | | 29,559,760 | | 29,901,313 |
| **Current assets** | | | | | |
| Stocks | 12 | 582,433 | | - | |
| Debtors | 13 | 278,859,620 | | 229,545,924 | |
| Cash at bank and in hand | | 657,066 | | 3,327,537 | |
| | | 280,099,119 | | 232,873,461 | |
| Creditors: amounts falling due within one year | 14 | (260,472,624) | | (224,174,063) | |
| **Net current assets/(liabilities)** | | | 19,626,495 | | 8,699,398 |
| **Total assets less current liabilities** | | | 49,186,255 | | 38,600,711 |
| **Capital and reserves** | | | | | |
| Called up share capital | 16 | | 8,629,508 | | 8,629,508 |
| Capital contribution from parent | | | 14,028,699 | | 12,243,447 |
| Profit and loss account | | | 26,528,048 | | 17,727,756 |
| **Total shareholders' funds** | | | 49,186,255 | | 38,600,711 |

The financial statements on pages 8 to 21 were approved and authorised for issue by the Board of directors on 19 December 2018 and were signed on its behalf.

The notes on pages 11 to 21 form part of these financial statements.

**Gareth Holton**
**Director**

# Lenovo Technology (United Kingdom) Limited

## Statement of changes in equity
## for the year ended 31 March 2018

| | Share capital £ | Capital contribution from parent £ | Profit and loss account £ | Total shareholders' funds £ |
|---|---|---|---|---|
| At 1 April 2016 | 8,629,508 | 10,521,274 | 10,112,933 | 29,263,715 |
| Capital contribution in respect of share-based payment | - | 1,722,173 | - | 1,722,173 |
| Profit for the year | - | - | 7,614,823 | 7,614,823 |
| **At 31 March 2017** | **8,629,508** | **12,243,447** | **17,727,756** | **38,600,711** |
| Capital contribution in respect of share-based payment | - | 1,785,252 | - | 1,785,252 |
| Profit for the year | - | - | 8,800,292 | 8,800,292 |
| **At 31 March 2018** | **8,629,508** | **14,028,699** | **26,528,048** | **49,186,255** |

# Lenovo Technology (United Kingdom) Limited

## Notes to the financial statements
## for the year ended 31 March 2018

### 1. General information

Lenovo Technology (United Kingdom) Limited is a private limited company incorporated in the United Kingdom under the Companies Act 2006. The address of the registered office is provided on the Company information page. The company sells personal computing equipment, computer peripheral, mobile telephones, maintenance services and storage systems. The company sells primarily to the UK.

### 2. Statement of Compliance

The individual financial statements of Lenovo Technology (United Kingdom) Limited have been prepared in compliance with UK Accounting Standards, including Financial Reporting Standard 102, "The Financial Reporting Standard applicable in the United Kingdom and the Republic of Ireland" ("FRS 102") and the Companies Act 2006.

### 3. Principal accounting policies

The principal accounting policies applied in the preparation of these financial statements are set out below. These policies have been consistently applied to all the years presented, unless otherwise stated. The company has adopted FRS 102 in these financial statements.

FRS 102 allows a qualifying entity certain disclosure exemptions, if certain condition, have been complied with, including notification of and no objection to, the use of exemptions by the Company's shareholders. A qualifying entity is defined as a member of a group that prepares publicly available financial statements, which give a true and fair view, in which that member is consolidated. Lenovo Technology (United Kingdom) Limited is a qualifying entity as its results are consolidated into the consolidated financial statements of Lenovo Group Limited which are publicly available.

As a qualifying entity, the Company has taken advantage of the following exemptions:

i) from the requirement to prepare a statement of cash flows as required by paragraph 3.17(d) of FRS 102
ii) from the requirement to present certain financial instrument disclosures, as required by sections 11 and 12 of FRS 102
iii) from the requirement to present a reconciliation of the number of shares outstanding at the beginning and end of the period as required by paragraph 4.12(a)(iv) of FRS 102; and
iv) from the requirement to disclose the key management personnel compensation in total as required by paragraph 33.7 of FRS 102.
v) Consolidated financial statements are not submitted as the company is exempt under section 400 of the Companies Act 2006 as it is a wholly owned subsidiary of Lenovo International Limited, which in turn is a wholly owned subsidiary of Lenovo Group which prepares consolidated financial statements.

#### 3.1 Basis of preparation of financial statements
The financial statements have been prepared on the going concern basis, under the historical cost convention and in accordance with the Companies Act 2006 and applicable United Kingdom accounting standards. The preparation of the financial statements in conformity with FRS 102 requires the use of certain critical accounting estimates. It also requires management to exercise its judgement in the process of applying the company's accounting policies.

#### 3.2 Turnover
Turnover includes sales of personal computing equipment, computer peripherals and maintenance services. Sales are exclusive of value added tax. Revenue from the sale of goods is recognised, net of allowance for estimated returns, when both ownership and risk of loss are effectively transferred to customers, generally when there is persuasive evidence that a sales arrangement exists, the price is fixed or determinable, collectability is reasonably assured and delivery has occurred.

# Lenovo Technology (United Kingdom) Limited

## Notes to the financial statements
## for the year ended 31 March 2018

3. **Principal accounting policies (continued)**

### 3.3 Revenue recognition
Income from the sale of goods is recognised in the Profit and loss account once all the major rights to economic benefits and significant risks relating to the goods have been transferred to the buyer, the income can be reliably measured and the income is probable to be received.
Income from the sale of services can be recognised in proportion to the service delivered it the result of the transaction relating to a service can be reliably estimated and the income probable to be received.

### 3.4 Financial instruments
*(a) Financial assets*
Basic financial assets, including trade and other receivables and cash and bank balances, are initially recognised at transaction price.

Financial assets are derecognised when (i) the contractual right to cashflows form the asset expire or are settled or (ii) substantially all the the risks and rewards of the ownership of the asset have transferred to another party.

*(b) Financial liabilities*
Basic financial liabilities, including trade and other payables and loans from fellow Group companies are initially recognised at transaction price.

Financial liabilities are derecognised when the liability is extinguished, that is when the contractual obligation is discharged, cancelled or expires.

Fixed asset investments held as fixed assets are shown at cost less provision for impairment. Impairment reviews are performed by the directors when there has been an indication of a potential impairment.

### 3.5 Fixed asset investments
Fixed asset investments held as fixed assets are shown at cost less provision for impairment. Impairment reviews are performed by the directors when there has been an indication of a potential impairment.

### 3.6 Goodwill
Goodwill is the difference between amounts paid on the acquisition of a business and the fair value of the identifiable assets and liabilities acquired. Based on the average life of servers, status of customer relationship and historical re-purchasing patterns of customers, Management estimated the average economic useful life of customer relationship to be 10 years. Goodwill is therefore amortised to the Profit and loss account over its estimated economic life of 10 years.

Goodwill is reviewed for impairment at the end of the first full financial year following the acquisition and in other periods if events or changes in circumstances indicate that the carrying value may not be recoverable.

### 3.7 Tangible assets
Tangible fixed assets are stated at cost less accumulated depreciation. Cost includes the original purchase price of the asset and the costs attributable to bringing the asset to its working condition for it's intended use. Depreciation is provided at rates calculated to write off the cost of fixed assets, less their estimated residual value, over their expected useful lives on the following bases:

Leasehold improvements - over the lease term
Equipment - over four years

# Lenovo Technology (United Kingdom) Limited

## Notes to the financial statements
## for the year ended 31 March 2018

3. **Principal accounting policies (continued)**

### 3.7 Tangible assets (continued)
The carrying values of tangible fixed assets are reviewed for impairment when events or changes in circumstances indicate the carrying value may not be recoverable.

### 3.8 Stocks
Stocks are stated at the lower of cost and estimated selling price less costs to sell after making due allowance for obsolete and slow-moving stocks.

Cost includes all direct costs and an appropriate proportion of fixed and variable overheads.

### 3.9 Taxation
The charge for taxation is based on the profit or loss for the period and takes into account taxation deferred because of timing differences between the treatment of certain items for taxation and accounting purposes.

Deferred tax is recognised, without discounting, in respect of all timing differences between the treatments of certain items for taxation and accounting purposes that have arisen but not reversed by the balance sheet date, except as otherwise required by FRS 102 section 29 Deferred tax.

The carrying amount of deferred tax assets is reviewed at the end of the year and reduced to the extent that it is no longer probable that sufficient taxable profit will be available to allow the benefit of part or that entire deferred tax asset to be utilised. A deferred tax asset is recognised for an unused tax loss carry forward or unused tax credit only if, it is considered probable that there will be sufficient future taxable profit against which the loss or credit carry forwards can be utilised.

### 3.10 Foreign currencies
Monetary assets and liabilities denominated in foreign currencies are translated into sterling at rates of exchange ruling at the balance sheet date. Transactions in foreign currencies are translated into sterling at the rate ruling on the date of the transaction. Exchange gains and losses are recognised in the Profit and loss account.

### 3.11 Operating Lease
Leases where substantially all the risks and rewards of ownership of assets remain with the leasing company are accounted for as operating leases. Rentals applicable to such operating leases are charged to the Profit and loss account on a straight line basis over the lease term.

### 3.12 Employee benefits
*(a) Pensions*
The company pays into employees' personal pension plans and the pension charge represents the amounts payable by the company to these plans in respect of the year. The assets are held in a separately administered fund.

*(b) Long-term incentive programme*
Lenovo Technology (United Kingdom) Limited participates in a group operated long-term incentive programme to recognise employees' individual and collective contributions. This includes two types of awards, namely share appreciation rights and restricted share units. The group reserves the right, at its discretion, to pay the award in cash or ordinary shares of the group. The fair value of the employee services received in exchange for the grant of the long-term incentive awards is recognised as an expense. The total amount to be expensed over the vesting period is determined by reference to the fair value of the long-term incentive awards granted. Non-market vesting conditions (for example profitability and sales growth targets) are included in the assumptions about the number of long term incentive awards that are expected to become exercisable/vested.

# Lenovo Technology (United Kingdom) Limited

## Notes to the financial statements
## for the year ended 31 March 2018

3.    **Principal accounting policies (continued)**

    3.12    **Employee benefits (continued)**
        At each balance sheet date, Lenovo Technology (United Kingdom) Limited revises its estimates of the number of long-term incentive awards that are expected to become exercisable. It recognises the impact of the revision of original estimates, if any, in the Profit and loss account, and a corresponding adjustment to reserves. This is treated as a capital contribution from the parent company.

    3.13    **Critical accounting estimates and judgements**
        The preparation of the financial statements requires management to make judgments, estimates and assumptions that affect the application of the accounting policies and the reported amounts of assets and liabilities, revenue and expenses. Actual results may differ from these estimates.

        Estimates and underlying assumptions are continually evaluated and are based on historical experience and other factors, including expectations of future events that are reasonable under the circumstances. Revisions to the accounting estimates are recognised in the period in which the estimates are revised and in any future periods affected. The estimates and assumptions that have a risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year are addressed below.

        *(a) Useful life of tangible assets*
        The annual depreciation charge for tangible assets is sensitive to economic changes in the estimated useful economic lives and residual values of the assets. The judgement of useful economic lives and residual values are reassessed annually. They are amended when necessary to reflect current estimates, based on technological advancement, future investments, economic utilisation and the physical conditions of the assets. See note 10 for the carrying amount of the tangible assets and accounting policy above for the useful economic lives for each class of assets.

4.    **Turnover**

    Turnover is attributable to the wholesale of personal computing equipment, computer peripherals, mobile telephones and maintenance services.

    All turnover arose within the United Kingdom.

5.    **Other operating income**

    Other operating income represents intercompany recharges to the group company for non-sales and distribution costs.

6.    **Operating profit**

    The operating profit is stated after charging/(crediting):

|  | 2018<br>£ | 2017<br>£ |
|---|---|---|
| Depreciation of tangible fixed assets: |  |  |
|     - owned by the company | 597,914 | 853,263 |
| Auditors' remuneration - fees payable for the statutory audit | 65,085 | 78,000 |
| Operating lease rentals | 1,283,668 | 1,131,750 |
| Difference on foreign exchange | (8,410,286) | 11,536,222 |
| Amortisation of intangible assets | - | 1,497,825 |

# Lenovo Technology (United Kingdom) Limited

## Notes to the financial statements
## for the year ended 31 March 2018

7.    **Staff costs**

Staff costs, including directors' remuneration, were as follows:

|  | 2018 £ | 2017 £ |
|---|---|---|
| Wages and salaries | **32,542,081** | 36,111,848 |
| Social security costs | **4,178,741** | 4,375,268 |
| Other pension costs (note 19) | **2,789,835** | 3,410,593 |
| Share based payment charge (note 17) | **1,785,252** | 1,722,173 |
|  | **41,295,909** | 45,619,882 |

The average monthly number of employees, including the directors, during the year was as follows:

|  | 2018 No. | 2017 No. |
|---|---|---|
| Sales and distribution | **163** | 155 |
| Administration | **187** | 190 |
|  | **350** | 345 |

8.    **Directors' remuneration**

|  | 2018 £ | 2017 £ |
|---|---|---|
| Aggregate emoluments | **191,846** | 733,780 |
| Company pension contributions to defined contribution pension schemes | **13,195** | 20,465 |

During the year, retirement benefits were accruing to 1 director (2017: 4) in respect of defined contribution pension schemes.

During the year, no directors (2017: 3 directors) exercised options in shares of Lenovo Group Limited, and at the year end 1 director (2017: 1 director) was entitled to shares in Lenovo Group Limited under long term incentive schemes.

The highest paid director received remuneration of £191,846 (2017: £243,966).

The value of the company's contributions paid to a defined contribution pension scheme in respect of the highest paid director amounted to £13,195 (2017: £8,361).

The highest paid director exercised zero (2017: 191,732) shares under the group operated long-term incentive schemes.

Colm Gleeson and Christophe Laurent did not receive any emoluments in respect of services to the company in the year. (2017: £nil)

# Lenovo Technology (United Kingdom) Limited

## Notes to the financial statements
## for the year ended 31 March 2018

9.    Tax on profit

|  | 2018 £ | 2017 £ |
|---|---|---|
| **Analysis of tax charge in the year** | | |
| **Current tax** | | |
| UK corporation tax on profits in year | 2,182,008 | 2,331,455 |
| Adjustments in respect of prior years | 25,251 | 5,006 |
| **Total current tax** | 2,207,259 | 2,336,461 |
| **Deferred tax** | | |
| Originating and reversal of timing differences | 2,181 | 138,096 |
| Adjustment in respect of prior years | (14,014) | (61,364) |
| Effect of changes in tax rates | (227) | 5,109 |
| **Total deferred tax** (note 15) | (12,060) | 81,841 |
| **Total tax per income statement** | 2,195,199 | 2,418,302 |

The charge for the year can be reconciled to the profit per the income statement as below:

|  | 2017 £ | 2017 £ |
|---|---|---|
| Profit for the year | 10,995,491 | 10,033,125 |
| Tax on profit at standard UK rate of 19% (2017: 20%) | 2,089,143 | 2,006,625 |
| **Effects of:** | | |
| Expenses not deductible | 402,465 | 462,927 |
| Adjustments from previous periods | 11,239 | (56,358) |
| Tax rate changes | (229) | 5,108 |
| Share options | (307,419) | - |
| **Tax charge for the period** | 2,195,199 | 2,418,302 |

# Lenovo Technology (United Kingdom) Limited

## Notes to the financial statements
## for the year ended 31 March 2018

10.    Tangible assets

| | Leasehold Improvements £ | Equipment £ | Total £ |
|---|---|---|---|
| **Cost** | | | |
| At 1 April 2017 | 2,868,447 | 2,043,480 | 4,911,927 |
| Additions | - | 310,739 | 310,739 |
| Disposals | - | (493,468) | (493,468) |
| At 31 March 2018 | 2,868,447 | 1,860,751 | 4,729,198 |
| **Accumulated Depreciation** | | | |
| At 1 April 2017 | 1,586,564 | 1,401,768 | 2,988,332 |
| Charge for the year | 326,813 | 271,101 | 597,914 |
| Disposals | - | (439,090) | (439,090) |
| At 31 March 2018 | 1,913,377 | 1,233,779 | 3,147,156 |
| **Net book value** | | | |
| At 31 March 2018 | 955,070 | 626,972 | 1,582,042 |
| At 31 March 2017 | 1,281,883 | 641,712 | 1,923,595 |

11.    Investments

| Shares in group undertakings | Lenovo Holding Company Inc £ | Lenovo Saudi Arabia Ltd £ | Total £ |
|---|---|---|---|
| **Cost and net book value** | | | |
| At 1 April 2017 | 27,969,033 | 8,685 | 27,977,718 |
| Additions | - | - | - |
| At 31 March 2018 | 27,969,033 | 8,685 | 27,977,718 |

**Subsidiary undertakings**

At 31 March 2018, the company held ordinary share capital in the following subsidiary undertakings. In all cases the country of incorporation was the USA.

| Name | Principal activity | Holding |
|---|---|---|
| Lenovo Holding Company Inc. | Holding company | 100% |
| - 1009 Think Pl, Morrisville, NC, 27650-9002, United States | | |
| Lenovo US Fulfilment LLC* | Warehousing services | 100% |
| - 6540 Franz Warner Pkwy, Whitsett, NC, 27377-9215, United States | | |
| Lenovo United States Inc.* | Sales and distribution | 100% |
| - 1009 Think Pl, Morrisville, NC, 27650-9002, United States | | |
| Stoneware Inc.* | Development and distribution | 100% |
| - 11555 N Meridian St #150, Carmel, IN 46032, United States | | |

* Held by subsidiary undertaking.

Page | 17

# Lenovo Technology (United Kingdom) Limited

## Notes to the financial statements
## for the year ended 31 March 2018

11. **Investments (continued)**

   **Minority interest**

   At 31 March 2018, the company held a minority interest in the following entity

| Name | Principal activity | Holding |
|------|-------------------|---------|
| Lenovo Saudi Arabia Ltd<br>- Floor 26, Hamad Towers, King Fahad Road, P.O Box 8049, Riyadh 122222 | Sales and distribution | 10% |

   The directors believe that the carrying value of the investments is supported by their underlying net assets.

12. **Stocks**

| | 2018<br>£ | 2017<br>£ |
|------|------|------|
| Stocks | 582,433 | - |
| | 582,433 | - |

13. **Debtors**

| | 2018<br>£ | 2017<br>£ |
|------|------|------|
| Trade debtors | 58,265,504 | 46,433,079 |
| Amounts owed by group undertakings | 215,313,796 | 177,793,171 |
| Other debtors | 3,986,949 | 4,173,012 |
| Deferred tax asset (note 15) | 114,181 | 102,119 |
| Prepayments and accrued income | 1,179,190 | 1,044,543 |
| | 278,859,620 | 229,545,924 |

   Amounts owed by group undertakings are unsecured, interest free and repayable on demand.

14. **Creditors: Amounts falling due within one year**

| | 2018<br>£ | 2017<br>£ |
|------|------|------|
| Trade creditors | 8,286,112 | 5,018,801 |
| Amounts owed to group undertakings | 173,716,127 | 140,455,504 |
| Other taxation and social security | 16,636,478 | 20,092,530 |
| Corporation tax | 1,870,652 | 343,889 |
| Other creditors | 31,702,250 | 30,119,369 |
| Accruals and deferred income | 28,261,005 | 28,143,970 |
| | 260,472,624 | 224,174,063 |

   Amounts owed to group undertakings are unsecured, interest free and repayable on demand.

# Lenovo Technology (United Kingdom) Limited

## Notes to the financial statements
## for the year ended 31 March 2018

**15.    Deferred tax asset**

|  | 2018<br>£ | 2017<br>£ |
|---|---|---|
| Asset at start of period | 102,119 | 228,307 |
| Adjustments in respect of prior years | 14,014 | 61,364 |
| Deferred tax charge to income statement for the period | (1,954) | (143,205) |
| Movement arising from transfer of trade | - | (44,347) |
| At end of period | 114,179 | 102,119 |

The deferred tax asset is made up as follows:

|  | 2018<br>£ | 2017<br>£ |
|---|---|---|
| Fixed asset timing differences | 81,027 | 85,938 |
| Short term timing differences | 33,152 | 16,181 |
|  | 114,179 | 102,119 |
| Deferred tax (assets)<br>Recoverable within 12 months | 114,179 | 228,307 |
|  | 114,179 | 228,307 |

**16.    Called up share capital**

|  | 2018<br>£ | 2017<br>£ |
|---|---|---|
| **Allotted and fully paid** |  |  |
| 8,629,508 ordinary shares of £1 each (2017: 8,629,508) | 8,629,508 | 8,629,508 |

**17.    Share based payments**

*Long term incentive programme*

Lenovo Technology (United Kingdom) Limited participates in a group operated long term incentive programme. This programme was approved on 26 May 2005 for the purpose of rewarding and motivating directors, executives and top performing employees of the group. The long term incentive programme is designed to attract and retain the best available personnel, and encourage and motivate participants to work towards enhancing the value of the group and its shares by aligning their interests with those of the shareholders of the group.

Under the long term incentive programme, the group may grant awards at its discretion, using one of two types of equity based compensation (i) share appreciation rights and (ii) restricted share units, which are described below.

*(i) Share Appreciation Rights ("SARs")*
SARs entitle the holder to receive the appreciation in value of the group's share price above a pre-determined level. SARs are typically subject to a vesting schedule of up to four years.

# Lenovo Technology (United Kingdom) Limited

## Notes to the financial statements
## for the year ended 31 March 2018

17.    **Share based payments (continued)**

*(ii) Restricted Share Units ("RSUs")*
RSUs are equivalent to the value of one ordinary share of the group. Once vested, RSUs are converted to an ordinary share or its cash equivalent. RSUs are typically subject to a vesting schedule of up to four years. Dividends are typically not paid on RSUs.

Under the two types of compensation, the group reserves the right, at its discretion, to pay the award in cash or in ordinary shares of the group.

Movements in the number of units of awards granted during the year and their related average fair values are as follows:

|  | SARs No. | RSUs No. |
|---|---|---|
| Unvested awards outstanding at 1 April 2017 | 3,609,187 | 4,600,711 |
| Granted during the year | 5,150,583 | 3,695,145 |
| Vested during the year | (1,244,883) | (1,952,598) |
| Lapsed/cancelled | (789,575) | (376,006) |
| Transferred | 70,415 | 493,155 |
| **At 31 March 2018** | **6,795,727** | **6,460,407** |

| Average fair value per unit (HK$) | | |
|---|---|---|
| At 31 March 2017 | 1.45 | 6.49 |
| At 31 March 2018 | 1.01 | 5.50 |

Of the 3,197,481 (2017: 2,086,746) units vested, 45,176 units were exercised/sold during the year (2017: nil). The number of awards exercisable at the end of the year was 3,511,024 (2017: 2,311,317).

The only requirement for vesting is that individuals must be an employee of the company.

The fair values of the SARs awarded under the long-term incentive program were calculated by applying a Black-Scholes pricing model. For the yer ended March 31, 2018, the model inputs were the fair value (i.e. market value) of the Company's shares at the grant date, taking into account the expected volatility of 34.04 percent (31 March 2017: 37.06 percent), expected dividends during the vesting periods of 5.59 percent (31 March 2017: 2.74 percent), contractual life of 4.5 years (31 March 2017: 4.5 years), and a risk-free interest rate of 0.94 percent (31 March 2017: 0.7 percent).

The remaining vesting periods of the awards under the long-term incentive program as at March 31, 2018 ranged from 0.14 to 2.92 years (31 March 2017: 0.28 to 3 years).

The charge through the Profit and loss account for 2018 was £1,785,252 (2017: £1,722,173).

The total capital contribution from the parent company as at 31 March 2018 was £14,028,699 (2017: £12,243,447).

18.    **Contingent liabilities**

The company has entered into a guarantee arrangement of £20,050,000 (2017: £18,000,000) in favour of Her Majesty's Revenue and Customs office for duty deferment. There is no expected cash outflow as a result of this guarantee.

# Lenovo Technology (United Kingdom) Limited

## Notes to the financial statements
## for the year ended 31 March 2018

19. **Pension commitments**

The company makes contributions into employees' personal pension plans. The total cost of contributions to the scheme in the year was £2,789,835 (2017: £3,410,593). There were no unpaid contributions at the year end (2017: £nil).

20. **Operating lease commitments**

At 31 March the company had annual commitments under non-cancellable operating leases as follows:

|  | Land and buildings | | Other | |
|  | 2018 £ | 2017 £ | 2018 £ | 2017 £ |
|---|---|---|---|---|
| **Expiry date:** | | | | |
| **Within 1 year** | 465,644 | 623,238 | 497 | 36,447 |
| **Between 2 and 5 years** | 382,438 | 520,125 | - | 497 |
| **After more than 5 years** | - | - | - | - |

21. **Related party transactions**

The company is wholly owned subsidiary of Lenovo Group Limited and has therefore taken advantage of the exemption contained in FRS 102 section 33.1A Related Party Disclosures from disclosing transactions or balances with entities which form part of the Lenovo.

22. **Ultimate parent undertaking and controlling party**

The company's ultimate parent undertaking and controlling party is Lenovo Group Limited which is incorporated in Hong Kong. Lenovo Group Limited is the largest group which consolidates these financial statements. Copies of the financial statements of this undertaking may be obtained from 23rd Floor, Lincoln House, Taikoo Place, 979 King's Road, Quarry Bay, Hong Kong.

The smallest undertaking which consolidates these financial statements is Lenovo International Limited which is incorporated in Hong Kong. Copies of these consolidated financial statements can be obtained from 23rd Floor, Lincoln House, Taikoo Place, 979 King's Road, Quarry Bay, Hong Kong.

23. **Post balance sheet events**

There are no post balance sheet events requiring disclosure.

Exhibit 10

Claim No. HP-2019-000024

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**INTELLECTUAL PROPERTY LIST (CHANCERY DIVISION)**
**PATENTS COURT**

**B E T W E E N :**

**IPCOM GMBH & CO. KG**
**(a company incorporated under the laws of Germany)**

<u>**Claimant**</u>

**- and -**

**(1) LENOVO TECHNOLOGY (UNITED KINGDOM) LIMITED**

**(2) MOTOROLA MOBILITY UK LTD**

<u>**Defendants**</u>

_____

**ANNEX 4**
**PARTICULARS OF INFRINGEMENT**

_____

Registered number: 06969556

# Motorola Mobility UK Ltd

**Annual report and financial statements**

**for the year ended 31 March 2018**



FRIDAY

*L7L9ØW5S*

LD3    21/12/2018    #371

COMPANIES HOUSE

**Motorola Mobility UK Ltd**

**Company information**

| | |
|---|---|
| **Director** | S Agrawal |
| **Registered number** | 6969556 |
| **Registered office** | Redwood Chineham Business Park<br>Crockford Lane<br>Basingstoke<br>Hampshire<br>RG24 8WQ |
| **Independent auditors** | PricewaterhouseCoopers LLP<br>Chartered Accountants and Statutory Auditors<br>141 Bothwell Street<br>Glasgow<br>G2 7EQ |
| **Bankers** | Citibank NA<br>33 Canada Square<br>Canary Wharf<br>London<br>E14 5LB |

**Motorola Mobility UK Ltd**

**Contents**

|                                        | Pages   |
| -------------------------------------- | ------- |
| Strategic report                       | 1 - 3   |
| Director's report                      | 4 - 5   |
| Statement of director responsibilities | 6       |
| Independent auditors' report           | 7 - 8   |
| Profit and loss account                | 9       |
| Balance sheet                          | 10      |
| Statement of changes in equity         | 11      |
| Notes to the financial statements      | 12 - 22 |

**Motorola Mobility UK Ltd**

**Strategic report
for the year ended 31 March 2018**

The director presents the strategic report on the Company for the year ended 31 March 2018.

**Review of business**

During the financial year 2017/18, the principal activity of the Company was the provision of mobile devices. The Company's portfolio included smart-phones, wearables and associated accessories. The Company was focused on high quality, innovative products that meet the expanding needs of customers around the world.

From 16 January 2018, all Motorola Mobility UK products will now be sold and distributed by Lenovo Technology United Kingdom Ltd. Motorola Mobility UK Ltd will still remain in existence for research and development purposes.

The Company achieved a profit for the financial year of £653,000 (2017: £2,226,000). The operating profit for the year was £656,000 (2017: £2,217,000). The results are stated after a share-based payment expense of £23,290 (2017: £112,000). The Company's net assets as at 31 March 2018 were £12,976,000 (31 March 2017: £12,300,000).

No dividends were paid or proposed during the financial year 2017/18 (2016/17: none).

The Company's turnover in the year was £62,456,000 (2017: £77,159,000).

**Key performance indicators**

The Company's key financial performance indicators include the review of the net asset position and the management of working capital. Some key ratios are highlighted below:

|  | Year ended 31 March 2018 | Year ended 31 March 2017 |
|---|---|---|
| Return on total assets | 2.8% | 5.02% |
| Collection period | 123 days | 92 days |

Return on total assets has decreased principally due to the decrease in earnings before interest and tax.

Collection period has increased by 31 days due to the timing of intercompany settlements of amounts owed by group undertakings and the decrease in turnover.

**Motorola Mobility UK Ltd**

**Strategic report**
**for the year ended 31 March 2018**

Principal risks and uncertainties

The principal risk and uncertainties faced by the Company include, among others, risks related to
competition, management of growth, new products, services and technologies, outcomes of legal
proceedings and claims, commercial agreements, acquisitions and strategic transactions, foreign
exchange rates, system interruption, government regulation and taxation, payments and fraud.

Future developments

The company is expected to remain as a continuing business for the foreseeable future primarily due
to the research and development centre based in the UK which is required to remain open for IP
licence requirements.

Financial risk and management

The Company's activities expose it to a variety of financial risks, market risk (including currency risk
and interest rate risk), credit risk and liquidity risk. Risk management is carried out by a central
treasury department (group treasury) under policies approved by the board of directors of the ultimate
parent undertaking, Lenovo Group Limited. The Company's overall risk management programme
focuses on the unpredictability of financial markets and seeks to minimise potential adverse effects in
the Company's financial performance. The Motorola Mobility group uses derivative financial
instruments to hedge certain risk exposures. These are held in Motorola Mobility International Sales
LLC, the immediate parent undertaking.

(a) Market risk

(i) Foreign exchange risk

The Company operates internationally and is exposed to foreign exchange risk arising from various
currency exposures, primarily with respect to the US dollar. Foreign exchange risk arises from future
commercial transactions, recognised assets and liabilities and net investments in foreign operations.
The management of the parent undertaking has set up a policy to require group companies to
manage their foreign exchange risk against their functional currency. To manage their foreign
exchange risk arising from future commercial transactions and recognised assets and liabilities,
entities in the group use forward contracts, transacted with group treasury. Foreign exchange risk
arises when future commercial transactions or recognised assets or liabilities are denominated in a
currency that is not the Company's functional currency.

(ii) Interest rate risk

The Company's interest rate risk arises from intercompany borrowings. Borrowings issued at variable
rates expose the Company to cash flow interest rate risk which is partially offset by cash held at
variable rates.

(b) Credit risk

Credit risk is managed on a group basis, except for credit risk relating to accounts receivable
balances. Each local entity is responsible for managing and analysing the credit risk for each of their
new clients before standard payment and delivery terms and conditions are offered. Individual risk
limits are set based on internal and external credit ratings in accordance with limits set by the board.
No credit limits were exceeded during the reporting period, and management does not expect any
losses from non-performance by these counterparties.

**Motorola Mobility UK Ltd**

**Strategic report
for the year ended 31 March 2018**

(c) Liquidity risk

Cash flow forecasting is performed and aggregated by group finance. Group finance monitors rolling forecasts of the group's liquidity requirements to ensure it has sufficient cash to meet operational needs while maintaining sufficient headroom on its undrawn committed borrowing facilities at all times so that the group does not breach borrowing limits or covenants (where applicable) on any of its borrowing facilities. Such forecasting takes into consideration the group's debt financing plans, covenant compliance, compliance with internal balance sheet ratio targets and, if applicable, external regulatory or legal requirements.

On behalf of the Board

**S Agrawal
Director**

19 December 2018

**Motorola Mobility UK Ltd**

**Director's report
for the year ended 31 March 2018**

The director presents his report and the audited financial statements of the Company for the year ended 31 March 2018.

**Results and dividends**

The Company's results for the financial year are set out in the profit and loss account on page 9.

The director does not recommend the payment of any dividends (2017: Nil).

**Future developments**

An indication of the likely future developments of the Company are provided in the Strategic report.

**Research and development**

Expenditure on research and development amounted to £591,000 (2017: £1,321,000) reflecting the Company's belief that a strong commitment to research and development is required to drive long-term growth.

**Directors**

The directors who held office during the year and to the date of signing the financial statements, unless otherwise indicated, was as follows:

S Agrawal
A Cooper (resigned 28 September 2018)

**Qualifying third party indemnity provisions**

During the year and to the date of signing the financial statements, a qualifying third party indemnity provision as defined in Section 232(2) of the Companies Act 2006 is in force for the benefit of each of the directors in respect of liabilities incurred as a result of their office, to the extent permitted by law. In respect of those liabilities for which directors may not be indemnified, a directors' and officers' liability insurance policy was maintained by the Lenovo group throughout the financial year.

**Motorola Mobility UK Ltd**

**Director's report
for the year ended 31 March 2018**

**Employees**

The Company recognises the benefits of keeping employees informed about the progress of the business and of involving them in the Company's performance. During the year, employees were provided with information on the performance of the Company and on other matters of concern to them as employees. Regular consultations take place with employees so that their views may be solicited on issues likely to affect their interests.

The Company policy for the employment of disabled persons is that full consideration is given to their applications and candidates are offered employment on the basis of their ability and aptitude. In the event of an individual becoming disabled whilst in employment, every effort is made to ensure that such employment is continued, and where necessary, appropriate re-training is provided. The training, career development and promotion opportunities for disabled persons are in no way different to those of other employees and the Company makes every effort to employ disabled persons in excess of statutory requirements.

**Health and safety**

The Company considers that the health and safety of its workforce is very important. The Company's policy therefore sets out its commitment to health and safety. The policy applies to all employees and anyone working for the Company in any of its business units or who are visiting any of the Company's premises. It is the Company's policy to operate its business in accordance with the Health and Safety at Work Act 1974 and all applicable regulations made under this legislation so far as is reasonably practicable. This policy is regularly reviewed and revised, as appropriate, to take into account changes in circumstances or in legal requirements.

**Going concern**

At the time of approving the financial statements the Company has reviewed its financial projections of future profits, cash flows and working capital in terms of its position within the overall Lenovo Group. The directors have a reasonable expectation that the Company will have sufficient resources to continue to trade satisfactorily, and hence continue to adopt the going concern basis in preparing these financial statements.

**Disclosure of information to auditors**

The director at the time when this Director's report is approved have confirmed that:

- so far as they are aware, there is no relevant audit information of which the Company's auditors are unaware; and

- they have taken all the steps that ought to have been taken as directors in order to be aware of any relevant audit information and to establish that the Company's auditors are aware of that information.

On behalf of the Board

**S Agrawal
Director**

19 December 2018

**Motorola Mobility UK Ltd**

**Statement of director's responsibilities
for the year ended 31 March 2018**

The director is responsible for preparing the Annual Report and the financial statements in accordance with applicable law and regulations.

Company law requires the director to prepare financial statements for each financial year. Under that law the director has prepared the financial statements in accordance with United Kingdom Generally Accepted Accounting Practice (United Kingdom Accounting Standards, comprising Financial Reporting Standard 102 The Financial Reporting Standard Applicable in the UK and Republic of Ireland (FRS 102), and applicable law). Under company law, the director must not approve the financial statements unless they are satisfied that they give a true and fair view of the state of affairs of the company and of the profit or loss of the company for that period. In preparing these financial statements, the director is required to:

- select suitable accounting policies and then apply them consistently;
- state whether applicable UK Accounting Standards comprising FRS 102 have been followed, subject to any material departures disclosed and explained in the financial statements;
- make judgements and accounting estimates that are reasonable and prudent;
- prepare the financial statements on the going concern basis unless it is inappropriate to presume that the company will continue in business.

The director is responsible for keeping adequate accounting records that are sufficient to show and explain the company's transactions and disclose with reasonable accuracy at any time the financial position of the company and enable them to ensure that the financial statements comply with the Companies Act 2006. They are also responsible for safeguarding the assets of the company and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities.

**Motorola Mobility UK Ltd**

## *Independent auditors' report to the members of Motorola Mobility UK Ltd*

## Report on the audit of the financial statements

### Opinion

In our opinion, Motorola Mobility UK Ltd's financial statements:

- give a true and fair view of the state of the company's affairs as at 31 March 2018 and of its profit for the year then ended;
- have been properly prepared in accordance with United Kingdom Generally Accepted Accounting Practice (United Kingdom Accounting Standards, comprising FRS 102 "The Financial Reporting Standard applicable in the UK and Republic of Ireland", and applicable law); and
- have been prepared in accordance with the requirements of the Companies Act 2006.

We have audited the financial statements, included within the Annual report and financial statements (the "Annual Report"), which comprise: the Balance sheet as at 31 March 2018; the Profit and loss account, the statement of changes in equity for the year then ended; and the notes to the financial statements, which include a description of the significant accounting policies.

### Basis for opinion

We conducted our audit in accordance with International Standards on Auditing (UK) ("ISAs (UK)") and applicable law. Our responsibilities under ISAs (UK) are further described in the Auditors' responsibilities for the audit of the financial statements section of our report. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

*Independence*

We remained independent of the company in accordance with the ethical requirements that are relevant to our audit of the financial statements in the UK, which includes the FRC's Ethical Standard, and we have fulfilled our other ethical responsibilities in accordance with these requirements.

### Conclusions relating to going concern

We have nothing to report in respect of the following matters in relation to which ISAs (UK) require us to report to you when:

- the director use of the going concern basis of accounting in the preparation of the financial statements is not appropriate; or
- the director has not disclosed in the financial statements any identified material uncertainties that may cast significant doubt about the company's ability to continue to adopt the going concern basis of accounting for a period of at least twelve months from the date when the financial statements are authorised for issue.

However, because not all future events or conditions can be predicted, this statement is not a guarantee as to the company's ability to continue as a going concern.

### Reporting on other information

The other information comprises all of the information in the Annual Report other than the financial statements and our auditors' report thereon. The director is responsible for the other information. Our opinion on the financial statements does not cover the other information and, accordingly, we do not express an audit opinion or, except to the extent otherwise explicitly stated in this report, any form of assurance thereon.

In connection with our audit of the financial statements, our responsibility is to read the other information and, in doing so, consider whether the other information is materially inconsistent with the financial statements or our knowledge obtained in the audit, or otherwise appears to be materially misstated. If we identify an apparent material inconsistency or material misstatement, we are required to perform procedures to conclude whether there is a material misstatement of the financial statements or a material misstatement of the other information. If, based on the work we have performed, we conclude that there is a material misstatement of this other information, we are required to report that fact. We have nothing to report based on these responsibilities.

With respect to the Strategic Report and Directors' Report, we also considered whether the disclosures required by the UK Companies Act 2006 have been included.

## Motorola Mobility UK Ltd

Based on the responsibilities described above and our work undertaken in the course of the audit, ISAs (UK) require us also to report certain opinions and matters as described below.

*Strategic Report and Directors' Report*

In our opinion, based on the work undertaken in the course of the audit, the information given in the Strategic Report and Directors' Report for the year ended 31 March 2018 is consistent with the financial statements and has been prepared in accordance with applicable legal requirements.

In light of the knowledge and understanding of the company and its environment obtained in the course of the audit, we did not identify any material misstatements in the Strategic Report and Directors' Report.

### Responsibilities for the financial statements and the audit

*Responsibilities of the director for the financial statements*

As explained more fully in the Statement of Director Responsibilities set out on page 6, the director is responsible for the preparation of the financial statements in accordance with the applicable framework and for being satisfied that they give a true and fair view. The director is also responsible for such internal control as they determine is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, the director is responsible for assessing the company's ability to continue as a going concern, disclosing as applicable, matters related to going concern and using the going concern basis of accounting unless the director either intend to liquidate the company or to cease operations, or have no realistic alternative but to do so.

*Auditors' responsibilities for the audit of the financial statements*

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditors' report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with ISAs (UK) will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these financial statements.

A further description of our responsibilities for the audit of the financial statements is located on the FRC's website at: www.frc.org.uk/auditorsresponsibilities. This description forms part of our auditors' report.

*Use of this report*

This report, including the opinions, has been prepared for and only for the company's members as a body in accordance with Chapter 3 of Part 16 of the Companies Act 2006 and for no other purpose. We do not, in giving these opinions, accept or assume responsibility for any other purpose or to any other person to whom this report is shown or into whose hands it may come save where expressly agreed by our prior consent in writing.

## Other required reporting

### Companies Act 2006 exception reporting

Under the Companies Act 2006 we are required to report to you if, in our opinion:

- we have not received all the information and explanations we require for our audit; or
- adequate accounting records have not been kept by the company, or returns adequate for our audit have not been received from branches not visited by us; or
- certain disclosures of director remuneration specified by law are not made; or
- the financial statements are not in agreement with the accounting records and returns.

We have no exceptions to report arising from this responsibility.

Sharron Moran (Senior Statutory Auditor)
for and on behalf of PricewaterhouseCoopers LLP
Chartered Accountants and Statutory Auditors
Glasgow
19 December 2018

**Motorola Mobility UK Ltd**

**Profit and loss account
for the year ended 31 March 2018**

| | Note | For the year ended 31 March 2018 £000 | For the year ended 31 March 2017 £000 |
|---|---|---|---|
| **Turnover** | 3 | 62,456 | 77,159 |
| Cost of sales | | (55,334) | (66,707) |
| **Gross profit** | | 7,122 | 10,452 |
| Administrative expenses | | (7,357) | (10,440) |
| Other operating income | | 891 | 2,205 |
| **Operating profit** | 4 | 656 | 2,217 |
| Interest receivable and similar income | 7 | 5 | 12 |
| **Profit before taxation** | | 661 | 2,229 |
| Tax on profit | 8 | (8) | (3) |
| **Profit for the financial year** | | 653 | 2,226 |

The notes on pages 12 to 22 form part of these financial statements.

**Motorola Mobility UK Ltd**

**Balance sheet
as at 31 March 2018**

| | Note | 31 March 2018 £000 | 31 March 2018 £000 | 31 March 2017 £000 | 31 March 2017 £000 |
|---|---|---|---|---|---|
| **Fixed assets** | | | | | |
| Tangible assets | 9 | | 141 | | 189 |
| | | | 141 | | 189 |
| **Current assets** | | | | | |
| Debtors | 10 | 21,805 | | 19,739 | |
| Cash at bank and in hand | | 1,496 | | 24,212 | |
| | | 23,301 | | 43,951 | |
| Creditors: amounts falling due within one year | 11 | (10,253) | | (31,487) | |
| Net current assets | | | 13,048 | | 12,464 |
| Total assets less current liabilities | | | 13,189 | | 12,653 |
| **Provisions for liabilities** | 12 | | (213) | | (353) |
| Net assets | | | 12,976 | | 12,300 |
| **Capital and reserves** | | | | | |
| Called up share capital | 13 | | - | | - |
| Capital contribution reserve | | | 2,764 | | 2,741 |
| Profit and loss account | | | 10,212 | | 9,559 |
| Total Shareholders' funds | | | 12,976 | | 12,300 |

The notes on pages 12 to 22 form part of these financial statements.

The financial statements on pages 9 to 22 were approved by the board of director's on 19 December 2018 and were signed on its behalf by:

S Agrawal
Director

**Motorola Mobility UK Ltd**

**Statement of changes in equity
for the year ended 31 March 2018**

| | Capital contribution reserve £000 | Profit and loss account £000 | Total shareholder's funds £000 |
|---|---:|---:|---:|
| At 1 April 2016 | 2,629 | 7,333 | 9,962 |
| Capital contribution in respect of share-based payment | 112 | - | 112 |
| Profit and total comprehensive income for the financial year | - | 2,226 | 2,226 |
| At 31 March 2017 | 2,741 | 9,559 | 12,300 |
| | | | |
| Capital contribution in respect of share-based payment | 23 | - | 23 |
| Profit and total comprehensive income for the financial year | - | 653 | 653 |
| At 31 March 2018 | 2,764 | 10,212 | 12,976 |

## Motorola Mobility UK Ltd

## Notes to the financial statements
## for the year ended 31 March 2018

### 1. General Information

Motorola Mobility UK Ltd is a private limited company incorporated in the United Kingdom under the Companies Act 2006. The address of the registered office is provided on the Company information page. The company sells mobile telephones and accessories. The company sells primarily to the UK.

### 2. Principal accounting policies

The principal accounting policies applied in the preparation of these financial statements are set out below. These policies have been consistently applied to all the years presented, unless otherwise stated. The company has adopted FRS 102 in these financial statements.

FRS 102 allows a qualifying entity certain disclosure exemptions, if certain conditions, have been complied with, including notification of and no objection to, the use of exemptions by the Company's shareholders. A qualifying entity is defined as a member of a group that prepares publicly available financial statements, which give a true and fair view, in which that member is consolidated. Motorola Mobility UK Ltd is a qualifying entity as its results are consolidated into the consolidated financial statements of Lenovo Group Limited which are publicly available.

As a qualifying entity, the Company has taken advantage of the following exemptions:

i) from the requirement to prepare a statement of cash flows as required by paragraph 3.17(d) of FRS 102;
ii) from the requirement to present certain financial instrument disclosures, as required by sections 11 and 12 of FRS 102;
iii) from the requirement to present a reconciliation of the number of shares outstanding at the beginning and end of the period as required by paragraph 4.12(a)(iv) of FRS 102; and
iv) from the requirement to disclose the key management personnel compensation in total as required by paragraph 33.7 of FRS 102.

#### 2.1 Basis of preparation

The financial statements have been prepared on the going concern basis, under the historical cost convention and in accordance with the Companies Act 2006 and applicable United Kingdom accounting standards. The preparation of financial statements in conformity with FRS 102 requires the use of certain critical accounting estimates. It also requires management to exercise its judgement in the process of applying the company's accounting policies.

#### 2.2 Going concern

The financial statements have been prepared on a going concern basis. The Company's forecasts and projections, taking account of reasonably possible changes in trading performance show that the Company should be able to operate within the level of its current financing. The directors have a reasonable expectation that the Company has adequate resources to continue in operational existence for the foreseeable future.

The Company therefore continues to adopt the going concern basis in preparing the financial statements.

#### 2.3 Related party disclosures

The company is a wholly owned subsidiary of Lenovo Group Limited and has therefore taken advantage of the exemption contained in FRS 102 section 33.1A Related Party Disclosures from disclosing transactions or balances with entities which form part of the Lenovo group.

**Motorola Mobility UK Ltd**

**Notes to the financial statements
for the year ended 31 March 2018**

### 2.4 Tangible fixed assets and depreciation

Tangible fixed assets are stated at cost (including capitalised interest on assets in the course of construction, where material) less accumulated depreciation and provision for impairment. Where an indication of impairment arises an impairment review is performed.

Depreciation is provided at rates calculated to write-off the cost of fixed assets, less their estimated residual value, over their expected useful lives as follows:

| | | |
|---|---|---|
| Leasehold improvements | - | 10 years straight line |
| Plant, machinery and equipment | - | 3 to 10 years straight line |

### 2.5 Foreign currencies

Transactions in foreign currencies are initially recorded using the exchange rate ruling at the date of the transaction. Monetary assets and liabilities denominated in foreign currencies are translated using the month end rate of exchange ruling at the balance sheet date and the gains or losses on translation are taken to the profit and loss account.

### 2.6 Operating leases

Rentals under operating leases are charged to the profit and loss account on an accruals basis. Leases that do not transfer all the risks and rewards of ownership are classified as operating leases.

### 2.7 Pensions

The Company operates a defined contribution pension scheme. The assets of the scheme are held separately from those of the Company in an independently administered fund. The amount charged to the profit and loss account represents the contributions payable to the scheme in respect of the financial period.

### 2.8 Research and development

Expenditure on research and development is recharged back to Motorola Mobility International Sales LLC, the immediate parent undertaking, at cost plus 10%.

### 2.9 Share-based payments

*Equity settled transactions*
Motorola Mobility UK Ltd participates in a group operated long-term incentive programme to recognise employees' individual and collective contributions. This includes two types of awards, namely share appreciation rights and restricted share units. The group reserves the right, at its discretion, to pay the award in cash or ordinary shares of the group. The fair value of the employee services received in exchange for the grant of the long-term incentive awards is recognised as an expense. The total amount to be expensed over the vesting period is determined by reference to the fair value of the long-term incentive awards granted. Non-market vesting conditions (for example profitability and sales growth targets) are included in the assumptions about the number of long term incentive awards that are expected to become exercisable/vested.

At each balance sheet date, Motorola Mobility UK Ltd revises its estimates of the number of long-term incentive awards that are expected to become exercisable. It recognises the impact of the revision of original estimates, if any, in the profit and loss account, and a corresponding adjustment to reserves. This is treated as a capital contribution from the parent company.

*Cash settled transactions*
The Company does not have any share-based payment resulting from cash-settled transactions.

**Motorola Mobility UK Ltd**

**Notes to the financial statements
for the year ended 31 March 2018**

### 2.10 Revenue recognition

The Company's material revenue streams are the result of a wide range of activities, from the delivery of stand-alone equipment to custom design and installation over a period of time to bundled sales of equipment, software and services. The Company recognises revenue when persuasive evidence of an arrangement exists, delivery has occurred, the sales price is fixed or determinable, and collectability of the sales price is reasonably assured. In addition to these general revenue recognition criteria, the following specific revenue recognition policies are followed:

*Products and equipment*
For product and equipment sales, revenue recognition generally occurs when products or equipment have been shipped, risk of loss has transferred to the customer, objective evidence exists that customer acceptance provisions have been met, no significant obligations remain and allowances for discounts, price protection, returns and customer incentives can be reasonably and reliably estimated. Recorded revenues are reduced by these allowances. The Company bases its estimates on historical experience taking into consideration the type of products sold, the type of customer, and the type of transaction specific in each arrangement. Where customer incentives cannot be reasonably and reliably estimated, the Company recognises the revenue at the time the product sells through the distribution channel to the end customer.

*Services*
Revenue for services (including software maintenance, technical support and unspecified upgrades) is generally recognised rateably over the contract term as services are performed.

*Software and licences*
Revenue from pre-paid perpetual licenses is recognised at the inception of the arrangement, presuming all other relevant revenue recognition criteria are met. Revenue from non-perpetual licenses or term licenses is recognised rateably over the period that the licensee uses the license. Revenue from software maintenance, technical support and unspecified upgrades is generally recognised over the period that these services are delivered.

*Multiple Element Arrangements*
Arrangements with customers may include multiple deliverables, including any combination of products, equipment, services and software. Revenue is allocated to each deliverable based on fair value and then revenue is recognised for each separate deliverable based on the nature of the revenue.

### 2.11 Taxation

The charge for taxation is based on the profit or loss for the period and takes into account taxation deferred because of timing differences between the treatment of certain items for taxation and accounting purposes.

Deferred tax is recognised, without discounting, in respect of all timing differences between the treatment of certain items for taxation and accounting purposes that have arisen but not reversed by the balance sheet date, except as otherwise required by FRS 102 section 29 Deferred tax.

The carrying amount of deferred tax assets is reviewed at the end of the year and reduced to the extent that it is no longer probable that sufficient taxable profit will be available to allow the benefit of part or all of that deferred tax asset to be utilised. A deferred tax asset is recognised for an unused tax loss carry forward or unused tax credit only if, it is considered probable that there will be sufficient future taxable profit against which the loss or credit carry forwards can be utilised.

### 2.12 Significant Estimates

No significant estimates or assumptions have been used in the preparation of these financial statements.

**Motorola Mobility UK Ltd**

**Notes to the financial statements
for the year ended 31 March 2018**

3.  **Turnover**

Turnover represents the value of goods supplied and services rendered to customers and other group undertakings by the Company (excluding VAT).

A geographical analysis of turnover is as follows:

|  | For the year ended 31 March 2018 £000 | For the year ended 31 March 2017 £000 |
|---|---|---|
| United Kingdom | 61,558 | 76,216 |
| Rest of world | 898 | 943 |
|  | 62,456 | 77,159 |

4.  **Operating profit**

Operating profit is stated after charging / (crediting):

|  | For the year ended 31 March 2018 £000 | For the year ended 31 March 2017 £000 |
|---|---|---|
| Depreciation of tangible fixed assets: |  |  |
| - owned by the company | 139 | 40 |
| Auditors' remuneration |  |  |
| - audit of the company's financial statements | 62 | 68 |
| Operating lease rentals: |  |  |
| - plant and machinery | 42 | 8 |
| - land and buildings | 554 | 580 |
| Foreign exchange loss/(gains) | 1,058 | (1,426) |
| Research and development expenditure | 591 | 1,321 |

During the period the auditor was paid £Nil (2017: £Nil) in respect of other services.

5.  **Director's emoluments**

|  | For the year ended 31 March 2018 £000 | For the year ended 31 March 2017 £000 |
|---|---|---|
| Aggregate emoluments in respect of qualifying services | - | 131 |
| Company pension contributions to defined contribution pension schemes | - | 19 |

During the period, 1 director exercised share options in a group undertaking (2017: 1).

Page 15

**Motorola Mobility UK Ltd**

**Notes to the financial statements
for the year ended 31 March 2018**

6.    **Staff costs and numbers**

Staff costs, including directors' emoluments, were as follows:

|  | For the year ended 31 March 2018 £000 | For the year ended 31 March 2018 £000 |
|---|---|---|
| Wages and salaries | 657 | 1,823 |
| Social security costs | 93 | 648 |
| Other pension costs (see note 14) | 15 | 116 |
| Share-based payment costs (see note 16) | 23 | 112 |
|  | 788 | 2,699 |

The average monthly number of employees, including the director, during the period was as follows:

|  | For the year ended 31 March 2018 No. | For the year ended 31 March 2017 No. |
|---|---|---|
| Administration, sales and management | 3 | 14 |
| Production and technical | 5 | 7 |
|  | 8 | 21 |

7.    **Interest receivable and similar income**

|  | For the year ended 31 March 2018 £000 | For the year ended 31 March 2017 £000 |
|---|---|---|
| On bank balances and deposits | 5 | 12 |

8.    **Tax on profit**

|  | For the year ended 31 March 2018 £000 | For the year ended 31 March 2017 £000 |
|---|---|---|
| **Current tax** |  |  |
| UK corporation tax charge on profit for the year | 1 | 3 |
| Adjustments in respect of prior periods | 7 | - |
| **Tax on profit** | 8 | 3 |

Page 16

**Motorola Mobility UK Ltd**

**Notes to the financial statements
for the year ended 31 March 2018**

8.  **Tax on profit (continued)**

**Factors affecting tax charge for the year**

The tax assessed for the year is lower (2017: lower) than the standard rate of corporation tax in the UK of 19% (2017: 20%). The differences are explained below:

|  | For the year ended 31 March 2018 £000 | For the year ended 31 March 2018 £000 |
|---|---|---|
| Profit before taxation | 661 | 2,229 |
| Profit multiplied by standard rate of corporation tax in the UK of 19% (2017: 20%) | 125 | 446 |
| **Effects of:** | | |
| Expenses not deductible for tax purposes | - | 6 |
| Adjustments in respect of prior periods | 7 | - |
| Amounts not recognised | (124) | (449) |
| **Total tax charge for the year** | 8 | 3 |

**Deferred tax**

There was no provision for deferred tax at 31 March 2018 (2017: £Nil). No deferred tax asset has been recognised due to the uncertainty surrounding its recoverability. The unrecognised deferred tax asset comprises:

|  | Unrecognised For year ended on 31.3.2018 £000 | Unrecognised For year ended on 31.3.2017 £000 |
|---|---|---|
| Fixed assets | 338 | 404 |
| Losses | 663 | 698 |
| Timing differences - trading | 44 | 498 |
|  | 1,045 | 1,600 |

The unrecognised deferred tax asset has been calculated at 17% for the period ended 31 March 2018 (2017: 17%).

**Motorola Mobility UK Ltd**

**Notes to the financial statements
for the year ended 31 March 2018**

8.  **Tax on profit (continued)**

The standard rate of corporation tax in the UK is 19% with effect from 1 April 2017. A reduction in the rate of corporation tax to 17% from 1 April 2020 was enacted during 2016.

Any deferred tax balances should be recognised at the rate at which they are expected to unwind.

9.  **Tangible assets**

| | Leasehold Improvements £000 | Plant, machinery and equipment £000 | Total £000 |
|---|---|---|---|
| **Cost** | | | |
| At 1 April 2017 | 1,779 | 595 | 2,374 |
| Disposal | (180) | (7) | (187) |
| At 31 March 2018 | 1,599 | 588 | 2,187 |
| **Accumulated Depreciation** | | | |
| At 1 April 2017 | 1,618 | 567 | 2,185 |
| Disposal | (180) | (7) | (187) |
| Charge for the year | 41 | 7 | 48 |
| At 31 March 2018 | 1,479 | 567 | 2,046 |
| **Net book value** | | | |
| At 31 March 2018 | 120 | 21 | 141 |
| At 31 March 2017 | 161 | 28 | 189 |

**Motorola Mobility UK Ltd**

**Notes to the financial statements
for the year ended 31 March 2018**

10.  **Debtors**

|  | 31 March 2018 £000 | 31 March 2017 £000 |
|---|---|---|
| Trade debtors | 3,188 | 9,909 |
| Amounts owed by group undertakings | 17,894 | 9,505 |
| Other debtors | 4 | 7 |
| Other taxation and social security | 389 | - |
| Prepayments and accrued income | 330 | 318 |
|  | 21,805 | 19,739 |

Amounts owed by group undertakings are unsecured, interest free and are repayable on demand.

11.  **Creditors: amounts falling due within one year**

|  | 31 March 2018 £000 | 31 March 2017 £000 |
|---|---|---|
| Trade creditors | 2,107 | 1,739 |
| Amounts owed to group undertakings | - | 21,963 |
| Corporation tax | 10 | 4 |
| Other creditors | - | 181 |
| Accruals and deferred income | 8,136 | 7,600 |
|  | 10,253 | 31,487 |

Trade amounts owed to group undertakings are unsecured, interest free and are repayable on demand.

12.  **Provisions**

|  | Dilapidation provision £000 |
|---|---|
| At 1 April 2017 | 353 |
| Released in the year | (140) |
| At 31 March 2018 | 213 |

The Dilapidation provision is for the leased office building at Chineham Park, Basingstoke, Hampshire. This lease expires on 10 April 2022.

**Motorola Mobility UK Ltd**

**Notes to the financial statements
for the year ended 31 March 2018**

13.    Called up share capital

|  | 31 March 2017 £ | 31 March 2016 £ |
|---|---|---|
| Allotted, called up and fully paid | | |
| 100 ordinary shares of £1 each (2017: 100) | 100 | 100 |

14.    Pension

The Company operates a defined contributions pension scheme. The assets of the scheme are held separately from those of the Company in an independently administered fund. The pension cost for the period represents contributions payable by the Company to the scheme and amounted to £15,000 (2017: £116,000). Pension contributions outstanding at 31 March 2018 amounted to £Nil (2017: £Nil).

15.    Operating lease commitments

At 31 March 2018, the Company had the following future minimum lease payments under non-cancellable operating leases for each of the following periods:

|  | Land and buildings | | Other | |
|---|---|---|---|---|
|  | 31 March 2018 £000 | 31 March 2017 £000 | 31 March 2018 £000 | 31 March 2017 £000 |
| Payments due: | | | | |
| Not later than one year | 646 | 505 | - | 6 |
| Later than one year and not later than five years | 1,577 | 2,318 | - | 3 |
| Later than 5 years | - | - | - | - |
|  | 2,223 | 2,898 | - | 9 |

The company had no other off-balance sheet arrangements.

16.    Share-based payment plans

*Long term incentive programme*

Motorola Mobility UK Ltd participates in a group operated long term incentive programme. Lenovo Group Limited, the ultimate parent undertaking at 31 March 2017, operates the 2008 Plan. The 2008 Plan is the Lenovo Group Limited Amended and Restated Restricted Share Unit Plan from which the Company issues RSUs. An RSU award is an agreement to issue shares of the stock at the time of vest. RSUs issued to employees under the 2008 Plan generally vest over three years contingent upon employment with Lenovo Group Limited on the vesting date.

This programme is for the purpose of rewarding and motivating directors, executives and top performing employees of the group. The long term incentive programme is designed to attract and retain the best available personnel, and encourage and motivate participants to work towards enhancing the value of the group and its shares by aligning their interests with those of the shareholders of the group.

**Motorola Mobility UK Ltd**

**Notes to the financial statements
for the period ended 31 March 2018**

16.   **Share-based payment plans (continued)**

Under the long term incentive programme, the group may grant awards at its discretion, using one of two types of equity based compensation (i) share appreciation rights and (ii) restricted share units, which are described below.

*(i) Share Appreciation Rights ("SARs")*
SARs entitle the holder to receive the appreciation in value of the group's share price above a pre-determined level. SARs are typically subject to a vesting schedule of up to four years.

*(ii) Restricted Share Units ("RSUs")*
RSUs are equivalent to the value of one ordinary share of the group. Once vested, RSUs are converted to an ordinary share or its cash equivalent. RSUs are typically subject to a vesting schedule of up to four years. Dividends are typically not paid on RSUs.

Under the two types of compensation, the group reserves the right, at its discretion, to pay the award in cash or in ordinary shares of the group.

Movements in the number of units of awards granted during the period and their related average fair values are as follows:

|  | SARs No. | RSUs No. |
|---|---|---|
| Unvested awards outstanding at 1 April 2016 | 453,557 | 320,148 |
| Granted during the year | - | 363,628 |
| Vested during the year | (123,226) | (26,012) |
| Lapsed/cancelled | (207,104) | (217,406) |
| Transfer | - | (105,948) |
| **At 31 March 2017** | **123,227** | **334,410** |
| Unvested awards outstanding at 1 April 2017 | 123,227 | 334,410 |
| Granted during the year | - | 101,168 |
| Vested during the year | (88,019) | (68,132) |
| Lapsed/cancelled | | |
| Transfer | (35,208) | (168,438) |
| **At 31 March 2018** | **-** | **199,008** |

| Average fair value per unit (HK$) | | |
|---|---|---|
| At 31 March 2017 | 1.45 | 6.49 |
| At 31 March 2018 | 1.01 | 5.50 |

The only requirement for vesting is that individuals must be an employee of the company.

**Motorola Mobility UK Ltd**

**Notes to the financial statements
for the year ended 31 March 2018**

16.     **Share-based payment plans (continued)**

The fair values of the SARs awarded under the long-term incentive program were calculated by applying a Black-Scholes pricing model. For the period ended 31 March 2018, the model inputs were the fair value (i.e. market value) of the Company's shares at the grant date, taking into account the expected volatility of 34.04 percent (2017: 37.06 percent), expected dividends during the vesting periods of 5.59 percent (2017: 2.74 percent), contractual life of 4.5 years (2017: 4.5 years), and a risk-free interest rate of 0.94 percent (2017: 0.7 percent).

The remaining vesting periods of the awards under the long-term incentive program as at 31 March 2018 ranged from 0.14 to 2.92 years (2017: 0.25 to 3 years).

The charge through the profit and loss account for the year ended 31 March 2018 was £23,000 (2017: £111,956).

The total capital contribution from the parent company as at 31 March 2018 was £2,764,000 (2017: £2,740,788).

17.     **Immediate and ultimate parent undertaking**

The company's ultimate parent undertaking of and controlling party is Lenovo Group Limited which is incorporated in Hong Kong. Lenovo Group Limited is the largest and smallest group which consolidates these financial statements. Copies of the financial statements of this undertaking may be obtained from 23rd Floor, Lincoln House, Taikoo Place, 979 King's Road, Quarry Bay, Hong Kong.

As at 31 March 2018, Motorola Mobility International Sales LLC was the immediate parent undertaking, a company incorporated in Bermuda.

18.     **Post balance sheet events**

There are no post balance sheet events requiring disclosure.

Exhibit 11

Case 5:19-cv-01398-EJD   Document 29-1   Filed 08/18/19   Page 134 of 156
Case 8:14-cv-00341-JVS-DFM   Document 279   Filed 06/29/18   Page 1 of 156   Page ID
#:7329

TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson et al.,
SACV 14-0341 JVS (ANx)

Related Case: 2:15-cv-02370-JVS-JCx

## **ORDER re Motions**

The above-titled action is a patent infringement action and FRAND licensing
dispute between Plaintiff and Counter-defendant TCL Communication Technology
Holdings, Ltd. ("TCL"), Defendant Telefonaktiebolaget LM Ericsson, and
Defendant and Counter-claimant Ericsson, Inc. (collectively, "Ericsson").  Before
the Court are four motions.

In response to the Court's request for briefing regarding the scope of the
FRAND trial, Ericsson moves the Court for a ruling regarding the scope of the
FRAND trial.  (Docket Nos. 222, 224.)  TCL opposes.  (Docket Nos. 241, 253,
270.)  Ericsson has replied.  (Docket Nos. 262, 269.)

TCL moves the Court to issue an anti-suit injunction enjoining Ericsson
from proceeding with litigation in Texas and a number of foreign jurisdictions.
(See Docket Nos. 195, 202.)  Ericsson opposes.  (Docket Nos. 242, 248.)  TCL has
replied.  (Docket Nos. 256, 273.)

Ericsson also moves the Court to order TCL to return, destroy, or treat as
confidential certain inadvertently disclosed materials.  (Docket Nos. 210-1, 213.)
TCL opposes.  (Docket Nos. 244, 264.)  Ericsson has replied.  (Docket Nos. 259,
268.)

Finally, the parties jointly move to consolidate this case with Ericsson Inc.,
et al. v. TCL Communication Technology Holdings, Ltd., et al, Case No 2:15-cv-
02370-JVS-JC ("the Transferred Action"), stay certain claims, and dismiss certain
claims.  (Docket No. 219.)

As set forth below, the Court (1) GRANTS IN PART and DENIES IN
PART Ericsson's motion regarding the scope of the FRAND trial; (2) GRANTS IN
PART and DENIES IN PART TCL's motion for an anti-suit injunction; (3)
GRANTS Ericsson's motion to treat as confidential inadvertently disclosed
materials; and (4) GRANTS the parties' joint motion.

1

I.    BACKGROUND

      **A.    The Present Action**

      TCL is a mobile telecommunications vendor that offers products in over one
hundred countries.  (Second Amended Complaint ("SAC") ¶ 2, Docket No. 31.)
Ericsson owns a portfolio of intellectual property rights, some of which are
"essential" to the global 2G (second generation), 3G (third generation), and 4G
(fourth generation) telecommunications standards established by the European
Telecommunications Standards Institute ("ETSI").[1]  (SAC ¶ 3; Answer ¶ 41,
Docket No 59.)

      ETSI is a standard-development organization ("SDO") that adopts globally-
accepted  technological standards to facilitate compatibility between related
products and services in the telecommunications industry.  (Mem. P. & A. Supp.
Mot. Anti-Suit Inj. 3; SAC ¶¶ 38-40; Answer ¶40.)  ETSI requires members who
declare their patents "standard-essential" ("standard-essential patents," or "SEPs")
to license them to others on fair, reasonable, and non-discriminatory ("FRAND")
terms.  (SAC ¶¶ 7-8.)

      TCL claims that prior to filing this action, it attempted in good faith to
negotiate a license to Ericsson's SEP portfolio but was unable to reach a license
agreement with Ericsson.  (Mem. P. & A. Supp. Mot. Anti-Suit Inj. 3.)  As a result,
TCL initiated this action on March 5, 2014, claiming third-party beneficiary status
to Ericsson's SDO obligations and alleging that Ericsson breached its obligation by
failing to license its SEP portfolio to TCL on FRAND terms.  (See SAC ¶¶ 11-12.)
TCL's SAC alleges claims for breach of Ericsson's FRAND obligations and
Ericsson's infringement of two TCL patents.  (SAC at 26-28, 37-41.)  TCL also
seeks declaratory judgment of invalidity and/or non-infringement of two of
Ericsson's patents.  (SAC at 35-37.)  Finally, TCL requests that the Court
determine the FRAND rates for a license of Ericsson's SEP portfolio to TCL.
(SAC at 41, ¶ D.)

---

[1] Ericsson also owns non-essential "implementation patents," which are "patents that are
not essential to the practice of a standard, and which have not been declared by Ericsson to be
essential."  (See Mem. P. & A. Supp. Mot. re Scope of FRAND Trial 1-2, 2 n.2, Docket No. 222-
1. )

Ericsson filed counterclaims against TCL on October 14, 2014 for "declaratory judgment that TCL has not acted in good faith during negotiations, along with a promissory estoppel claim based on alleged promises made by TCL during the parties' licensing negotiations." (Mem. P. & A. Supp. Mot. Anti-Suit Inj. 4; Answer at 26-29.) Ericsson has also requested that the Court determine "the FRAND terms and conditions of a worldwide license between Ericsson and TCL" for Ericsson's SEP portfolio. (Mem. P. & A. Supp. Mot. Anti-Suit Inj. 4; Answer 29.)

At the same time, Ericsson and TCL (or entities that TCL owns) are litigating patent infringement claims related to patents at issue in the present FRAND action in other jurisdictions. The Court briefly summarizes the related litigation and its connection to the present dispute <u>infra</u> Part III.A.

## II.    MOTION TO DEFINE SCOPE OF FRAND TRIAL

Ericsson moves the Court to issue a "ruling that the FRAND terms to be adjudicated at the jury trial will: (1) not include a license to implementation patents . . . and (2) include a 'release payment' for TCL's past unlicensed sales." (Mem. P. & A. Supp. Mot. re Scope of FRAND Trial 1, Docket Nos. 222, 224.) The Court will discuss each issue in turn.

### A.    **Implementation Patents**

The parties agree that this action is a breach of contract action against Ericsson. (Mem. P. & A. Supp. Mot. re Scope of FRAND Trial 1.) "The underlying basis for each of TCL's asserted causes of action is its allegation that Ericsson breached its contract to ETSI (under which TCL claims third-party beneficiary status) to offer licenses under its standard essential patents on FRAND terms." (<u>Id.</u>)

The parties do not appear to dispute that the implementation patents are not declared standard-essential patents. Thus, Ericsson argues that there is no possible way the FRAND litigation could implicate Ericsson's implementation patents. (Mem. P. & A. Supp. Mot. re Scope of FRAND Trial 1-2.)

The Court agrees that Ericsson is not independently obligated to provide a license to non-SEP implementation patents. As Ericsson correctly notes, "[b]y the

express terms of the ETSI IPR declaration, which is the contract TCL seeks to enforce by this action, there is no commitment to license implementation patents." (Reply Supp. Mot. re Scope of FRAND Trial at 1, 3-5.)  The Court finds no legal support for TCL's contention that Ericsson is obligated to offer its non-essential implementation patents on FRAND terms merely because Ericsson may have licensed its implementation patents along with its standard essential patents to TCL's competitors.  An ETSI obligation to offer an SEP on FRAND terms does not require the standard-essential patentholder to offer identical terms to all licensees.  (Gibson Decl., Ex. B at 2, Docket 262-3 ("License terms and conditions should be non-discriminatory; this does not necessarily imply identical terms."))

However, the Court agrees with TCL that the value of the implementation patents is relevant to the FRAND litigation regarding the SEPs.  The royalty rate for the SEPs negotiated between Ericsson and other competitors may incorporate an agreement regarding the implementation patents, and thus comparison of those rates will require the parties to adjudicate the value apportioned to the SEPs versus the value of a license to the SEPs combined with an agreement or license regarding the implementation patents.  See Microsoft Corp. v. Motorola, Inc., No. C10-1823JLR, 2013 WL 2111217, *69 ¶ 427 (W.D. Wash. Apr. 25, 2013) (finding it necessary to apportion the value of standard essential patents from other licensed properties where "multiple technologies (including both standard essential and non-essential patents) are licensed within the same agreement").  TCL correctly notes that a standard essential patentholder is entitled only "to a royalty that reflects the contribution of the standard-essential patent to the standard."  (Opp'n Mot. re Scope of FRAND Trial 20.)  Ericsson does not materially oppose this position.  (See Reply Supp. Mot. re Scope of FRAND Trial 8:20-9:1-3.)

Accordingly, the Court concludes that the FRAND trial will not adjudicate a license of the non-essential implementation patents or a covenant not to sue regarding the non-essential implementation patents.  However, the Court also concludes that the value of the implementation patents will be relevant to the extent necessary to determine the value of the SEPs at issue where apportionment is part of a comparative analysis of past licenses.

## B.    Release Payment

Ericsson argues that the FRAND litigation should adjudicate the issue of whether TCL owes Ericsson a release payment for past unlicensed sales and for

4

what amount.  (<u>See</u> Mem. P. & A. Supp. Mot. re Scope of FRAND Trial 9-14.)
The Court agrees.

With respect to a release payment, TCL has represented to the Court that
"the jury will need to decide (a) whether any such payment is owed, (b) the scope
of the 'forgiveness' entailed by the payment, if any, and (c) the amount of the
payment, if any."  (Pls.' Prelim. Br. re Jury Determinations 4, Docket No. 110.)

TCL now represents to the Court that it informed Ericsson that "it would
agree to adjudicate the release payment issue during the FRAND trial . . . ."
(Opp'n Mot. re Scope of FRAND Trial 1.)  Specifically, TCL has offered to "agree
to litigate the extent to which a release payment is owed, and the amount of any
release payment, in the FRAND trial . . . ." (<u>Id.</u>, quoting Bader Decl., Ex. 2.,
Docket Nos. 241-3, 254.)

On the basis of TCL's representations, the Court concludes that TCL has
conceded that an adjudication of the release payment falls within the scope of the
FRAND trial.  Therefore, "the FRAND trial will address both Ericsson's
entitlement to a release payment, as well as the amount of any release payment."
(<u>See</u> Opp'n Mot. re Scope of FRAND Trial 2 n.1.)

III.    MOTION FOR ANTI-SUIT INJUNCTION

As noted <u>supra</u> Part I, the parties are presently litigating infringement actions
related to patents allegedly covered by Ericsson's FRAND obligation in at least
seven other jurisdictions, both domestic and foreign.  Because the parties agree that
the present FRAND action should resolve their global licensing dispute, TCL
moves the Court to enjoin Ericsson "from further prosecuting any actions alleging
infringement of its 2G, 3G, and 4G patents until the FRAND issues are resolved
here in [this] action."  (Mem. P. & A. Supp. Mot. Anti-Suit Inj. 12-13.)

The Court briefly summarizes the other actions below.

**A.      Background on Other Actions**

1.      <u>Texas Actions</u>

a.      *The First Texas Action*

5

Several months after the filing of the present action, Ericsson filed suit against TCL in the United States District Court, Eastern District of Texas, seeking a declaratory judgment that Ericsson had complied with its FRAND obligations and for patent infringement of two alleged SEPs.  (Mem. P. & A. Supp. Mot. Anti-Suit Inj. 6.)  The First Texas Action was transferred to the Central District of California on March 31, 2015.  (Ericsson Inc., et al. v. TCL Communication Technology Holdings Ltd., et al., 2:15-cv-02370-JVS-JC (the "Transferred Action") at Docket No. 89).  The Transferred Action was assigned to this Court on April 2, 2014.  (Id. at Docket No. 104.)

> ### b.    The Second Texas Action

On January 8, 2015, Ericsson sued TCL in the Eastern District of Texas alleging infringement of non-essential implementation patents and seeking damages and injunctive relief.  (Mem. P. & A. Supp. Mot. Anti-Suit Inj. 7.)  "TCL's Answer alleges a license defense based on Ericsson's FRAND obligations."  (Id.)

> ## 2.    Foreign Actions

> ### a.    France

On October 17, 2012, Ericsson initiated an action in France against TCT Mobile Europe SAS, TCT Mobile International Limited, and TCT Mobile Limited[2] for alleged infringements of three 3G SEPs.  (Mem. P. & A. Supp. Mot. Anti-Suit Inj. 8.)  The SEPs in question in the French action have been identified by the parties as at issue in the present FRAND litigation because Ericsson has identified them as essential to the 2G, 3G, and 4G standards.  (Id.)  As a remedy, Ericsson seeks damages, injunctive relief, and recall and destruction of all allegedly infringing devices.  (Id.)

> ### b.    United Kingdom

On August 20, 2013, TCT Mobile SAS initiated an action against Ericsson

---

[2] TCL notes that TCT Mobile Limited is a plaintiff and counter-defendant in the present action and that TCT Mobile Europe SAS and TCT Mobile International Limited are owned by TCL.  (Mem. P. & A. Supp. Mot. Anti-Suit Inj. 8.)

in the United Kingdom ("UK") "seeking the revocation of the UK designations of
three Ericsson patents."  (Mem. P. & A. Supp. Mot. Anti-Suit Inj. 8.)  The three
UK patents are the UK counterparts of the three French patents described <u>supra</u>,
Part III.A.2.  (<u>Id.</u>)  Ericsson counter-claimed for infringement of the three UK
patents, which have been identified by Ericsson as 2G, 3G, and 4G SEPs.  (<u>Id.</u> at 8-
9.)  Ericsson seeks damages and an injunction.  (<u>Id.</u> at 9.)

> ### c.    Brazil

On September 20, 2012, "Ericsson appealed to the Brazilian court" to
prevent TCT Mobile-Telefones LTDA[3] from selling an TCL phone that allegedly
infringes on Ericsson's patent.  (Mem. P. & A. Supp. Mot. Anti-Suit Inj. 9.)

"On December 17, 2012, Ericsson initiated a second infringement action
against the same defendant regarding the same phone model, this time invoking
another patent."  (<u>Id.</u>)

"On June 11, 2014, Ericsson initiated a third infringement action against the
same defendant, based on the same patent invoked in the first case, but with respect
to other TCL phones."  (<u>Id.</u>)

Finally, on December 19, 2014, "Ericsson initiated a fourth infringement
action against the same defendant, also regarding the same patent invoked in the
first case, but again with respect to other TCL phones."  (<u>Id.</u>)  As a result of each
action, Ericsson obtained preliminary injunctions, and TCT Mobile-Telefones
LTDA was required to post a bond.  (<u>Id.</u>)

Ericsson's infringement allegations in the Brazilian Actions are based on
patents that Ericsson has identified as 2G, 3G, and 4G SEPs in the present FRAND
litigation.  (<u>Id.</u> at 10.)

> ### d.    Russian Federation

On December 13, 2012, Ericsson initiated an action in the Russian
Federation against TMC Rus Limited Liability Company ("TMC Rus"), which is

---

[3] TCL owns TCT Mobile-Telefones LTDA.  (Mem. P. & A. Supp. Mot. Anti-Suit Inj. 9.)

owned by TCL.  (Mem. P. & A. Supp. Mot. Anti-Suit Inj. 9.)  Ericsson sought to enjoin the import and sale of TCL products in Russia that allegedly infringe on a standard-essential Russian patent.  (See id. 9-10.)

On January 21, 2014, Ericsson initiated a second infringement action alleging that the import and sale of other TCL phones infringed the same patent. (Id. at 9.)  However, the Russian Court dismissed the second complaint.  (Id.)  No final judgment has been issued in the first action.  (Id.)

###### e.  Argentina

On May 23, 2014, Ericsson initiated an action against TCT Mobile S.A. alleging infringement of an Argentine patent by various TCL phones.  (Mem. P. & A. Supp. Mot. Anti-Suit Inj. 11.)  TCT Mobile S.A. is owned by TCL.  (Id.) The Argentine patent "belongs to the same patent family as the patents at issue in the UK and France Actions and was identified by Ericsson as essential to the 2G, 3G, and 4G technologies standard."  (Id.)  Ericsson seeks injunctive relief preventing TCT Mobile S.A. from "manufacturing, using, selling, offering for sale, and/or importing" any infringing products.  (Id.)  The court granted Ericsson's request for a preliminary injunction regarding one phone, and TCT Mobile S.A. has appealed. (Id.)  Ericsson is further requesting that the injunction apply to the other phones. (Id.)  The appeal and Ericsson's request are pending as of the date of filing of TCL's injunction motion.  (Id.)

###### f.  Germany

On November 26, 2014, Ericsson filed a patent infringement action against TCT Mobile Germany GmbH[4] based on TCL phones' infringing use of three German patents.  (Mem. P. & A. Supp. Mot. Anti-Suit Inj. 11-12.)  The German patents in question are the counterparts of the patents at issue in the French and UK Actions.  (Id. at 12.)  Ericsson then filed a parallel action in Germany against TCL, TCT Mobile Limited, TCT Mobile Europe SAS, and TCT Mobile International Limited alleging infringement of the same patents.  (Id.)  Ericsson has represented that the German patents at issue in the German actions are 2G, 3G, and 4G SEPs.

---

[4] TCL notes that it owns TCT Mobile Germany GmbH.  (Mem. P. & A. Supp. Mot. Anti-Suit Inj. 12.)

Case 8:14-cv-00341-JVS-DFM   Document 2052   Filed 08/28/19   Page 142 of 156
Case 5:19-cv-01398-EJD   Document 29-1   Filed 09/18/19   Page 142 of 156   Page ID
#:7337

(Id.)  Ericsson seeks infringement damages, injunctive relief, and recall and destruction of infringing phones.  (Id.)

**B.  Legal Standards & Discussion**

        1.    The Second Texas Action

     The Court may enjoin parties "from proceeding with a concurrent action involving the same or related issues."  In re Van Geuns, 946 F.2d 845, 849 (Fed. Cir. 1991.)  The "first-to-file" rule "favors pursuing only the first-filed action when multiple lawsuits involving the same claims are filed in different jurisdictions." Merial Ltd. v. Cipla Ltd., 681 F.3d 1283, 1299 (Fed. Cir. 2012).  "Under the first-to-file rule, a district court may choose to stay, transfer, or dismiss a duplicative later-filed action."  Id.

     As noted, Ericsson is currently pursuing infringement claims against TCL based on TCL's alleged infringement of Ericsson's non-standard-essential implementation patents in the Eastern District of Texas ("the Second Texas Action").

     The Court declines to enjoin the Second Texas Action.  Although it was filed later than this action, the issues are not the same and are not necessarily related.

     As the Court discusses supra, Part II.A, Ericsson has not designated the implementation patents as SEPs, and thus it is under no obligation to license the implementation patents under FRAND terms.  The Court thus has no basis to prevent Ericsson from pursuing infringement claims that will not be resolved by the present FRAND litigation relating to Ericsson's 2G, 3G, and 4G SEPs.  In other words, Ericsson should be able to pursue infringement claims based on patents that are not at issue in this case.

     Accordingly, the Court declines to enjoin Ericsson from proceeding with its implementation patent infringement action in the Eastern District of Texas.

        2.    The Foreign Actions

            *a.    Legal Standard*

9

In appropriate circumstances, the Court may issue an anti-suit injunction enjoining parties from proceeding with an action in a foreign jurisdiction. See E. & J. Gallo Winery v. Andina Licores S.A., 446 F.3d 984, 989 (9th Cir. 2006). Importantly, the Court enjoins the parties, not the foreign court, from proceeding with an action.  Id.  The Court's power to enjoin parties from proceeding with foreign litigation should be used "sparingly," out of comity.  See Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League, 652 F.2d 852, 855 (9th Cir. 1981) (internal punctuation and citations omitted).

In order to determine whether an anti-suit injunction is warranted, the Court follows a three-step framework.  Microsoft Corp. v. Motorola, Inc., 696 F.3d 872, 882 (9th Cir. 2012).  The Court must first determine (1) whether the "parties and the issues are the same in both the domestic and foreign actions;" and (2) whether "the first action is dispositive of the action to be enjoined."  Id. (quoting Gallo, 446 F.3d at 991).

If the threshold inquiry is met, the Court then considers whether the foreign litigation would "(1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's in rem or quasi in rem jurisdiction; or (4) where the proceedings prejudice other equitable considerations."  Gallo, 446 F.3d at 990 (quoting Seattle Totems, 652 F.2d at 855 (finding instructive In re Unterweser Reederei GmbH, 428 F.2d 888, 896 (5th Cir. 1970)).  The Unterweser factors are disjunctive; "if any of the four elements is present, an anti-suit injunction may be proper."  Gallo, 446 F.3d at 990.  A court "may rely on any of the Unterweser factors if it applies to the case and if the impact on comity is tolerable."  Id. at 991.

Finally, the Court considers whether an anti-suit injunction's "impact on comity is tolerable."  Microsoft, 696 F.3d at 886 (citing Gallo, 446 F.3d at 991).

      *b.*    *Discussion*

The Court agrees that the parties in the foreign action are either literally or effectively the same (see Mem. P. & A. Supp. Mot. Anti-Suit Inj. 14-15), which as a threshold matter permits the Court to consider issuing an injunction.  See Microsoft, 696 at 882.  The parties also appear to agree now that the FRAND litigation will be dispositive of the Foreign Actions, because the parties agree that a bilateral injunction is appropriate in this case now that the parties have agreed that

the FRAND litigation should adjudicate a release payment for past SEP infringement.  (See Reply Supp. Mot. Anti-Suit Inj. 4-6.)

Ericsson's main objection to the injunction of its foreign patent infringement actions is that an injunction binding Ericsson, but not TCL, from pursuing litigation in foreign jurisdictions would be unilateral and unfair.  "Ericsson is not opposed to a global resolution of its essential patent licensing and damages claims in this litigation."  (Opp'n Mot. Anti-Suit Inj. 13.)  Ericsson reports that it is "willing to enter a mutual injunction regarding essential patent litigation if the FRAND trial in this case will result in a cross license, including payments for unlicensed sales prior to the effective date of the cross license ('release payment')."  (Opp'n Mot. Anti-Suit Inj. 2-3.)

In response, TCL concedes that it "has agreed to litigate the release payment issue in the FRAND trial, and also has agreed to a bilateral injunction with respect to the foreign litigation."  (Reply Supp. Mot. Anti-Suit Inj. 4-6.)

In sum, both parties have indicated their desire that this action should result in a "global resolution" of the SEP patent licensing and damages claims.  (See Opp'n Mot. Anti-Suit Inj. 12-13; Reply Supp. Mot. Anti-Suit Inj. 4-6.)  The parties' failure to stipulate appears to have turned on previously unresolved issues related to the non-standard-essential implementation patents and the release payment.  Having resolved both issues, this Court determines that a bilateral preliminary anti-suit injunction is warranted based on the parties' mutual agreement.  Thus, the Court orders that neither party, nor its affiliates or subsidiaries shall initiate or continue to prosecute a patent infringement action against the other regarding the 2G, 3G, and 4G SEPs at issue before this Court or their foreign equivalents.

Accordingly, TCL's motion for an anti-suit injunction is DENIED IN PART with respect to the Second Texas Action and GRANTED IN PART with respect to the Foreign Actions as described herein.

The parties shall submit a proposed injunction consistent with this order within seven (7) days.

## IV.   MOTION FOR RETURN, DESTRUCTION, OR CONFIDENTIAL TREATMENT OF INADVERTENTLY DISCLOSED MATERIALS

Ericsson's present motion seeks return, destruction, or confidential treatment
of licensing-related information TCL obtained from the public domain that
Ericsson argues was inadvertently disclosed ("the Contested Documents").  (Mot.
Return 1.)  The parties have conducted discovery in this case under Magistrate
Judge Nakazato's December 8, 2014 Confidentiality Order Governing the
Designation and Handling of Discovery Material ("Confidentiality Order").
(Docket No. 72.)

In his November 17, 2014 Order Granting in Part and Denying in Part the
parties' Joint Motion for Entry of Confidentiality Order, the Magistrate Judge
found that TCL's in house counsel should not have access to Ericsson's
confidential third-party licensing related documents "given the nature of the
competitive business environment the parties are both involved in."  (Docket No.
69.)

## A.    The Confidentiality Order

The Confidentiality Order governs all "Discovery Material furnished by any
party to any other party, and it includes any non-party who receives a subpoena in
connection with this action."  (Confidentiality Order 3.)

Under the Confidentiality Order, "protected information" "includes any
Discovery Material that the Disclosing Party in good faith designates as
'CONFIDENTIAL,' 'CONFIDENTIAL – OUTSIDE ATTORNEY'S EYES
ONLY,' or 'CONFIDENTIAL – OUTSIDE ATTORNEY'S EYES ONLY –
SOURCE CODE' pursuant to this Confidentiality Order . . . ."  (Id. at 5.)  The
protective order specifically defines the term "Discovery Material" as that
"produced or provided by any party or non-party or obtained by any party during
discovery or in connection with Rule 26(a) disclosures in this action . . . ."  (Id.)

The Confidentiality Order further notes that the following information is not
confidential under its terms:

(a) any information which, at the time of disclosure to a
Receiving Party, is lawfully in the public domain;

(b) any information which, after disclosure to a
Receiving Party, lawfully becomes part of the public

12

domain as a result of publication not involving a
violation of this Confidentiality Order;

(c) any information that a Receiving Party can show was
received by it, whether before or after the disclosure,
from a source other than the Producing Party who
obtained the information lawfully and under no
obligation of confidentiality to the Producing Party; and

(d) any information that a Receiving Party can show was
independently developed by it after the time of disclosure
by personnel who have not had access to the Producing
Party's Protected Information.

(<u>Id.</u> at 8-9.)  In the event of inadvertent disclosure of protected information, the
Confidentiality Order provides that "[i]nadvertent failure to designate as Protected
Information . . . shall not constitute a waiver of, nor a prejudice to, any claim that
such or related material is Protected Information . . . provided that the Producing
Party notifies the Receiving Party in writing within ten (10) business days after
discovery of such inadvertent production or disclosure."  (<u>Id.</u> at 30-31, § V.J.)
Furthermore, "inadvertent disclosure does not change the status of Protected
Information or waive the right to hold the disclosed document or information as
Protected Information."  (<u>Id.</u> at 23-24, § III.G.)

## B.    TCL's "Discovery" of the Contested Documents

The Contested Documents are demonstrative exhibits uploaded without any
confidentiality designation by Ericsson's counsel to an online case docket in
connection with litigation between Ericsson and Samsung before the International
Trade Commission ("ITC").  (Opp'n Mot. Return 1.)

In January 2014, Ericsson and Samsung entered into a license agreement
which covered, <u>inter alia</u>, Ericsson's 2G, 3G, and 4G SEPs. (Opp'n Mot. Return 3.)
The existence of a license agreement between Ericsson and Samsung is public
information.  (<u>Id.</u> at 3.)

In June 2014, TCL propounded a set of document requests on Ericsson,
seeking, <u>inter alia</u>, (1) "all documents related to Ericsson's license agreements

which cover the same intellectual property at issue in this case;" and (2) "all documents related to FRAND royalty rates for the same intellectual property, including negotiations regarding a FRAND rate."  (Opp'n Mot. Return 3.)  TCL did not produce the Contested Documents.  (See Opp'n Mot. Return 6-7.)

In February 2015, TCL's counsel was reviewing the Ericsson v. Samsung online case docket (the Electronic Document Information System ("EDIS")) and identified the Contested Documents.  (Opp'n Mot. Return 5.)  The Contested Documents were not designated "confidential" and were available for download to any member of the public.  (Opp'n Mot. Return 5.)  The Contested Documents were uploaded by Ericsson's counsel in January 2014, and had at that time been available to the public for 13 months.  (Opp'n Mot. Return 5.)  TCL's counsel downloaded the Contested Documents, which contain information that is highly relevant to the current litigation.  (Opp'n Mot. Return 5.)

TCL reports that it has shared some of the Contested Documents with in-house counsel for TCL.  (Opp'n Mot. Return 6.)

## C.    Ericsson's Remedial Action

Ericsson acknowledges that the Contested Documents were placed in the public domain on EDIS without an express confidentiality designation but claims that TCL should have known they contained the kind of confidential business information subject to confidential treatment under the Confidentiality Order.  (See Mot. Return 3-4.)  Ericsson also notes that many of the slides in the Contested Documents contain "express reference to their confidential nature, either through a citation to a confidential source of the information in the slide or a notation that the slide 'contains confidential business information.'" (Mot. Return 4, 4 n.1.)

Ericsson discovered the inadvertent public disclosure of its confidential information on April 16, 2015 when TCL filed portions of the Contested Documents in the present action at Docket No. 152-2.  On April 17, Ericsson took remedial action by calling the ITC, which immediately removed the Contested Documents from public access.  The same day, Ericsson sent a letter to TCL requesting, inter alia, "Confidential - Outside Attorneys' Eyes Only" treatment of the Contested Documents.

## D.    Discussion

TCL argues that the Court should not treat the Contested Documents as confidential because they were available to the public for over a year.  (Opp'n Mot. 1.)  The Court disagrees.

Although the information was publicly available, TCL's continued use of what it likely should have known was confidential business information is in tension with the Magistrate Judge's decision to treat confidential business information relating to Ericsson's third-party licensing agreements as "Confidential - Outside Attorneys' Eyes Only."  (Docket No. 69.)  As Ericsson notes, the Confidentiality Order provides that "inadvertent disclosure does not change the status of Protected Information."  (Confidentiality Order 23024, § III.G.)  The Magistrate Judge rather clearly notes that the type of information contained in the Contested Documents is "Protected Information" within the meaning of this litigation.  (Docket No. 69.)

By the very terms of the Confidentiality Order, Ericsson has not waived its right to seek protection of information that it clearly inadvertently disclosed to the public.  Ericsson, having discovered an inadvertent public disclosure of information that the Magistrate Judge determined protected, acted immediately to remedy the inadvertent disclosure of protected information pursuant to the terms of the Confidentiality Order.

Notably, TCL does not argue that Ericsson intended to make public the information it disclosed in the ITC proceeding.  Furthermore, given the content of the Contested Documents and the Magistrate Judge's discussion of this precise issue in his November 17th Order, TCL likely should have known that the Contested Documents fairly should have been treated as confidential.  TCL cannot in good faith claim that Ericsson is seeking to treat the Contested Documents as confidential in hindsight in order to gain an advantage in this litigation.

Furthermore, the Court perceives no prejudice to TCL by treating the Contested Materials as confidential.  (See Mot. Return 16.) As noted by the Magistrate Judge, confidential treatment does not prevent TCL from using the highly relevant business information to its benefit in the present FRAND litigation.  (See Docket  No. 69.)  In addition, Ericsson admits that it "is not seeking to prevent TCL from using the relevant confidential licensing information in this litigation."  (Mot. Return 20.)

15

Accordingly, the Court GRANTS Ericsson's motion and directs the parties to treat the Contested Documents as "Confidential – Outside Attorneys' Eyes Only" in accordance with the Confidentiality Order and the Magistrate Judge's November 17, 2014 Order.

V.    JOINT MOTION TO CONSOLIDATE CASES

The parties jointly move the Court to consolidate this case with <u>Ericsson Inc., et al. V. TCL Communication Technology Holdings, LTD, et al.</u>, Case No. 2-15-cv-02370-JVS-JC (the "Transferred Action").  (Joint Mot. Consolidate 1.)

In the Transferred Action, Ericsson asserts claims for patent infringement relating to its '506 and '556 Patents and one count of declaratory judgment regarding FRAND.  (Joint Mot. Consolidate 2-3.)  TCL also asserts claims of patent infringement relating to its '340 and '718 Patents in the Transferred Action. Because the Court stayed all matters other than FRAND in the present action, the parties similarly request that the Court stay the non-FRAND matters in the Transferred Action.  (<u>See</u> Joint. Mot. Consolidate 2-3.)

Prior to transfer of the Transferred Action, Ericsson moved for leave to amend its complaint to drop its declaratory judgment claims for non-infringement and invalidity of TCL's '340 and '718 Patents.  (Joint Mot. Consolidate 3-4.)  The motion was granted.  (<u>Id.</u> at 4.)  Thus, the parties also request that the Court issue an order to be reflected on the docket sheet in this action noting the prior dismissal without prejudice of Ericsson's declaratory judgment claims in regard to TCL's patents.

The Court GRANTS the parties' motion to consolidate cases, stays the claims as requested, and notes that Ericsson previously dismissed without prejudice its declaratory judgment claims as described herein.

VI.    CONCLUSION

For the foregoing reasons, the Court (1) GRANTS IN PART and DENIES IN PART Ericsson's motion regarding the scope of the FRAND Trial; (2) GRANTS IN PART and DENIES IN PART TCL's motion for an anti-suit injunction; (3) GRANTS Ericsson's motion to treat as confidential inadvertently disclosed materials; and (4) GRANTS the parties' motion to consolidate cases and

stay non-FRAND claims in the Transferred Action.  The docket shall reflect
Ericsson's voluntary dismissal without prejudice of its declaratory judgment claims
of noninfringement of TCL's '340 and '718 patents.

      IT IS SO ORDERED.

Exhibit 12

*Antitrust*, Vol. 32, No. 32, Summer 2018. © 2018 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

# Comparative Analysis of Court-Determined FRAND Royalty Rates

BY FEI DENG, GREGORY K. LEONARD, AND MARIO A. LOPEZ

STARTING WITH THE *MICROSOFT v. Motorola* decision in 2013, litigation over licensing practices involving standard-essential patents (SEPs), and particularly the appropriate "fair, reasonable and non-discriminatory" (FRAND) royalty rates for portfolios of such patents, has taken off.[1] In *Microsoft v. Motorola* (U.S., 2013), *In re Innovatio* (U.S., 2013), and *Realtek v. LSI* (U.S., 2014), FRAND rates were determined for portfolios of 802.11 Wi-Fi SEPs (in the first two cases by judges and in the latter case by a jury).[2] In *Huawei v. InterDigital* (China, 2013), *Unwired Planet v. Huawei* (UK, 2017), and *TCL v. Ericsson* (U.S., 2017), FRAND rates were determined for cellular (2G, 3G, and 4G) SEPs (in each case by judges).[3]

These litigations have taken place in various jurisdictions around the world, which raises the possibility of inconsistency across jurisdictions, either in the FRAND rates themselves or in the methodologies used to determine the rates. Inconsistency could be particularly problematic given that some of these litigations have set FRAND rates that would apply globally (e.g., *TCL*). We review and compare the two most recent cellular cases, *Unwired Planet* and *TCL*, to determine the extent to which the decisions are consistent with each other.[4]

In patent infringement litigation in the United States, one form of damages that a patent owner may seek is a "reasonable royalty." The reasonable royalty is meant to be limited to the "incremental value of the invention" and, in the case of an SEP, the reasonable royalty should exclude "the value of the standard as a whole or any increased value the patented feature gains from its inclusion in the standard."[5] Three approaches commonly used to determine the reasonable royalty in patent litigation in the United States are (1) benchmarking of the royalty based on "comparable" licenses ("com-

parable license approach"), (2) calculation of the incremental economic benefit of the patented technology versus a non-infringing alternative ("bottom-up approach"), and (3) explicit "apportionment" of an appropriately defined profit to the patented technology, taking into account the contributions of factors other than the patented technology at issue ("top-down approach"). Versions of these approaches have also provided the basis for experts opining on FRAND royalty determination in SEP litigation.

## Summary of the Two Decisions

In *Unwired Planet*, the court began with a set of Ericsson patent licenses on the basis that *Unwired Planet* had acquired the SEP portfolio at issue from Ericsson.[6] After analyzing and "unpacking" each of these licenses to assess the "one-way" royalty rate that Ericsson charged the counter-party, the court chose one specific license (the counter-party was not named), and Ericsson's one-way rate from that license, as a starting point.[7] To adjust for differences in size between the Ericsson and Unwired Planet portfolios, the court multiplied the Ericsson one-way rate from the chosen comparable license by the ratio of Unwired Planet's portfolio strength to Ericsson's portfolio strength.[8] As a "cross-check," the court calculated the "aggregate royalty burden" (ARB) for all SEPs that would be implied by the Ericsson and Unwired Planet one-way rates.[9] The ARB is a key element of a top-down approach.

In *TCL*, the court relied on both a top-down analysis and comparable licenses. In its top-down analysis, the court determined an ARB for all SEPs for a given standard, then apportioned the ARB to the Ericsson SEP portfolio based on Ericsson's share of total SEP value of that standard. In its comparable license analysis, the court determined that the appropriate comparable licensees were those with global businesses and then unpacked the licenses to determine the one-way rate that Ericsson was charging each counter-party. The court compared the range of rates from the top-down and comparable license approaches and settled upon a FRAND royalty rate from the range of these rates.[10]

An important question is the extent of consistency between these two decisions. We start by comparing the outcomes, i.e., the determined rates, and subsequently compare the methodologies used and the inputs to those methodologies.

The royalty that the UK *Unwired Planet* court determined for the six Unwired Planet LTE SEPs was 0.062 percent. In

*Fei Deng, Gregory Leonard, and Mario Lopez are economists and partners at Edgeworth Economics LLC. They have consulted for or testified on behalf of the following entities in FRAND-related litigation: Samsung (Deng, Leonard, Lopez), TCL (Deng, Leonard, Lopez), Oppo (Lopez), Vivo (Lopez), Cisco (Leonard, Lopez), Realtek (Leonard, Lopez), Intel/D-Link/Netgear (Leonard, Lopez), and Motorola (Leonard). Fei Deng is an editor of The Antitrust Source. Gregory Leonard is a Senior Editor of The Antitrust Law Journal. The authors thank Nethra Venkatesh, Jessie Jiang, and Michael O'Donnell for excellent research assistance.*

addition, as an intermediate step in the analysis, the *Unwired Plane* court concluded that the FRAND rate for Ericsson's LTE SEP portfolio was 0.80 percent for a "major market."[11] In contrast, the *TCL* court found the FRAND rate for Ericsson's LTE SEP portfolio (after the divestiture of the SEPs to Unwired Planet) in the United States to be 0.45 percent.[12] The difference between the two decisions in their conclusions regarding the FRAND rate for Ericsson's portfolio is substantial. We analyze the methodologies of the two decisions to identify the reasons for this difference.

## Comparison of the Comparable License Approaches in the Two Decisions

Although both courts relied on Ericsson licenses as comparables, they ultimately arrived at substantially different FRAND royalty rates for Ericsson's SEP portfolio. As noted above, the *Unwired Planet* court found a rate for Ericsson's LTE portfolio that is almost double that found by the *TCL* court.[13] It is therefore instructive to consider what can be gleaned from the decisions as to why the two courts may have differed in their comparable license analyses.

A first consideration is the list of licenses that were available for analysis to each court and the specific licenses the respective courts chose to examine. A comparable license analysis typically begins by identifying those licenses that were signed under economic circumstances that are sufficiently comparable to the situation being studied or for which reasonable adjustments can be made to account for any significant differences. Moreover, in a FRAND case, the non-discriminatory component of FRAND would appear to limit consideration to licenses with counter-parties that are "similarly situated" to the prospective counter-party in question.

Although both decisions focus on licenses with major handset manufacturers, the courts may not have considered the same set of licenses.[14] For example, the *TCL* decision discusses a 2015 Ericsson license with Apple, but this license may not have been considered in *Unwired Planet*.[15] The TCL court specifically addressed the question of whether Apple and Samsung (the world's two largest handset manufacturers) were similarly situated to TCL, which was substantially smaller than those two companies.[16] The court found that such firms should be included in the FRAND analysis for TCL because excluding them "would have the effect of insulating them, and further contributing to their dominant positions, by imposing a barrier in the form of higher rates for those not at the top end of the market."[17]

Both courts also concentrated on more recent licenses, with the *Unwired Planet* court specifically noting evidence of a decline in rates over time due to a number of FRAND decisions worldwide that reduced the threat of injunction faced by implementers.[18]

Apart from the respective sets of licenses that were analyzed, the specific assumptions and methodologies may also have differed between the two courts. While both courts appeared to have adopted a similar framework for unpacking

Although both courts relied on Ericsson licenses as comparables, they ultimately arrived at substantially different FRAND royalty rates for Ericsson's SEP portfolio. . . . [T]he *Unwired Planet* court found a rate for Ericsson's LTE portfolio that is almost double that found by the *TCL* court.

the licenses at a high level, both decisions redacted much of the information necessary to compare details of the assumptions made on a license-by-license basis. The major factors considered by the courts were:

- **Unpacking one-way rates from cross-license agreements.** Because Ericsson also sells cellular networking equipment (e.g., cellular base stations), most of the license agreements involving Ericsson were cross-licenses. Under a cross-license, one party typically makes payments to the other, and those payments are net of any cross-licensing value the paying party receives under the license. In both *TCL* and *Unwired Planet*, Ericsson's one-way rates were unpacked using various measures of the relative SEP portfolio strengths of the parties to the respective licenses.[19]

- **Sales forecast estimates.** In *TCL*, Ericsson's expert relied upon Ericsson's internal projections (referred to as its "Business Case"), which the court viewed skeptically, while TCL's expert relied upon both the Ericsson Business Case projections, as well as sales data from a third-party vendor, International Data Corporation (IDC).[20] The court favored the IDC data, noting that such "independent third-party data serves as a valuable check on a party's internal and unvalidated projections."[21] In *Unwired Planet*, the court did not specifically address the types of sales forecasts used to calculate the effective royalty rates, and appears to have relied on the projections used by the experts in the case.

- **Other provisions.** A license may include other provisions that may need to be taken into account if they had a material effect on the net payments made under the license. Examples of such provisions are the exchange of patents, licensing of other patent rights (e.g., patents to other standards, non-SEP or implementation patents, etc.), or other business arrangements.

- **Unpacking of rates for major and minor markets.** Many of Ericsson's licenses covered worldwide sales. In principle, its worldwide royalty rate for a given counter-party should reflect its average portfolio strength across jurisdictions, weighted by the counter-party's sales in those jurisdictions. Ericsson's portfolio strength varies substantially across jurisdictions. The *TCL* court unpacked the Ericsson licenses into U.S. rates, European rates, and rest-of-world rates. Notably, it placed a lower bound on Ericsson's portfolio strength in each jurisdiction based on Ericsson's

portfolio strength in China, where TCL manufactured its products. We note, however, that patent rights covering products manufactured, but not sold, in a country are generally less valuable than patent rights covering products sold in a country because a manufacturer could, in principle, choose to manufacture in a different country. The *Unwired Planet* court appears to have made a similar unpacking adjustment to calculate Ericsson's rate in "major markets," which was then used to calculate Unwired Planet's rate in such a market.[22] The court then made a downward adjustment to obtain Unwired Planet's rate in the rest of the world. As in *TCL*, the *Unwired Planet* court used China as a lower bound for the rest-of-world rates, though it relied on an ad hoc 50 percent adjustment to the major market rate rather than an adjustment based directly on portfolio strength.[23]

**Comparison of the Top-Down Approaches in the Two Decisions**

In its top-down approach, the TCL court began by determining the appropriate aggregate royalty burden for the standard as a whole, and then apportioned that ARB to the Ericsson SEP portfolio. Thus, the FRAND rate for Ericsson's LTE SEP portfolio can be expressed as:

Ericsson FRAND LTE Rate = ARB x Ericsson's Share of the Value of All LTE SEPs.

In assessing the ARB, the *TCL* court cited statements regarding ARB levels that Ericsson and other SEP holders made at around the time the standards were set. The court noted that Ericsson had long endorsed the concept of a maximum ARB, that these statements held special importance in a FRAND context because the statements were made prior to or around the time the standards were set and, at the time, Ericsson was both a licensee and a licensor for handsets, and therefore had an incentive to "strike a reasonable balance" with respect to how FRAND rates should be set.[24] Moreover, the court found that "Ericsson's statements were thus not a hope or prediction, but a pledge to the market that if the market adopted Ericsson's championed standard, the total aggregate royalties would be calculated" based on its 6 to 8 percent ARB.[25] Based on these statements, the *TCL* court adopted 5 percent as the ARB for 2G and 3G, and a range of 6 to 10 percent as the ARB for LTE.

The *TCL* court then turned to determining Ericsson's appropriate share of the ARB, noting that the ARB should be apportioned across SEP holders according to the relative values of their respective portfolios.[26] It is widely accepted among economists that patent values vary widely, and the court acknowledged that "many [SEPs] are relatively trivial, while some are key features of the standard."[27] TCL had presented a technical analysis of Ericsson's patents that attempted to measure the "contribution" and "importance" of Ericsson's SEPs to the standard. While the court found certain flaws in the technical analysis, it nevertheless concluded

that the technical analysis provided "some value" in showing that "Ericsson's patent portfolio is certainly not as strong or essential as it has claimed."[28]

TCL's economics expert also presented a forward citation analysis of Ericsson's portfolio as a secondary approach.[29] However, although a number of empirical economic studies have shown a relationship between patent value and forward citations,[30] and other courts have endorsed this form of analysis,[31] the TCL court chose not to rely on forward citation analysis to calculate Ericsson's share of the ARB. The TCL court effectively concluded, based on the evidence, that the relative strength of the Ericsson SEP portfolio was reasonably approximated by its share of the total number of all SEPs, which is equivalent to concluding that the average Ericsson SEP had value equal to the average SEP.

The *TCL* court made certain adjustments, such as accounting for patents that would expire over the license term as well as new SEPs that would issue during that period. As discussed above, the *TCL* court also accounted for variation in Ericsson's portfolio strength across jurisdictions, adopting TCL's expert's estimate of Ericsson's regional portfolio strength ratios in arriving at separate FRAND rates for different regions.[32]

Although the *Unwired Planet* court rejected the Ericsson statements on which the TCL court based its range for the ARB, calling them "self-serving," it nevertheless relied upon the ARB as a check against its FRAND rate determinations.[33] As discussed above, the *Unwired Planet* court did not perform a full top-down analysis, but instead calculated the ARB that is implied by the Unwired Planet one-way rate and its relative portfolio strength. Specifically, rearranging the equation above,

ARB = UP LTE FRAND Rate / UP's Share of the Value of All LTE SEPs.

The *Unwired Planet* court's calculation yielded an ARB of 8.8 percent.[34] This is within the range that the *TCL* court determined for the ARB (6 to 10 percent).

**Conclusion**

The *Unwired Planet* and *TCL* decisions found different rates for Ericsson's LTE SEP portfolio primarily because they reached different conclusions from their respective comparable license analyses. While the details of these analyses are not entirely clear, the two analyses likely differed in the licenses considered most comparable and the sales forecasts used to unpack the Ericsson one-way rates.

The two decisions also differed substantially in their respective implied assessments of Ericsson's portfolio strength. From the *Unwired Planet* court's calculations, the implied Ericsson share of all LTE SEP value was 9.1 percent. The *TCL* court, on the other hand, concluded that Ericsson's share of all LTE SEP value was only about half as large.[35]

Interestingly, these two factors roughly canceled out so that the two decisions were in rough agreement as to the ARB

C O V E R   S T O R I E S

for all LTE SEPs. The ARBs determined in the two decisions are also consistent with statements made by Ericsson, Nokia, NTT Docomo, NEC, and Sony—some of which had both significant SEP portfolios and handset businesses—at around the time of LTE adoption advocating a single-digit ARB for LTE handsets.[36] This suggests that future FRAND rate litigation in the cellular space may focus more on the measurement of relative portfolio strength and less on the level of the ARB. ∎

---

[1] In some contexts (e.g., 802.11), the term "RAND" ("reasonable and non-discriminatory") is used instead of FRAND. As economists, we view the two terms as having the same meaning. We use FRAND throughout this article for ease of exposition.

[2] Microsoft Corp. v. Motorola, Inc., No. C10-1823JLR, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013); In re Innovatio IP Ventures, LLC Patent Litig., No. 11 C 9308, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013); Realtek Semiconductor Corp. v. LSI Corp., No. C-12-3451-RMN, 2014 WL 10936481 (N.D. Cal. Feb. 26, 2014).

[3] Unwired Planet Int'l Ltd. v. Huawei Techs. Co., [2017] EWHC (Pat) 711; TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson, Nos. SACV 14-341 JVS(DFMx) and CV 15-2370 JVS (DFMx), 2017 WL 6611635 (C.D. Cal. Dec. 21, 2017), ECF No. 1802; InterDigital v. Huawei, Civil Judgment Record No. 305 (2013), Final, Civil Division III, Higher People's Court of Guangdong Province.

[4] In both Unwired Planet and TCL, FRAND rates were determined for the 2G, 3G, and LTE portfolios as well as for both handsets and infrastructure. For simplicity, we focus on the FRAND rates for LTE handset SEPs.

[5] Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1235 (Fed. Cir. 2014).

[6] The Unwired Planet court also considered other agreements entered into directly by Unwired Planet with Lenovo and Samsung, but ultimately concluded that the Lenovo license "is not a useful comparable from the point of view of setting a FRAND rate today" and that the Samsung license "does not represent useful evidence of the market value of the Unwired Planet patent portfolio." Unwired Planet, [2017] EWHC (Pat) 711 ¶¶ 389, 409.

[7] A license agreement may involve each party licensing the other (a "cross-license"). Instead of specifying "one-way" royalty payments (or royalty rates) that would be applicable to each party, cross-licenses often specify only the "balancing" royalty payment (or royalty rate) that is the difference between the two one-way payments. Thus, what has been termed an "unpacking" analysis is required to determine the one-way royalty payments (or rates) from a typical cross-license that specifies only the balancing payment (or rate). For more detail, see infra note 22.

[8] For example, for LTE, the court determined that Ericsson's one-way royalty rate from the chosen license was 0.80%. The court then determined that Unwired Planet's LTE SEP portfolio was 7.69% of the value of Ericsson's LTE Portfolio, arriving at an adjusted royalty rate of 0.062% for Unwired Planet's LTE portfolio. Unwired Planet, [2017] EWHC (Pat) 711 ¶ 475.

[9] Id. ¶ 476.

[10] For example, for LTE the TCL court first analyzed the range of rates from both the top-down and comparable licenses approaches (which ranged from 0.28% to 0.84%) and then narrowed down the range by eliminating the highest and lowest rates. It then selected a data point near the middle of this range, 0.45%, as the final FRAND rate for the United States. TCL, supra note 3, at *51.

[11] Unwired Planet, [2017] EWHC (Pat) 711 ¶¶ 464, 476. Note that the heavily redacted Unwired Planet decision does not explicitly identify the rates as Major Market rates, but it is implied by the adjustments made by the court. See id. ¶¶ 478, 807. Also, although the Unwired Planet decision does not explicitly say so, the court's calculations imply that it was evaluating the Ericsson portfolio after divestiture of the patents to Unwired Planet. See also id. ¶ 228 ("From now on I intend to put most weight on figures derived from the [post-divestiture] portfolio.").

[12] TCL, supra note 3, at *51.

[13] In TCL, although the royalty rate rates from the top-down approach influenced the final rate of 0.45% in the U.S., the derived rates from many of Ericsson's licenses were also near 0.45%: three of the eight were below 0.45%, while two others were slightly above 0.45% (one at 0.50% and the other at 0.53%). Id.

[14] The TCL court focused on licenses with Apple (2015), Samsung (2014), Huawei (2016), LG (2014), HTC (2014), and ZTE (2011 with a 2015 Amendment), though it is likely that other licenses were produced in the matter. Id. at *41–48. The Unwired Planet court listed other licenses, such as Huawei (2009), RIM (unspecified date), Apple (2008), Sony (2012), and an unnamed licensee. Unwired Planet, [2017] EWHC (Pat) 711 ¶¶ 382–468. The TCL decision specifically excluded certain Ericsson licenses with regional manufacturers. TCL, supra note 3, at *32 ("Local kings [regional manufacturers] are not similarly situated to global firms for two reasons. First, their sales largely occur in one country, while a single country will generally account for a relatively small percentage of the global firm's sales . . . . Second, local kings receive a different license from Ericsson. A local king only needs license to Ericsson's SEPs in one jurisdiction, and Ericsson is bound to limit its offer to a rate that reflects the SEP strength of its portfolio in that jurisdiction. . . . Thus, a license between Ericsson and a local king does not reflect the rate that a global firm like TCL would have to pay.").

[15] The Unwired Planet decision does not name the parties to the licenses it analyzed and, given the date of the Ericsson-Apple license, it is possible that it was executed after the close of discovery.

[16] The Unwired Planet court also rejected the idea that the FRAND rate should vary with licensee size, stating that "it would not be FRAND, for example, for a small new entrant to the market to have to pay a higher royalty rate than an established large entity." Unwired Planet, [2017] EWHC (Pat) 711 ¶ 175.

[17] TCL, supra note 3, at *30. The court further noted that "ETSI contemplates facilitating competition in the market, particularly from emerging firms" and that "permitting Ericsson to define similarly situated very narrowly by picking and choosing criteria with no relation to its SEPs or the FRAND commitment would effectively allow Ericsson to read the non-discrimination prong out of the FRAND commitment." Id.

[18] Huawei's expert pointed to decisions in jurisdictions, such as the United States, China, Japan, and the EU. The court accepted that there was "some evidence of a decline in some rates over time and I am sure that at least part of the explanation is the emergence by 2013 of decisions in which courts were prepared to set FRAND rates, which in turn strengthened the bargaining position of licensees by reducing the power of the threat of an injunction." The court rejected the proposed ad hoc 50% adjustment to the rates in early licenses. Unwired Planet, [2017] EWHC (Pat) 711 ¶¶ 431–432; see also id. ¶ 175.

[19] That is, the balancing payment made by the counter-party is equal to Ericsson's one-way royalty rate multiplied by the counter-party's sales, less the counter-party's one-way royalty rate multiplied by Ericsson's sales. Mathematically, if the balancing payment and the parties' sales are known, there is one equation and two unknowns—i.e., the royalty rates. However, under FRAND, the counter-party's one-way royalty rate would be expected to be proportional to Ericsson's one-way royalty rate, with the factor of proportionality equal to the relative strengths of the parties' SEP portfolios. This provides a second equation that allows calculation of Ericsson's one-way royalty rate.

In Unwired Planet, the parties to the litigation appeared to have considered portfolio strength measures based on quality-adjusted patent counts, where the quality adjustment was based on the number of a party's technical "contributions" to the standard-setting organization. Unwired Planet, [2017] EWHC (Pat) 711 ¶¶ 187–195. The Unwired Planet court noted that such contribution measures do not necessarily reflect patented technologies and that just because "Ericsson advanced arguments on this [contributions] basis during negotiations does not mean it is accepted as a method by the counterparty." Id. ¶ 185. In TCL, TCL's expert relied on the estimated number of SEPs based on a technical assessment of whether the SEPs were essential and related to handsets. Ericsson's expert relied upon technical contributions to the standard-setting organization. As in Unwired Planet, the TCL court rejected this measure because "standard contribution

counting counts contributions, not patents," and because such contributions "can be made for ideas that are unpatented . . . [or] patented by someone else." The *TCL* decision in particular noted the incentive to manipulate this measure, pointing to Ericsson's internal documents, which showed "that it has inflated its counts by 'hijacking' the contributions of various companies as well as requiring subsidiaries to vote for Ericsson's proposals." *TCL*, *supra* note 3, at *41.

20  The *TCL* court noted that the "IDC data is based on actual handset sales, which makes it much more reliable." The court further noted that, in many cases, "Ericsson's business cases dramatically underestimated the licensee's revenue when compared to IDC data." *Id.* at *39–40.

21  *Id.*; *see also id.* at *39.

22  The redacted decision does not specifically detail the court's unpacking methodology. However, the court uses the Ericsson royalty rate to calculate Unwired Planet's adjusted royalty rate in a major market. For example, the court took the 0.80% Ericsson rate for LTE and adjusted it downward to calculate the rate for Unwired Planet as the benchmark rate in major markets, which implies that the 0.80% rate was also for a major market. *Unwired Planet*, [2017] EWHC (Pat) 711 ¶¶ 464, 591.

23  *Id.* ¶¶ 582–584.

24  *TCL*, *supra* note 3, at *11.

25  *Id.* at *13.

26  *Id.* at *8.

27  *Id.* at *21.

28  *Id.* at *24.

29  A patent receives a forward citation when it is cited by a later patent.

30  *See generally* Dietmar Harhoff et al., *Citations, Family Size, Opposition and the Value of Patent Rights*, 32 RESEARCH POL'Y 1343 (2003); Dietmar Harhoff et al., *Citation Frequency and the Value of Patented Inventions*, 81 REV. ECON. STAT. 511 (1999); ADAM JAFFE & MANUEL TRAJTENBERG, PATENTS, CITATIONS AND INNOVATIONS: A WINDOW ON THE KNOWLEDGE ECONOMY (2002); Mark Schankerman, *How Valuable Is Patent Protection? Estimates by Technology Field*, 29 RAND J. ECON. 77 (1998); Manuel Trajtenberg, *A Penny for Your Quotes: Patent Citations and the Value of Innovations*, 21 RAND J. ECON. 172 (1990).

31  *See, e.g.*, Better Mouse Co. v. Steelseries ApS, No. 2:14-cv-198-RSP, ECF No. 308 (E.D. Tex. Jan. 5, 2016); Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co., No. 12-859, ECF No. 334 (E.D. Pa. Nov. 21, 2016).

32  *TCL*, *supra* note 3, at *24–26.

33  The court also claimed that Ericsson's statements did "not take into account what implementers and SEP holders have actually been content to agree in the intervening years," and "have little value in arriving at a benchmark rate today." *Unwired Planet*, [2017] EWHC (Pat) 711 ¶¶ 269–270. This stands in contrast to the *TCL* court, which viewed Ericsson's statements as a "pledge to the market," and that were "designed to entice manufacturers to invest in LTE" over alternative standards at the time. *TCL*, *supra* note 3, at *11, *13. From this perspective, effective royalty rates for Ericsson above the level implied by Ericsson's ARB "pledge" would constitute hold-up.

34  *Unwired Planet*, [2017] EWHC (Pat) 711 ¶ 807.

35  The Ericsson share of 9.1% implied by the *Unwired Planet* decision is calculated by dividing the 0.70% Unwired Planet LTE share by the 7.69% relative strength of Unwired Planet's portfolio as compared to Ericsson's portfolio. *Id.* ¶ 807. The Ericsson share implied by the *TCL* decision is obtained by dividing the *TCL* court's U.S. rate of 0.45%, which was based on both a comparable license analysis and a top-down analysis, by an ARB of 10%, which is the upper end of the range that the *TCL* court considered.

36  *TCL*, *supra* note 3, at *11–12; *see also* Press Release, Ericsson, Wireless Industry Leaders Commit to Framework for LTE Technology IPR Licensing, (Apr. 14, 2008), http://www.ericsson.com/en/press-releases/2008/4/wireless-industry-leaders-commit-to-framework-for-lte-technology-ipr-licensing. As noted above, the *TCL* court specifically cited these statements as support for its ARB range, while the *Unwired Planet* court declined to rely on these statements, despite finding an ARB consistent with them.