1    MAKAN DELRAHIM
     Assistant Attorney General, Antitrust Division
2

3    DAVID L. ANDERSON (CABN 149604)
     United States Attorney
4

5    MICHAEL F. MURRAY
     Deputy Assistant Attorney General, Antitrust Division
6

7    WILLIAM J. RINNER
     Senior Counsel and Chief of Staff to the Assistant Attorney General, Antitrust Division
8

9    TAYLOR M. OWINGS
     Counsel to the Assistant Attorney General, Antitrust Division

10   DANIEL E. HAAR
     JENNIFER DIXTON
11   ANDREW N. DeLANEY
     Attorneys, Antitrust Division
12   U.S. Department of Justice
     950 Pennsylvania Ave. NW
13   Office 3224
     Washington, DC 20530
14   Telephone: (202) 514-2414
     Facsimile: (202) 514-0536
15   E-mail: andrew.delaney@usdoj.gov
16

17   Attorneys for the United States of America

18                     UNITED STATES DISTRICT COURT

19                    NORTHERN DISTRICT OF CALIFORNIA

20                          SAN JOSE DIVISION

21

22   LENOVO (UNITED STATES) INC. and          No. 5:19-cv-01389-EJD

23   MOTOROLA MOBILITY, LLC,
                                              **STATEMENT OF INTEREST OF**
24              Plaintiffs,                   **THE UNITED STATES**

25   v.

26     IPCOM GMBH & CO., KG,

27

28              Defendant.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................ii

I. INTRODUCTION ...........................................................................................1

II. BACKGROUND ...........................................................................................1

    A. Procedural History and Relevant Allegations ................................1

    B. The Role of Standard Setting Organizations................................4

III. LEGAL STANDARDS APPLICABLE TO ANTI-SUIT INJUNCTIONS..........5

IV. ARGUMENT ...............................................................................................6

    A. It Is Not a Violation of United States Antitrust Law for a SEP Holder to Seek an Injunction for Patent Infringement ................................7

    B. It Is Not a Violation of United States Antitrust Law for a Patent Holder to Negotiate for Purportedly Supra-FRAND Terms .........................10

V. CONCLUSION............................................................................................15

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
4
   836 F.3d 1171 (9th Cir. 2016) ...................................................... 12

5

6
*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
7
   486 U.S. 492 (1988) ...................................................................... 4

8
*Apple Inc. v. Motorola, Inc.*,
9
   757 F.3d 1286 (Fed. Cir. 2014) ............................................... 7, 8

10

11
*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
12
   472 U.S. 585 (1985) ..................................................................... 12

13
*Atari Games Corp. v. Nintendo of Am., Inc.*,
14
   897 F.2d 1572 (Fed. Cir. 1990) .................................................... 9

15

16
*Broadcom Corp. v. Qualcomm Inc.*,
   501 F.3d 297 (3d Cir. 2007) .................................................. 13, 14
17

18
*Cal. Motor Transp. Co. v. Trucking Unlimited*,
19
   404 U.S. 508 (1972) ...................................................................... 8

20
*E. & J. Gallo Winery v. Andina Licores S.A.*,
21
   446 F.3d 984 (9th Cir. 2006) ........................................................ 6

22
*eBay Inc. v. MercExchange, L.L.C.*,
23
   547 U.S. 388 (2006) ...................................................................... 7
24

25
*In re Unterweser Reederei*,
26
   428 F.2d 888 (5th Cir. 1970) ........................................................ 6

27
*Kartell v. Blue Shield*,
28
   749 F.2d 922 (1st Cir. 1984) ....................................................... 13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ................................................................ 15

*MetroNet Servs. Corp. v. Qwest Corp.*,
383 F.3d 1124 (9th Cir. 2004) .................................................. 11

*Microsoft Corp. v. Motorola, Inc.*,
696 F.3d 872 (9th Cir. 2012) ............................................ 4, 5, 6

*Microsoft Corp. v. Motorola, Inc.*,
795 F.3d 1024 (9th Cir. 2015) ........................................ 7, 8, 14

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ................................................ 12

*NYNEX Corp. v. Discon*,
525 U.S. 128 (1998) ............................................................ 13, 15

*Orion Pictures Distrib. Corp. v. Syufy Enters.*,
829 F.2d 946 (9th Cir. 1987) ............................................ 14, 15

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009) ............................................................ 11, 12

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, Inc.,
508 U.S. 49 (1993) ...................................................................... 8

*Rambus Inc. v. FTC*,
522 F.3d 456 (D.C. Cir 2008) ........................................ 12, 13, 14

*Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*,
652 F.2d 852 (9th Cir. 1981) ...................................................... 5

*Simpson v. Union Oil Co.*,
377 U.S. 13 (1964) ...................................................................... 8

*Smith Int'l, Inc. v. Hughes Tool Co.*,
   718 F.2d 1573 (Fed. Cir. 1983) ........................................................................ 9

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ........................................................................ 11

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ........................................................................ 11, 12, 15

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
   382 U.S. 172 (1965) ........................................................................ 9

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) ........................................................................ 7

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................ 5

**Statutes**

15 U.S.C. § 2 ........................................................................ 10

28 U.S.C. § 517 ........................................................................ 1

**Other Authorities**

Douglas H. Ginsburg, Taylor M. Owings & Joshua D. Wright, *Enjoining Injunctions:*
   *The Case Against Antitrust Liability for Standard Essential Patent Holders Who Seek*
   *Injunctions*, The Antitrust Source (Oct. 2014) ........................................................................ 10

Douglas H. Ginsburg, Koren W. Wong-Ervin & Joshua D. Wright, *The Troubling Use of*
   *Antitrust to Regulate FRAND Licensing*, Comp. Policy Int'l (Oct. 2015) ........................................................................ 13

STATEMENT OF INTEREST OF THE UNITED STATES
Case No. 19-cv-01389-EJD                    iv

Joanna Tsai & Joshua D. Wright, *Standard Setting, Intellectual Property Rights, and the Role of Antitrust in Regulating Incomplete Contracts*, 80 Antitrust L.J. 157 (2015) .......................................................................... 9

Kristen Osenga, *Ignorance Over Innovation: Why Misunderstanding Standard Setting Organizations Will Hinder Technological Progress*,, 56 U. Louisville L. Rev. 159 (2018) ............................................................................................................ 4

Makan Delrahim, Asst. Attorney General, Antitrust Division, U.S. Dep't of Justice, Remarks as Prepared for The Federal Circuit Bar Association Global Series 2018, Protecting Free-Market Patent Bargaining, Competition, and the Right To Exclude (Oct. 10, 2018) ...................................................................................................... 9

Mark A. Lemley, *Intellectual Property Rights and Standard-Setting Organizations*, 90 Calif. L. Rev. 1889 (2002) .......................................................................... 4

Richard A. Epstein & Kayvan B. Noroozi, *Why Incentives for 'Patent Holdout' Threaten to Dismantle FRAND, and Why it Matters*, 32 Berkeley Tech. L.J. 1381 (2018) ............................................................... 9

Robert P. Merges, *Of Property Rules, Coase, and Intellectual Property*, 94 Colum. L. Rev. 2655 (1994) ..................................................................... 9

U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* (2017) ......................................................................... 1, 12

U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition* (2007) ............................. 1, 4

# I. INTRODUCTION

The United States respectfully submits this statement pursuant to 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the Department of Justice to attend to the interests of the United States in any case pending in a federal court. The Antitrust Division of the Department of Justice enforces the federal antitrust laws and has a strong interest in their correct application. The United States has a particular interest in this case because it involves the intersection of antitrust law and intellectual property rights, a topic which the United States has long studied and for which it has considerable enforcement experience.[1] The United States seeks to ensure that the antitrust laws are applied in a manner that promotes innovation and enhances consumer welfare.

This Statement addresses Plaintiffs' Motion for Anti-Suit Injunction to the extent it relies on U.S. antitrust law. In particular, Plaintiffs appear to contend that it would frustrate the purposes of U.S. antitrust law for Defendant to "threaten[] a U.K. injunction to pressure Plaintiffs to accept *supra*-FRAND terms." *See* Plaintiffs' Motion for Anti-Suit Injunction at 16. That argument is incorrect: U.S. antitrust law supplies no discernable reason to grant an anti-suit injunction in the present case. The United States takes no position on the merits of Plaintiffs' other arguments in support of the injunction.

# II. BACKGROUND

## A. Procedural History and Relevant Allegations

On March 14, 2019, Plaintiffs Lenovo (United States) Inc. and Motorola Mobility, LLC (collectively "Lenovo" or "Plaintiffs") brought a complaint ("Complaint") against IPCom GmbH & Co., KG ("IPCom" or "Defendant") related to an alleged dispute over the licensing of IPCom's patents. Per the allegations in Lenovo's Complaint, IPCom claims to own patents that

---

[1] *See, e.g.,* U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* (2017), https://www.ftc.gov/system/files/documents/public_statements/1049793/ip_guidelines_2017.pdf; U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition* (2007), https://www.justice.gov/sites/default/files/atr/legacy/2007/07/11/222655.pdf.

STATEMENT OF INTEREST OF THE UNITED STATES
Case No. 19-cv-01389-EJD                    1

are essential to cellular connectivity standards adopted by the European Telecommunications Standards Institute ("ETSI").  *See* Complaint at ¶ 3.  As part of the standard-setting process, IPCom committed to ETSI that it would license the essential patents that were incorporated into ETSI's standards on fair, reasonable, and non-discriminatory ("FRAND") terms to potential licensees.  *See id.* at ¶¶ 3-5, 42-47.  According to the Complaint, Lenovo is attempting to license these patents on FRAND terms, but "IPCom has demanded royalties that are discriminatory and far higher than FRAND rates."  *See id.* at ¶¶ 7-8, 48-57.  By "failing to offer a license to Plaintiffs on FRAND terms" and "demand[ing]" supra-FRAND rates, IPCom allegedly (1) breached its contractual obligations to ETSI (of which Lenovo is a third-party beneficiary); and (2) unlawfully monopolized the market for its patented products in violation of antitrust law, specifically Section 2 of the Sherman Act.  *See id.* at ¶¶ 7-8, 58-64, 68-91.  Lenovo claims that IPCom unlawfully monopolized the markets for its allegedly essential patents by making an "intentional false promise [to ETSI] to license the relevant technologies on FRAND terms."  *See id.* at ¶¶ 74, 77.  As part of the breach of contract claim, Lenovo seeks an order that IPCom must offer a license on FRAND terms to "Plaintiffs and all of their worldwide affiliates" and a determination of what constitutes such terms.  *See id.* at ¶¶ 64-67, Prayer for Relief ¶¶ B-C.  As part of the monopolization claim, Lenovo seeks various remedies that include treble damages. *See id.* at ¶ 91.[2]

On July 2, 2019, IPCom filed an action in the United Kingdom against Lenovo Technology (United Kingdom) Limited and Motorola Mobility UK LTD (collectively "Lenovo U.K."[3]).  *See generally* Plaintiffs' Motion for Anti-Suit Injunction, Exhibit 1 to Bader Declaration (containing IPCom's U.K. claim), Doc. 40-2.  In that action, IPCom seeks a declaration that one of its European standard essential patents has been infringed by Lenovo

---

[2] Lenovo also seeks declaratory judgments of non-infringement of two patents.  *See* Complaint at ¶¶ 92-105.

[3] Lenovo U.K., like Lenovo U.S., is a subsidiary of "Lenovo Group Limited," a Chinese corporation.

U.K.  *See id.* at 4.  IPCom claims that it has been and remains willing to enter into a FRAND license that would cover past and future use of the patent, and had sought negotiations with Lenovo entities to that end since 2014.  *See id.* at 8-9, ¶¶ 15-18.  In this claim, IPCom states that it would be willing to accept commitments from Lenovo U.K. that include the following: (1) if the patent is found to be "valid, essential, and infringed" by the U.K. court, then Lenovo U.K. would enter into a FRAND license for past and future uses of the patent on the terms deemed to be FRAND in the present U.S. case, and (2) if the present U.S. case "fail[s] to settle the terms of a FRAND license . . . covering all of [Lenovo U.K's] acts of infringement" then Lenovo U.K. would submit to the U.K. court for a FRAND determination.  *See id.* at 10, ¶ 22.  In the absence of such commitments, IPCom seeks an injunction that would restrain Lenovo U.K. (and its affiliates) from infringing on the patent, as well as damages.  *See id.* at 11-12.[4]

On September 18, 2019, Lenovo filed a Motion for Anti-Suit Injunction in this Court seeking to enjoin IPCom from proceeding with the U.K. action.  As part of this motion, Plaintiffs argue that "IPCom's request for injunctive relief from the U.K court frustrates . . .  important U.S. policies," including antitrust law, and that "IPCom is attempting to escape its contractual commitments and antitrust laws by threatening a U.K. injunction to pressure Plaintiffs to accept *supra*-FRAND terms."  Plaintiffs' Motion for Anti-Suit Injunction at 16.  IPCom filed its Opposition to Lenovo's Motion for Anti-Suit Injunction on October 11, 2019.

On September 23, 2019, Lenovo U.K. filed an opposition to IPCom's U.K. claim.  Lenovo U.K. argued, among other things, that "even if (which is denied) [the patent] is valid and has been infringed by the Defendants, it will likely have expired before the trial of this action.  Accordingly, no final injunction will be granted by this Court and the Claimant's only remedy

---

[4] Also on July 2, 2019, IPCom (a German firm) filed a motion to dismiss Lenovo's Complaint on the basis of lack of personal jurisdiction.  This motion is pending before the Court and the United States takes no position on its merits.

STATEMENT OF INTEREST OF THE UNITED STATES
Case No. 19-cv-01389-EJD                           3

1   will be in damages."  Opposition to Plaintiffs' Motion for Anti-Suit Injunction, Exhibit 1 to Jelf

2   Declaration (containing Lenovo U.K.'s response), Doc. 43-2 at 7, ¶ 21.

3          **B. The Role of Standard Setting Organizations**

4          "Industry standards are widely acknowledged to be one of the engines driving the modern

5   economy."  *See* U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Enforcement and*

6   *Intellectual Property Rights: Promoting Innovation and Competition* (2007) at 33,

7   https://www.justice.gov/sites/default/files/atr/legacy/2007/07/11/222655.pdf.  The establishing of

8   standards has significant procompetitive effects, "including not just interoperability but also

9   lower product costs and increased price competition."  *Microsoft Corp. v. Motorola, Inc.*, 696

10  F.3d 872, 876 (9th Cir. 2012); *see also* 2007 U.S. Dep't of Justice & Fed. Trade Comm'n,

11  *Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition*

12  (2007) at 34, https://www.justice.gov/sites/default/files/atr/legacy/2007/07/11/222655.pdf.

13  Many products in the modern economy, especially those that utilize advanced technologies and

14  patented inventions such as mobile devices, are standardized.  *See* Mark A. Lemley, *Intellectual*

15  *Property Rights and Standard-Setting Organizations*, 90 Calif. L. Rev. 1889, 1896 (2002).

16         Private standard setting organizations ("SSOs"), such as ETSI, create many of these

17  technical standards.  Many SSOs adopt intellectual property rights ("IPR") policies that seek to

18  encourage participation by both innovators and implementers of standardized technology in the

19  standard-setting process.[5]  Often such policies, including ETSI's, require patent holders to

20

21  _____

22  [5] Encouraging broad participation in the standard-setting process tends to increase its
    procompetitive benefits.  With many innovators participating, for instance, it is more
23  likely that the best technologies will be submitted to be considered for inclusion in the
    standard.  In contrast, less participation could result in suboptimal standards and less
24  implementation in the marketplace, which would diminish key benefits of standards,
    including interconnectivity and interoperability.  *See* Kristen Osenga, *Ignorance Over*
25  *Innovation: Why Misunderstanding Standard Setting Organizations Will Hinder*
    *Technological Progress*, 56 U. Louisville L. Rev. 159, 162 (2018); *cf. Allied Tube &*
26  *Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988) ("When, however, private
    associations promulgate safety standards based on the merits of objective expert
27  judgments and through procedures that prevent the standard-setting process from being
    biased by members with economic interests in stifling product competition . . . , those
28  private standards can have significant procompetitive advantages.").

commit to license any technology essential to the standard (including standard essential patents or "SEPs") on FRAND terms.  FRAND-licensing commitments are designed to facilitate widespread access to the technology while ensuring that intellectual property holders are compensated adequately for their contributions.

Typically, the exact terms of a license are negotiated bilaterally between the patent holder and the implementer after the standard-setting process is complete.  For example, ETSI's IPR Guide provides that "commercial terms are a matter for discussion between the IPR holder and the potential licensee, outside of ETSI."  ETSI Guide on Intellectual Property Rights § 2.2 (2013), https://www.etsi.org/images/files/IPR/etsi-guide-on-ipr.pdf; *see also id.* at § 4.1 ("[S]pecific licensing terms and negotiations are commercial issues between the companies and shall not be addressed within ETSI.").  Instead of committing to particular terms prior to standard setting, patent holders are required to commit that they will be "prepared to grant licenses on fair, reasonable and non-discriminatory [FRAND] terms and conditions."  *Id.* at § 4.1.  Such a commitment is "sufficient when selecting technologies for ETSI standards."  *Id.* Whether SEP holders are able to obtain injunctions for infringement is not addressed in the IPR Guide.

## III. LEGAL STANDARDS APPLICABLE TO ANTI-SUIT INJUNCTIONS

"A federal district court with jurisdiction over the parties has the power to enjoin them from proceeding with an action in the courts of a foreign country, although the power should be used sparingly."  *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 881 (9th Cir. 2012) (quoting *Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*, 652 F.2d 852, 855 (9th Cir. 1981)).

The Ninth Circuit requires the party seeking an anti-suit injunction to establish, at a minimum, three elements.[6]  *First*, the court determines if the parties and issues are the same in

---

[6] The parties diverge on whether, in addition to satisfying the Ninth Circuit's anti-suit injunction-specific test, a party seeking an anti-suit injunction must also meet the requirements for a preliminary injunction laid out in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).  The United States takes no position here on this question.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

both proceedings and whether the U.S. action is dispositive of the foreign action that would be enjoined.  *Microsoft Corp.* 696 F.3d at 881; *see also E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 991 (9th Cir. 2006).  *Second*, the court determines whether at least one of four "*Unterweser*" factors (derived from the Fifth Circuit decision in *In re Unterweser Reederei*, 428 F.2d 888 (5th Cir. 1970)) applies to the matter.  *See Microsoft Corp.*, 696 F.3d at 881.  *Third*, it determines if the "injunction's impact on comity is tolerable."  *See id.* (internal quotation marks omitted).

Per the *Unterweser* factors, the court attempts to determine if the "foreign litigation would (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's *in rem or quasi in rem* jurisdiction; or (4) . . . prejudice other equitable considerations."  *Id.* at 882 (internal quotation marks and alterations omitted).  These factors are disjunctive and the court only needs to find that one applies to meet the second prong of the three-part test.  *Id.* at 881.

## IV. ARGUMENT

The antitrust laws provide no sturdy hook on which Lenovo could hang its anti-suit injunction argument.  In an attempt to satisfy the first of the *Unterweser* factors, Lenovo argues that IPCom's seeking of an injunction in the U.K. for the enforcement of a European patent frustrates U.S. antitrust law.  *See* Plaintiffs' Motion for Anti-Suit Injunction at 16.  Lenovo does not elaborate upon how such an injunction would serve to frustrate U.S. antitrust law.  The closest it comes to explaining this claim is the statement that "IPCom is attempting to escape its contractual commitments and antitrust laws by threatening a U.K. injunction to pressure Plaintiffs [Lenovo] to accept *supra*-FRAND terms."  *See* Plaintiffs' Motion for Anti-Suit Injunction at 16.  It is not contrary to U.S. antitrust law, however, (1) to seek an injunction, or (2) to attempt to negotiate for supra-FRAND terms.  Indeed, the right to seek injunctive relief is an indispensable part of a U.S. patent right because it incentivizes innovation and, thus, dynamic

competition.  IPCom's U.K. action, therefore, does not "frustrate" the antitrust policy of the forum under the first *Unterweser* factor.[7]

### A. It Is Not a Violation of United States Antitrust Law for a SEP Holder to Seek an Injunction for Patent Infringement

It is well established that patent holders, including SEP holders that made a FRAND commitment, are permitted to seek injunctive relief for infringement of such patents under U.S. law.  "We agree with the Federal Circuit that a RAND commitment does not always preclude an injunctive action to enforce the SEP."  *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1048 n.19 (9th Cir. 2015)[8] (citing *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1331-1332 (Fed. Cir. 2014) ("To the extent that the district court applied a *per se* rule that injunctions are unavailable for SEPs, it erred."), *overruled in irrelevant part by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015)). The Supreme Court has confirmed that injunctions to remedy patent infringement under U.S. law are governed by equitable principles and courts should not depart from these principles in favor of categorical standards.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-94 (2006); *see also Apple Inc.*, 757 F.3d at 1332 ("The framework laid out by the Supreme Court in *eBay*, as interpreted by subsequent decisions of this court,

---

[7] As Lenovo must meet multiple components of the test laid out by the Ninth Circuit, it would be possible for the Court to rule against its Motion without reaching the antitrust issues discussed here.  IPCom argues in its Opposition (among other things) that the Court lacks personal jurisdiction, the parties and issues are not the same across the litigations, that the U.S. litigation would not be dispositive of the U.K. litigation, that an injunction would offend comity, that none of the *Unterweser* factors are met, and that Lenovo has failed to establish the necessary predicates for a preliminary injunction.  *See generally* Opposition to Plaintiffs' Motion for Anti-Suit Injunction.  Lenovo also cites to additional potential *Unterweser* factors, not related to antitrust law, to support its request for an injunction, in addition to arguing their motion otherwise establishes the required elements.  The United States takes no position here on the merits of the parties' remaining arguments for and against the injunction beyond those based in antitrust law.

[8] "The parallel terms of some SEP licensing agreements require fair, reasonable, and nondiscriminatory, or 'FRAND' rates.  FRAND and RAND have the same meaning in the world of SEP licensing and in this opinion." *Microsoft Corp.*, 795 F.3d at 1031 n.2 (9th Cir. 2015).

provides ample strength and flexibility for addressing the unique aspects of FRAND committed patents and industry standards in general.").  The Ninth Circuit provided an example of when an injunction for infringing a SEP would be appropriate, noting "if an infringer refused to accept an offer on RAND terms, seeking injunctive relief could be consistent with the RAND agreement, even where the commitment limits recourse to litigation." *Microsoft Corp.*, 795 F.3d at 1048 n.19; *see also Apple Inc.*, 757 F.3d at 1332 ("[A]n injunction may be justified where an infringer unilaterally refuses a FRAND royalty or unreasonably delays negotiations to the same effect.").  These hypothetical circumstances are similar to those alleged by IPCom, although the United States takes no position on whether that injunction is ultimately justified under U.K. law.[9]  That U.S. antitrust law would not prohibit a patent holder's general right to enforce its patent under the law of the appropriate jurisdiction is consistent with Supreme Court precedent noting that patent laws "are *in pari materia* with the antitrust laws and modify them *pro tanto*." *Simpson v. Union Oil Co.*, 377 U.S. 13, 24 (1964).  Lenovo cites to no cases and offers no explanation as to how it could offend U.S. antitrust law to seek an injunction in the U.K. when seeking an injunction in the U.S. would not be prohibited by these precedents.[10]

---

[9]  *See* Plaintiffs' Motion for Anti-Suit Injunction, Exhibit 1 to Bader Declaration (containing IPCom's U.K. claim), Doc. 40-2 at 8, ¶ 15 (IPCom "has, since at least 2014 been actively pursuing negotiations with the Lenovo group seeking to license the IPCom Portfolio . . . to the Lenovo group . . . on FRAND terms but has thus far been unsuccessful."); *see also* Opposition to Plaintiffs' Motion for Anti-Suit Injunction at 3 (describing alleged efforts by IPCom to negotiate that were not reciprocated).

[10] The United States does not mean to imply that seeking an injunction would necessarily comply with antitrust law in every conceivable instance.  For example, under certain circumstances, "sham" litigation brought to harm a competitor can form the basis of an antitrust claim.  *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, *Inc.*, 508 U.S. 49, 57-61 (1993) (holding that a legal action is immunized from antitrust liability unless it is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and "the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor, through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon.") (internal quotation marks, citations, emphases, and alterations omitted); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 511 (1972).  Moreover,

The policy considerations underlying patent law and antitrust law also support allowing SEP holders to seek injunctions as appropriate under the law of the jurisdiction. Both patent law and antitrust law are aligned in their mutual aim to foster innovation and dynamic competition. *See, e.g., Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1576 (Fed. Cir. 1990) ("[T]he two bodies of law are . . . complementary, as both are aimed at encouraging innovation, industry and competition."). "Patent rights function best if an owner retains a right to exclude." *See* Makan Delrahim, Asst. Attorney General, Antitrust Division, U.S. Dep't of Justice, Remarks as Prepared for The Federal Circuit Bar Association Global Series 2018, *Protecting Free-Market Patent Bargaining, Competition, and the Right To Exclude* (Oct. 10, 2018), https://www.justice.gov/opa/speech/file/1100016/download.[11] "[B]y stripping the SEP holder's right to injunctive relief, the SSO may enable a potential licensee to delay good faith negotiation of a F/RAND license and the patent holder could be forced to accept less than fair market value for the use of the patent." Joanna Tsai & Joshua D. Wright, *Standard Setting, Intellectual Property Rights, and the Role of Antitrust in Regulating Incomplete Contracts*, 80 Antitrust L.J. 157, 182 (2015); *see also* Richard A. Epstein & Kayvan B. Noroozi, *Why Incentives for 'Patent Holdout' Threaten to Dismantle FRAND, and Why it Matters*, 32 Berkeley Tech. L.J. 1381, 1408 (2018) ("It is the very threat of the injunction right . . . that brings the parties to the negotiating table and motivates them to draw upon the full scope of their knowledge and creativity in forming contractual and institutional solutions to the perceived holdup problem."). A blanket antitrust prohibition

---

enforcing an invalid patent obtained by fraud on the Patent and Trademark Office may violate Section 2 of the Sherman Act if all the elements otherwise necessary to establish a violation are proved. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 176-77 (1965). Lenovo does not argue that such an instance is present here.

[11] *Citing* Robert P. Merges, *Of Property Rules, Coase, and Intellectual Property*, 94 Colum. L. Rev. 2655, 2667 (1994) ("Without the right to obtain an injunction, the right to exclude granted to the patentee would have only a fraction of the value it was intended to have, and would no longer be as great an incentive to engage in the toils of scientific and technological research.") (*quoting Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1578 (Fed. Cir. 1983)).

on seeking an injunction outside the U.S. when one is allowed under the applicable patent law where it is sought, would risk "diminish[ing] the value of their patents and hence their incentive to innovate" as well as discouraging patent holders from contributing to a standard at all "if doing so will require it to give up the option to protect its rights by seeking an injunction against infringing users." *See* Douglas H. Ginsburg, Taylor M. Owings & Joshua D. Wright, *Enjoining Injunctions: The Case Against Antitrust Liability for Standard Essential Patent Holders Who Seek Injunctions*, The Antitrust Source, October 2014, https://www.americanbar.org/content/dam/aba/publishing/ antitrust_source/oct14_ginsburg_10_21f.authcheckdam.pdf.

Lenovo offers no argument as to how IPCom's seeking of an injunction in these circumstances could violate U.S. antitrust law. While such an argument finds no support in precedent or policy generally, the argument is particularly lacking in this case because Lenovo U.K. has argued that the patent at issue in IPCom's U.K. claim "will likely have expired before the trial of this action. Accordingly, no final injunction will be granted by [the U.K. court] and [IPCom's] only remedy will be in damages." *See* Opposition to Plaintiffs' Motion for Anti-Suit Injunction, Exhibit 1 to Jelf Declaration (containing Lenovo U.K.'s response), Doc. 43-2 at 7, ¶ 21. As Lenovo represents, then, the U.K. law that governs that matter will appropriately determine whether exclusion is appropriate.

**B. It Is Not a Violation of United States Antitrust Law for a Patent Holder to Negotiate for Purportedly Supra-FRAND Terms**

To the extent that Lenovo argues the seeking of an injunction violates antitrust law in this instance because it "pressure[s] Plaintiffs to accept *supra*-FRAND terms," *see* Plaintiffs' Motion for Anti-Suit Injunction at 16, such an argument is similarly unavailing. The argument that IPCom violates antitrust law by attempting to receive supra-FRAND terms is an extension of Lenovo's claim that IPCom's conduct in its license negotiations with Lenovo constituted unlawful monopolization in violation of Section 2 of the Sherman Act (15 U.S.C. § 2). *See* Complaint at ¶¶ 68-91. A private plaintiff bringing a monopolization claim under Section 2 must demonstrate that the defendant "(1) possessed monopoly power in the relevant market, (2)

willfully acquired or maintained that power through exclusionary conduct and (3) caused antitrust injury." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004). This Statement addresses the second element:  IPCom's alleged attempt to negotiate for supra-FRAND terms, in and of itself, does not constitute "exclusionary" conduct cognizable under U.S. antitrust law.

"[T]o be condemned as exclusionary, a monopolist's act must have an anticompetitive effect.  That is, it must harm the competitive *process* and thereby harm consumers."  *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc) (per curiam) (internal quotation marks omitted).  Because discerning "[w]hether any particular act of a monopolist is exclusionary, rather than merely a form of vigorous competition, can be difficult," *id.*, courts applying Section 2 are careful not to condemn conduct, such as innovation, that is driven by competition on the merits, *see Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*.").

It is not exclusionary conduct, nor does it violate any rule of antitrust, for a licensor simply to charge a high price or even a monopoly price.  "The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."  *Trinko*, 540 U.S. at 407.  "Simply possessing monopoly power and charging monopoly prices does not violate § 2; rather, the statute targets the willful acquisition or maintenance of that power."  *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447-48 (2009) (internal quotation marks omitted).  The antitrust laws have that structure because "[t]he opportunity to charge monopoly prices—at least for a short period—is what attracts business acumen in the first place; it induces risk taking that produces innovation and economic growth."  *Trinko*, 540 U.S. at 407 (internal quotation marks omitted).

Nor is it exclusionary conduct to decline to license a product on a potential licensee's preferred terms.  "As the Supreme Court has repeatedly emphasized, there is 'no duty to deal

under the terms and conditions preferred by a competitor's rivals.'"  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) (internal alterations omitted) (quoting *linkLine*, 555 U.S. at 457); *see also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (Gorsuch, J.) ("Even a monopolist generally has no duty to share (or continue to share) its intellectual or physical property with a rival."); U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* (2017), https://www.ftc.gov/system/files/documents/public_statements/1049793/ip_guidelines_2017.pdf § 2.1 ("The antitrust laws generally do not impose liability upon a firm for a unilateral refusal to assist its competitors, in part because doing so may undermine incentives for investment and innovation.").  This follows from the principle that a firm generally has no antitrust duty to deal with another firm at all, and only in limited circumstances will a refusal to deal give rise to a potential antitrust claim.  *See Trinko*, 540 U.S. at 409 (describing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), which recognized a refusal to deal claim based on a firm's voluntarily termination of a profitable course of prior dealing in order to exclude competition, as a case "at or near the outer boundary of § 2 liability").   A licensor does not run afoul of antitrust laws just by offering business terms that a licensee does not wish to accept. "*Aspen Skiing* offers no relief [where plaintiff] simply did not like the business terms offered by [defendant]."  *Aerotec Int'l, Inc.*, 836 F.3d at 1184.[12]

The setting alleged here—a SEP holder made a contractual commitment to an SSO to license its patent on FRAND terms and later seeks supra-FRAND terms—does not change the licensor's *antitrust law* obligations:  A patent holder is not obliged by antitrust law to license on any specific terms, and a patent holder does not commit an antitrust violation by seeking supra-FRAND terms when licensing its product.  The D.C. Circuit's decision in *Rambus, Inc. v. FTC* is instructive.  *See Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir 2008).  There, the FTC claimed

---

[12] As noted by the Supreme Court, "for antitrust purposes, there is no reason to distinguish between price and nonprice components of a transaction."  *linkLine*, 555 U.S. at 450.

that the defendant violated Section 2's prohibition on exclusionary conduct by deceiving the

SSO regarding the extent of its patents when its technologies were incorporated into the

standard.  The D.C. Circuit held that this alleged conduct alone did not constitute exclusionary

conduct.  To the extent that this "deceit merely enable[ed] a monopolist to charge higher prices

than it otherwise could have charged [the alleged deceit] would not in itself constitute

monopolization."  *See Rambus* 522 F.3d at 459 (internal punctuation marks omitted); *see also id.*

at 464 ("[A]n otherwise lawful monopolist's use of deception simply to obtain higher prices

normally has no particular tendency to exclude rivals and thus to diminish competition.").

Evasion of a pricing constraint by a monopolist does not render the price increase "exclusionary

conduct" that harms competition itself.  *See NYNEX Corp. v. Discon,* 525 U.S. 128, 136 (1998);

*see also Rambus* 522 F.3d at 466 ("[A]s in *NYNEX*, an otherwise lawful monopolist's end-run

around price constraints, even when deceptive or fraudulent, does not alone present a harm to

competition in the monopolized market.").[13]  This is consistent with the general principle that

antitrust law does not police prices—even those prices charged by monopolists—for

"reasonable[ness]."  *See Kartell v. Blue Shield*, 749 F.2d 922, 927-28 (1st Cir. 1984) (Breyer,

J.).[14]

---

[13] Douglas H. Ginsburg, Koren W. Wong-Ervin & Joshua D. Wright, *The Troubling Use of Antitrust to Regulate FRAND Licensing*, Comp. Policy Int'l Oct. 2015 ("Ginsburg, Wong-Erving & Wright") at 6-7, https://competitionpolicyinternational.com/assets/Uploads/GinsburgetalOct-151.pdf ("With respect to reneging on a FRAND commitment, as the Supreme Court explained in *NYNEX* [], while the evasion of a pricing constraint may hurt consumers, it does not harm the competitive process.  The Court distinguished the mere breach of a pricing commitment from the unlawful exercise of monopoly power. . . .").

[14] Lenovo's Complaint attempts to circumvent these well-established principles and bring their licensing dispute under the rubric of exclusionary conduct by making a barebones "deceptive conduct" claim.  *See* Complaint at ¶¶ 74-75.  Lenovo alleges that IPCom deceived ETSI "through the intentional false promise to license the relevant technologies on FRAND terms" when it in fact "never intended to comply with its obligations to license . . . on FRAND terms and conditions."  *See id.* at ¶¶ 74-75.  As the alleged "deceit" relates solely to the willingness to offer particular terms, *NYNEX* and *Rambus* foreclose the claim that the licensing dispute constitutes an exclusionary act.  The Third Circuit's decision in *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) does not revive the claim.  The court there allowed an antitrust

1        If a party does violate its FRAND commitments, then contractual remedies are available
2   that allow the beneficiary of the FRAND commitment to seek damages that arise from such a
3   breach.  In that situation, a potential licensee with a contractual remedy has not been forced to
4   overpay.  There is thus no sound policy reason to allow such a licensee to seek treble damages in
5   an antitrust claim.  Any rule to the contrary could incentivize bad faith bargaining on the part of
6   a potential licensee who would have more to gain from failing to reach a deal.  Indeed, even if
7   the patent holder and implementer fail to agree on FRAND terms, the implementer can avoid
8   injury by seeking declaratory relief and a FRAND determination, as Lenovo has done here.  *See,*
9   Complaint at ¶¶ 64-67; *cf. Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1040-45 & n.2 (9th
10  Cir. 2015) (upholding district court's analysis of a proper FRAND rate in breach of contract
11  action).
12       The Ninth Circuit has ruled that *antitrust remedies* are not available for *contractual*
13  *harms* in the context of alleged monopoly pricing.  *See Orion Pictures Distrib. Corp. v. Syufy*
14  *Enters.*, 829 F.2d 946, 949 (9th Cir. 1987).  In *Orion*, the parties signed a contract requiring
15  defendant to make a payment to plaintiff.  After signing this contract, defendant made
16  acquisitions in order to become a monopolist and would go on to breach its contract with
17  plaintiff by declining to make the payment.  The court held that plaintiff suffered no antitrust
18
19  _____
20  claim to go forward based on an allegation that, when creating a standard, an SSO relied upon a
21  SEP holder's false promise to license its patents on FRAND terms.  *Id.* at 314.  The predicates of
    this decision have been weakened, as the Third Circuit relied in significant part on the Federal
22  Trade Commission's "landmark" decision in *Rambus*—which was overruled on appeal by the
    D.C. Circuit after the *Broadcom* decision issued.  *See Rambus* 522 F.3d at 466; *Broadcom Corp.*
23  501 F.3d at 311.  "[T]o the extent that [*Broadcom*] may have rested on a supposition that there is
    a cognizable violation of the Sherman Act when a lawful monopolist's deceit has the effect of
24  raising prices (without an effect on competitive structure), it conflicts with *NYNEX*."  *Rambus*
25  522 F.3d at 466; *see also id.* ("The contention that price-raising deception has downstream
    effects is surely correct, but that consequence was equally surely true in *NYNEX* . . . and equally
26  obvious to the Court.").  In any event, the question of whether Lenovo's allegations of past
    deceptive conduct by IPCom are sufficient to state a cognizable claim under antitrust law need
27  not be decided here, as Lenovo has not justified how the foreign litigation would enable IPCom
    to "escape . . . antitrust laws" in the present case.  *See* Plaintiffs' Motion for Anti-Suit Injunction
28  at 16.

STATEMENT OF INTEREST OF THE UNITED STATES
Case No. 19-cv-01389-EJD                 14

injury (only contractual injury) because the alleged monopoly came into being after the contract was signed.  By the time defendant became a monopolist, its duties "were fixed by its contractual commitment" rather than competition, and so the breach of contract posed no injury to competition.  *Id.*  Appropriate damages could be sought under contract law.  *Id.*  Also in the context of an alleged monopoly-pricing case, the Supreme Court has warned against "transform[ing] cases involving business behavior that is improper for various reasons. . . into treble-damages antitrust cases."  *See NYNEX Corp.*, 525 U.S. at 136-37.[15]  Similarly here, if Lenovo is harmed by an overcharge, it can seek redress under contract law, and an anti-suit injunction on antitrust grounds is inappropriate.

## V. CONCLUSION

For the foregoing reasons, the Court should decline to hold that the conduct alleged by Plaintiffs frustrates U.S. antitrust law and does not satisfy any required element of their Motion for Anti-Suit Injunction.  The United States otherwise takes no position on the merits of Plaintiffs' Motion for Anti-Suit Injunction.

*          *          *

---

[15] The wrongful conversion of breach-of-contract claims into antitrust claims would have a potentially significant impact, as the threat of treble damages could chill lawful, pro-competitive conduct.  *See, e.g., Trinko*, 540 U.S. at 414 ("Mistaken inferences and the resulting false condemnations 'are especially costly, because they chill the very conduct the antitrust laws are designed to protect.'") (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)); Ginsburg, Wong-Erving & Wright at 3 ("[I]mposing antitrust liability for patent holdup and a patent holder's refusals to issue a license on FRAND terms is not only unnecessary, given that the law of contracts is sufficient to provide optimal deterrence, it is likely to be harmful to both competition and consumers by diminishing the value of patents and hence reducing incentives to innovate and to participate in standard setting.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

MAKAN DELRAHIM
Assistant Attorney General

DAVID L. ANDERSON
United States Attorney

MICHAEL F. MURRAY
Deputy Assistant Attorney General

WILLIAM J. RINNER
Senior Counsel and Chief of Staff to
the Assistant Attorney General

TAYLOR M. OWINGS
Counsel to the Assistant Attorney
General

DANIEL E. HAAR,
JENNIFER DIXTON,
ANDREW N. DeLANEY
Attorneys

Dated:  October 25, 2019

/s/ Andrew DeLaney
ANDREW N. DeLANEY

Attorneys for the United States of
America