EXHIBIT A



Tribunal de Grande Instance
de PARIS

Le   1 5 OCT. 2019

3ème chambre civile

A Madame ou Monsieur le Président du
Tribunal de Grande Instance de Paris

---

# REQUÊTE

## AUX FINS DE SAISIE-CONTREFAÇON

**(Brevets - Articles L.615-5 et R.615-2
du Code de la Propriété Intellectuelle)**

---

**IPCom GmbH & Co. KG,** société de droit allemand ayant la forme d'une *Kommanditgesellschaft*, dont le siège social est Zugspitzstrasse 15, 82049 Pullach, Allemagne, immatriculée au registre des sociétés de Munich (Allemagne) sous le N° HRA 93950, représentée par son associé commandité IPCom Beteiligungs GmbH, société de droit allemand ayant la forme d'une *Gesellschaft mit beschränker Haftung*, dont le siège social est Zugspitzstrasse 15, 82049 Pullach, Allemagne, elle-même représentée par son *Geschäftsführer* (gérant) domicilié en cette qualité audit siège,

Ayant pour avocat:     **BARDEHLE PAGENBERG** SELAS
Agissant par Maître Julien Fréneaux
Avocat au barreau de Paris
demeurant 5, rue Boudreau – 75009 Paris
Tél. : 01 53 05 15 00 – Fax. : 01 53 05 15 05
Palais Paris P 0390

**élisant domicile en son cabinet,**

. 2 .

**A L'HONNEUR DE VOUS EXPOSER :**

### *La requérante*

1.  La société **IPCom GmbH & Co. KG** (ci-après désignée "la société IPCom") est une société allemande basée à Pullach, à proximité de Munich (Allemagne).

    Depuis plus de 15 ans, la société IPCom a pour activité la R&D et la constitution et l'exploitation de portefeuilles de brevets d'invention, en particulier dans le domaine des télécommunications.

    Les inventions protégées par les brevets de la société IPCom sont réalisées par sa propre équipe de R&D ou par des tiers qui lui cèdent ou concèdent leurs droits d'exploitation.

    La société IPCom est un membre actif des groupes de travail des organismes de normalisation qui élaborent les normes et spécifications techniques standardisées du domaine des télécommunications, et en particulier de l'ETSI (*European Telecommunications Standards Institute*).

    > **Pièce n°1.1 : Extrait du registre du commerce de Munich concernant IPCom (+ traduction en français)**
    >
    > **Pièce n°1.2 : Extrait du site internet d'IPCom**

### *Le brevet EP 1 841 268 B2 (EP'268)*

2.  La société IPCom est propriétaire, notamment, d'un portefeuille de plus de 160 familles de brevets protégeant des technologies de télécommunication mobile 2G, 3G et 4G, développées par l'équipementier automobile allemand Robert Bosch GmbH.

    Parmi ces brevets figure en particulier le brevet suivant :

    ▪ Brevet européen **EP 1 841 268** désignant la France, ayant pour titre *"Accès d'une station mobile à un canal d'accès aléatoire en dépendance de sa classe d'utilisateur"*, issu d'une demande européenne divisionnaire n°07009265.5 déposée sur la base d'une demande de brevet européen n°00916749.5, elle-même issue d'une demande internationale PCT WO 00/54534 du 15 février 2000 revendiquant la priorité d'une demande allemande DE 19910239 du 8 mars 1999, délivré à la société IPCom le 17 mars 2010 et maintenu sous forme modifiée ("**B2**") après opposition (ce brevet sera ci-après désigné par commodité "brevet EP'268").

    > **Pièce n°2.1 : Fascicule de brevet européen EP 1 841 268 B2**
    >
    > **Pièce n°2.2 : Traduction en français de la description du brevet EP 1 841 268 B2**
    >
    > **Pièce n°2.3 : Communication de l'OEB du 6 juin 2007, concernant l'enregistrement du transfert de propriété de la demande de brevet européen 07009265.5**
    >
    > **Pièce n°2.4 : État des inscriptions au RNB au 19.08.2019 et inscriptions complémentaires du 13.09.2019 concernant la partie française du brevet EP'268**

. 3 .

3.  Au cours des 8 années qui ont suivi sa délivrance, le brevet EP'268 a fait l'objet d'une lourde procédure d'opposition devant l'Office Européen des Brevets, à l'initiative de 6 sociétés différentes actives dans le domaine des équipements et services de télécommunication mobile, à savoir Microsoft, Deutsche Telekom, Ericsson, HTC, Vodafone et Apple.

    Cette procédure d'opposition s'est terminée par une décision définitive T 0767/14 de la Chambre de Recours de l'OEB en date du 19 juillet 2017, maintenant le brevet EP'268 au bénéfice de la société IPCom sous une forme modifiée, dite "B2", publiée le 25 avril 2018.

    **Pièce n°2.5 : Décision T 0767/14 de la Chambre de Recours de l'OEB du 19 juillet 2017 (+ traduction en français)**

4.  Les annuités de la partie française du brevet EP'268 sont régulièrement acquittées à l'INPI. La 20$^{ème}$ annuité a été payée le 21 février 2019.

    **Pièce n°2.6 : État de paiement des annuités concernant la partie française du brevet EP'268**

5.  Conformément à l'article 64 de la Convention de Munich sur le brevet européen et aux articles L.614-7 et suivants du Code de la propriété intellectuelle, depuis la date de publication de sa délivrance (17 mars 2010), le brevet EP'268 confère à son titulaire, la société IPCom, les mêmes droits que ceux que lui conférerait un brevet français.

### _L'invention protégée par le brevet EP'268_

6.  L'invention protégée par le brevet EP'268 porte sur une station d'abonné mobile (par exemple un téléphone mobile, un ordinateur portable ou une tablette numérique) équipée de moyens permettant de contrôler son accès à un canal de transmission d'accès aléatoire d'un réseau de télécommunication mobile conforme à la norme UMTS (_Universal Mobile Telecommunications System_), communément appelée 3G ou encore WCDMA (_Wideband Code Division Multiple Access_).

7.  Le réseau UMTS est notamment composé de cellules, chaque cellule étant définie par la couverture d'une station de base.

    Des stations mobiles (par exemple des téléphones mobiles, des ordinateurs portables ou des tablettes numériques) présentes dans une cellule peuvent communiquer avec la station de base (EP'268, paragraphe [0016]).

8.  L'opérateur d'un réseau UMTS fournit des services de télécommunication pouvant être utilisés par les stations mobiles, tels que l'envoi de paquets de données de petite taille, l'envoi de paquets de données de taille importante ou la transmission de données vocales (EP'268, paragraphe [0017]).

9.  Le réseau UMTS possède des ressources limitées. Par conséquent, lorsqu'une station mobile est inactive, c'est-à-dire qu'aucun service de télécommunication n'est utilisé, aucun canal radio entre la station de base et la station mobile pour la transmission vocale ou de paquets de données n'est réservé.

    Lorsque la station mobile sort de son état inactif, un canal radio avec la station de base doit alors être attribué à la station mobile afin que celle-ci puisse utiliser les services de télécommunications.

. 4 .

10.     Une station mobile ne peut pas s'allouer un tel canal radio de façon indépendante. Elle doit en faire la demande en envoyant un message à la station de base. Cela se fait généralement via un canal d'accès aléatoire appelé RACH (pour *Random Access Channel*) (EP'268, paragraphe [0019]). Le canal d'accès aléatoire RACH est un canal unidirectionnel allant de la station mobile à la station de base.

11.     Lorsque la station de base reçoit un message sur ce canal RACH, elle confirme sa réception sur un canal séparé.

12.     Chaque station mobile peut en principe envoyer à tout moment une demande pour l'allocation d'un canal radio à la station de base (accès aléatoire).

Par conséquent, plusieurs stations mobiles peuvent envoyer un message sur ce canal au même moment provoquant une collision des messages, de sorte qu'aucune des stations mobiles ne se voit attribuer un canal. En effet, dans un tel cas, la station de base n'envoie pas de message de confirmation de réception aux stations mobiles émettrices des messages. Ces dernières vont alors réémettre leur message après un temps prédéfini (EP'268, paragraphe [0020]).

En cas de forte demande, le risque de collision entre les messages des stations mobiles est accru et les stations mobiles dont le message n'a pas pu être transmis du fait d'une collision, vont renvoyer leur message provoquant une augmentation de la congestion sur le canal RACH et une éventuelle surcharge (EP'268, paragraphe [0020]).

13.     Il existait donc un besoin de mieux contrôler comment les stations mobiles d'un réseau de télécommunication UMTS (3G) accèdent au canal d'accès aléatoire RACH afin d'éviter les surcharges sur ce canal.

14.     Le problème technique ci-dessus est résolu par une station mobile conforme à la revendication 1 (unique) du brevet EP'268, qui peut être décomposée comme suit :

> 1.0 *Station mobile (5, 10, 15, 20) destinée à être utilisée dans un réseau de radiocommunication mobile UMTS au sein duquel sont distinguées plusieurs classes d'utilisateur (35, 40),*

> 1.1 *dans lequel des signaux d'information comportant des données d'autorisation d'accès sont transmis à la station mobile, les données d'autorisation d'accès étant transmises comme un motif de bits,*

> *caractérisée en ce que*

> *la station mobile (5, 10, 15, 20) est conçue pour*

> 1.2 *lire une classe d'utilisateur (35, 40) à partir d'une carte SIM (75),*

> 1.3 *recevoir les données d'autorisation d'accès, lesquelles contiennent des bits de seuil d'accès (S3, S2, S1, S0) et des bits de classe d'accès (Z0, Z1, Z2, Z3) par le biais d'un canal de commande de diffusion (25),*

> 1.4 *déterminer un seuil d'accès (S) à partir des bits de seuil d'accès (S3, S2, S1, S0), sous réserve que l'autorisation d'accès au canal d'accès aléatoire soit déterminée en fonction d'une interprétation de seuil d'accès,*

. 5 .

*1.5    déterminer, à l'aide des bits de classe d'accès (Z0, Z1, Z2, Z3) qui concernent la classe d'utilisateur (35, 40), si la station mobile (5, 10, 15, 20) est autorisée à accéder à un canal d'accès aléatoire, par exemple RACH, indépendamment des bits de valeur seuil d'accès (S3, S2, S1, S0) reçus, ou si l'autorisation d'accès au canal d'accès aléatoire, par exemple RACH, est à déterminer en fonction d'une interprétation du seuil d'accès,*

*1.6    et est conçue pour, comme interprétation du seuil d'accès, comparer le seuil d'accès (S) à un nombre aléatoire ou un nombre pseudo-aléatoire (R),*

*1.7    et est conçue pour accéder au canal d'accès aléatoire en fonction de la détermination à l'aide du bit de classe d'accès, soit indépendamment des bits de seuil d'accès (S3, S2, S1, S0) reçus, soit en fonction du résultat de la comparaison.*

15.    La solution technique objet du brevet EP'268 permet donc de réguler l'accès des stations mobiles à un canal d'accès aléatoire, comme le canal d'accès RACH, au moyen de deux concepts qui sont le seuil d'accès et la classe d'accès.

16.    La station mobile va ainsi recevoir de la part de la station de base des bits de valeur de seuil d'accès (S3, S2, S1, S0) et des bits de classe d'accès (Z0, Z1, Z2, Z3) via un canal de commande de diffusion, qui vont permettre de déterminer si la station mobile peut accéder au canal d'accès aléatoire à cet instant T, ou si elle doit retenter sa chance ultérieurement.

La station mobile est configurée pour déterminer une valeur de seuil d'accès (S) à partir des bits de valeur de seuil d'accès (S3, S2, S1, S0) qui lui ont été transmis par la station de base. Elle va alors procéder à un test comparant un nombre aléatoire ou pseudo-aléatoire (R) qu'elle aura préalablement généré, à la valeur de seuil d'accès S. En fonction du résultat de cette comparaison, la station mobile a ou n'a pas l'autorisation d'accéder au canal d'accès aléatoire.

Chaque station mobile appartient par ailleurs à une classe d'utilisateur prédéfinie, stockée sur sa carte SIM. La station mobile peut alors déterminer, au regard des bits de classe d'accès (Z0, Z1, Z2, Z3) reçus de la station de base, si la classe d'utilisateurs à laquelle elle appartient est autorisée à accéder directement au canal d'accès aléatoire, indépendamment des bits de valeur de seuil d'accès (S3, S2, S1, S0) et du résultat de la comparaison entre le nombre aléatoire R et la valeur de seuil d'accès S.

17.    Il est ainsi possible de procéder à une distribution différenciée de l'autorisation d'accès à un canal d'accès aléatoire, comme le canal RACH, pour une ou plusieurs stations mobiles, en fonction des bits de valeur de seuil d'accès (S3, S2, S1, S0) et des bits de classe d'accès (Z0, Z1, Z2, Z3) envoyés par la station de base.

L'invention objet du brevet EP'268 permet par conséquent de disposer d'un système de contrôle d'accès flexible combinant un accès dépendant du seuil d'accès S avec un accès dépendant de la classe d'accès (EP'268, paragraphes [0010] et suivants).

. 6 .

### *L'essentialité du brevet EP'268 au regard de la norme UMTS (3G)*

18.   Le brevet EP'268 fait partie d'un portefeuille de brevets initialement déposés par la société Robert Bosch GmbH, dont plusieurs sont considérés comme essentiels aux normes de téléphonie mobile GSM et UMTS édictées notamment par l'ETSI (*European Telecommunications Standards Institute*). Les termes "normes" et "essentiel" ont ici le sens indiqué dans la politique de l'ETSI sur les droits de propriété intellectuelle du 18 avril 2018 et contenue dans la version 39 des directives de l'ETSI du 8 octobre 2018 ("ETSI IPR Policy").

**Pièce n°3.1 :  Extraits des Directives de l'ETSI, version 39 du 8 octobre 2018**

19.   C'est la raison pour laquelle en 2009, la société IPCom a déclaré à la Commission Européenne être disposée à concéder aux tiers des licences à des conditions FRAND (pour *Fair, Reasonable and Non-Discriminatory*) sur les brevets essentiels de ce portefeuille. Le 11 juin 2014, la société IPCom a réitéré cet engagement auprès de l'ETSI.

**Pièce n°3.2 :  Communiqué de presse de la Commission Européenne du 10 décembre 2009**

**Pièce n°3.3 :  "*General IPR Licensing Declaration*" de la société IPCom à l'ETSI du 11 juin 2014**

20.   Le 28 février 2017, la Cour d'Appel de l'Angleterre et du Pays de Galles a confirmé que le brevet EP'268 de la société IPCom est un brevet essentiel à la norme UMTS (*Universal Mobile Telecommunications System*) communément appelée 3G, dans un arrêt *IPCom v. HTC* rendu sur le fondement d'une version du brevet EP'268 identique à la version modifiée maintenue par la décision T 0767/14 de la Chambre de Recours de l'OEB du 19 juillet 2017.

**Pièce n°3.4 :  Arrêt de la Cour d'Appel de l'Angleterre et du Pays de Galles du 28 février 2017, ([20017] EWCA Civ 90) (+ traduction en français)**

**Pièce n°3.5 :  Ordonnance de la Cour d'Appel de l'Angleterre et du Pays de Galles du 28 février 2017, *IPCom v. HTC***

### *Les rapports de la société IPCom avec le groupe Lenovo*

21.   Le groupe Lenovo est un groupe industriel chinois spécialisé dans la fabrication et la commercialisation d'ordinateurs, serveurs informatiques, tablettes numériques, télévisions connectées et téléphones.

Le groupe Lenovo a acquis en octobre 2014 l'entreprise américaine Motorola Mobility, spécialisée dans la fabrication et la commercialisation de téléphones mobiles.

22.   Le groupe Lenovo fabrique et commercialise trois types d'appareils électroniques qui sont aptes à fonctionner conformément à la norme UMTS (3G) et constituent donc des "stations mobiles" au sens de la revendication 1 du brevet EP'268. Il s'agit :

–   de téléphones mobiles de marque Motorola,

–   d'ordinateurs portables de marque Lenovo et/ou Thinkpad et/ou Yoga équipés d'une carte réseau mobile,

–   et de tablettes numériques de marque Lenovo et/ou Thinkpad et/ou Yoga équipées d'une connectivité aux réseaux mobiles.

. 7 .

23.   Depuis plusieurs années, la société IPCom invite le groupe Lenovo à régulariser sa situation. Elle lui a offert de souscrire à cet effet une licence d'exploitation de son portefeuille de brevets à des conditions FRAND.

En mars 2019, la société IPCom a renouvelé son offre de licence FRAND au groupe Lenovo en l'invitant à la fixer sur ses intentions pour le 15 mars 2019, faute de quoi elle serait contrainte d'engager une procédure judiciaire pour la protection de ses droits.

Pour toute réponse, le 14 mars 2019, deux sociétés américaines du groupe Lenovo, à savoir les sociétés Lenovo (United States) Inc. et Motorola Mobility LLC, ont engagé une procédure judiciaire contre la société IPCom devant le Tribunal de District des Etats-Unis pour le District Nord de Californie, auquel elles demandent notamment de déterminer les conditions d'une licence FRAND mondiale pour le portefeuille de brevets de la société IPCom (sans pour autant s'engager, ni pour elles-mêmes ni pour les autres sociétés du groupe Lenovo, à souscrire une telle licence).

> **Pièce n°7.1 :  "*Complaint*" des sociétés Lenovo (United States) Inc. et Motorola Mobility LLC du 14 mars 2019**

24.   Le groupe Lenovo n'a donc, en l'état, ni accepté l'offre de licence FRAND de la société IPCom, ni soumis à cette-dernière une contre-offre concrète de licence qui corresponde à des conditions FRAND.

Les sociétés du groupe Lenovo continuent en revanche à exploiter dans le monde entier, sans autorisation, les inventions protégées par le portefeuille de brevets de la société IPCom, et en particulier le brevet EP'268.

### *La contrefaçon et la procédure parallèle au Royaume-Uni*

25.   Le 4 juillet 2019, la société IPCom a engagé une action en contrefaçon de la partie anglaise du brevet EP'268 devant la High Court of Justice d'Angleterre et du Pays de Galles à l'encontre de deux sociétés anglaises du groupe Lenovo, à savoir :
   ▪ Lenovo Technology (United Kingdom) Limited ;
   ▪ Motorola Mobility UK Limited.

Cette procédure est pendante, les sociétés anglaises du groupe Lenovo ayant signifié leurs moyens de défense et demandes reconventionnelles le 23 septembre 2019.

> **Pièce n°6.1 :  "Particulars of Claim" (Détails de la demande) de la société IPCom du 4 juillet 2019**
>
> **Pièce n°6.2 :  "Particulars of Infringement" (Détails de la contrefaçon) de la société IPCom du 4 juillet 2019**
>
> **Pièce n°6.3 :  "Defence and Counterclaim" (Défense et demande reconventionnelle) des sociétés Lenovo Technology (United Kingdom) Limited et Motorola Mobility UK Limited, du 23 septembre 2019.**
>
> **Pièce n°6.4 :  "Grounds of Invalidity" (Motifs de nullité) des sociétés Lenovo Technology (United Kingdom) Limited et Motorola Mobility UK Limited, du 23 septembre 2019**

. 8 .

## *La "Motion for Anti-Suit Injunction" des sociétés américaines du groupe Lenovo aux Etats-Unis*

26.  Le 18 septembre 2019, dans le cadre de la procédure qu'elles avaient engagée le 14 mars 2019 devant le Tribunal de District des Etats-Unis pour le District Nord de Californie, les sociétés américaines du groupe Lenovo ont déposé une "*Motion for Anti-Suit Injunction*" (littéralement "Requête en injonction anti-procès"), aux termes de laquelle elles demandent à cette juridiction américaine :

–   d'interdire à la société IPCom de poursuivre son action en contrefaçon du brevet EP'268 au Royaume-Uni,

–   d'interdire à la société IPCom d'engager quelque action en contrefaçon que ce soit contre l'une quelconque des sociétés du groupe Lenovo, aux Etats-Unis ou à l'étranger, sur le fondement de l'un quelconque de ses brevets essentiels aux normes 2G, 3G et 4G, y compris le brevet EP'268,

–   d'interdire à la société IPCom de demander à un tribunal étranger (c'est-à-dire non-américain) d'ordonner toute mesure visant à empêcher les sociétés du groupe Lenovo de mettre en œuvre une telle "injonction anti-procès" si elles venaient à l'obtenir,

et ce aussi longtemps que la juridiction américaine n'aura pas définitivement statué sur les demandes des sociétés américaines du groupe Lenovo tendant à la détermination des conditions d'une licence FRAND mondiale pour le portefeuille de brevets de la société IPCom (mais toujours sans que les sociétés du groupe Lenovo ne prennent un quelconque engagement de souscrire une telle licence).

> **Pièce n°7.2 : "** *Motion for Anti-Suit Injunction*" **(Requête en injonction anti-procès) déposée par les sociétés Lenovo (United States) Inc. et Motorola Mobility LLC le 18 septembre 2019**

27.  Le 11 octobre 2019, la société IPCom a soulevé une exception d'incompétence de la juridiction américaine et a réfuté l'ensemble des arguments présentés par les sociétés américaines du groupe Lenovo au soutien de leur "*Motion for Anti-Suit Injunction*".

> **Pièce n°7.3 : "***Opposition to Motion for Anti-Suit Injunction***" (Défense à la requête en injonction anti-procès") déposée par la société IPCom le 11 octobre 2019**

28.  L'audience de plaidoiries devant le Tribunal de District des Etats-Unis pour le District Nord de Californie, concernant la "*Motion for Anti-Suit Injunction*" ainsi que l'exception d'incompétence, est fixée au 14 novembre 2019.

## *La contrefaçon en France*

29.  La société IPCom a constaté la présentation et/ou l'offre en vente et/ou la vente, sur le marché français, de téléphones mobiles de marque **Motorola**, d'ordinateurs portables de marque **Lenovo** et/ou **ThinkPad** et/ou **Yoga**, et de tablettes numériques de marque **Lenovo** et/ou **ThinkPad** et/ou **Yoga** aptes à fonctionner conformément à la norme UMTS (3G), qui reproduisent par conséquent les caractéristiques de la revendication 1 (unique) du brevet EP'268 qui est essentiel à cette norme.

30.    Il s'agit tout d'abord notamment des téléphones mobiles de marque **Motorola** listés ci-après :

- modèles de la gamme "**Motorola one**", en particulier les modèles "motorola one", "motorola one zoom", "motorola one action", "motorola one vision" ;

- modèles de la gamme "**moto z**", en particulier les modèles "moto $z^3$ play", "moto $z^2$ force", "moto $z^2$ play", "moto z", "moto z play" ;

- modèles de la gamme "**moto g**", en particulier les modèles "moto $g^7$ plus", "moto $g^7$", moto $g^7$ power", "moto $g^7$ play", "moto $g^6$", "moto $g^6$ play", "moto $g^{5s}$ plus", "moto $g^{5s}$", "moto $g^5$ plus", "moto $g^5$", "moto $g^4$ play" ;

- modèles de la gamme "**moto x**", en particulier les modèles "moto $x^4$", "moto x force" ;

- modèles de la gamme "**moto e**", en particulier les modèles "moto $e^6$ plus", "moto $e^5$ play", "moto $e^5$", "moto $e^4$ plus", "moto $e^4$" ;

- modèles de la gamme "**moto c**", en particulier les modèles "moto c plus", "moto c".

Il s'agit ensuite notamment des ordinateurs portables de marque **Lenovo** et/ou **Thinkpad** et/ou **Yoga** listés ci-après :

- modèles de la gamme "**X**", en particulier les modèles "X1 Carbon (7e gén.)", "X1 Yoga (4e gén.)", "X395", "X390 Yoga", "X390", lorsqu'ils sont équipés d'une carte réseau mobile ;

- modèles de la gamme "**T**",, en particulier les modèles "T590", "T495", "T495s", "T490s", "T490", lorsqu'ils sont équipés d'une carte réseau mobile ;

- modèles de la gamme "**P**", en particulier les modèles "P53s", "P53", "P43s", "P52s", "P52", lorsqu'ils sont équipés d'une carte réseau mobile ;

- modèles de la gamme "**L**", en particulier les modèles "L590", "L490", "L480", lorsqu'ils sont équipés d'une carte réseau mobile.

Il s'agit enfin notamment des tablettes numériques de marque **Lenovo** et/ou **ThinkPad** et/ou **Yoga** listées ci-après :

- modèles de la gamme "**SERIES P & M**", en particulier les modèles "Yoga Smart Tab avec l'Assistant Google", "Tab M10", "Tab E10", "Tab M10 (HD)", "Tab P10", lorsqu'ils sont équipés de la connectivité aux réseaux mobiles ;

- modèles de la gamme "**SERIE YOGA**", en particulier les modèles "Yoga Book C930", "Yoga C630 WOS", lorsqu'ils sont équipés de la connectivité aux réseaux mobiles.

> **Pièce n°4.8 :   Tableau de correspondance indicatif et non-limitatif entre les dénominations de vente des modèles de tablettes numériques équipés de la connectivité aux réseaux mobiles et leur(s) référence(s) produits(s)**

. 10 .

31.     Quatre procès-verbaux de constat d'huissier en dates du 20, 27 et 30 septembre 2019, ainsi que des recherches sur l'Internet, ont permis d'établir :

(i)     que la quasi-totalité des modèles de téléphones mobiles précités sont présentés et/ou sont offerts à la vente aux consommateurs français sur le site internet motorola.fr, et que ce site internet renvoie les consommateurs français souhaitant acheter les téléphones mobiles susvisés vers différentes catégories de points de vente, dont notamment le site internet marchand de **Lenovo** accessible à l'adresse lenovo.com/fr,

(ii)    que le nom de domaine lenovo.com appartient à la société chinoise Lenovo Beijing Ltd ;

(iii)   qu'un certain nombre des modèles de téléphones mobiles susvisés ainsi que les ordinateurs portables et les tablettes numériques précités sont effectivement présentés et/ou directement offerts à la vente aux consommateurs français sur le site internet précité de **Lenovo** ;

(iv)    que ce site internet identifie le vendeur de ces produits comme étant la société irlandaise **Digital River Ireland Ltd** mais désigne expressément, comme point de contact du public et des consommateurs français, la société française **Lenovo France**, dont le siège social se trouve 20 rue des Deux Gares, 92500 Rueil-Malmaison.

| | |
|---|---|
| **Pièce n°4.1 :** | **Procès-verbal de constat du 20 septembre 2019 effectué sur le site internet motorola.fr de la société Motorola** |
| **Pièce n°4.2 :** | **Fiche produit du "Motorola One Zoom" sur le site internet fnac.com** |
| **Pièce n°4.3 :** | **Procès-verbal de constat du 20 septembre 2019 effectué sur le site internet lenovo.com/fr de la société Lenovo** |
| **Pièce n°4.4 :** | **Procès-verbal de constat du 27 septembre 2019 effectué sur le site internet lenovo.com/fr de la société Lenovo** |
| **Pièce n°4.5 :** | **Fiche technique des différentes cartes réseau mobile intégrées dans les ordinateurs portables de la société Lenovo** |
| **Pièce n°4.6 :** | **Procès-verbal de constat du 30 septembre 2019 effectué sur le site internet lenovo.com/fr de la société Lenovo** |
| **Pièce n°4.7 :** | **Extrait "Whois" du nom de domaine lenovo.com** |
| **Pièce n°5.1 :** | **Extrait Kbis Lenovo France** |

32.     Au vu des éléments de preuve raisonnablement accessibles présentés ci-dessus, la société IPCom peut légitimement estimer qu'il est porté atteinte à ses droits, en sa qualité de propriétaire du brevet EP'268, par la société Lenovo France et/ou par toutes autres personnes coopérant avec cette société pour réaliser la fourniture, l'importation, le stockage, le transport, la distribution en France et l'exportation depuis la France des téléphones mobiles, des ordinateurs portables et des tablettes numériques contrefaisants.

33.     La société IPCom est donc recevable et fondée, en prévision des procédures qu'elle doit engager devant la juridiction française compétente pour assurer la défense de ses droits, à faire procéder d'urgence à la constatation légale de la matérialité, de l'origine et de l'étendue de la contrefaçon dont elle est victime en France, et ce conformément aux articles L.615-5 et R.615-2 du Code de la propriété intellectuelle.

C'est la raison pour laquelle la société IPCom a sollicité et obtenu une ordonnance aux fins de saisie-contrefaçon le 4 octobre 2019 **(Pièce n°8.1)**.

. 11 .

34.    La société IPCom n'a toutefois pas fait exécuter cette ordonnance, et elle en sollicite présentement la modification, car elle souhaite :

     –  d'une part, préciser que les ordinateurs portables et tablettes numériques contrefaisants et entrant dans le champ des mesures de saisie-contrefaçon sollicitées sont uniquement ceux qui sont équipés d'une carte réseau mobile ou d'une connectivité aux réseaux mobiles,

     –  et d'autre part, porter à la connaissance du Président du Tribunal l'existence de la "*Motion for Anti-Suit Injunction*" déposée par les sociétés américaines du groupe Lenovo devant le Tribunal de District des Etats-Unis pour le District Nord de Californie.

35.    L'existence de la "*Motion for Anti-Suit Injunction*" des sociétés américaines du groupe Lenovo n'affecte en rien le droit de la société IPCom de faire procéder d'urgence à la constatation légale de la matérialité, de l'origine et de l'étendue de la contrefaçon dont elle est victime en France, et ce conformément aux articles L.615-5 et R.615-2 du Code de la propriété intellectuelle.

Il doit en effet être souligné ici qu'en dehors de certains cas très particuliers de litiges impliquant la mise en œuvre d'une clause compromissoire et/ou d'une clause attributive de compétence librement acceptée par les parties – ce qui n'est pas le cas en l'espèce – la jurisprudence de la Cour de Justice de l'Union Européenne et de la Cour de Cassation[1] considère les "*anti-suit injunctions*" comme contraires à l'ordre public international européen et français.

36.    La "*Motion for Anti-Suit Injunction*" des sociétés américaines du groupe Lenovo justifie donc de plus fort la présente requête, car si les preuves de la contrefaçon n'étaient pas complétées d'urgence, en particulier si l'identité de l'ensemble des responsables de l'importation et de la commercialisation en France des téléphones mobiles contrefaisants n'était pas établie dès à présent, l'exercice ultérieur des droits légitimes de la société IPCom devant la juridiction française serait susceptible d'être rendu impossible.

En effet, dans l'hypothèse où une "*anti-suit injunction*" serait prononcée contre la société IPCom à l'issue de l'audience de plaidoiries prévue le 14 novembre 2019 devant le Tribunal de District des Etats-Unis pour le District Nord de Californie, elle empêcherait alors la société IPCom d'exercer ses droits en France pendant toute la durée de la procédure devant la juridiction américaine tendant à la détermination des conditions d'une licence FRAND mondiale pour le portefeuille de brevets de la société IPCom, c'est-à-dire probablement pendant une durée d'au moins deux ans, procédure d'appel comprise.

Or, le brevet EP'268 expire le 15 février 2020.

37.    Par conséquent, même si la société IPCom est confiante dans le fait que la juridiction américaine n'ordonnera pas "*l'anti-suit injunction*" sollicitée par les sociétés américaines du groupe Lenovo, l'atteinte à ses droits fondamentaux qui en résulterait serait irrémédiable. Cette circonstance justifie de plus fort que les mesures de saisie-contrefaçon sollicitées par la société IPCom soient ordonnées, afin de lui permettre d'engager d'urgence, devant la juridiction française compétente, les procédures appropriées à la défense de ses droits sur la partie française du brevet EP'268.

---

[1] CJUE 27.04.2004 *Turner v. Grovit* C-159/02 ; CJUE 10.02.2009 *Allianz v. West Tankers* C-185/07 ; CJUE 13.05.2015 *Gazprom v. Lituanie* C-536/13 ; Cass. Civ. 1, 30.06.2004, N° pourvois 01-03248 et 01-15452 ; Cass. Civ. 1, 14.10.2009, N° pourvois 08-16369 et 08-16549.

. 12 .

## C'EST POURQUOI

### l'exposante requiert qu'il plaise au Président :

1. L'autoriser à faire procéder par tout huissier de son choix, dans les locaux de la société **Lenovo France** situés au 20 Rue des Deux Gares, 92500 Rueil-Malmaison, ainsi que dans tous autres lieux dépendant de ladite société situés à proximité dans lesquels les opérations révéleraient que des preuves de la contrefaçon du brevet EP 1 841 268 B2 sont susceptibles d'être détenues, à la description détaillée des caractéristiques et du fonctionnement des appareils désignés ci-après :

- Les téléphones mobiles de marque "Motorola" tels que listés ci-après :
    - modèles de la gamme **"Motorola one"**, en particulier les modèles "motorola one", "motorola one zoom", "motorola one action", "motorola one vision" ;
    - modèles de la gamme **"moto z"**, en particulier les modèles "moto $z^3$ play", "moto $z^2$ force", "moto $z^2$ play", "moto z", "moto z play", "moto $g^4$ play", "moto x force" ;
    - modèles de la gamme **"moto g"**, en particulier les modèles "moto $g^7$ plus", "moto $g^7$", moto $g^7$ power", "moto $g^7$ play", "moto $g^6$", "moto $g^6$ play", "moto $g^{5s}$ plus", "moto $g^{5s}$", "moto $g^5$ plus", "moto $g^5$", "moto $g^4$ play" ;
    - modèles de la gamme "moto x", en particulier les modèles "moto $x^{4n}$", "moto x force" ;
    - modèles de la gamme **"moto e"**, en particulier les modèles "moto $e^6$ plus", "moto $e^5$ play", "moto $e^{5n}$", "moto $e^4$ plus", "moto $e^{4n}$" ;
    - modèles de la gamme **"moto c"**, en particulier les modèles "moto c plus", "moto c" ;

- Les ordinateurs portables de marque "Lenovo" et/ou "ThinkPad" et/ou "Yoga" tels que listés ci-après :
    - modèles de la gamme **"X"**, en particulier les modèles "X1 Carbon (7e gén.)", "X1 Yoga (4e gén.)", "X395", "X390 Yoga", "X390", lorsqu'ils sont équipés d'une carte réseau mobile ;
    - modèles de la gamme **"T"**, en particulier les modèles "T590", "T495", "T495s", "T490s", "T490", lorsqu'ils sont équipés d'une carte réseau mobile ;
    - modèles de la gamme **"P"**, en particulier les modèles "P53s", "P53", "P43s", "P52s", "P52", lorsqu'ils sont équipés d'une carte réseau mobile ;
    - modèles de la gamme **"L"**, en particulier les modèles "L590", "L490", "L480", lorsqu'ils sont équipés d'une carte réseau mobile ;

- Les tablettes numériques de marque "Lenovo" et/ou "ThinkPad" et/ou "Yoga" telles que listées ci-après :
    - modèles de la gamme **"SERIES P & M"**, en particulier les modèles "Yoga Smart Tab avec l'assistant Google", "Tab M10", "Tab E10", "Tab M10 (HD)", "Tab P10", lorsqu'ils sont équipés de la connectivité aux réseaux mobiles ;
    - modèles de la gamme **"SERIE YOGA"**, en particulier les modèles "Yoga Book C930", "Yoga C630 WOS", lorsqu'ils sont équipés de la connectivité aux réseaux mobiles.

. 13 .

2.  Autoriser l'huissier instrumentaire à procéder ou faire procéder, pour les besoins de la description des caractéristiques et du fonctionnement des téléphones mobiles, des ordinateurs portables et des tablettes numériques contrefaisants, à toutes opérations nécessaires à cet effet, et notamment au chargement de leur batterie, à l'insertion dans chacun d'eux d'une carte SIM avec abonnement prépayé préalablement achetée par ses soins auprès d'un opérateur de télécommunication mobile français et conservée dans son emballage fermé jusqu'au début de ses opérations, et à leur mise en marche ;

3.  Autoriser la requérante à faire procéder par le même huissier dans les lieux susvisés à la saisie réelle, en offrant d'en payer le prix au tarif normal, de deux exemplaires de chaque modèle de téléphone mobile, d'ordinateur portable et de tablette numérique contrefaisant, avec leurs accessoires et emballages, pour être remis par l'huissier sous scellés à la requérante ou à tel laboratoire que celle-ci lui désignera aux fins d'analyses techniques ; autoriser l'ouverture ultérieure des scellés par l'huissier instrumentaire aux fins desdites analyses techniques ;

4.  Autoriser l'huissier instrumentaire à effectuer dans les lieux susvisés toutes recherches et constatations utiles afin de découvrir la preuve, l'origine, la consistance et l'étendue de la contrefaçon, et ce même en l'absence des téléphones mobiles, des ordinateurs portables et des tablettes numériques contrefaisants sur les lieux de la saisie, y compris à ouvrir ou faire ouvrir par un serrurier toutes portes de locaux, de meubles meublants ou de véhicules se trouvant sur place, à présenter aux personnes présentes sur les lieux de la saisie l'une quelconque des pièces visées à l'appui de la requête, à consigner les déclarations des répondants et toutes paroles prononcées au cours des opérations, mais en s'abstenant de toute interpellation autre que celles strictement nécessaires à l'accomplissement de sa mission ;

5.  Autoriser l'huissier instrumentaire à décrire, copier ou reproduire tous documents ou informations tels que pièces de comptabilité, factures, bons de commande, bons de livraison, listings de commandes, d'achats, de vente ou de livraison, lettres et correspondances, ainsi que tous livres, papiers, prospectus, brochures, catalogues, notices, tarifs, plans, dessins, notices d'utilisation, documentations et spécifications techniques, pouvant établir la preuve, l'origine, la consistance et/ou l'étendue de la contrefaçon, et ce même en l'absence des téléphones mobiles, des ordinateurs portables et des tablettes numériques contrefaisants sur les lieux de la saisie ; autoriser l'huissier instrumentaire à utiliser, pour les besoins des opérations de reproduction de documents, tout appareil de photocopie se trouvant sur les lieux de la saisie, moyennant le paiement de ces photocopies à leur coût normal ; l'autoriser, en l'absence d'appareil de photocopie sur place, à emporter ces documents en son étude, charge à lui de les restituer au saisi une fois les opérations de reproduction terminées ;

6.  Autoriser l'huissier instrumentaire à prendre ou faire prendre des clichés photographiques ou prises de vues vidéo ou numériques des téléphones mobiles, des ordinateurs portables et des tablettes numériques contrefaisants, de leurs notices d'utilisation et de leurs emballages et, même en l'absence de téléphones mobiles, d'ordinateurs portables et de tablettes numériques contrefaisants sur les lieux de la saisie, de tous documents ou informations s'y rapportant tels qu'énumérés ci-dessus ; dire que les tirages ou supports vidéographiques ou électroniques destinés à être joints à la copie du procès-verbal de saisie qui sera remise au saisi pourront ne lui être adressés qu'après la clôture des opérations de saisie, dans un délai de 2 jours ouvrés ;

. 14 .

7. Autoriser l'huissier instrumentaire à procéder ou à faire procéder à une édition sur papier, et/ou à une copie sur tout support électronique approprié (notamment clé USB, CD, DVD, disque dur), de tous documents ou informations tels qu'énumérés ci-dessus pouvant établir la preuve, l'origine, la consistance et/ou l'étendue de la contrefaçon, et qui seraient conservés sur un support autre que le papier, notamment sur microfilm ou sur tout support électronique, y compris les disques durs d'ordinateurs, serveurs informatiques, et autres appareils de stockage de données se trouvant sur les lieux de la saisie ou accessibles à distance depuis les lieux de la saisie ; autoriser à cet effet l'huissier instrumentaire à procéder ou à faire procéder par les experts et/ou les techniciens informatiques qui l'assisteront, à toutes investigations et recherches, notamment par mots clés correspondant aux dénominations, marques et références des téléphones mobiles, des ordinateurs portables et des tablettes numériques contrefaisants et aux références de la norme en cause (3G, UMTS, WCDMA), sur tous systèmes informatiques, ordinateurs, serveurs informatiques et autres appareils de stockage de données se trouvant sur les lieux de la saisie ou accessibles à distance depuis les lieux de la saisie ;

8. Autoriser l'huissier instrumentaire à procéder à la saisie réelle en trois exemplaires de tous prospectus, brochures, catalogues, notices, tarifs, plans, dessins, notices d'utilisation, documentations et spécifications techniques se rapportant aux téléphones mobiles, aux ordinateurs portables et aux tablettes numériques contrefaisants, et ce même en l'absence de ces derniers sur les lieux de la saisie ; dire que les exemplaires des documents saisis seront remis à la requérante après apposition du cachet de l'huissier ;

9. Ordonner le placement sous séquestre provisoire entre les mains de l'huissier instrumentaire, dans les conditions prévues à l'article R.153-1 du Code de commerce, de tous documents ou informations copiés ou saisis dont la partie saisie déclarerait à l'huissier qu'il contient un secret des affaires, à l'exception des informations permettant l'identification des personnes impliquées dans la fourniture, l'importation, le stockage, le transport, la distribution ou l'exportation des téléphones mobiles, des ordinateurs portables et des tablettes numériques contrefaisants ; rappeler que conformément à l'article susvisé : "*Si le juge n'est pas saisi d'une demande de modification ou de rétractation de son ordonnance en application de l'article 497 du code de procédure civile dans un délai d'un mois à compter de la signification de la décision, la mesure de séquestre provisoire mentionnée à l'alinéa précédent est levée et les pièces sont transmises au requérant*" ;

10. Autoriser l'huissier instrumentaire à viser et parapher *ne varietur* les livres comptables, registres, carnets de commande, lettres, factures, contrats, et en général tous documents commerciaux ou comptables relatifs aux téléphones mobiles, aux ordinateurs portables et aux tablettes numériques contrefaisants, même en l'absence de ces derniers sur les lieux de la saisie ;

11. Autoriser l'huissier instrumentaire à se faire assister, pour l'ensemble des opérations relevant de sa mission, par un expert choisi par la requérante en dehors de ses salariés et dirigeants, dont il enregistrera les explications sur les points qui échappent à sa compétence, en distinguant, dans les énonciations de son procès-verbal, celles résultant de ses constatations personnelles et celles qui lui seront dictées par l'expert qui l'assistera ;

. 15 .

12. Autoriser l'huissier instrumentaire à se faire assister, pour l'ensemble de ses opérations, par un serrurier, par un photographe et par un technicien informatique, à l'exclusion de tout dirigeant ou salarié de la requérante ;

13. Autoriser l'huissier instrumentaire à requérir l'assistance et se faire accompagner de tout représentant de la force publique territorialement compétent ;

14. Dire que les opérations de saisie-contrefaçon pourront se poursuivre après l'heure de fermeture des locaux et pourront le cas échéant être suspendues pour se poursuivre le lendemain ;

15. Dire qu'il sera procédé aux opérations de saisie-contrefaçon dans les deux mois qui suivront Votre ordonnance ;

16. Dire qu'en cas de difficultés, il Vous en sera référé conformément aux articles 496 et 497 du Code de procédure civile, mais seulement après accomplissement des opérations de saisie-contrefaçon et apposition des visas.

Fait à Paris, le _15 octobre 2019_

. 16 .

**Pièces jointes à l'appui de la requête :**

**I.    La société IPCom**

    1.1    Extrait du registre du commerce de Munich concernant IPCom

    1.1bis Traduction de l'extrait du registre du commerce de Munich concernant IPCom

    1.2    Extrait du site internet d'IPCom

**II.   Le brevet EP 1 841 268 B2**

    2.1    Fascicule de brevet européen EP 1 841 268 B2

    2.2    Traduction en français de la description du brevet EP 1 841 268 B2

    2.3    Communication de l'OEB du 6 juin 2007 concernant l'enregistrement du transfert de propriété de la demande de brevet européen 07009265.5

    2.4    État des inscriptions au RNB au 19.08.2019 et inscriptions complémentaires du 13.09.2019 concernant le brevet EP'268

    2.5    Décision T 0767/14 de la Chambre de recours de l'OEB du 19 juillet 2017

    2.5bis Traduction en français de la Pièce n°2.5

    2.6    État de paiement des annuités concernant la partie française du brevet EP'268

**III.  L'essentialité du brevet EP'268 à la norme UMTS**

    3.1    Extraits des Directives de l'ETSI, version 39, du 8 octobre 2018

    3.2    Communiqué de presse de la Commission Européenne du 10 décembre 2009

    3.3    "General IPR Licensing declaration" de la société IPCom à l'ETSI du 11 juin 2014

    3.4    Arrêt de la Cour d'Appel de l'Angleterre et du Pays de Galles du 28 février 2017, *IPCom v. HTC* ([20017] EWCA Civ 90)

    3.4bis Traduction en français de la Pièce n°3.4

    3.5    Ordonnance de la Cour d'Appel de l'Angleterre et du Pays de Galles du 28 février 2017, *IPCom v. HTC*

**IV.   Les constatations de la contrefaçon**

    4.1    Procès-verbal de constat du 20 septembre 2019 sur le site internet motorola.fr de la société Motorola.

    4.2    Fiche produit du "Motorola One Zoom" sur le site internet fnac.com

    4.3    Procès-verbal de constat du 20 septembre 2019 sur le site internet lenovo.com/fr de la société Lenovo

    4.4    Procès-verbal de constat du 27 septembre 2019 sur le site internet lenovo.com/fr de la société Lenovo

    4.5    Fiche technique des différentes cartes réseau mobile intégrées dans les ordinateurs portables de la société Lenovo

    4.6    Procès-verbal de constat du 30 septembre 2019 sur le site internet lenovo.com/fr de la société Lenovo

    4.7    Extrait "Whois" du nom de domaine lenovo.com/fr

. 17 .

4.8   Tableau de correspondance indicatif et non-limitatif entre les dénominations de vente des modèles de tablettes numériques équipés de la connectivité aux réseaux mobiles et leur(s) référence(s) produits(s)

**V.   La société saisie**

5.1   Extrait Kbis Lenovo France

5.2   Extrait du registre irlandais des sociétés concernant la société Digital River Ireland Limited

**VI.   La procédure au Royaume-Uni**

6.1   "Particulars of Claim" (Détails de la demande) de la société IPCom du 4 juillet 2019

6.2   "Particulars of Infringement" (Détails de la contrefaçon) de la société IPCom du 4 juillet 2019

6.3   "Defence and Counterclaim" (Défense et demande reconventionnelle) des sociétés Lenovo Technology (United Kingdom) Limited et Motorola Mobility UK Limited, du 23 septembre 2019.

6.4   "Grounds of Invalidity" (Motifs de nullité) des sociétés Lenovo Technology (United Kingdom) Limited et Motorola Mobility UK Limited, du 23 septembre 2019

**VII.   La procédure aux Etats-Unis**

7.1   "*Complaint*" des sociétés Lenovo (United States) Inc. et Motorola Mobility LLC du 14 mars 2019

7.2   "*Motion for Anti-Suit Injunction*" (Requête en injonction anti-procès) déposée par les sociétés Lenovo (United States) Inc. et Motorola Mobility LLC le 18 septembre 2019

7.3   "*Opposition to Motion for Anti-Suit Injunction*" (Défense à la requête en injonction anti-procès") déposée par la société IPCom le [*date*] octobre 2019.

**VIII.   La procédure en France**

8.1   Requête et ordonnance aux fins de saisie-contrefaçon du 4 octobre 2019


Subscribe to DeepL Pro to edit this document.
Visit www.DeepL.com/Pro for more information.

P 6 19/02687



--. I of the First Instance
Inbunad        PARIS-
         e
The 15 OCT. 2019

- 38"1st *Civil Division*

To the President of the
Tribunal de Grande Instance de Paris

# REQUEST

### FOR THE PURPOSE OF
### COUNTERFEIT SEIZURE<;ON

### (Patents - Articles L.615-5 and R.615-
### 2 of the Intellectual Property Code)

---

**IPCom GmbH** & Co. **KG, a** company under German law in the form of a Kommanditgesellschaft*, whose* registered office is Zugspitzstrasse 15, 82049 Pullach, Germany, registered in the Company Register of Munich (Germany) under number HRA 93950, represented by its limited partner IPCom Beteiligungs GmbH, a company under German law in the form of a *Gesellschcift mit beschriinker Haftung,* whose registered office is Zugspitzstrasse 15, 82049 Pullach, Germany, represented by its *Geschaftsfiihrer* (manager) domiciled at that registered office,

**With BARDEHLE PAGENBERG** SELAS **as counsel**

Acting by Maître Julien Freneaux
Attorney at law at the Paris Bar
residing at 5, rue Boudreau - 75009 Paris
Tel: 01 53 05 15 00-    Fax: 01 53 05 15 05
Palais Paris P 0390

**electing domicile in his office,**

. 2.

**HAS THE HONOR OF EXPOSING YOU:**


*The rea11era11te*


1. **IPCom GmbH** & Co **KG (hereinafter** referred to as "IPCom") is a German company based in Pullach, near Munich (Germany).

For more than 15 years, IPCom has been active in R&D and the creation and exploitation of patent portfolios, particularly in the field of telecommunications.

Inventions protected by IPCom's patents are made by its own R&D team or by third parties who assign or grant their exploitation rights to IPCom.

IPCom is an active member of the working groups of the standardisation bodies that develop standardised technical standards and specifications in the telecommunications sector, and in particular of the *European Telecommunications Standards Institute (ETSI).*

> **Exhibit n°1.l: Extract from the Munich Commercial Register concerning IPCom** (+ **French translation)**
>
> **Exhibit n°1.2 : Excerpt from the IPCom website**


*The EP 1 841 268 B2 (EP'268) patent*


2. IPCom owns, in particular, a portfolio of more than 160 patent families protecting 2G, 3G and 4G mobile telecommunication technologies developed by the German automotive equipment manufacturer Robert Bosch GmbH.

Among these patents is in particular the following patent:

- European patent **EP 1 841 268** designating France, entitled "*Access from a mobile station to a random access channel depending on its user class", resulting from a European* divisional *application* n°07009265.5 filed on the basis of a European patent application No. 00916749.5, itself based on an international application PCT WO 00/54534 of 15 February 2000 claiming the priority of a German application DE 19910239 of 8 March 1999, issued to the

IPCom company on March 17, 2010 and maintained in amended form **("B2") after** opposition (this patent will hereinafter be referred to as "EP'268 patent" for convenience).

> **Part n°2.l : European Patent File EP 1 841 268 B2**
>
> **Exhibit n°2.2 : Translation into French of the description of the EP patent 1 841 268 82**
>
> **Exhibit n°2.3: EPO Communication of 6 June 2007, concerning the registration of the transfer of ownership of the European patent application 07009265.5**
>
> **Exhibit n°2.4: Statement of GNI registrations as at 19.08.2019 and additional registrations as at 13.09.2019 concerning the French part of the EP'268 patent**

3.  In the 8 years following its issue, the EP'268 patent was the subject of a lengthy opposition procedure before the European Patent Office, at the initiative of 6 different companies active in the field of mobile telecommunications equipment and services, namely Microsoft, Deutsche Telekom, Ericsson, HTC, Vodafone and Apple.

This opposition procedure ended with a final decision T 0767/14 of the EPO Board of Appeal dated 19 July 2017, maintaining the EP'268 patent for IPCom in an amended form, known as "B2", published on 25 April 2018.

**Exhibit n°2.5 : Decision T 0767/14 of the EPO Board of Appeal of 19 July 2017**
(+ **translation into**
**French)**

4.  The annuities of the frarn;aise part of the EP'268 patent are regularly paid to the INPI. The 2nd year was paid on 21 February 2019.

**Exhibit n°2.6: Payment status of the annuities concerning the French part of the EP'268 patent**

5.  In accordance with Article 64 of the Munich Convention on the European Patent and Articles L. 614-7 et seq. of the Intellectual Property Code, since the date of publication of its issue (17 March 20 I 0), the EP'268 patent confers on its holder, the company IPCom, the same rights as those granted to it by a frarn patent.

### The i11ventio11 protected by the EP'268 patent

6.  The invention protected by the EP'268 patent concerns a mobile subscriber station (for example a mobile phone, a laptop computer or a digital tablet) equipped with means to control its access to a random access transmission channel of a mobile telecommunication network compliant with the UMTS (Universal Mobile *Telecommunications System)* standard*, commonly known as 3G or* WCDMA (Wideband Code Division *Multiple Access).*

7.  The UMTS network is composed of cells, each cell being defined by the coverage of a base station.

Mobile stations (e. g. mobile phones, laptops or digital tablets) in a cell can communicate with the base station (EP'268, paragraph[0016]).

8.  The operator of a UMTS network provides telecommunication services that can be used by mobile stations, such as sending small data packets, sending large data packets or transmitting voice data (EP'268, paragraph[0017]).

9.  The UMTS network has limited resources. Therefore, when a mobile station is inactive, i.e. no telecommunication services are used, no radio channel between the base station and the mobile station for voice or data packet transmission is reserved.

When the mobile station comes out of its inactive state, a radio channel with the base station must then be assigned to the mobile station so that it can use the telecommunications services.

. 4.

10.    A mobile station cannot allocate such a radio channel to itself from a university;:one independent. It must request it by sending a message to the base station. This is usually done via a random access channel called RACH (for Random *Access Channel) (EP'268*, paragraph[0019]). The access channel aleatory RACH is a unidirectional channel going from the mobile station to the base station.

11.    When the base station receives a message on this RACH channel, it confirms its reception on a separate channel.

12.    In principle, each mobile station can send a request at any time for the allocation of a radio channel to the base station (random access).

As a result, several mobile stations can send a message on this channel at the same time causing a collision of messages, so that none of the mobile stations are assigned a channel. In such a case, the base station does not send a reception confirmation message to the mobile stations sending the messages. The latter will then deliver their message again after a predefined time (EP'268, paragraph[0020]).

In case of high demand, the risk of collision between mobile station messages is increased and mobile stations whose message could not be transmitted due to a collision will return their message causing increased congestion on the RACH channel and possible overload (EP'268, paragraph[0020]).

13.    11 there was a need to control how mobile stations in a UMTS (3G) telecommunication network access the RACH random access channel in order to avoid overloading on this channel.

14.    The above technical problem is solved by a mobile station according to claim 1 (unique) of the EP'268 patent, which can be broken down as follows:

      *1.0   A mobile station (5, 10, 15, 20) for use in a UMTS mobile radio network in which several user classes are distinguished (35, 40),*

      *1.1   in which information signals containing access authorization data are transmitted to the mobile station, the access authorization data being transmitted as a bit pattern,*

    *characterized in that*

    *the mobile station (5, 10, 15, 20) is designed to*

      *1.2   read a user class (35, 40) from a SIM card (75),*

      *1.3   receiving access authorization data, which contains access threshold bits (S3, S2, SI, SO) and access class bits (ZO, Zl, Z2, Z3) through a broadcast control channel (25),*

      *1.4   determine an access threshold (S) from the access threshold bits (S3, S2, SI, SO), provided that the access authorization to the random access channel is determined according to an access threshold interpretation,*

. 5.

*1.5   determine, using access class bits (ZO, ZJ, Z2, Z3) that relate to the user class (35, 40), whether the mobile station (5, 10, 15, 20) is allowed to access a channel*

*random access, e. g. RACH, regardless of the access threshold value bits (S3, S2, Si, SO) successful, or if the access authorization to the random access channel, e. g. RACH, is* **to be** *determined on the basis of an interpretation of the access threshold,*

*1.6   and is designed to, as an interpretation of the access threshold, compare the access threshold (S) with a random* **number** *or a pseudo-random number (R),*

*1.7   and is designed to access the random access channel according to the determination a!' using the access class bit, either independently of the access threshold bits (S3, S2, Si, SO) successful, or according to the result of the comparison.*

15.   The technical solution covered by the EP'268 patent allows to regulate the access of mobile stations to a random access channel, such as the RACH access channel, by means of two concepts which are the access threshold and the access class.

16.   The mobile station will thus receive access threshold value bits (S3, S2, SI, SO)     and access class bits (20, 21, 22, 23) from the base station via a broadcast control channel, which will determine if the mobile station can access the random access channel at this time T, or if she has to try her luck again later.

The mobile station is configured to determine an access threshold value (S) from the access threshold value bits (S3, S2, S1, SO) that have been transmitted to it by the base station. She then goes to carry out a test comparing a random or pseudo-random number (R) that it will have previously at the access threshold value S. Depending on the result of this comparison, the mobile station has or does not have the authorization to access the random access channel.

Each mobile station also belongs to a predefined user class, stored on its SIM card. The mobile station can then determine, with respect to the access class bits (20, 21, 22, 22, 23) received from the base station, whether the user class to which it belongs is allowed to access the random access channel directly, regardless of the access threshold value bits (S3, S2, SI, SO) and the result of the comparison between the random number R and the access threshold value S.

17.   It is thus possible to proceed  to a differentiated distribution of the access authorization to a random access channel, such as the RACH channel, for one or more mobile stations, depending on the access threshold value bits (S3, S2, SI, SO) and the access class bits (20, 21, 22, 23) sent by the base station.

The invention covered by the EP'268 patent therefore provides a flexible access control system combining access depending on the access threshold S with access depending on the access class (EP'268, paragraphs[0010] and following).

. 6.

### *The essentiality of the EP'268 patent with regard to the 11 UMTS (3G) form*

18.     The EP'268 patent is part of a portfolio of patents initially filed by Robert Bosch GmbH, several of which are considered essential to GSM and UMTS mobile telephony standards, notably by ETSI (European *Telecommunications Standards Institute)*. The terms "standards" and "essential" here have the same meaning as in ETSI's policy on intellectual property rights of 18 April 2018 and contained in version 39 of the ETSI Guidelines of 8 October 2018 ("ETSI IPR Policy").

**Exhibit 3.1: Excerpts from the ETSI Guidelines, version 39 of 8 October 2018**

*19.*    This is why in 2009, the company IPCom declared to the European Commission that it was prepared to grant licences to third parties on FRAND terms (for Fair, *Reasonable and Non Discriminatory)* on the essential patents in this portfolio. On June 11, 2014, IPCom reiterated this commitment to ETSI.

**Exhibit n°3.2: European Commission press release of 10 December 2009**

**Exhibit n°3.3: *"General IPR Licensing Declaration" of the company* IPCom at the ETSI of 11 June 2014**

20.     On 28 February 2017, the Court of Appeal for England and Wales confirmed that the EP'268 is a patent essential to the UMTS *(Universal Mobile Telecommunications System)* standard commonly referred to as 3G, in an *IPCom v. HTC* judgment rendered on the basis of a version of the EP'268 patent identical to the amended version maintained by decision T 0767/14 of the EPO Board of Appeal of 19 July 2017.

**Exhibit 3.4: Judgment of the Court of Appeal of England and Wales of 28 February 2017, ([20017] EWCA Civ 90) (+ French** translation)

**Exhibit 3.5: Order of the Court of Appeal of England and Wales of 28 February 2017, *IPCom v. HTC***

### *IPCom's relationship with Lenovo Group*

21.     Lenovo Group is a Chinese industrial group specializing in the manufacture and marketing of computers, computer servers, digital tablets, connected televisions and telephones.

In October 2014, the Lenovo Group acquired Motorola Mobility, a US company specializing in the manufacture and marketing of mobile phones.

22.     The Lenovo Group manufactures and markets three types of electronic devices that are suitable for operate in accordance with the UMTS (3G) standard and constitute "mobile stations" within the meaning of claim 1 of the EP'268 patent. These are:

Motorola  mobile phones,

Lenovo laptops and/or Thinkpad and/or Yoga equipped with a mobile network card,

and Lenovo and/or Thinkpad and/or Yoga digital tablets equipped with connectivity to mobile networks.

. 7.

23.   For several years, IPCom has been inviting the Lenovo group to regularize its situation. She gave him offered to subscribe for this purpose a license to operate its patent portfolio under FRAND conditions.

In March 2019, IPCom renewed its FRAND license offer to the Lenovo group by inviting it to set it on its intentions by 15 March 2019, failing which it would be obliged to initiate legal proceedings for the protection of its rights.

In response, on March 14, 2019, two American companies of the Lenovo group, Lenovo (United States) Inc. and Motorola Mobility LLC, filed legal proceedings against IPCom before the United States District Court for the Northern District of California, requesting, inter alia, that the terms of a worldwide FRAND license for the

IPCom's patent portfolio (without committing, either for themselves or for the other companies of the Lenovo group, to subscribe to such a license).

**Exhibit 7.1:** *Complaint by* **Lenovo (United States) Inc. and Motorola Mobility LLC dated March 14, 2019**

24.   The Lenovo Group has not, as it stands, made or accepted IPCom's FRAND license offer or submitted a concrete counter-offer to it that corresponds to FRAND conditions.

Lenovo group companies, on the other hand, continue to exploit worldwide, without authorization, Jes inventions protected by IPCom's patent portfolio, and in particular the EP'268 patent.

### *Counterfeiting and the paralll!le procedure in the United Kingdom*

25.   On July 4, 2019, IPCom filed an action for infringement of the English part of the EP'268 patent before the High Court of Justice of England and Wales against two English companies of the Lenovo group, namely:
   •   Lenovo Technology (United Kingdom) Limited ;
   •   Motorola Mobility UK Limited.

This proceeding is pending, with the English Lenovo Group companies serving their defences and counterclaims on September 23, 2019.

**Exhibit n°6.1: "Particulars of Claim" (Details of the request) of the company IPCom of 4 July 2019**

**Exhibit n°6.2 : "Particulars of Infringement" (Details of the counterfeit; on) of the company IPCom of 4 July 2019**

**Piece n°6.3: "Defence and Counterclaim" (Defense et demande reconventionnelle) des societes Lenovo Technology (United Kingdom) Limited et Motorola Mobility UK Limited, du 23 septembre 2019.**

**Piece n°6.4 : "Grounds of Invalidity" (Motifs de nullite) des societes Lenovo Technology (United Kingdom) Limited et Motorola Mobility UK Limited, du 23 septembre 2019**

. 8.

### *The "Motion for Anti-Suit lI1i11nction" of the American companies of the Lenovo group in the United States*

26.     On September 18, 2019, as part of the proceedings they initiated on March 14, 2019 before the United States District Court for the Northern District of California, the American companies of the Lenovo Group filed a "*Motion for Anti-Suit Injunction" (literally* "Request for an anti-process injunction"), to the lands from which they are seeking this American jurisdiction:

>    to prohibit IPCom from pursuing its action for infringement of the EP'268 patent in the United Kingdom,

>    to prohibit IPCom from bringing any infringement action against any of the Lenovo Group companies, in the United States or abroad, on the basis of any of its patents essential to 2G, 3G and 4G standards, including the EP'268 patent,

>    to prohibit IPCom from asking a foreign (i.e. non-US) court to order any measure to prevent Lenovo group companies from implementing such an "anti-process injunction" if they were to obtain it,

and for as long as the American court has not definitively ruled on the requests of the American companies of the Lenovo group to determine the conditions of a worldwide FRAND license for the patent portfolio of the IPCom company (but still without the companies of the Lenovo group making any commitment to subscribe to such a license).

>    **Exhibit No. 7.2:** "*Motion for Anti-Suit Injunction"* **filed by Jes Lenovo (United States) Inc. and Motorola Mobility LLC on September 18, 2019**

*27.*    On October 11, 2019, IPCom raised an objection of incompetence by the US court and rejected all the arguments presented by the US companies of the Lenovo group in support of their "Motion *for Anti-Suit Injunction".*

>    **Exhibit n°7.3:** *"Opposition to Motion for Anti-Suit Injunction"* **filed by IPCom on 11 October 2019**

28.     The hearing before the United States District Court for the Northern District of California, regarding the "*Motion for Anti-Suit Injunction" and the* objection of incompetence, is scheduled for November 14, 2019.

### *Lt. counterfeit e11 France*

29.     The company IPCom has noted the presentation and/or the offer for sale and/or the sale, on the French market, of Motorola mobile phones**, Lenovo and/or** ThinkPad **and/or Yoga** laptops, and Lenovo and/or ThinkPad **and/or Yoga** digital tablets able to operate in accordance with UMTS (3G) standards, which therefore reproduce the characteristics of claim 1 (unique) of the EP'268 patent which is essential to this standard.

. 9.

30.     First of all, these include the Motorola branded mobile phones **listed below**:

- models in the **"Motorola one"** range**, in** particular the "motorola one", "motorola one zoom", "motorola one action", "motorola one vision" models;

- models in the **"moto z"** range**, in** particular the models "moto z3 play", "moto $^{z2}$ force", "moto z2 play", "$^{~moto}$ z", "moto z play";

- models in the **"moto g"** range**, in** particular the "moto g7 plus", "moto $^{g7}$, moto g7 power", "moto g7 play", "moto g6, "moto$_{"}$$^{g6}$ play", "moto $^{g5"}$ plus", "moto g5", "$^{"moto}$ $^{g5}$ plus", "g5 motorcycle", "$^{"}_{g}$  $_{4}$ play $_{motorcycle}$";

- models of the **"moto x"** range**, in** particular the "moto x4", "moto x$^{-force.}$ models;

- models in the **"moto e"** range**, in** particular the models "moto e6 plus", "moto$^{e5}$ play", "moto e5. "motorcycle e4 $^{plus"}$, "motorcycle e4 ;

- models in the **"moto c"** range**, in** particular the "moto c plus" and "moto c" models.


This is then followed by Lenovo **and/or** Thinkpad **and/or** Yoga laptops
lists below:

- models of the **"X"** range**, in** particular the "XI Carbon (7th gen.)", "XI Yoga (4th gen.)", "X395", "X390 Yoga", "X390" models, when equipped with a mobile network card;

- models of the **"T"** range, in particular models "T590", "T495", "T495s", "T490s", "T490s", "T490", when equipped with a mobile network card;

- models of the **"P"** range**, in** particular models "P53s", "P53s", "P43s", "P52s", "P52", when equipped with a mobile network card;

- models of the **"L"** range**, in** particular models "L590", "L490", "L480", when equipped with a mobile network card.


Finally, these include Lenovo **and/or** ThinkPad **and/or** Yoga digital tablets.
the following lists:

- models of the **"SERIES P & M"** range**, in particular** the "Yoga Smart Tab with Google Assistant", "Tab MIO", "Tab EIO", "Tab MIO (HD)", "Tab PIO" models, when they are equipped from connectivity to mobile networks;

- models from the **"YOGA SERIES"** range**, in** particular the "Yoga Book C930", "Yoga C630 WOS" models, when they are equipped from connectivity to mobile networks.

**Exhibit n°4.8: Indicative and non-limitative correspondence table between the sales names of the digital tablet models equipped with connectivity to mobile networks and their product reference(s)**

31.   Four bailiff's report minutes dated 20, 27 and 30 September 2019, as well as research on the Internet, made it possible to establish:

(i)   that almost all of the above mobile phone models are presented and/or offered a la vente aux consommateurs frarn;:ais sur le site internet motorola.fr, et que ce site internet renvoie les consommateurs fran9ais souhaitant acheter les telephones mobiles susvises vers different categories of points of sale, including **Lenovo**'s merchant   website available at lenovo.com/en,

(ii)   that the domain name lenovo.com belongs to the Chinese company Lenovo Beijing Ltd;

(iii)   that a number of the above mobile phone models as well as the above-mentioned laptops and digital tablets are actually present and/or directly offered for sale to French consumers on Lenovo's aforementioned website**;**

(iv)   that this website identifies the seller of these products as the Irish company **Digital River Ireland Ltd** but expressly designates **Lenovo** France, whose registered office is located at *20* rue des Deux Gares, 92500 Rueil-Malmaison, as the contact point for the public and French designers.

> **Exhibit n°4.1 : Report of the report of 20 September 2019 made on the Motorola.fr website of the Motorola company**
>
> **Piece Motorola One Zoom productn°4.2:        sheet on the website fnac.com Piece**
>
> **Report of the report of 20 September 2019 carried out on the website lenovo.com/en of Lenovo company**
>
> **Exhibit n°4.4 : Report of the report of September 27, 2019 made on the Lenovo website lenovo.com/en**
>
> **Part n°4.5 : Technical data sheet of the different mobile network cards integrated in Lenovo laptops**
>
> **Exhibit n°4.6 : Report of the report of September 30, 2019 made on the Lenovo website lenovo.com/en**
>
> **Piecen°4.7:        "Whois" extract from the domain name**
>
> **lenovo.c o m   Piece n°5.1 :Extract Kbis Lenovo France**

32.   In view of the reasonably accessible evidence presented above, IPCom may legitimately consider that its rights are infringed, in its capacity as owner of the EP'268 patent, by Lenovo France and/or by any other person cooperating with this company to achieve the supply, import, storage, transport, distribution in France and export from France of counterfeit mobile telephones, laptops and digital tablets.

33.   The company IPCom is deemed admissible and founded, in anticipation of the procedures it must initiate before the competent French court to ensure the defence of its rights, to proceed urgently to the legal recognition of the materiality, origin and extent of the counterfeit of which it is a victim in France, in accordance with Articles L. 615-5 and R. 615-2 of the Intellectual Property Code.

This is the reason why IPCom requested and obtained an order for the purpose of counterfeit seizure;:on October 4, 2019 (Exhibit n°**8.1).**

. 11.

34.    However, IPCom has not enforced this order, and is currently seeking an amendment to it because it wishes to:

> on the one hand, to specify that the counterfeiting laptops and digital tablets that fall within the scope of the counterfeit seizure measures requested are only those equipped with a mobile network card or mobile network connectivity,

> and on the other hand, bring to the attention of the President of the Court) the existence of the "Motion *for Anti Suit Injunction" filed by the* American *companies of* the Lenovo group before the United States District Court for the Northern District of California.

35.    The existence of the "*Motion for Anti-Suit Injunction" of the* Lenovo group of *American companies in* no way affects the right of IPCom to have the materiality, origin and extent of the counterfeiting of which it is a victim in France determined by law as a matter of urgency, in accordance with Articles L. 615-5 and R. 615-2 of the Intellectual Property Code.

It must be stressed here that, apart from certain very specific cases of disputes involving the implementation of an arbitration clause and/or a clause conferring jurisdiction freely accepted by the parties - which does not mean that the parties have to accept it - it must be stressed that, in the absence of certain very specific cases of disputes involving the implementation of an arbitration clause and/or a clause conferring jurisdiction freely accepted by the parties.is not the case in this case - the case law of the Court of Justice of the European Union and the Court of Cassation1 considers "anti-suit *injunctions" to be contrary to* European and French international public policy.

36.    The *"Motion for Anti-Suit Injunction" of the* Lenovo group of American *companies* justifies this request even more strongly, because if the evidence of counterfeiting was not urgently complete, in particular if the identity of all those responsible for the counterfeiting was not known.import and marketing in France of counterfeiting mobile telephones was not established at this time, the subsequent exercise of the legitimate rights of the company IPCom before the French court would be likely to be made impossible.

Indeed, in the event that an "*anti-suit injunction" is issued* against IPCom after the pleadings hearing scheduled for 14 November 2019 before the United States District Court for the Northern District of California, it would then prevent IPCom fromexercise its rights in France throughout the duration of the procedure before the American court for determining the conditions of a worldwide FRAND licence for the patent portfolio of the company IPCom, i.e. probably for a period of two years, including the appeal procedure.

However, the EP'268 patent expires on 15 February 2020.

37.    Consequently, even if IPCom is confident that the American court will not order"!'*anti-suit injunction" requested by the* American companies of the Lenovo group, the resulting infringement of its fundamental rights would be irremediable. This circumstance justifies even more strongly that I take measures of seizure and counterfeiting requested by the company IPCom be ordered, in order to allow it to bring urgently, before the competent French court, Jes procedures appropriate to the defense of its rights on the French part of the EP'268 patent.

---

1 ECJ 27.04.2004 *Turner v. Gravit* C-159/02 ; ECJ 10.02.2009 *Allianz v. West Tankers* C-185/07 ; ECJ 13.05.2015 *Gazprom v. Lithuania* C-536/13 ; ECJ Civ. Cass. 1, 30.06.2004, No. 01-03248 and 01-15452; ECJ 10.02.2009, No. 08-16369 and 08-16549

. 12.

## IT'S FOR YOU

**the exhibitor requests that the President be
pleased:**

I.   Authorize him to proceed by any bailiff of his choice, in the premises of Lenovo **France located**
at 20 Rue des Deux Gares, 92500 Rueil-Malmaison, as well as in any other place
depending on the said company located in the vicinity in which the operations would reveal
that evidence of infringement of the EP 1 841 268 B2 patent is likely to be held, at the
detailed description of the characteristics and operation of the devices designed below:

- **Motorola"** mobile phones as listed below:

    models in the **"Motorola one"** range, **in** particular the "motorola one", "motorola one
    zoom", "motorola one action", "motorola one vision" models;

    models in the **"moto z"** range, **in** particular the models "moto z3 play", "moto $^{z2}$ force", "moto
    z2 play", "moto z", "moto z play", "moto g4 play", "moto x force";

    models in the **"moto g"** range, **in** particular the models "moto g7 plus", "moto $^{g7}$, moto g7
    power", "moto $^{g7}$ play", "moto g6, "moto g6 play", "moto g55 plus", "moto g55, "moto
    g5 plus", "moto g5, "moto $^{g4}$ play" ;

    models of the **"moto x"** range, **in** particular the "moto x4", "moto x $^{force}$ models;

    models of the **"moto e"** range, **in** particular Jes models "moto e6 plus", "moto $^{e5}$ play",
    "moto e5", "moto e4 plus", "moto e4";

    models in the **"moto c"** range, **in** particular the "moto c plus" and "moto c" models;

- **Lenovo"** and/or **"**ThinkPad" and/or **"Yoga"** brand laptops as **listed below:**

    models of the **"X"** range, **in particular** the "Xl Carbon (7th gen. )", "Xl Yoga (4th gen.)",
    "X395", "X390 Yoga", "X390" models, when equipped with a mobile network card;

    models of the **"T"** range, **in** particular models "T590", "T495", "T495s", "T490s",
    "T490s", "T490", when equipped with a mobile network card;

    models of the **"P"** range, in **particular** models "P53s", "P53s", "P43s", "P52s", "P52", when
    equipped with a mobile network card;

    models of the **"L"** range, **in** particular models "L590", "L490", "L480", when equipped
    with a mobile network card;

- **The "Lenovo"** and/or **"**ThinkPad" and/or **"Yoga"** digital tablets as **listed below:**

    models of the **"SERIES P & M"** range, **in particular** the "Yoga Smart Tab" models with
    Google assistant", "Tab MIO", "Tab ElO", "Tab MIO (HD)", "Tab PIO", when they are
    equipped from connectivity to mobile networks;

    models from the **"YOGA SERIES"** range, **in** particular the "Yoga Book C930", "Yoga
    C630 WOS" models, when they are equipped from connectivity to mobile networks.

. 13.

2. Authorize the bailiff to proceed or have proceeded, for the purposes of describing the characteristics and operation of mobile telephones, laptops and counterfeiting digital tablets, to all operations necessary for this purpose, and in particular to charge their battery, to insert in each of them a SIM card with subscription prepayment previously purchased by him from a   mobile telecommunications operator frarn;ais and kept in its closed packaging until the beginning of its operations, and when they are started;

3. Authorise the applicant to have the same bailiff proceed with the actual seizure, by offering to pay the price at the normal rate, of two copies of each model of counterfeiting mobile telephone, laptop computer and digital tablet, with their accessories and packaging, to be handed over by the bailiff under seal to the applicant or such person laboratory that it will designate for the purpose of technical analyses; authorize the subsequent opening of the seals by the instrumental bailiff for the purpose of such technical analyses;

4. Authorize the instrumental bailiff to carry out all necessary research and observations in the above-mentioned places in order to discover the proof, origin, consistency and scope of the counterfeit, even in the absence of counterfeiting mobile telephones, laptops and digital tablets at the scene of the seizure, including opening or having opened by a locksmith any doors of premises, furniture or vehicles on the scene, presenting to the persons present at the scene of the seizure any of the documents referred to in support of the request, recording the declarations of the respondents and any words spoken at the during the course of operations, but by refraining from any questioning other than those strictly necessary for the performance of its mission;

5. Authorize the instrumental bailiff to describe, copy or reproduce any documents or information such as accounting documents, invoices, order boos, delivery boos, order, purchase, sale or delivery listings, letters and correspondence, as well as any books, papers, leaflets, brochures, catalogues, notices, tariffs, plans, drawings, instructions foruse, documentation and technical specifications, which may establish the proof, origin, consistency and/or extent of the counterfeit, even in the absence of counterfeiting mobile telephones, laptops and digital tablets at the place of seizure; authorise the bailiff instrument to be used, for the purposes of document reproduction operations, any photocopying apparatus at the place of seizure, upon payment of such photocopies at their normal cost; authorize it, in the absence of photocopying apparatus on site, to take these documents with him to his study, he is responsible for returning them to the distrainee once the reproduction operations have been completed;

6. Authorize the bailiff to take or have taken photographic, video or digital pictures of counterfeiting mobile phones, laptops and tablets, their instructions for use and packaging and, even in the absence of counterfeiting mobile phones, laptops and tablets at the place of seizure, of any documents or information relating thereto such as those listed above; state that I am printing or videographic or electronic media intended to be attached to the a copy of the seizure report that will be given to the distrainee may only be sent to him after the seizure operations have been completed, within a period of 2 working days;

. 14.

7.   Authorize the instrumental bailiff to proceed or have proceeded to a paper edition, and/or to a copy on any appropriate electronic medium (in particular USB key, CD, CD, DVD, hard disk), of any documents or information as listed above that may establish the proof, origin, consistency and/or extent of the counterfeit;:on, and which would be stored on a medium other than paper, including microfilm or any electronic medium, including hard disks

computers, computer servers, and other data storage devices located on the premises of the seizure or remotely accessible from the premises of the seizure; authorize the bailiff to do so

instrument to be used or to be used by the experts and/or computer technicians who will assist it, for all investigations and research, in particular by keywords corresponding to the

names, brands and references of mobile phones, laptops and laptops

counterfeiting digital tablets and references to the relevant standard (3G, UMTS, WCDMA), on all computer systems, computers, servers and other storage devices

data located at the data entry site or remotely accessible from the data entry site;

8.   Authorize the bailiff to carry out the actual seizure in triplicate of all prospectuses, brochures, catalogues, notices, tariffs, tariffs, plans, drawings, operating instructions, documentation and technical specifications relating to mobile telephones, computers

counterfeiting laptops and digital tablets, even in the absence of such documents at the scene of the seizure; state that the copies of the seized documents will be given to the applicant

after the bailiff's stamp has been affixed;

9.   Order the placement under provisional sequestration in the hands of the instrumental bailiff, under the conditions provided for in Article R. 153-1 of the French Commercial Code, of any documents or information copied or seized, the part seized of which declares to the bailiff that it contains a business secret, a

With the exception of information allowing identification of the persons involved in the procurement, import, storage, transport, distribution or export of counterfeiting mobile phones, laptops and digital tablets; recall that in accordance with

the above article: "If the *judge does not receive an application to amend or revoke his order pursuant to /'article 497 of the Code of Civil Procedure within a period of one month as from the service of the decision, the provisional sequestration measure referred to in paragraph previous is lifted and the parts are transmitted to the applicant";*

10.  Authorize the bailiff to endorse and initial the accounting books, registers, order books, letters, invoices, contracts, and in general all commercial or accounting documents relating to counterfeiting mobile telephones, laptops and digital tablets, even if they are not present at the place of seizure;

11.  Authorize the instrumental bailiff to be assisted in all operations relating to his

mission, by an expert chosen by the applicant outside her employees and managers, of whom I will record explanations on the points that fall outside her competence, distinguishing, in the

enunciations of his minutes, those resulting from his personal observations and those dictated by the expert who will assist him;

. 15.

12. Authorize the instrumental bailiff to be assisted, for all his operations, by a locksmith, a photographer and a computer technician, to the exclusion of any manager or employee of the applicant;

13. Authorize the instrumental bailiff to request assistance and be accompanied by any representative of the territorially competent police force;

14. Say that the counterfeit seizure operations may continue after the closing time of the premises and may, if necessary, be suspended to continue the next day;

15. Say that the counterfeit seizure operations will be carried out within two months of Your order;

16. Say that in case of difficulties, You will be referred to it in accordance with articles 496 and 497 of the Code of Civil Procedure, but only after completion of the operations of seizure-counterfeiting and affixing of visas.

Done at Paris, on 

. 16.

**Attachments in support of the rejoinder:**

**I.    The company IPCom**

1.1    Extract from the Munich Commercial Register concerning IPCom

I. Ibis Translation of the extract from the Munich Commercial Register concerning IPCom

1.2    Extract from the IPCom website

**II.    The EP 1 841268 B2 patent**

2.1    European Patent File EP 1 841 268 B2

2.2    Translation into French of the description of the EP patent 1 841 268 B2

2.3    EPO Communication of 6 June 2007 on the registration of the transfer of ownership of the European patent application 07009265.5

2.4    Statement of GNI registrations as at 19.08.2019 and additional registrations as at 13.09.2019 concerning the EP'268 patent

2.5    Decision T 0767/14 of the EPO Board of Appeal of 19 July 2017 2.5bis

Translation into French of Exhibit n°2.5

2.6    Payment status of the annuities concerning the French part of the EP'268 patent

**III.    The essentiality of the EP'268 patent is the UMTS standard**

3.1    Excerpts from the ETSI Guidelines, version 39, dated 8 October 2018

3.2    European Commission press release of 10 December 2009

3.3    "General IPR Licensing declaration" of the company IPCom a)'ETSI of 11 June 2014

*3.4*    Judgment of the Court of Appeal of England and Wales of 28 February 2017, IPCom *v. HTC* ([20017] EWCA Civ 90)

3.4bis Translation into French of Piece n°3.4

3.5    Order of the Court of Appeal of England and Wales of 28 February 2017, *IPComv. HTC*

**IV.    The findings of the counterfeit**

4.1    Minutes of the report of 20 September 2019 on the Motorola.fr website of the Motorola company.

4.2    Motorola One Zoom" product sheet on the fnac.com website

4.3    Minutes of the report of 20 September 2019 on the Lenovo website lenovo.com/en

4.4    Minutes of the report of 27 September 2019 on the Lenovo website lenovo.com/en

4.5    Technical data sheet of the different mobile network cards integrated in Jes Lenovo laptops

4.6    Minutes of the report of September 30, 2019 on the Lenovo website lenovo.com/en

4.7    Whois" extract from the domain name lenovo.com/en

. 17.

4.8   Indicative and non-limitative correspondence table between the sales names of the digital tablet models equipped with connectivity to mobile networks and their product reference(s)

**V.    The company seized**

5.1   Extract Kbis Lenovo France

5.2   Extract from the Irish register of companies forming part of Digital River Ireland Limited

**VI.   The procedure in the United Kingdom**

6.1   "Particulars of Claim" of the company IPCom of 4 July 2019

6.2   "Particulars of Infringement" (Counterfeit details) of the company IPCom of 4 July 2019

6.3   "Defence and Counterclaim" (Defense et demande reconventionnelle) des societes Lenovo Technology (United Kingdom) Limited et Motorola Mobility UK Limited, du 23 septembre 2019.

6.4   "Grounds of Invalidity" (Motifs de nullite) des societes Lenovo Technology (United Kingdom) Limited et Motorola Mobility UK Limited, du 23 septembre 2019

**VII.  The procedure in the United States**

7.1   *"Complaint" of* Lenovo (United States) Inc. and Motorola Mobility LLC dated March 14, 2019

7.2   *"Motion for Anti-Suit Injunction"* filed by Jes Lenovo (United States) Inc. and Motorola Mobility LLC on September 18, 2019

7.3   *"Opposition to Motion for Anti-Suit Injunction"* filed by IPCom on[date] October *2019*.

**VIII. The procedure in France**

8.1   Application and order for seizure of counterfeit goods dated October 4, 2019

**ORDER**

**ORDER**

We, ->< < <=:=:....;;; <_-'·'·'=-=.......'---IH:.,11-=-+---'''V_;...=...=...=....---+'·'" ----1...::    $0$-$cv$-   ~.....        o{;q- b°"-

President of the Paris Court of First Instance,

Considering articles L.615-5 and R.615-2 of the Intellectual Property
Code, Considering the preceding request and my attachments,

I.  Let us authorize the company **IPCom Gmbh** & Co **KG to** proceed by any bailiff of its choice, in Jes
    premises of the company Lenovo **France located** at 20 Rue des Deux Gares, 92500 Rueil Malmaison,
    as well as in all other places dependent on the said company located nearby in
    which I would disclose that evidence of alleged infringement of the EP I 841 268 B2 patent is likely
    to be held, to the detailed description of the characteristics and the
    operation of the devices designed below:

  - **Motorola"** mobile phones **as** listed below:

    models of the **"Motorola one"** range**, in** particular Jes models "motorola one", "motorola
    one zoom", "motorola one action", "motorola one vision";

    models of the **"moto z"** range**, in** particular Jes models "moto z3 play", "moto $^{z2}$ force",
    "moto z2 play", "moto z", "moto z play", "moto g4 play", "moto x force";

    models in the **"moto g"** range**, in** particular the "moto g7 plus", "moto $^{g7}$            ~
    moto g7 power", "moto g7 play", "moto g6", "moto g6 play", moto g5 plus", "moto g58 ,
    "g5 $^{plus}$ motorcycle", "g5 motorcycle", "g4 $^{play}$ motorcycle";

    models of the **"moto x"** range**, in** particular Jes models "moto x4, "moto x $^{force}$ ~:

    models of the **"moto e"** range**, in** particular Jes models "moto e6 plus", "moto $^{e5}$ play",
    "moto e5", "moto e4 plus", "moto e4";

    models from the **"moto c"** range**, in** particular Jes models "moto c plus", "moto c";

  - **Lenovo"** and/or **"ThinkPad"** and/or "**Yoga"** brand laptops as **listed below:**

    models of the **"X"** range**, in** particular the "Xl Carbon (7th gen.)", "Xl Yoga (4th
    gen.)","X395", "X390 Yoga", "X390" models, when equipped with a mobile network
    card;

    models of the **"T"** range**, in** particular Jes models "T590", "T495", "T495s", "T490s",
    "T490s", "T490", when equipped with a mobile network card;

    models of the **"P"** range**, in** particular the "P53s", "P53s", "P43s", "P52s", "P52"
    models, when equipped with a mobile network card;

    models of the **"L"** range**, in particular** models "L590", "L490", "L480", when equipped
    with a mobile network card;

. 2 .

- **The "Lenovo" and/or "**ThinkPad" and/or **"Yoga"** digital tablets as **listed below:**

    modeJes from the **"SERIES P & M"** range**, in particular** Jes modeJes "Yoga Smart Tab with Google Assistant", "Tab MIO", "Tab EIO", "Tab MIO (HD)", "Tab PIO", when they are equipped with connectivity to mobile networks;

    models from the **"YOGA SERIES"** range**, in** particular Jes models "Yoga Book C930", "Yoga C630 WOS", when they are equipped from connectivity to mobile networks.

2. Authorize the instrumental bailiff to proceed or have proceeded, for Jes purposes, with the description of the characteristics and operation of mobile telephones, laptops and

    digital tablets argues of counterfeit<;:on, has all operations necessary for this purpose, and in particular to charge their battery, to insert in each of them a SIM card with

    prepayment     subscription  previously  purchased  by  him     from  an operator  of French mobile telecommunications:: is and remains in its closed packaging until the beginning of its operations, and until they are put into operation;

3. Let us authorize the applicant to have the same bailiff proceed with the actual seizure, by offering to pay the price at the normal rate, of two copies of each model of mobile telephone, laptop and digital tablet argument of counterfeiting, with their

    accessories and packaging, to be delivered by }'bailiff under seal  to the applicant)

    laboratory that it will design for the purpose of technical analyses; let us authorise the subsequent opening of the seals by the instrumental bailiff for the purpose of the said technical analyses;

4. Let us authorize the instrumental bailiff to carry out in the above-mentioned places all useful research and observations in order to discover the proof, the origin, the consistency and the extent of the

    counterfeit <;:allegated, even in the absence of mobile phones, laptops and digital tablets argues of counterfeiting at the scene of the seizure, including to open or make

    open by a locksmith any doors of premises, furniture or vehicles on site, present to the persons present at the scene of the seizure any of the documents referred to in support of the request, record Jes declarations of the respondents and any words

    pronounced during the operations, but refraining from any questioning other than those strictly necessary for the accomplishment of its mission;

5. Authorize the instrumental bailiff to describe, copy or reproduce any documents or information such as accounting documents, invoices, purchase orders, delivery notes, order lists, order lists, etc.purchases, sales or delivery, letters and correspondence, as well as all books, papers, leaflets, brochures, catalogues, manuals, tariffs, plans, drawings, instructions for use, documentation and technical specifications, which may establish the proof, origin, consistency and/or extent of the counterfeiting:on alleguee, et ce même en ]'absence des telephones mobiles, des

    laptops and digital tablets of counterfeiters at the place of seizure; the authorisations to use, for the purpose of document reproduction operations, any photocopying equipment at the place of seizure, subject to payment of such photocopies at their normal cost; the authorisations, in the absence of photocopying equipment on site, to take these documents with it to its study, instruct it to return the reproduction operations to the seized once

    finished;

. 3 .

6.  Authorize the bailiff to take or have taken photographic, video or digital pictures of counterfeit mobile telephones, laptops and digital tablets9on, their instructions for use and packaging and, even in the absence of mobile telephones, laptops and digital tablets

    of counterfeiting on the premises of the seizure, of any documents or information relating thereto such as

    that listed above; let us say that I drawings or videographic or electronic supports intended to be attached to the copy of the seizure report which will be given to the seized person may only be addressed to him after the closure of the seizure operations, within a period of 2 working days;

7.  Authorize the instrumental bailiff to proceed or have proceeded to a paper edition, and/or to a copy on any appropriate electronic medium (in particular USB key, CD, DVD, hard disk), of any documents or information as listed above which may establish the proof, origin, consistency and/or extent of the alleged counterfeit, and which would be kept on another medium

    that paper, in particular on microfilm or any electronic medium, including hard disks

    computers, computer servers and other data storage devices located on Jes premises or remotely accessible from Jes premises; to this end, let us authorize the instrumental bailiff to proceed or to have proceeded by the experts and/or Jes computer technicians who will assist him, to all investigations and searches, in particular by    keywords

    corresponding to the names, brands and references of mobile phones, computers, etc.

    and the references of the standard in question (3G, UMTS, WCDMA), on all computer systems, computers, servers and

    other data storage devices located on or accessible at the data entry site

    distance from my data entry location;

8.  Authorize the bailiff to proceed to the actual seizure in triplicate of all prospectuses, brochures, catalogues, notices, tariffs, tariffs, plans, drawings, operating instructions, documentation and technical specifications relating to counterfeit mobile telephones, laptops and digital tablets, even in theabsence of these latter.

    at the scene of the seizure; let us say that I copies of the seized documents will be given to the applicant after affixing the bailiff's stamp;

9.  Let us order the placement under provisional sequestration in the hands of the instrumental bailiff, under the conditions provided for in Article R. 153-1 of the French Commercial Code, of any documents or information copied or seized whose part seized declares to the bailiff that it contains a trade secret, a

    !'exception of information allowing !'identification of the persons involved in the fourniture,

    ) the import, storage, transport, distribution or export of    counterfeit mobile phones, laptops and digital   tablets; it should be recalled    that

    in accordance with the above-mentioned article: "If the *judge does not receive an application to amend or revoke his order pursuant to /'article 497 of the Code of Civil Procedure in a Within one month of service of the decision, the provisional sequestration measure referred to in the preceding paragraph shall be lifted and the documents transmitted to the applicant";*

. 4 .

10. Authorize the bailiff to endorse and initial the accounting books, registers, order books, letters, invoices, contracts, and in general all commercial or accounting documents relating to mobile telephones, laptops and counterfeit digital tablets, even in the absence of such documents at the place of seizure  ;

11. Let us authorize the instrumental bailiff to be assisted, for all operations relating to its mission, by an expert chosen by the applicant outside her employees and managers, whose explanations on the points that fall outside her competence will be recorded, distinguishing, in the enunciations of his minutes, those resulting from his personal observations and those dictated by the expert who will assist him;

12. Let us authorize the instrumental bailiff to be assisted, for all his operations, by a locksmith, a photographer and a computer technician, to the exclusion of any manager or employee of the applicant;

13. Authorize the instrumental bailiff to request assistance and be accompanied by any representative of the territorially competent police force;

14. Let us say that counterfeit seizure operations may continue after the closing time of the premises and may, if necessary, be suspended to continue the next day;

15. Let's say that the seizure and counterfeiting operations will be carried out within two months of Our order;

16. Let us say that in case of difficulties, we will be referred to them in accordance with articles 496 and 497 of the Code of Civil Procedure, but only after completion of the operations of seizure of counterfeit goods and affixing of visas.

Done at Our firm, at the Tribunal de Grande Instance de Paris,

on 15/10/2019