# EXHIBIT B

A Madame ou Monsieur le Président du
Tribunal de Grande Instance de Paris



# REQUÊTE

## AUX FINS DE SAISIE-CONTREFAÇON

### (Brevets - Articles L.615-5 et R.615-2
### du Code de la Propriété Intellectuelle)

**IPCom GmbH & Co. KG,** société de droit allemand ayant la forme d'une *Kommanditgesellschaft*, dont le siège social est Zugspitzstrasse 15, 82049 Pullach, Allemagne, immatriculée au registre des sociétés de Munich (Allemagne) sous le N° HRA 93950, représentée par son associé commandité IPCom Beteiligungs GmbH, société de droit allemand ayant la forme d'une *Gesellschaft mit beschränker Haftung*, dont le siège social est Zugspitzstrasse 15, 82049 Pullach, Allemagne, elle-même représentée par son *Geschäftsführer* (gérant) domicilié en cette qualité audit siège,

**Ayant pour avocat:**     BARDEHLE PAGENBERG SELAS
Agissant par Maître Julien Fréneaux
Avocat au barreau de Paris
demeurant 5, rue Boudreau – 75009 Paris
Tél. : 01 53 05 15 00 – Fax. : 01 53 05 15 05
Palais Paris P 0390

**élisant domicile en son cabinet,**

. 2 .

**A L'HONNEUR DE VOUS EXPOSER :**

*__La requérante__*

1.    La société **IPCom GmbH & Co. KG** (ci-après désignée "la société IPCom") est une société allemande basée à Pullach, à proximité de Munich (Allemagne).

Depuis plus de 15 ans, la société IPCom a pour activité la R&D et la constitution et l'exploitation de portefeuilles de brevets d'invention, en particulier dans le domaine des télécommunications.

Les inventions protégées par les brevets de la société IPCom sont réalisées par sa propre équipe de R&D ou par des tiers qui lui cèdent ou concèdent leurs droits d'exploitation.

La société IPCom est un membre actif des groupes de travail des organismes de normalisation qui élaborent les normes et spécifications techniques standardisées du domaine des télécommunications, et en particulier de l'ETSI (*European Telecommunications Standards Institute*).

> **Pièce n°1.1 : Extrait du registre du commerce de Munich concernant IPCom (+ traduction en français)**
>
> **Pièce n°1.2 : Extrait du site internet d'IPCom**

*__Le brevet EP 1 841 268 B2 (EP'268)__*

2.    La société IPCom est propriétaire, notamment, d'un portefeuille de plus de 160 familles de brevets protégeant des technologies de télécommunication mobile 2G, 3G et 4G, développées par l'équipementier automobile allemand Robert Bosch GmbH.

Parmi ces brevets figure en particulier le brevet suivant :

- Brevet européen **EP 1 841 268** désignant la France, ayant pour titre *"Accès d'une station mobile à un canal d'accès aléatoire en dépendance de sa classe d'utilisateur"*, issu d'une demande européenne divisionnaire n°07009265.5 déposée sur la base d'une demande de brevet européen n°00916749.5, elle-même issue d'une demande internationale PCT WO 00/54534 du 15 février 2000 revendiquant la priorité d'une demande allemande DE 19910239 du 8 mars 1999, délivré à la société IPCom le 17 mars 2010 et maintenu sous forme modifiée ("**B2**") après opposition (ce brevet sera ci-après désigné par commodité "brevet EP'268").

> **Pièce n°2.1 : Fascicule de brevet européen EP 1 841 268 B2**
>
> **Pièce n°2.2 : Traduction en français de la description du brevet EP 1 841 268 B2**
>
> **Pièce n°2.3 : Communication de l'OEB du 6 juin 2007, concernant l'enregistrement du transfert de propriété de la demande de brevet européen 07009265.5**
>
> **Pièce n°2.4 : État des inscriptions au RNB au 19.08.2019 et inscriptions complémentaires du 13.09.2019 concernant la partie française du brevet EP'268**

. 3 .

3.  Au cours des 8 années qui ont suivi sa délivrance, le brevet EP'268 a fait l'objet d'une lourde procédure d'opposition devant l'Office Européen des Brevets, à l'initiative de 6 sociétés différentes actives dans le domaine des équipements et services de télécommunication mobile, à savoir Microsoft, Deutsche Telekom, Ericsson, HTC, Vodafone et Apple.

Cette procédure d'opposition s'est terminée par une décision définitive T 0767/14 de la Chambre de Recours de l'OEB en date du 19 juillet 2017, maintenant le brevet EP'268 au bénéfice de la société IPCom sous une forme modifiée, dite "B2", publiée le 25 avril 2018.

**Pièce n°2.5 : Décision T 0767/14 de la Chambre de Recours de l'OEB du 19 juillet 2017 (+ traduction en français)**

4.  Les annuités de la partie française du brevet EP'268 sont régulièrement acquittées à l'INPI. La 20ème annuité a été payée le 21 février 2019.

**Pièce n°2.6 : État de paiement des annuités concernant la partie française du brevet EP'268**

5.  Conformément à l'article 64 de la Convention de Munich sur le brevet européen et aux articles L.614-7 et suivants du Code de la propriété intellectuelle, depuis la date de publication de sa délivrance (17 mars 2010), le brevet EP'268 confère à son titulaire, la société IPCom, les mêmes droits que ceux que lui conférerait un brevet français.

### _L'invention protégée par le brevet EP'268_

6.  L'invention protégée par le brevet EP'268 porte sur une station d'abonné mobile (par exemple un téléphone mobile) équipée de moyens permettant de contrôler son accès à un canal de transmission d'accès aléatoire d'un réseau de télécommunication mobile conforme à la norme UMTS (_Universal Mobile Telecommunications System_), communément appelée 3G ou encore WCDMA (_Wideband Code Division Multiple Access_).

7.  Le réseau UMTS est notamment composé de cellules, chaque cellule étant définie par la couverture d'une station de base.

Des stations mobiles (par exemple des téléphones mobiles) présentes dans une cellule peuvent communiquer avec la station de base (EP'268, paragraphe [0016]).

8.  L'opérateur d'un réseau UMTS fournit des services de télécommunication pouvant être utilisés par les stations mobiles, tels que l'envoi de paquets de données de petite taille, l'envoi de paquets de données de taille importante ou la transmission de données vocales (EP'268, paragraphe [0017]).

9.  Le réseau UMTS possède des ressources limitées. Par conséquent, lorsqu'une station mobile est inactive, c'est-à-dire qu'aucun service de télécommunication n'est utilisé, aucun canal radio entre la station de base et la station mobile pour la transmission vocale ou de paquets de données n'est réservé.

Lorsque la station mobile sort de son état inactif, un canal radio avec la station de base doit alors être attribué à la station mobile afin que celle-ci puisse utiliser les services de télécommunications.

. 4 .

10.   Une station mobile ne peut pas s'allouer un tel canal radio de façon indépendante. Elle doit en faire la demande en envoyant un message à la station de base. Cela se fait généralement via un canal d'accès aléatoire appelé RACH (pour *Random Access Channel*) (EP'268, paragraphe [0019]). Le canal d'accès aléatoire RACH est un canal unidirectionnel allant de la station mobile à la station de base.

11.   Lorsque la station de base reçoit un message sur ce canal RACH, elle confirme sa réception sur un canal séparé.

12.   Chaque station mobile peut en principe envoyer à tout moment une demande pour l'allocation d'un canal radio à la station de base (accès aléatoire).

Par conséquent, plusieurs stations mobiles peuvent envoyer un message sur ce canal au même moment provoquant une collision des messages, de sorte qu'aucune des stations mobiles ne se voit attribuer un canal. En effet, dans un tel cas, la station de base n'envoie pas de message de confirmation de réception aux stations mobiles émettrices des messages. Ces dernières vont alors réémettre leur message après un temps prédéfini (EP'268, paragraphe [0020]).

En cas de forte demande, le risque de collision entre les messages des stations mobiles est accru et les stations mobiles dont le message n'a pas pu être transmis du fait d'une collision, vont renvoyer leur message provoquant une augmentation de la congestion sur le canal RACH et une éventuelle surcharge (EP'268, paragraphe [0020]).

13.   Il existait donc un besoin de mieux contrôler comment les stations mobiles d'un réseau de télécommunication UMTS (3G) accèdent au canal d'accès aléatoire RACH afin d'éviter les surcharges sur ce canal.

14.   Le problème technique ci-dessus est résolu par une station mobile conforme à la revendication 1 (unique) du brevet EP'268, qui peut être décomposée comme suit :

*1.0   Station mobile (5, 10, 15, 20) destinée à être utilisée dans un réseau de radiocommunication mobile UMTS au sein duquel sont distinguées plusieurs classes d'utilisateur (35, 40),*

*1.1   dans lequel des signaux d'information comportant des données d'autorisation d'accès sont transmis à la station mobile, les données d'autorisation d'accès étant transmises comme un motif de bits,*

*caractérisée en ce que*

*la station mobile (5, 10, 15, 20) est conçue pour*

*1.2   lire une classe d'utilisateur (35, 40) à partir d'une carte SIM (75),*

*1.3   recevoir les données d'autorisation d'accès, lesquelles contiennent des bits de seuil d'accès (S3, S2, S1, S0) et des bits de classe d'accès (Z0, Z1, Z2, Z3) par le biais d'un canal de commande de diffusion (25),*

*1.4   déterminer un seuil d'accès (S) à partir des bits de seuil d'accès (S3, S2, S1, S0), sous réserve que l'autorisation d'accès au canal d'accès aléatoire soit déterminée en fonction d'une interprétation de seuil d'accès,*

. 5 .

> 1.5 *déterminer, à l'aide des bits de classe d'accès (Z0, Z1, Z2, Z3) qui concernent la classe d'utilisateur (35, 40), si la station mobile (5, 10, 15, 20) est autorisée à accéder à un canal d'accès aléatoire, par exemple RACH, indépendamment des bits de valeur seuil d'accès (S3, S2, S1, S0) reçus, ou si l'autorisation d'accès au canal d'accès aléatoire, par exemple RACH, est à déterminer en fonction d'une interprétation du seuil d'accès,*
>
> 1.6 *et est conçue pour, comme interprétation du seuil d'accès, comparer le seuil d'accès (S) à un nombre aléatoire ou un nombre pseudo-aléatoire (R),*
>
> 1.7 *et est conçue pour accéder au canal d'accès aléatoire en fonction de la détermination à l'aide du bit de classe d'accès, soit indépendamment des bits de seuil d'accès (S3, S2, S1, S0) reçus, soit en fonction du résultat de la comparaison.*

15.   La solution technique objet du brevet EP'268 permet donc de réguler l'accès des stations mobiles à un canal d'accès aléatoire, comme le canal d'accès RACH, au moyen de deux concepts qui sont le seuil d'accès et la classe d'accès.

16.   La station mobile va ainsi recevoir de la part de la station de base des bits de valeur de seuil d'accès (S3, S2, S1, S0) et des bits de classe d'accès (Z0, Z1, Z2, Z3) via un canal de commande de diffusion, qui vont permettre de déterminer si la station mobile peut accéder au canal d'accès aléatoire à cet instant T, ou si elle doit retenter sa chance ultérieurement.

La station mobile est configurée pour déterminer une valeur de seuil d'accès (S) à partir des bits de valeur de seuil d'accès (S3, S2, S1, S0) qui lui ont été transmis par la station de base. Elle va alors procéder à un test comparant un nombre aléatoire ou pseudo-aléatoire (R) qu'elle aura préalablement généré, à la valeur de seuil d'accès S. En fonction du résultat de cette comparaison, la station mobile a ou n'a pas l'autorisation d'accéder au canal d'accès aléatoire.

Chaque station mobile appartient par ailleurs à une classe d'utilisateur prédéfinie, stockée sur sa carte SIM. La station mobile peut alors déterminer, au regard des bits de classe d'accès (Z0, Z1, Z2, Z3) reçus de la station de base, si la classe d'utilisateurs à laquelle elle appartient est autorisée à accéder directement au canal d'accès aléatoire, indépendamment des bits de valeur de seuil d'accès (S3, S2, S1, S0) et du résultat de la comparaison entre le nombre aléatoire R et la valeur de seuil d'accès S.

17.   Il est ainsi possible de procéder à une distribution différenciée de l'autorisation d'accès à un canal d'accès aléatoire, comme le canal RACH, pour une ou plusieurs stations mobiles, en fonction des bits de valeur de seuil d'accès (S3, S2, S1, S0) et des bits de classe d'accès (Z0, Z1, Z2, Z3) envoyés par la station de base.

L'invention objet du brevet EP'268 permet par conséquent de disposer d'un système de contrôle d'accès flexible combinant un accès dépendant du seuil d'accès S avec un accès dépendant de la classe d'accès (EP'268, paragraphes [0010] et suivants).

. 6 .

### *L'essentialité du brevet EP'268 au regard de la norme UMTS (3G)*

18.    Le brevet EP'268 fait partie d'un portefeuille de brevets initialement déposés par la société Robert Bosch GmbH, dont plusieurs sont considérés comme essentiels aux normes de téléphonie mobile GSM et UMTS édictées notamment par l'ETSI (*European Telecommunications Standards Institute*). Les termes "normes" et "essentiel" ont ici le sens indiqué dans la politique de l'ETSI sur les droits de propriété intellectuelle du 18 avril 2018 et contenue dans la version 39 des directives de l'ETSI du 8 octobre 2018 ("ETSI IPR Policy").

**Pièce n°3.1 : Extraits des Directives de l'ETSI, version 39 du 8 octobre 2018**

19.    C'est la raison pour laquelle en 2009, la société IPCom a déclaré à la Commission Européenne être disposée à concéder aux tiers des licences à des conditions FRAND (pour *Fair, Reasonable and Non-Discriminatory*) sur les brevets essentiels de ce portefeuille. Le 11 juin 2014, la société IPCom a réitéré cet engagement auprès de l'ETSI.

**Pièce n°3.2 : Communiqué de presse de la Commission Européenne du 10 décembre 2009**

**Pièce n°3.3 : "*General IPR Licensing Declaration*" de la société IPCom à l'ETSI du 11 juin 2014**

20.    Le 28 février 2017, la Cour d'Appel de l'Angleterre et du Pays de Galles a confirmé que le brevet EP'268 de la société IPCom est un brevet essentiel à la norme UMTS (*Universal Mobile Telecommunications System*) communément appelée 3G, dans un arrêt *IPCom v. HTC* rendu sur le fondement d'une version du brevet EP'268 identique à la version modifiée maintenue par la décision T 0767/14 de la Chambre de Recours de l'OEB du 19 juillet 2017.

**Pièce n°3.4 :   Arrêt de la Cour d'Appel de l'Angleterre et du Pays de Galles du 28 février 2017, ([20017] EWCA Civ 90) (+ traduction en français)**

**Pièce n°3.5 :   Ordonnance de la Cour d'Appel de l'Angleterre et du Pays de Galles du 28 février 2017, *IPCom v. HTC***

### *Les rapports de la société IPCom avec le groupe Lenovo (auquel appartient Motorola Mobility)*

21.    Motorola Mobility est une entreprise industrielle américaine spécialisée dans la fabrication et la commercialisation de téléphones mobiles.

Elle a été rachetée en octobre 2014 par le groupe Lenovo, un groupe industriel chinois spécialisé dans la fabrication et la commercialisation d'ordinateurs, serveurs informatiques, tablettes numériques, télévisions connectées et téléphones.

22.    Motorola Mobility fabrique et commercialise des téléphones mobiles qui sont aptes à fonctionner conformément à la norme UMTS (3G) et constituent donc des "stations mobiles" au sens de la revendication 1 du brevet EP'268.

23.   Depuis plusieurs années, la société IPCom invite le groupe Lenovo à régulariser sa situation. Elle lui a offert de souscrire à cet effet une licence d'exploitation de son portefeuille de brevets à des conditions FRAND.

En mars 2019, la société IPCom a renouvelé son offre de licence FRAND au groupe Lenovo en l'invitant à la fixer sur ses intentions pour le 15 mars 2019, faute de quoi elle serait contrainte d'engager une procédure judiciaire pour la protection de ses droits.

Pour toute réponse, le 14 mars 2019, deux sociétés américaines du groupe Lenovo, à savoir les sociétés Lenovo (United States) Inc. et Motorola Mobility LLC, ont engagé une procédure judiciaire contre la société IPCom devant le Tribunal de District des Etats-Unis pour le District Nord de Californie, auquel elles demandent notamment de déterminer les conditions d'une licence FRAND mondiale pour le portefeuille de brevets de la société IPCom (sans pour autant s'engager, ni pour elles-mêmes ni pour les autres sociétés du groupe Lenovo, à souscrire une telle licence).

> **Pièce n°7.1 : *"Complaint"* des sociétés Lenovo (United States) Inc. et Motorola Mobility LLC du 14 mars 2019**

24.   Le groupe Lenovo n'a donc, en l'état, ni accepté l'offre de licence FRAND de la société IPCom, ni soumis à cette-dernière une contre-offre concrète de licence qui corresponde à des conditions FRAND.

Les sociétés du groupe Lenovo continuent en revanche à exploiter dans le monde entier, sans autorisation, les inventions protégées par le portefeuille de brevets de la société IPCom, et en particulier le brevet EP'268.

### *La contrefaçon et la procédure parallèle au Royaume-Uni*

25.   Le 4 juillet 2019, la société IPCom a engagé une action en contrefaçon de la partie anglaise du brevet EP'268 devant la High Court of Justice d'Angleterre et du Pays de Galles à l'encontre de deux sociétés anglaises du groupe Lenovo, à savoir :
- Lenovo Technology (United Kingdom) Limited ;
- Motorola Mobility UK Limited.

Cette procédure est pendante, les sociétés anglaises du groupe Lenovo ayant signifié leurs moyens de défense et demandes reconventionnelles le 23 septembre 2019.

> **Pièce n°6.1 : "Particulars of Claim" (Détails de la demande) de la société IPCom du 4 juillet 2019**
>
> **Pièce n°6.2 : "Particulars of Infringement" (Détails de la contrefaçon) de la société IPCom du 4 juillet 2019**
>
> **Pièce n°6.3 : "Defence and Counterclaim" (Défense et demande reconventionnelle) des sociétés Lenovo Technology (United Kingdom) Limited et Motorola Mobility UK Limited, du 23 septembre 2019.**
>
> **Pièce n°6.4 : "Grounds of Invalidity" (Motifs de nullité) des sociétés Lenovo Technology (United Kingdom) Limited et Motorola Mobility UK Limited, du 23 septembre 2019**

. 8 .

### *La "Motion for Anti-Suit Injunction" des sociétés américaines du groupe Lenovo aux Etats-Unis*

26.   Le 18 septembre 2019, dans le cadre de la procédure qu'elles avaient engagée le 14 mars 2019 devant le Tribunal de District des Etats-Unis pour le District Nord de Californie, les sociétés américaines du groupe Lenovo ont déposé une "*Motion for Anti-Suit Injunction*" (littéralement "Requête en injonction anti-procès"), aux termes de laquelle elles demandent à cette juridiction américaine :

   −   d'interdire à la société IPCom de poursuivre son action en contrefaçon du brevet EP'268 au Royaume-Uni,

   −   d'interdire à la société IPCom d'engager quelque action en contrefaçon que ce soit contre l'une quelconque des sociétés du groupe Lenovo, aux Etats-Unis ou à l'étranger, sur le fondement de l'un quelconque de ses brevets essentiels aux normes 2G, 3G et 4G, y compris le brevet EP'268,

   −   d'interdire à la société IPCom de demander à un tribunal étranger (c'est-à-dire non-américain) d'ordonner toute mesure visant à empêcher les sociétés du groupe Lenovo de mettre en œuvre une telle "injonction anti-procès" si elles venaient à l'obtenir,

et ce aussi longtemps que la juridiction américaine n'aura pas définitivement statué sur les demandes des sociétés américaines du groupe Lenovo tendant à la détermination des conditions d'une licence FRAND mondiale pour le portefeuille de brevets de la société IPCom (mais toujours sans que les sociétés du groupe Lenovo ne prennent un quelconque engagement de souscrire une telle licence).

> **Pièce n°7.2 : " *Motion for Anti-Suit Injunction*" (Requête en injonction anti-procès) déposée par les sociétés Lenovo (United States) Inc. et Motorola Mobility LLC le 18 septembre 2019**

27.   Le 11 octobre 2019, la société IPCom a soulevé une exception d'incompétence de la juridiction américaine et a réfuté l'ensemble des arguments présentés par les sociétés américaines du groupe Lenovo au soutien de leur "*Motion for Anti-Suit Injunction*".

> **Pièce n°7.3 : "*Opposition to Motion for Anti-Suit Injunction*" (Défense à la requête en injonction anti-procès") déposée par la société IPCom le 11 octobre 2019**

28.   L'audience de plaidoiries devant le Tribunal de District des Etats-Unis pour le District Nord de Californie, concernant la "*Motion for Anti-Suit Injunction*" ainsi que l'exception d'incompétence, est fixée au 14 novembre 2019.

### *La contrefaçon en France*

29.   La société IPCom a constaté la présentation et/ou l'offre en vente et/ou la vente, sur le marché français, de téléphones mobiles de marque **Motorola** aptes à fonctionner conformément à la norme UMTS (3G), qui reproduisent par conséquent les caractéristiques de la revendication 1 (unique) du brevet EP'268 qui est essentiel à cette norme.

30.    Il s'agit notamment des téléphones mobiles listés ci-après :

- modèles de la gamme **"Motorola one"**, en particulier les modèles "motorola one", "motorola one zoom", "motorola one action", "motorola one vision" ;

- modèles de la gamme **"moto z"**, en particulier les modèles "moto $z^3$ play", "moto $z^2$ force", "moto $z^2$ play", "moto z", "moto z play" ;

- modèles de la gamme **"moto g"**, en particulier les modèles "moto $g^7$ plus", "moto $g^7$", moto $g^7$ power", "moto $g^7$ play", "moto $g^{6s}$", "moto $g^6$ play", "moto $g^{5s}$ plus", "moto $g^{5s}$", "moto $g^5$ plus", "moto $g^{5s}$", "moto $g^4$ play" ;

- modèles de la gamme **"moto x"**, en particulier les modèles "moto $x^4$", "moto x force" ;

- modèles de la gamme **"moto e"**, en particulier les modèles "moto $e^6$ plus", "moto $e^5$ play", "moto $e^{5s}$", "moto $e^4$ plus", "moto $e^{4s}$" ;

- modèles de la gamme **"moto c"**, en particulier les modèles "moto c plus", "moto c".

31.    Un procès-verbal de constat d'huissier en date du 20 septembre 2019, ainsi que des recherches sur l'Internet, ont permis d'établir :

(i)    que la quasi-totalité des modèles de téléphones mobiles précités sont présentés et/ou sont offerts à la vente aux consommateurs français sur le site internet motorola.fr ;

(ii)    que le nom de domaine motorola.fr appartient à la société **Motorola Mobility France** ;

(iii)   que ce site internet indique qu'il est mis à la disposition du public français par la société américaine Motorola Mobility International Sales LLC, mais que les conditions générales de vente diffusées sur ce site internet, ainsi que la page de ce site internet intitulée "Informations Légales", désignent comme responsable commercial pour la France la société française **Motorola Mobility France**, anciennement immatriculée au registre du commerce et des sociétés de Paris et dont le siège social a été transféré en avril 2017, à Rueil-Malmaison (92500), 20 Rue des Deux Gares.

    **Pièce n°4.1 :**  **Procès-verbal de constat du 20 septembre 2019 effectué sur le site internet motorola.fr de la société Motorola**

    **Pièce n°4.2 :**  **Fiche produit du "Motorola One Zoom" sur le site internet fnac.com**

    **Pièce n°4.3 :**  **Extrait "Whois" du nom de domaine motorola.fr**

    **Pièce n°5.1 :**  **Extrait Kbis Motorola Mobility France (RCS Paris, radié)**

    **Pièce n°5.2 :**  **Extrait Kbis Motorola Mobility France (RCS Nanterre)**

Le site internet motorola.fr précité renvoie les consommateurs français souhaitant acheter l'un des téléphones mobiles susvisés vers quatre catégories de points de vente, à savoir (i) le site internet français de **Lenovo**, lenovo.com/fr, (ii) des plateformes de vente en ligne telles que **Amazon, Cdiscount, Rue du Commerce**, (iii) les sites internet d'opérateurs de télécommunications mobiles français tels que **Orange, Bouygues Telecom, Sosh**, et (iv) des grandes enseignes de distribution telles que notamment **Darty, Fnac, Boulanger, Auchan, Carrefour**, etc.

. 10 .

32.   Au vu des éléments de preuve raisonnablement accessibles présentés ci-dessus, la société IPCom peut légitimement estimer qu'il est porté atteinte à ses droits, en sa qualité de propriétaire du brevet EP'268, par la société Motorola Mobility France et/ou par toutes autres personnes coopérant avec cette société pour réaliser la fourniture, l'importation, le stockage, le transport, la distribution en France et l'exportation depuis la France des téléphones mobiles contrefaisants.

33.   La société IPCom est donc recevable et fondée, en prévision des procédures qu'elle doit engager devant la juridiction française compétente pour assurer la défense de ses droits, à faire procéder d'urgence à la constatation légale de la matérialité, de l'origine et de l'étendue de la contrefaçon dont elle est victime en France, et ce conformément aux articles L.615-5 et R.615-2 du Code de la propriété intellectuelle.

C'est la raison pour laquelle la société IPCom a sollicité et obtenu une ordonnance aux fins de saisie-contrefaçon le 4 octobre 2019 **(Pièce n°8.1)**.

34.   La société IPCom n'a toutefois pas fait exécuter cette ordonnance, et elle en sollicite présentement la modification, car elle souhaite porter à la connaissance du Président du Tribunal l'existence de la *"Motion for Anti-Suit Injunction"* déposée par les sociétés américaines du groupe Lenovo devant le Tribunal de District des Etats-Unis pour le District Nord de Californie.

35.   L'existence de la *"Motion for Anti-Suit Injunction"* des sociétés américaines du groupe Lenovo n'affecte en rien le droit de la société IPCom de faire procéder d'urgence à la constatation légale de la matérialité, de l'origine et de l'étendue de la contrefaçon dont elle est victime en France, et ce conformément aux articles L.615-5 et R.615-2 du Code de la propriété intellectuelle.

Il doit en effet être souligné ici qu'en dehors de certains cas très particuliers de litiges impliquant la mise en œuvre d'une clause compromissoire et/ou d'une clause attributive de compétence librement acceptée par les parties – ce qui n'est pas le cas en l'espèce – la jurisprudence de la Cour de Justice de l'Union Européenne et de la Cour de Cassation[1] considère les *"anti-suit injunctions"* comme contraires à l'ordre public international européen et français.

36.   La *"Motion for Anti-Suit Injunction"* des sociétés américaines du groupe Lenovo justifie donc de plus fort la présente requête, car si les preuves de la contrefaçon n'étaient pas complétées d'urgence, en particulier si l'identité de l'ensemble des responsables de l'importation et de la commercialisation en France des téléphones mobiles contrefaisants n'était pas établie dès à présent, l'exercice ultérieur des droits légitimes de la société IPCom devant la juridiction française serait susceptible d'être rendu impossible.

En effet, dans l'hypothèse où une *"anti-suit injunction"* serait prononcée contre la société IPCom à l'issue de l'audience de plaidoiries prévue le 14 novembre 2019 devant le Tribunal de District des Etats-Unis pour le District Nord de Californie, elle empêcherait alors la société IPCom d'exercer ses droits en France pendant toute la durée de la procédure devant la juridiction américaine tendant à la détermination des conditions d'une licence FRAND mondiale pour le portefeuille de brevets de la société IPCom, c'est-à-dire probablement pendant une durée d'au moins deux ans, procédure d'appel comprise.

Or, le brevet EP'268 expire le 15 février 2020.

---

[1] CJUE 27.04.2004 *Turner v. Grovit* C-159/02 ; CJUE 10.02.2009 *Allianz v. West Tankers* C-185/07 ; CJUE 13.05.2015 *Gazprom v. Lituanie* C-536/13 ; Cass. Civ. 1, 30.06.2004, N° pourvois 01-03248 et 01-15452 ; Cass. Civ. 1, 14.10.2009, N° pourvois 08-16369 et 08-16549.

. 11 .

37.     Par conséquent, même si la société IPCom est confiante dans le fait que la juridiction américaine n'ordonnera pas *"l'anti-suit injunction"* sollicitée par les sociétés américaines du groupe Lenovo, l'atteinte à ses droits fondamentaux qui en résulterait serait irrémédiable. Cette circonstance justifie de plus fort que les mesures de saisie-contrefaçon sollicitées par la société IPCom soient ordonnées, afin de lui permettre d'engager d'urgence, devant la juridiction française compétente, les procédures appropriées à la défense de ses droits sur la partie française du brevet EP'268.

### C'EST POURQUOI

#### l'exposante requiert qu'il plaise au Président :

1.     L'autoriser à faire procéder par tout huissier de son choix, dans les locaux de la société **Motorola Mobility France** situés au 20 Rue des Deux Gares, 92500 Rueil-Malmaison, ainsi que dans tous autres lieux dépendant de ladite société situés à proximité dans lesquels les opérations révéleraient que des preuves de la contrefaçon du brevet EP 1 841 268 B2 sont susceptibles d'être détenues, à la description détaillée des caractéristiques et du fonctionnement des téléphones mobiles de marque **"Motorola"**, y compris notamment :

  - les modèles de la gamme **"Motorola one"**, en particulier les modèles "motorola one", "motorola one zoom", "motorola one action", "motorola one vision" ;

  - les modèles de la gamme **"moto z"**, en particulier les modèles "moto $z^3$ play", "moto $z^2$ force", "moto $z^2$ play", "moto z", "moto z play", "moto $g^4$ play", "moto x force" ;

  - les modèles de la gamme **"moto g"**, en particulier les modèles "moto $g^7$ plus", "moto $g^7$", moto $g^7$ power", "moto $g^7$ play", "moto $g^6$", "moto $g^6$ play", "moto $g^{5s}$ plus", "moto $g^{5s}$", "moto $g^5$ plus", "moto $g^5$", "moto $g^4$ play" ;

  - les modèles de la gamme **"moto x"**, en particulier les modèles "moto $x^4$", "moto x force" ;

  - les modèles de la gamme **"moto e"**, en particulier les modèles "moto $e^6$ plus", "moto $e^5$ play", "moto $e^{5}$", "moto $e^4$ plus", "moto $e^4$" ;

  - les modèles de la gamme **"moto c"**, en particulier les modèles "moto c plus", "moto c".

2.     Autoriser l'huissier instrumentaire à procéder ou faire procéder, pour les besoins de la description des caractéristiques et du fonctionnement des téléphones mobiles contrefaisants, à toutes opérations nécessaires à cet effet, et notamment au chargement de leur batterie, à l'insertion dans chacun d'eux d'une carte SIM avec abonnement prépayé préalablement achetée par ses soins auprès d'un opérateur de télécommunication mobile français et conservée dans son emballage fermé jusqu'au début de ses opérations, et à leur mise en marche ;

3.     Autoriser la requérante à faire procéder par le même huissier dans les lieux susvisés à la saisie réelle, en offrant d'en payer le prix au tarif normal, de deux exemplaires de chaque modèle de téléphone mobile contrefaisant, avec leurs accessoires et emballages, pour être remis par l'huissier sous scellés à la requérante ou à tel laboratoire que celle-ci lui désignera aux fins d'analyses techniques ; autoriser l'ouverture ultérieure des scellés par l'huissier instrumentaire aux fins desdites analyses techniques ;

4.  Autoriser l'huissier instrumentaire à effectuer dans les lieux susvisés toutes recherches et constatations utiles afin de découvrir la preuve, l'origine, la consistance et l'étendue de la contrefaçon, et ce même en l'absence des téléphones mobiles contrefaisants sur les lieux de la saisie, y compris à ouvrir ou faire ouvrir par un serrurier toutes portes de locaux, de meubles meublants ou de véhicules se trouvant sur place, à présenter aux personnes présentes sur les lieux de la saisie l'une quelconque des pièces visées à l'appui de la requête, à consigner les déclarations des répondants et toutes paroles prononcées au cours des opérations, mais en s'abstenant de toute interpellation autre que celles strictement nécessaires à l'accomplissement de sa mission ;

5.  Autoriser l'huissier instrumentaire à décrire, copier ou reproduire tous documents ou informations tels que pièces de comptabilité, factures, bons de commande, bons de livraison, listings de commandes, d'achats, de vente ou de livraison, lettres et correspondances, ainsi que tous livres, papiers, prospectus, brochures, catalogues, notices, tarifs, plans, dessins, notices d'utilisation, documentations et spécifications techniques, pouvant établir la preuve, l'origine, la consistance et/ou l'étendue de la contrefaçon, et ce même en l'absence des téléphones mobiles contrefaisants sur les lieux de la saisie ; autoriser l'huissier instrumentaire à utiliser, pour les besoins des opérations de reproduction de documents, tout appareil de photocopie se trouvant sur les lieux de la saisie, moyennant le paiement de ces photocopies à leur coût normal ; l'autoriser, en l'absence d'appareil de photocopie sur place, à emporter ces documents en son étude, charge à lui de les restituer au saisi une fois les opérations de reproduction terminées ;

6.  Autoriser l'huissier instrumentaire à prendre ou faire prendre des clichés photographiques ou prises de vues vidéo ou numériques des téléphones mobiles contrefaisants, de leurs notices d'utilisation et de leurs emballages et, même en l'absence de téléphones mobiles contrefaisants sur les lieux de la saisie, de tous documents ou informations s'y rapportant tels qu'énumérés ci-dessus ; dire que les tirages ou supports vidéographiques ou électroniques destinés à être joints à la copie du procès-verbal de saisie qui sera remise au saisi pourront ne lui être adressés qu'après la clôture des opérations de saisie, dans un délai de 2 jours ouvrés ;

7.  Autoriser l'huissier instrumentaire à procéder ou à faire procéder à une édition sur papier, et/ou à une copie sur tout support électronique approprié (notamment clé USB, CD, DVD, disque dur), de tous documents ou informations tels qu'énumérés ci-dessus pouvant établir la preuve, l'origine, la consistance et/ou l'étendue de la contrefaçon, et qui seraient conservés sur un support autre que le papier, notamment sur microfilm ou sur tout support électronique, y compris les disques durs d'ordinateurs, serveurs informatiques, et autres appareils de stockage de données se trouvant sur les lieux de la saisie ou accessibles à distance depuis les lieux de la saisie ; autoriser à cet effet l'huissier instrumentaire à procéder ou à faire procéder par les experts et/ou les techniciens informatiques qui l'assisteront, à toutes investigations et recherches, notamment par mots clés correspondant aux dénominations, marques et références des téléphones mobiles contrefaisants et aux références de la norme en cause (3G, UMTS, WCDMA), sur tous systèmes informatiques, ordinateurs, serveurs informatiques et autres appareils de stockage de données se trouvant sur les lieux de la saisie ou accessibles à distance depuis les lieux de la saisie ;

. 13 .

8.  Autoriser l'huissier instrumentaire à procéder à la saisie réelle en trois exemplaires de tous prospectus, brochures, catalogues, notices, tarifs, plans, dessins, notices d'utilisation, documentations et spécifications techniques se rapportant aux téléphones mobiles contrefaisants, et ce même en l'absence de ces derniers sur les lieux de la saisie ; dire que les exemplaires des documents saisis seront remis à la requérante après apposition du cachet de l'huissier ;

9.  Ordonner le placement sous séquestre provisoire entre les mains de l'huissier instrumentaire, dans les conditions prévues à l'article R.153-1 du Code de commerce, de tous documents ou informations copiés ou saisis dont la partie saisie déclarerait à l'huissier qu'il contient un secret des affaires, à l'exception des informations permettant l'identification des personnes impliquées dans la fourniture, l'importation, le stockage, le transport, la distribution ou l'exportation des téléphones mobiles contrefaisants ; rappeler que conformément à l'article susvisé : *"Si le juge n'est pas saisi d'une demande de modification ou de rétractation de son ordonnance en application de l'article 497 du code de procédure civile dans un délai d'un mois à compter de la signification de la décision, la mesure de séquestre provisoire mentionnée à l'alinéa précédent est levée et les pièces sont transmises au requérant"* ;

10. Autoriser l'huissier instrumentaire à viser et parapher *ne varietur* les livres comptables, registres, carnets de commande, lettres, factures, contrats, et en général tous documents commerciaux ou comptables relatifs aux téléphones mobiles contrefaisants, même en l'absence de ces derniers sur les lieux de la saisie ;

11. Autoriser l'huissier instrumentaire à se faire assister, pour l'ensemble des opérations relevant de sa mission, par un expert choisi par la requérante en dehors de ses salariés et dirigeants, dont il enregistrera les explications sur les points qui échappent à sa compétence, en distinguant, dans les énonciations de son procès-verbal, celles résultant de ses constatations personnelles et celles qui lui seront dictées par l'expert qui l'assistera ;

12. Autoriser l'huissier instrumentaire à se faire assister, pour l'ensemble de ses opérations, par un serrurier, par un photographe et par un technicien informatique, à l'exclusion de tout dirigeant ou salarié de la requérante ;

13. Autoriser l'huissier instrumentaire à requérir l'assistance et se faire accompagner de tout représentant de la force publique territorialement compétent ;

14. Dire que les opérations de saisie-contrefaçon pourront se poursuivre après l'heure de fermeture des locaux et pourront le cas échéant être suspendues pour se poursuivre le lendemain ;

15. Dire qu'il sera procédé aux opérations de saisie-contrefaçon dans les deux mois qui suivront Votre ordonnance ;

. 14 .

16. Dire qu'en cas de difficultés, il Vous en sera référé conformément aux articles 496 et 497 du Code
    de procédure civile, mais seulement après accomplissement des opérations de saisie-contrefaçon et
    apposition des visas.

Fait à Paris, le    15 octobre 2019

. 15 .

## Pièces jointes à l'appui de la requête :

**I.      La société IPCom**

    1.1      Extrait du registre du commerce de Munich concernant IPCom

    1.1bis Traduction de l'extrait du registre du commerce de Munich concernant IPCom

    1.2      Extrait du site internet d'IPCom

**II.     Le brevet EP 1 841 268 B2**

    2.1      Fascicule de brevet européen EP 1 841 268 B2

    2.2      Traduction en français de la description du brevet EP 1 841 268 B2

    2.3      Communication de l'OEB du 6 juin 2007 concernant l'enregistrement du transfert de propriété de la demande de brevet européen 07009265.5

    2.4      État des inscriptions au RNB au 19.08.2019 et inscriptions complémentaires du 13.09.2019 concernant le brevet EP'268

    2.5      Décision T 0767/14 de la Chambre de recours de l'OEB du 19 juillet 2017

    2.5bis Traduction en français de la Pièce n°2.5

    2.6      État de paiement des annuités concernant la partie française du brevet EP'268

**III.    L'essentialité du brevet EP'268 à la norme UMTS**

    3.1      Extraits des Directives de l'ETSI, version 39, du 8 octobre 2018

    3.2      Communiqué de presse de la Commission Européenne du 10 décembre 2009

    3.3      "General IPR Licensing declaration" de la société IPCom à l'ETSI du 11 juin 2014

    3.4      Arrêt de la Cour d'Appel de l'Angleterre et du Pays de Galles du 28 février 2017, *IPCom v. HTC* ([20017] EWCA Civ 90)

    3.4bis Traduction en français de la Pièce n°3.4

    3.5      Ordonnance de la Cour d'Appel de l'Angleterre et du Pays de Galles du 28 février 2017, *IPCom v. HTC*

**IV.    Les constatations de la contrefaçon**

    4.1      Procès-verbal de constat du 20 septembre 2019 sur le site internet motorola.fr de la société Motorola.

    4.2      Fiche produit du "Motorola One Zoom" sur le site internet fnac.com

    4.3      Extrait "Whois" du nom de domaine motorola.fr

**V.     La société saisie**

    5.1      Extrait Kbis Motorola Mobility France (RCS Paris, radié)

    5.2      Extrait Kbis Motorola Mobility France (RCS Nanterre)

**VI.    La procédure au Royaume-Uni**

6.1    "Particulars of Claim" (Détails de la demande) de la société IPCom du 4 juillet 2019

6.2    "Particulars of Infringement" (Détails de la contrefaçon) de la société IPCom du 4 juillet 2019

6.3    "Defence and Counterclaim" (Défense et demande reconventionnelle) des sociétés Lenovo Technology (United Kingdom) Limited et Motorola Mobility UK Limited, du 23 septembre 2019.

6.4    "Grounds of Invalidity" (Motifs de nullité) des sociétés Lenovo Technology (United Kingdom) Limited et Motorola Mobility UK Limited, du 23 septembre 2019

**VII.   La procédure aux Etats-Unis**

7.1    "*Complaint*" des sociétés Lenovo (United States) Inc. et Motorola Mobility LLC du 14 mars 2019

7.2    "*Motion for Anti-Suit Injunction*" (Requête en injonction anti-procès) déposée par les sociétés Lenovo (United States) Inc. et Motorola Mobility LLC le 18 septembre 2019

7.3    "*Opposition to Motion for Anti-Suit Injunction*" (Défense à la requête en injonction anti-procès") déposée par la société IPCom le [*date*] octobre 2019.

**VIII.  La procédure en France**

8.1    Requête et ordonnance aux fins de saisie-contrefaçon du 4 octobre 2019